**Paula A. Barran,** OSB No. 803974
pbarran@barran.com
**Shayda Zaerpoor Le,** OSB No. 121547
sle@barran.com
**Donovan L. Bonner,** OSB No. 181929
dbonner@barran.com
Barran Liebman LLP
601 SW Second Avenue, Suite 2300
Portland, Oregon  97204-3159
Telephone: (503) 228-0500
Facsimile No.: (503) 274-1212
Attorneys for Defendants
University of Oregon and Hal Sadofsky

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Portland

| | |
|---|---|
| JENNIFER JOY FREYD, | **CV. 6:17-cv-448-MC** |
| Plaintiff, | |
| v. | **DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT** |
| UNIVERSITY OF OREGON,  MICHAEL H. SCHILL and HAL SADOFSKY, | |
| Defendants. | **(ORAL ARGUMENT REQUESTED)** |

Page 1 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

# TABLE OF CONTENTS

Page

I.     CERTIFICATE PURSUANT TO L.R. 7-1 ...........................................................1

II.    INTRODUCTION AND MOTION.......................................................................1

III.   SUMMARY OF PLAINTIFF'S CLAIMS ...........................................................3

IV.   BACKGROUND AND PLAINTIFF'S IDENTIFIED COMPARATORS .........................6

     A.    Differences in the Day-to-Day Duties as Performed by Plaintiff in Contrast to Professors Mayr, Hall, Fisher, and Allen...............................................6

     B.    Divisional Dean Sadofsky's Review of Plaintiff's Complaints............................15

V.    RETENTION:  THE UNIVERSITY'S RESPONSE TO EXTERNAL RECRUITMENT AND THE NEED TO RETAIN WORLD-CLASS FACULTY ..........16

VI.   FACULTY UNIONIZATION AND THE COLLECTIVE BARGAINING AGREEMENT..........................................................................................19

VII.  THE COMPENSATION DIFFERENTIALS AT ISSUE ...............................20

VIII. DISCUSSION ..........................................................................................21

     A.    Plaintiff Does Not Prove a Prima Facie Case Under the Equal Pay Act.  She Is Paid More Than the Average Male Full Professor and Her Work Is Not Substantially Equal to That of Professors Mayr, Hall, Fisher, or Allen ...............21

     B.    Plaintiff's Title VII, Title IX, and Oregon State Law Claims Also Fail.  She Does Not Demonstrate a Prima Facie Case Under These Laws Because Her Work Is Not Substantially Equal to Professors Mayr, Hall, Fisher, or Allen........27

     C.    Providing Retention Adjustments to Ensure That Key Faculty Do Not Leave the University Is a Lawful and Proper Academic Decision Which Does Not Produce a Disparate Impact.  Those Claims Which Challenge Such Adjustments (The First, Second, Third, Sixth, Eighth and Ninth Claims) Should Be Dismissed ................................................................................30

          1.    Retention is a lawful factor other than sex.................................31

          2.    Retention offers in the Psychology Department have been made to both women and men as a lawful exercise of the University's discretion and academic judgment............................................32

          3.    Plaintiff personally decided not to entertain the kinds of inquiries that begin a recruitment conversation; she cannot complain if some

Page i – DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

colleagues make different decisions and any complaints based on retentions lack causation ..................................................................33

4.   Other women faculty in the Psychology Department are sought after and the University has made retention offers in response to their external recruitments ..................................................................33

5.   The University's Retention adjustments do not result in a disparate impact against women, and have not affected plaintiff personally because of her gender ..................................................................34

6.   Principles of discretionary immunity and the academic freedom of a public entity preserve the right of the University to determine its priorities and how to allocate the University's scarce resources ..............38

D.   Since 2013 Plaintiff's Employment Has Been Covered by the Terms of a Collective Bargaining Agreement; She Cannot Have a Separate Contract and She Cannot Sue for Breach of the Bargaining Agreement ....................................40

E.   The Individual Claims Against Hal Sadofsky Should Be Dismissed.  There Is No Equal Protection Violation, He Did Not Discriminate Against Her, and He Is Protected by Qualified Immunity ..................................................................41

IX.   CONCLUSION ..................................................................45

00723895.1

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

# TABLE OF AUTHORITIES

Page

**Cases**

*Ahern v. Or. Pub. Emples. Union*, 329 Or. 428 (1999) ................................................ 41

*Allender v. Univ. of Portland*, 689 F. Supp. 2d 1279 (D. Or. 2010) ............................. 21

*Ariz. ex rel Horne v. Geo Group, Inc.*, 816 F.3d 1189 (9th Cir. 2016) ......................... 28

*Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214 (D. Or. 2016) ......................................... 43

*Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971 (9th Cir. 1998) ........ 45

*Brown v. Stored Value Cards, Inc.,* No. 3:15-cv-01370-MO, 2016 U.S. Dist. LEXIS 23026 (D. Or. Feb. 25, 2016) ........................................................ 5

*Budnick v. Town of Carefree*, 518 F.3d 1109 (9th Cir. 2008) ....................................... 37

*Chavez v. Tempe Union High Sch. Dist.*, 565 F.2d 1087 (9th Cir. 1977) ....................... 43

*Cherry v. Univ. of Wis. Sys. Bd. of Regents*, 265 F.3d 541 (7th Cir. 2001) ..................... 5

*Conroy v. Hewlett-Packard Co.*, No. 3:14-CV-01580-AC, 2016 U.S. Dist. LEXIS 44396 (D. Or. Mar. 31, 2016) ........................................................ 4, 29

*Cooper v. Ga. Gwinnett Coll.,* No. 1:16-CV-01177-TWT-JFK, 2016 U.S. Dist. LEXIS 147705 (N.D. Ga. Sep. 16, 2016) ........................................ 29

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974) ............................................... 21

*Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693 (7th Cir. 2003) ..................................... 24

*Delima v. Home Depot U.S.A., Inc.*, 616 F. Supp. 2d 1055 (D. Or. 2008) ..................... 4

*EEOC v. Maricopa Cty. Cmty. Coll. Dist.*, 736 F.2d 510 (9th Cir. 1984) ................ 22, 30

*Eugene Educ. Asso. v. Eugene Sch. Dist.*, 58 Or. App. 32, 648 P.2d 56 (1982) ............ 40

*Ewing v. Country Mut. Ins. Co.*, No. 2:11-cv-968-SU, 2012 U.S. Dist. LEXIS 68556 (D. Or. Apr. 25, 2012) ........................................................ 41

*Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409 (9th Cir. 1988) ...................... 4, 23, 28, 30

*Garcia v. Spun Steak Co.*, 998 F.2d 1480 (9th Cir. 1993) ....................................... 35, 36

*Griffin by & Through Stanley v. Tri-County Metro. Transp. Dist.*, 318 Or. 500 (1994) .............. 29

00723895.1

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

*Gunther v. Cty. of Wash.*, 623 F.2d 1303 (9th Cir. 1979), *aff'd*, 452 U.S. 161(1981) ............ 4, 22

*Hardie v. NCAA*, 876 F.3d 312 (9th Cir. 2017) ........................................................ 40

*Hein v. Or. Coll. of Educ.*, 718 F.2d 910 (9th Cir. 1983) ........................................ 21

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002)..................................... 37

*Horner v. Mary Inst.,* 613 F.2d 706 (8th Cir. 1980) ............................................. 23, 32

*Huffman v. Scappoose Sch. Dist. No. 1 J*, No. 3:14-CV-00941-MO, 2015 U.S. Dist. LEXIS 97971 (D. Or. July 28, 2015)........................................................... 20, 41

*Jovanovich v. Sweeney*, No. 93-35372, 1993 U.S. App. LEXIS 31899 (9th Cir. Dec. 1, 1993)............................................................................................ 28

*Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406 (9th Cir. 1987) ................................... 36

*Juran v. Independence Or. Cent. Sch. Dist. 13J*, 898 F. Supp. 728 (D. Or. 1995)...................... 29

*Knox v. Southwest Airlines*, 124 F.3d 1103 (9th Cir. 1997) ..................................... 45

*Kramer v. Cullinan*, 878 F.3d 1156 (9th Cir. 2018) ............................................. 45

*Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995) .................................................. 29

*Lee v. City of L.A.*, 250 F.3d 668 (9th Cir. 2001) ............................................... 42

*Mazzella v. RCA Global Communications, Inc.*, 642 F. Supp. 1531 (S.D. N.Y. 1986) .............. 32

*McBride v. Magnuson*, 282 Or. 433 (1978)....................................................... 39

*McCabe v. State*, 108 Or. App. 672 (1991), aff'd, 314 Or. 605 (1992)......................... 29

*McDowell by & Through McDowell v. Evey*, No. 97-35422, 1999 U.S. App. LEXIS 1216 (9th Cir. Jan. 26, 1999) ................................................................ 39

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988)........................................... 4

*Miller v. Bd. of Regents of the Univ. of Minn.*, No. 15-CV-3740, 2018 U.S. Dist. LEXIS 17531 (D. Minn. Feb. 1, 2018) ......................................................... 31

*Nulf v. Int'l Paper Co.*, 656 F.2d 553 (10th Cir. 1981) ......................................... 22

*NW Nat. Gas Co. v. Chase Gardens Inc.*, 333 Or. 304 (2002) ................................... 41

*Olson v. Or. Univ. Sys.*, No. CV 09-167-MO, 2009 U.S. Dist. LEXIS 38229 (D. Or. May 5, 2009) ..................................................................... 5

*Pearson v. Callahan*, 555 U.S. 223 (2009)....................................................... 45

Page iv –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

*Pena v. Hous. & Cmty. Serv. Agency*, No. 09-6150-TC, 2010 U.S. Dist. LEXIS 89743 (D. Or. Aug. 30, 2010) ..................................................................... 35, 36

*Penk v. Or. State Bd. of Higher Educ.*, No. 80-436 FR, 1984 U.S. Dist. LEXIS 24437 (D. Or. Aug. 10, 1984) ......................................................................... 6

*Penk v. Or. State Bd. of Higher Educ.*, No. 80-436 FR, 1985 U.S. Dist. LEXIS 22624 (D. Or. Feb. 13, 1985) .................................................................. passim

*Plumeau v. Sch. Dist. # 40 County of Yamhill*, 130 F.3d 432 (9th Cir. 1997) ............................... 5

*Pottenger v. Potlatch Corp.*, 329 F.3d 740 (9th Cir. 2003) ......................................... 36

*Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985) ........................................... 39

*Reznick v. Associated Orthopedics & Sports Med., P.A.*, 104 F. App'x 387 (5th Cir. 2004) .................................................................................. 32

*Richard v. Portland Gen. Elec*, 83 Or. App. 59, 730 P.2d 578 (Or. Ct. App. 1986) ............. 20, 41

*Rick Franklin Corp. v. State Dept. of Trans.*, 207 Or. App. 183, 140 P.3d 1136, *rev. den.*, 342 Or. 116 (2006) ..................................................................... 5

*Romero-Manzano v. Carlton Plants, LLC*, No. 3:15-CV-00508-BR, 2016 U.S. Dist. LEXIS 112738 (D. Or. Aug. 24, 2016) ....................................................... 27

*Rose v. Wells Fargo & Co.*, 902 F.2d 1417 (9th Cir. 1990) ......................................... 37

*Rudebusch v. Hughes*, 313 F.3d 506 (9th Cir. 2002) .................................................. 43

*Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123 (D. Or. 2016) ............................. 5, 28

*Saucier v. Katz*, 533 U.S. 194 (2001) ...................................................................... 42

*Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667 (S.D. N.Y. 1995) ...................... 32

*Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080 (9th Cir. 2001) ......................... 30

*Sobol v. Kidder, Peabody & Co.*, 49 F. Supp. 2d 208 (S.D. N.Y. 1999) ...................................... 32

*Spaulding v. Univ. of Wash.*, 740 F.2d 686 (9th Cir. 1984) ................................... passim

*Stanley v. Trs. of the Cal. State Univ.*, 433 F.3d 1129 (9th Cir. 2006) ..................... 5, 28

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994) ............................... 5, 22, 31

*Stanley v. Univ. of Southern Cal.*, 178 F.3d 1069 (9th Cir. 1999) ........................... 4, 30

*Stith v. Perot Sys. Corp.*, 122 F. App'x 115 (5th Cir. 2005) ................................... 24

*Stockwell v. City & Cty. of S.F.*, 749 F.3d 1107 (9th Cir. 2014) ............................. 35

Page v –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

*Suter v. Univ. of Tex. at San Antonio*, Civil Action No. SA-12-CV-969-OLG, 2013 U.S. Dist. LEXIS 182995 (W.D. Tex. Dec. 20, 2013) ..................................... 31

*Sweezy* v. *New Hampshire*, 354 U.S. 234 (1957) .......................................... 39

*Szaley v. Pima Cty.*, 371 F. App'x 734 (9th Cir. 2010) ................................... 24

*Thomson v. Mentor Graphics Corp.*, No. CV-03-1350-ST, 2004 U.S. Dist. LEXIS 23676 (D. Or. Nov. 12, 2004)................................................................ 22, 30

*Thornton v. City of St. Helens,* 425 F.3d 1158 (9th Cir. 2005)..................................... 43

*Torres v. Sch. Dist.*, No. 8:14-cv-1021-T-33TBM, 2014 U.S. Dist. LEXIS 117254 (M.D. Fla. Aug. 22, 2014) ........................................................................ 29

*Turner v. State*, 359 Or. 644, 375 P.3d 508 (2016)........................................ 39

*United Air Lines v. Evans*, 431 U.S. 553, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977)................. 4, 27

*Usery v. Richman*, 558 F.2d 1318 (8th Cir. 1977) .......................................... 22

*Vejo v. Portland Pub. Sch.*, No. 16-35817, 2018 U.S. App. LEXIS 15253 (9th Cir. June 6, 2018) .................................................................................. 5

*Walter v. KFGO Radio*, 518 F. Supp. 1309 (D. N.D. 1981)........................................ 32

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) ................................. 37

*Winkes v. Brown Univ.*, 747 F.2d 792 (1st Cir. 1984) ...................................... 31

*Wood v. City of San Diego*, 678 F.3d 1075 (9th Cir. 2012)........................................ 21

*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385(1982) ................................. 28

**Statutes**

ORS 12.080(1) ........................................................................................................ 5
ORS 12.110(1) .................................................................................................. 5, 28
ORS 243.650(7) ................................................................................................... 40
ORS 30.260 to 30.300 .................................................................................. 4, 29, 38
ORS 30.265(3)(c)................................................................................................. 39
ORS 30.265(6)(c)................................................................................................. 39
ORS 30.275............................................................................................................ 4, 29
ORS 352.033......................................................................................................... 38
ORS 352.054......................................................................................................... 38
ORS 352.089......................................................................................................... 38
ORS 352.096......................................................................................................... 38
ORS 352.146......................................................................................................... 38
ORS 652.220......................................................................................................... 3, 30
ORS 659.030......................................................................................................... 30
ORS 659.220.................................................................................................... 27, 29

Page vi –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

ORS 659A.030...................................................................................3, 27, 29
ORS Ch. 352..............................................................................................38
ORS Ch. 659A...........................................................................................36

**Other Authorities**
20 U.S.C. § 1681.......................................................................................28
29 U.S.C. § 206(d)(1) ...............................................................................21
29 U.S.C. § 216...........................................................................................4
29 U.S.C. § 255(a) ......................................................................................4
42 U.S.C. § 2000e-2(k)..............................................................................37
42 U.S.C. § 2000e-5..............................................................................4, 27
Ore. Const. Art. I, § 46..............................................................................30

Page vii –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR
SUMMARY JUDGMENT

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

## I.    CERTIFICATE PURSUANT TO L.R. 7-1

Defendants, University of Oregon ("University") and Hal Sadofsky ("Sadofsky"), hereby certify pursuant to L.R. 7-1 that they have conferred in good faith with plaintiff's counsel regarding this motion for summary judgment and the parties have been unable to resolve the disputed subject matter of this motion.

## II.    INTRODUCTION AND MOTION

Plaintiff cannot show valid pay discrimination claims against the University of Oregon, its Divisional Dean, or its President because undisputed facts show that all pay differences plaintiff alleges are caused by legitimate and non-discriminatory factors.  Plaintiff is among the highest paid faculty at the University, and her history with the University demonstrates that her pay has never been affected by discrimination.  Rather, the University enthusiastically recruited plaintiff to its Psychology Department 30 years ago, giving her everything she requested to facilitate her move.  It provided her a large lab, a promise of prompt tenure, and even a corner office which a more senior person in her department vacated for her.  She felt wanted.  The University hired her husband as well so the family could move both careers to Oregon.  Shortly before plaintiff filed this lawsuit, when the Divisional Dean reviewed her compensation complaint, she was the sixteenth highest paid faculty member in the University's College of Arts and Sciences.  For many years, the highest paid professor in the Psychology Department was Professor Helen Neville, who remained the highest paid professor until she retired in 2016 except when the higher-paid Dr. Kimberly Espy held an academic appointment in the department.

Plaintiff's lawsuit is based on the fact that four male colleagues currently earn more than she does.  But not all faculty jobs are the same.  They perform different duties with varying levels of complexity requiring different skills, and have different responsibilities and accountabilities.  For example, some of plaintiff's named comparators have brought millions of grant dollars into the University, supervise many employees, and manage complex federal grant requirements.  Three have directed the department's clinical training program and managed accreditation and

Page 1 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

re-accreditation.   One has spent years in a University leadership role outside the Psychology Department as an Associate Director of Research and as a Director of the University's Center on Diversity and Community (CoDaC).  Another is the department head and plaintiff's supervisor.

Faculty compensation also varies because competing universities often recruit the University's top grant-funded faculty–whether they be women or men–offering them higher pay, greater research funding, and other benefits.  That requires the University to make individual compensation adjustments to fend off the other universities and retain its top faculty who would otherwise leave with their specialties, grant money, and maybe even graduate students and other colleagues who work with them.  The University cannot overlook the importance of major grant funding which supports a professor's own research and also generates funds that help pay for infrastructure, equipment, graduate students, and even the work of other faculty who do not attract such external funding.  Major grant funding helps softens the reduction of state support of higher education, and eases the tuition burden on students.  In short, external grant funding provides resources to carry on work of the University's core academic and strategic missions, and even offsets the cost of salary increases needed for retention (*i.e. f*aculty with major grant funding help pay for themselves).  For example, with some grants the University is able to take grant money and put it directly towards a faculty member's salary (Sadofsky Tr. 66:22–67:6).  Accordingly, when necessary, the University makes pay adjustments or "retention offers" to try to retain the women and men it cannot afford to lose. Plaintiff does not dispute that the University must do so.

For at least the entire time covered by plaintiff's claims, the University has made retention offers to every woman in the Psychology Department who had an external offer.  Plaintiff suspects that some external institutions may recruit men disproportionately, but has not supplied any facts to support that suspicion and admits that this Psychology Department is so strong that any faculty member, man or woman, can attract outside offers and she has herself decided not to entertain the kinds of discussions that typically lead to such offers.

Page 2 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

In sum, plaintiff's claims fail on the admitted and undisputed facts, and as a matter of law because the four male colleagues she has chosen as comparators perform work that is significantly different than plaintiff's and in some cases have received lawful retention raises so they remain at the University.  Because her compensation claims fail, her equal protection claims against Sadofsky must also fail.

Accordingly, pursuant to Fed. R. Civ. P. 56 and the Local Rules of this court, defendants University and Sadofsky move for summary judgment on plaintiff's claims.  This motion is based on the pleadings herein; the Declarations of Nicholas Allen, David Conover, Brandalee Davis, Philip Fisher, Gordon Hall, Andrea Larson, and Hal Sadofsky; and the pleadings and deposition transcripts provided with the Declaration of Paula A. Barran.

### III.    SUMMARY OF PLAINTIFF'S CLAIMS

Plaintiff's overlapping legal theories are variations of the same complaint: that she is paid less than Professors Nick Allen, Phil Fisher, Gordon Hall, and Ulrich Mayr.  For each claim she must show more than a disparity in pay, for "that payments are different is insufficient alone to establish a prima facie case. We will not, therefore, infer intent merely from the existence of wage differences between jobs that are only similar."  *Spaulding v. Univ. of Wash.*, 740 F.2d 686, 700 (9th Cir. 1984).  At a minimum, for each claim plaintiff asserts, she must prove that her male colleagues do the same work and that she is comparing "like to like."  On the undisputed facts, Professors Allen, Fisher, Hall, and Mayr perform significantly different work with significantly different duties, obligations, responsibilities, accountabilities, and complexity, and requiring different effort and skills and knowledge.

In the order numbered in the complaint, plaintiff sues under: (1) the Equal Pay Act; (2) Title VII (for disparate treatment); (3) Title VII (for disparate impact); (4) Title IX; (5) the Equal Protection Clause of the federal constitution (the claim against Sadofsky); (6) the Equal Rights Amendment of the Oregon Constitution; (7) ORS 659A.030 (for disparate treatment); (8) ORS 659A.030 (for disparate impact); (9) ORS 652.220; and (10) breach of contract.

Page 3 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

The **Equal Pay Act** (claim one) requires plaintiff to establish a prima facie case by showing that her male comparators were paid different wages for **substantially equal** work. *Stanley v. Univ. of Southern Cal.*, 178 F.3d 1069, 1073-74 (9th Cir. 1999). The jobs are evaluated as to whether they have a common core of tasks, and whether any additional tasks incumbent on one but not the other make the two jobs substantially different. *Id.* This claim is timely only after March 21, 2014.[1] This claim fails because on the undisputed facts, plaintiff's work is not substantially equal.

**Title VII** (claims two and three) applies the same Equal Pay Act test. "Equal pay claims asserted under Title VII must satisfy the same substantial equality test applied to claims asserted under the EPA." *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988) (citing *Gunther v. County of Washington*, 623 F.2d 1303, 1313 (9th Cir. 1979), *aff'd*, 452 U.S. 161, 166 (1981)). These claims are timely only after April 14, 2016.[2] These two claims fail because plaintiff's work is not substantially equal.

**Oregon state law** (claims six, seven, eight, and nine) also requires that plaintiff prove she performs **substantially equal** work; state law applies the federal standards. *Conroy v. Hewlett-Packard Co.*, No. 3:14-CV-01580-AC, 2016 U.S. Dist. LEXIS 44396, at *35 (D. Or. Mar. 31, 2016) ("The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used under federal law"). These claims are timely only after August 13, 2016.[3] They fail because plaintiff's work is not substantially equal.

//

---

[1] The applicable statute of limitations is two years, or three if a violation is found to have been willful. 29 U.S.C. § 216 (applying 29 U.S.C. § 255(a)); *Delima v. Home Depot U.S.A., Inc.*, 616 F. Supp. 2d 1055, 1082 (D. Or. 2008), citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988).
[2] 42 U.S.C. § 2000e-5; *United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S. Ct. 1885, 1889, 52 L. Ed. 2d 571, 578 (1977).
[3] *See* ORS 30.260 to 30.300. ORS 30.275 requires formal notice to be given within 180 days after a loss or injury. Plaintiff's notice was provided February 9, 2017 (Davis Decl. Ex. B).

Page 4 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

**Title IX** (claim four) is coextensive with the Equal Pay Act.  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1323 (9th Cir. 1994) (plaintiff's Title IX claim failed because her Equal Pay Act claim failed).  This claim is timely only after March 21, 2015.[4]  It fails for the same reasons that the Equal Pay Act claim fails – plaintiff does not perform **substantially equal** work.

**The Equal Protection Clause** (claim five, asserted against Sadofsky individually) requires plaintiff to prove "that the defendant acted in a discriminatory manner and that the discrimination was intentional." *Vejo v. Portland Pub. Sch.*, No. 16-35817, 2018 U.S. App. LEXIS 15253, at *2 (9th Cir. June 6, 2018).  It is congruent with the Equal Pay Act.  *Cherry v. Univ. of Wis. Sys. Bd. of Regents*, 265 F.3d 541, 551 (7th Cir. 2001).  It fails for three reasons:  because the underlying theories from plaintiff's other statutory claims fail, there is no evidence of discriminatory intent on Sadofsky's part, and Sadofsky is entitled to qualified immunity.  This claim is timely only after May 8, 2016,[5] two years before Sadofsky was named.

**Breach of Contract** (claim ten) requires plaintiff to prove that there is an agreement other than the bargaining agreement that governs the terms and conditions of her employment and that the University failed to honor it; there is no such agreement.  Plaintiff must establish there is a contract, interpreted objectively.  *Rick Franklin Corp. v. State Dept. of Trans.*, 207 Or. App. 183, 190, 140 P.3d 1136, *rev. den.*, 342 Or. 116 (2006); *Brown v. Stored Value Cards, Inc.,* No. 3:15-cv-01370-MO, 2016 U.S. Dist. LEXIS 23026, at *6 (D. Or. Feb. 25, 2016).  This claim is timely only after March 21, 2011,[6] and fails on the merits.  In recent years, plaintiff has been a member of a bargaining unit covered by a collective bargaining agreement, and does not have separate contract claims.  Before the bargaining agreement, she asserts that her contract was her very first

---

[4] Title IX adopts the state's personal injury statute of limitations, which is two years as established by ORS 12.110(1).  *See Stanley v. Trs. of the Cal. State Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006); *Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1134 (D. Or. 2016) (in Oregon, two year statute of limitations applies to Title IX).

[5] In Oregon for claims under §1983 the statute of limitations is two-years.  *Plumeau v. Sch. Dist. # 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997); *Olson v. Or. Univ. Sys.*, No. CV 09-167-MO, 2009 U.S. Dist. LEXIS 38229, at *7 (D. Or. May 5, 2009).

[6] The statute of limitations for a contract claim is six years.  ORS 12.080(1).

Page 5 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

job offer.  That was for a different entry level non-tenured job, the University honored it, she was since promoted, and she has failed to identify any other agreement that supports her wage claims.

## IV.    BACKGROUND AND PLAINTIFF'S IDENTIFIED COMPARATORS

### A.    Differences in the Day-to-Day Duties as Performed by Plaintiff in Contrast to Professors Mayr, Hall, Fisher, and Allen.

For all claims, plaintiff has the burden of showing the substantial equality of the jobs being compared.  There is no prima facie case here because her four identified male colleagues, Professors Mayr, Hall, Fisher, and Allen,[7] perform substantially different work.

Each of plaintiff's statutory claims requires that she first prove that her day-to-day duties are substantially equal to those four named male colleagues she has identified as comparators.  She asserts that all faculty perform the general duties of teaching, research, and service (Freyd Tr. Vol. 1, 35:19-20, 202:11-21).  That is accurate in only a broad and general sense, but it disregards the legally determinative factor which is actual job content.  *See Spaulding*, 740 F.2d at 698 (the contention that "teaching is teaching," although superficially appealing, lacks merit), *Penk v. Or. State Bd. of Higher Educ.*, No. 80-436 FR, 1984 U.S. Dist. LEXIS 24437, at *33 (D. Or. Aug. 10, 1984) ("*Spaulding* explicitly rejects the notion that all university faculty engage in substantially equal work without regard to discipline, without regard to differences in background and training, and without regard to the actual content of the jobs"), and *Penk v. Or. State Bd. of Higher Educ.*, No. 80-436 FR, 1985 U.S. Dist. LEXIS 22624, at *102; 161 (D. Or. Feb. 13, 1985) ["*Penk 2*"] (in a Title VII claim the court must make a case-by-case analysis of actual job contents; rejecting argument that "we were all teachers").  Academic freedom provides faculty members with the opportunity to "remake" or "reshape" their jobs with "relatively large degrees of freedom" (Mayr Tr. 18:12-19:3; 19:22-20:14).  Faculty do very different things, and their work varies widely from

---

[7] Plaintiff testified that at the time her lawsuit was filed she contemplated Professors Fisher, Hall, and Mayr but later included Professor Allen.  (Freyd Tr. Vol , 26:3-11; 27:9-22. See also Barran Decl. Ex. D: Plaintiff's Suppl. Response to Interrogatory No. 2.)

professor to professor (Mayr Tr. 61:8-14). It is "very difficult to find two professors who really do the same things" (Mayr Tr. 299:2-10). Psychology is "one of the most heterogeneous and broadest areas that you can think of" (Mayr Tr. 41:7-9). Job content varies "widely" from professor to professor (Mayr Tr. 61:8-17), and "there's a whole boatload of differences between the things that we do" (Mayr Tr. 299:9-10). How individual faculty members meet their general responsibilities of teaching, research, and service "varies tremendously" and "once you get to the quotidian, it becomes very individualized" (Sadofsky Tr. 62:4-19, 73:4-12).

**Professor Mayr.** The differences between plaintiff's day-to-day duties and Professor Mayr's are stark. Since 2013, Professor Mayr has been the department head (Freyd Tr. Vol. 1, 83:15-20). That is a leadership and supervisory position and is different in its day-to-day duties, responsibilities, and accountabilities from the work that plaintiff does. (*See* Sadofsky Decl. ¶ 6(d)). Plaintiff has never been a department head (Freyd Tr. Vol. 1, 83:21-22), but knows it is a "busy job" that includes preparing reports, running faculty meetings, responding to personnel issues, and "probably lots more" (Freyd Tr. Vol. 1, 83:23–84:4). Plaintiff does not know how much time Professor Mayr spends doing "department head duties" (Freyd Tr. Vol. 1, 86:12-15); it could be 90% of his time, and those duties "tend to take a toll on people's research productivities" (Freyd Tr. Vol. 1, 86:16-22). Being a department head is "historically taxing on people's research" (Freyd Tr. Vol. 1, 86:23–87:8).

As department head, Professor Mayr has supervisory responsibilities over plaintiff (Sadofsky Decl. ¶ 6(d)) and has a range of different duties and responsibilities and "none of those things I ever had to worry about as just a regular professor" that accompany that position and differentiate it from plaintiff's day-to-day work (Mayr Tr. 52:6-14; Conover Decl. ¶ 5).

Unlike plaintiff, Professor Mayr is not a member of the bargaining unit; the agreement excludes department heads (Sadofsky Ex. B, Article 1). As department head, Prof Mayr is supervised and evaluated by the Deans (Mayr Tr. 53:12-24; 289:10-15). He prepares budgets and deals with the finances of the department, supervises personnel, and handles grievances (Mayr Tr.

Page 7 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

52:1-14).  His responsibility to investigate scientific misconduct included an incident that occupied months of his time (Mayr Tr. 52:8-10).  He heads department meetings, and plans the schedule (Mayr Tr. 52:11-14).  He implements the faculty merit review process; supervises junior faculty; manages the tenure process; oversees the functioning of the faculty review process; sets agendas and presides over meetings; and appoints the chair of the graduate admissions committee (Mayr Tr. 286:20–287:25).  He conducts annual reviews for tenure-track faculty; administers the initial step for promotion of non-tenure track faculty; provides and prepares progress reports of faculty; conducts the third-year and sixth-year reviews of tenured faculty; serves as the first step in faculty grievance processes; receives the faculty sabbatical reports; and performs other management duties (Mayr Tr. 288:1-289:4).  He is responsible for human resources, personnel, and scheduling (Mayr Tr. 52:6-8, 285:22–288:7).    He supervises approximately 10 department staff including information technology staff, an executive assistant, the "front office people" who deal with students, and a business manager who also has two or three direct reports (Mayr Tr. 286:11-19).  He makes appointments; oversees policy development; makes strategic curriculum decisions; evaluates whether the department needs to add staff and faculty; and manages the grievance process (Mayr Tr. 287:1-25).  He manages the process to accelerate promotions where merited and oversees the evaluation of instructors (Mayr Tr. 288:1-13).  If there were such thing as the "job of a full professor," Professor Mayr does not believe he is currently doing it given his role as department head (Mayr Tr. 62:16-22).  Like other department heads he has to address the challenge of recruitments of faculty by other universities, an issue that "takes up a lot of head space" (Mayr Tr. 138:4-9).  Plaintiff does not perform any of these duties, or expend the same effort; her job requires different skillsets, and she does not have the same responsibilities and accountabilities (Freyd Tr. Vol. 1, 83:15–84:4; 85:6-12).[8]

---

[8] Plaintiff describes her daily job duties and responsibilities by reference to Freyd 00341-50, 00319-331, and 00633-41 (Barran Decl. Ex. E).

Page 8 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

**Professor Hall.** Professor Hall's academic home has been in Psychology, but for the time covered by plaintiff's lawsuit, until his recent retirement announcement, his day-to-day duties were substantially different from plaintiff's (Hall Decl. ¶ 3; Sadofsky Decl. ¶ 6(d)). He was externally appointed to CoDaC where he was Interim Director (2001-02), Associate Director of Research (2008-15), and again Interim Director (2016-17) (Hall Decl. ¶ 4). He spent approximately half of his time directing CoDaC or its research activities towards the goal of advancement and inclusion of University minority populations and supporting research for faculty across all departments of the University (Hall Decl. ¶ 4). Plaintiff has not done that kind of work and does not even know what Professor Hall's day-to-day duties were in his external role (Freyd Tr. Vol. 1, 21:8-11; 21:16–22:4; 23:7-23).

As part of CoDaC, Professor Hall worked strategically with the Vice President for Equity & Inclusion, as well as individually with faculty across the University, to address specific diversity issues. He supported the research work of faculty across all departments, assisted faculty with financial and other kinds of support, and provided assistance with faculty development. He represented Equity & Inclusion in meetings with central administration. (Hall Decl. ¶¶ 3-4; Sadofsky Tr. 94:19–95:4). At CoDaC he performed University-wide duties with a reporting relationship outside the Psychology Department (Mayr Tr. 291:1-15). At times he had "either zero or very little FTE in our department" (Mayr Tr. 164:23–165:3). Professor Hall "is highly valued in the administration because of his role in the diversity activities" (Mayr Tr. 178:1-3). When the faculty unionized in approximately 2013, the bargaining agreement required faculty to include a statement on contributions to diversity, equity, and inclusion in the promotion material, and Professor Hall worked to help faculty learn how to meet that responsibility and document it appropriately (Sadofsky Tr. 90:14-23).

From 2003-2007, and again from 2010-2014, he also served as the Director of Clinical Training for the Psychology Department (the second time while still holding his half-time position with CoDaC) (Hall Decl. ¶ 5). The Director of Clinical Training does "a different job" which

Page 9 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

imposes responsibilities for the overall integrity of the training program, curriculum development and staffing, organizing the supervision of practica, and the "big production" of accreditation with self-studies and site visits (Mayr Tr. 65:2-22; Hall Decl. ¶¶ 6-9 ). In that position, Professor Hall had wide-ranging administrative responsibilities and accountabilities that differentiated his day-to-day work from plaintiff's (Mayr Tr. 295:9-17). During the 2010-14 period, he was almost fully occupied in leading two separate accreditations for the Psychology Department (Hall Decl. ¶ 9). Plaintiff does not know what Professor Hall did, just that she is sure he was "fulfilling some role of directing the program in some way" (Freyd Tr. Vol. 1, 21:24–22:4, 23:7-23). Plaintiff has not been Director of Clinical Training, nor done the accreditation work; the person serving in this role has significant duties, responsibilities, and accountabilities that plaintiff has not had (Mayr Tr. 295:9-17).

At the end of the 2016-17 academic year, Professor Hall stepped down from his CoDaC directorship; he has provided a notice of retirement to the University which results in one automatic compensation increase (Sadofsky Tr. 92:23–93:7; Hall Decl. ¶ 4).

**Professor Fisher.** For all of the time at issue in this lawsuit, Professor Fisher has obtained grant funding that pays a meaningful percentage of his salary – 25% for 2011-13; 35% for 2013-14; 49% for 2014-15, 80% for 2015-17, and all of his salary for 2017-18 (Sadofsky Decl. ¶ 6(d)). Professor Fisher is the founding director of the Center for Translational Neuroscience (CTN) where he presently serves as Co-Director (Fisher Decl. ¶ 3; Sadofsky Decl. ¶ 6). CTN's mission and activities are more fully described in his declaration, as is the nature of the work he has done and continues to do in CTN (Fisher Decl. ¶ 3). As part of his work with CTN, Professor Fisher manages professional development activities including training of scholars in how to procure funding for the Center's necessary resources. He has had recent extensive involvement, including overall strategic decisions, in transitioning the Center into the structure of the University's Psychology Department, a role that includes its budgeting. As part of his CTN responsibilities, he supervises administrative staffers including project directors and managers. He has other

Page 10 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

personnel management duties in addition to those at CTN, many of which relate to running federal grants, and he directly or indirectly supervises 10-15 employees (Fisher Decl. ¶¶ 3-4).

A large percentage of Professor Fisher's time is filled with the duties and responsibilities resulting from his external and federal grants (Fisher Decl. ¶¶ 5-6; Conover Decl. ¶¶ 3, 4, 6, 7, 8, 11, 12).  He has been responsible for bringing more than $12 million in grant funding to the University since he joined as a faculty member, and his grant management work requires administrative and professional responsibilities and accountabilities on a very large scale commensurate with the size and number of grants he is managing (Conover Decl. ¶¶  3, 4, 13; Fisher Decl. ¶ 5; Fisher Decl. Ex. A).  Professor Fisher is affiliated with and works with Harvard University through its Center for the Developing Child and has secured funding for the University through his Harvard work (Mayr Tr. 54:22–55:2; Fisher Decl. ¶ 5).  From 2014 to the end of the 2016-17 academic year, Professor Fisher also served as the Director of Clinical Training for the Psychology Department with responsibilities for the student clinical training and completing some necessary requirements of the just-completed accreditation that Professor Hall had managed during his latest term as Director (Fisher Decl. ¶ 7; Hall Decl. ¶ 15).

Professor Fisher has significant responsibilities related to his external grant funding and the supervision and direction responsibilities necessary for his large research operation (Sadofsky Tr. 85:2-7).  Plaintiff does not do the kind of work Professor Fisher does (Sadofsky Decl. ¶ 6 (d)).  Her day-to-day activities are different and she does not have the responsibilities or accountabilities his grant-related duties impose upon him.  Those responsibilities require him to be accountable for the budget, compliance issues, data security as required by the federal government, supervision or monitoring of personnel on the grants, and sign-off on the required reports (Mayr Tr. 296:2–297:4).  The responsibility is heavy: in a worst-case scenario, his failure to fulfill his grant obligations could result in a loss of federal funding to the entire University (Mayr Tr. 297:5-13).  Plaintiff agrees that where Professor Fisher is concerned "we're lucky to have him" (Freyd Tr. Vol. 1, 75:3-

Page 11 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

00723895.1

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

7) and that if he were thinking about leaving it would be worth an effort to retain him (Freyd Tr. Vol. 1, 82:11–83:7).

**Professor Allen.** When Professor Allen joined the University in 2014, he could not move his Australian funding to Oregon, but completed this international work from Oregon. He managed those international projects and involved his Oregon students and collaborators, providing the opportunity to be involved and to participate in the international grant work (Allen Decl. ¶ 5).

Professor Allen has day-to-day duties and responsibilities that differentiate him from plaintiff (Sadofsky Decl. ¶ 6(d); Conover Decl. ¶¶ 3, 4, 6, 7, 8, 11, 12). His research concentrations and grant funded activities are described in more detail in the curriculum vitae which is supplied with his declaration (Allen Decl. Ex. A). He has responsibilities and accountabilities as the primary investigator ("PI") or Co-PI on federal grants, including from the National Institute of Health (NIH), and is a Co-PI on two others (Allen Decl. ¶ 5). In addition to completing the research work, for each grant on which he is a PI or Co-PI, he is responsible for verifying the accuracy of the time he and his staff are spending in the grant work as the reports are prepared (Allen Decl. ¶ 7). For federal grants on which he is a PI or Co-PI, he serves as the primary individual responsible for the scientific integrity and fiscal oversight for his award, and is accountable for compliance obligations. He certifies the accuracy and originality of the initial proposal; obtains appropriate institutional reviews and approvals; performs or oversees work under the grant; ensures that project-related charges are allowable, allocable, and reasonable; prepares and timely submits PI specific reports; and signs-off and approves of effort reports, effort certifications, travel reimbursements, purchase orders, and journal vouchers. He ensures the work remains in compliance with the requirements of a variety of laws (Allen Decl. ¶ 7; Fisher Decl. ¶¶ 6-7; Sadofsky Decl. ¶ 6). In the few years he has been at the University, Professor Allen has prepared many complex grant applications and is doing research and grant administration under federal grants awarded by the National Institute of Mental Health, National Institute of Child Health and

Page 12 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Development, and a grant funded by the Bill and Melinda Gates Foundation. He has additional grant funding from the National Science Foundation and international research funding (Allen Decl. ¶¶ 5-6). He is "almost insanely productive" (Mayr Tr. 193:9-11). The grant application process in which Professor Allen engages and to which he devotes much of his work time is onerous: only a small percentage of applications are granted (Mayr Tr. 36:14-23) and the application is "a lot of hard work" that has to survive "these very rigorous review committees" (Mayr Tr. 36:22–37:1). The applications can be hundreds of pages long (Allen Decl. ¶ 5) and take "anything between weeks and months" (Mayr Tr. 303:5-12). Professor Allen has prepared funding proposals for an average of three or four major external grants each year. (Allen Decl. ¶ 5).

Starting in academic year 2017-18, Professor Allen has also assumed the responsibilities of Director of Clinical Training, a role in which he had "a bunch of work" that he would not otherwise have been doing (Mayr Tr. 67:15-19; 68:2-7; 69:13-17). That position now includes primary responsibility for the re-accreditation process, which requires preparation of a detailed self-study on data collected over many years, alumni surveys, and descriptions of procedures and processes for contingencies such as misconduct and poor performance. He is and was responsible to prepare for and manage the site visit and interact with an external faculty team involved in that review process. The accreditation process and Director role involve hundreds of hours of work, ongoing considerations of the strategic direction of course work, and negotiating with the administration to hire additional faculty (Allen Decl. ¶ 11; Hall Decl. ¶ 7).

Professor Allen does a specialized type of research which involves brain imaging and the collection of biological samples. Among other things, his use of scanning and imaging technology requires oversight over the process as well as the technological staff (Allen Decl. ¶ 9).

Professor Allen also serves as the Director of the Center for Digital Mental Health which uses new technology to develop mental health treatments; he developed the vision for this center and initiated the process to set it up, and worked to gather broad support including building partnerships outside the University such as with technology companies (Allen Decl. ¶ 10). He

00723895.1

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

works in collaboration with people across the University and across the country, and has a fairly sizable research unit with research personnel mostly paid for by external funding sources (Sadofsky Tr. 86:15-22). He is responsible for the supervision and direction of his research personnel, and for maintaining the external funding (Sadofsky Tr. 86:23-25).

The major grant administration duties for which Professors Fisher and Allen are accountable result in something "almost like a second employer which is the federal government that overlooks what you are doing" and imposes "a lot of reporting requirements that come with that job" along with supervisory obligations (Mayr Tr. 295:21–297:4). "There's a lot of really nasty overhead that comes with running these types of grants" (Mayr Tr. 297:3-4). Large external grants impose large obligations on the faculty responsible for them. They bring with them different and greater stresses, duties, responsibilities, and accountabilities. Preparing the applications is time consuming and onerous and requires considerable skill, and running a major grant is almost a job in itself (Mayr Tr. 295:9–297:13). Responsible faculty hire, manage, and supervise varying numbers of grant-dedicated personnel and have overall responsibility and accountability for compliance with the many requirements of the funding entity or agency along with budgeting, fiscal monitoring, and financial accountability. "Faculty who are running major NIH grants have a very different day-to-day than faculty who aren't running major grants. Faculty who have a large research staff have a very different day-to-day than faculty who don't have a large research staff" (Sadofsky Tr. 73:16-21). The principal investigator is responsible to ensure that the funded research is performed, manage students and researchers to make sure the milestones are met, prepare and submit an annual progress report for the NIH or other federal agency on which continued funding is contingent, manage the budgets, drive the scientific process, prepare technical and administrative reports, and handle communications. If there are multiple grants, the PI does this work for the several funding agencies who provide the funding. The PI hires and supervises personnel, ensures compliance with federal research and spending protocols and accountability rules, maintains documentation including technical and administrative reports, and manages

Page 14 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

compliance with many pages of requirements (such as approximately 150 pages in the case of the NIH).  He or she is responsible for the scientific integrity of the work, and is the ultimate responsible person to ensure federal compliance obligations are met (Sadofsky Decl. ¶ 6; Allen Decl. ¶ 7; Fisher Decl. ¶ 6).  Some major grants, such as federal NIH grants, even require the recipient to identify and allocate some defined portion of that recipient's FTE as outlined in the grant (Sadofsky Tr. 64:6-10).  With some grants, the University is even permitted to use grant funding to pay a faculty member's salary (Sadofsky Tr. 66:22–67:6).

**B.    Divisional Dean Sadofsky's Review of Plaintiff's Complaints.**

In January 2017, plaintiff asked the University to make an equity adjustment and raise her pay; Divisional Dean Sadofsky reviewed her concerns, something he had also looked into a few months earlier after attending a faculty meeting at which the subject of pay equity was raised (Sadosfky Decl. ¶ 6).  Although he has a "fairly minimal" role in making such salary decisions, which are actually made by the provost, he received background information, and he performed an analysis of salaries within the Psychology Department as well as in the larger College of Arts and Sciences, looking at objective compensation data (Sadofsky Tr. 49:24–50:17, 58:7-25, Sadofsky Decl. ¶ 6).  His review informed him that although faculty pay at the University is low on average as compared to other universities (known through benchmarking data from the American Association of Universities), plaintiff was an exception since her salary was greater than the AAU average.  That meant that she was paid generally higher than her Oregon peers (Sadofsky Decl. ¶ 6(d)).  He also reviewed her compensation internally (within the University) by comparing it to others in his division (natural sciences).  There, her salary was 20% higher than the average full professor.  She was ranked sixteenth in pay out of the approximately 90 full professors in the division.  Plaintiff's salary was higher than more than 80% of the full processors in the division.  Of the natural sciences faculty who were paid more, some of them were in different disciplines; two of them were members of the very prestigious National Academy of Sciences.  Some were present or former department heads.  Two were affected by retirement (which provides a pay raise

Page 15 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

for the last three years) and one other was very senior. The remaining ones were those colleagues about whom plaintiff has complained in this lawsuit (Sadofsky Decl. ¶ 6(c)). Sadofsky reviewed other information, including that some of the lowest paid faculty in the Psychology Department are men (Sadofsky Decl. ¶ 6). He is a trained mathematician, and attempted to replicate the scatterplots he understood to have been prepared by plaintiff. His conclusion was that the analysis did not evidence discrimination, but showed the natural and nondiscriminatory effects of inflationary changes in starting salary at time of hire and recruitment "compression," and the effects of necessary retention increases (Sadofsky Decl. ¶¶ 6-10). He summarized the back-and-forth of University compensation:

> [A]t at various times Prof. Freyd has been paid more than people about whom she complains. For example, she was paid more than Nick Allen for three of the five years that he has been at the University, for 2014-15, 2015-16, and 2016-17. His current base salary is $160,000, meaning he is paid $4,763 more than Prof. Freyd. That is due to a retention offer. I cannot see a gender pattern in paying a woman, Prof. Freyd, more than Prof. Allen for all years except when he has been aggressively recruited by an outside institution and the university concluded that his retention was important to its mission and goals. In such case the University made a considered judgment of the importance of retaining Prof. Allen. Prof. Allen is not the only person in a similar situation. Prof. Freyd was paid more than Ulrich Mayr in 2012-13, 2014-15 and 2015-16. That kind of back and forth, with Prof. Freyd being paid sometimes more and sometimes less than the principal men about whom she complains, does not in my view support a suggestion that her compensation is biased against her on the basis of gender.
>
> Prof. Freyd's department head and colleagues have been strong advocates for her and I did not see any indication that her raises were handled improperly within her department due to any gender-based considerations within the department.

(Sadofsky Decl. ¶¶ 6(i), 7.)

## V.    RETENTION: THE UNIVERSITY'S RESPONSE TO EXTERNAL RECRUITMENT AND THE NEED TO RETAIN WORLD-CLASS FACULTY

The Psychology Department is strong, and since the University generally pays less than other comparable institutions, one of the department head's "biggest jobs" is dealing with the fact that "we are constantly sort of a feeding ground for people" by richer institutions (Mayr Tr. 136:8-25), a problem that cannot be solved unless there is a "completely fixed pay scale across the whole

Page 16 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

country" (Mayr Tr. 137:1-8). Dealing with external recruitment is the "number one complaint" all department heads have, "no matter from which university" (Mayr Tr. 137:20–138:3).

There is a process to evaluate next steps in responding to an external recruitment threat, starting with an evaluation whether the outside offer is serious, whether the department wants to retain the individual, "whether he or she is on the way out anyway" (Mayr Tr. 151:8–152:1), and an evaluation of "what it takes to keep him or her" (Mayr Tr. 151:19–152:1).

External recruiting cannot be ignored. Some faculty are involved in grant activity together with others, and the University must be concerned about a domino effect, that "when one leaves, the others start leaving too" (Mayr Tr. 154:14-25). Plaintiff agrees that the University must try to retain its world-class scientists (Freyd Tr. Vol. 1, 39:2-9, 81:20-23, 83:3-7, 266:9-14), and that it must respond to these external recruitments so that the University will not lose its valuable faculty (Freyd Tr. Vol. 1, 129:24–130:12), even if it means moving salaries "out of alignment" (Freyd Tr. Vol. 1, 101:10-13). The recruitment of her former colleagues Professors Ed Awh and Ed Vogel by the University of Chicago was a loss (Freyd Tr. Vol. 1, 38:6–39:9). Similarly, the University is "better off" with Professor Fisher than without him (Freyd Tr. Vol. 1, 81:20–82:19) and it is worth an effort to retain him (Freyd Tr. Vol. 1, 83:3-7). The mission of the University is "to produce world class research and to meet the university's goals"; it is "very important" to have world-class scientists doing world-class research (Freyd Tr. Vol. 1, 37:1-14, 39:2-9). The University is an R1 or Research Intensive (Highest Research Activity) institution (Freyd Tr. Vol. 1, 38:22–39:2) in accordance with the Carnegie Classification of Institutions of Higher Education www.carnegieclassifications.iu.edu. That classification is important to the University's mission for strategic reasons (Sadofsky Tr. 272:22-24; Conover Decl. ¶ 1). External funding, especially federal funding, is important to maintain that classification and such funding greatly benefits the University. It needs nationally-recognized faculty; retention is particularly important if the University might be unable to recruit a suitable replacement after a loss (Freyd Tr. Vol. 1, 266:9–

Page 17 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

267:8).  "[T]he realities that I see on the ground every day" is that retention offers are necessary to remain a strong department (Mayr Tr. 258:12-16).

Plaintiff is no stranger to recruitment and retention herself (Freyd Tr. Vol. 1, 90:8-11).  The University offered her an attractive recruitment package to encourage her to leave a position at Cornell University–the offer included tenure, a large lab, and a corner office which a senior person vacated just for her.  The University also offered her spouse a job.  "I felt very wanted" (Freyd Tr. Vol. 1, 106:20–107:5).  She accepted, acknowledging that "everything I thought to ask for I had a satisfactory outcome on" and knowing that the University was really trying to recruit her (Freyd Tr. Vol. 1, 107:6-14).  Cornell offered her more money to stay (Freyd Tr. Vol. 1, 108:17-18), but she thought that Oregon offered a better department where she could be a more productive researcher, a better place for her family, a place where she could be a "happier human being," all with better weather (Freyd Tr. Vol. 1, 108:19–109:1).[9]

The University is particularly vulnerable to losing faculty who have secured major grant funding.  Grant funding is one of the key factors in an institution's decision whether to recruit a faculty member (Mayr Tr. 92:13-22).  In that regard, the four males that plaintiff has identified as possible comparators have all been responsible for considerable external funding and, not coincidentally, have therefore been aggressively recruited by other institutions. Over the time beginning fiscal year 2008 and ending fiscal year 2018, for example, plaintiff secured total grant funding of $25,500.  In contrast, during the same time Professor Fisher was awarded 34 grants resulting in $12,359,571 for the University.  Professor Mayr received eight awards, bringing in $2,710,306.  In a considerably shorter period (since he was not hired until 2013-14) Professor Allen was awarded $786,109, and other very large grants have since come to fruition (Conover

---

[9] *See Penk 2* rejecting one sex discrimination claim and observing that "she was actively recruited by the College of Education."  1985 U.S. Dist. LEXIS 22624, at *312-313.

Page 18 – DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Decl. ¶ 13; Allen Decl. ¶ 6). Professor Hall secured a co-investigator role in a $4.3 million grant, with the University receiving $492,796 in funding from that grant (Conover Decl. ¶ 13).

Major grant funding, which is so attractive to other institutions looking to hire away key faculty, is a very valuable asset for the University and worth holding onto. "[T]he more external funding there is . . . the more research can actually get done." External funding allows the support of PhDs and post-docs and laboratory managers and research associates (Sadofsky Tr. 21:4–22:11). Some grants contribute "indirect costs" which are in addition to the grant funding and go to the University as reimbursement for the development and maintenance of research facilities (Mayr Tr. 35:13-25; Freyd Tr. Vol. 1, 37:1-14). These added indirect costs (additional grant money contributed to the University and department overhead) benefit the University (Freyd Tr. Vol. 1, 37:1-14). External grant funding can "pull up a whole group of other faculty" (Mayr Tr. 29:23-30:24) and permits high quality work (Mayr Tr. 33:21–34:1) and greater production (Mayr Tr. 34:2-6), and the University "likes the added money" (Mayr Tr. 34:25–35:3) which helps fund its infrastructure (Mayr Tr. 35:13-25).

Although she acknowledges the need to retain world class faculty, plaintiff still broadly challenges the University's making retention adjustments in compensation as part of that effort. As is discussed more fully below, courts have repeatedly held that employers may adjust compensation in order to retain key employees who might otherwise leave.

## VI. FACULTY UNIONIZATION AND THE COLLECTIVE BARGAINING AGREEMENT

There is no genuine issue of material fact that would permit plaintiff's contract claims to proceed. She cannot sue for breach of the labor agreement that has been in effect since 2013, admits she does not contend there was a side agreement, and is unable to identify any agreement preceding 2013 (Freyd Tr. Vol. 1, 67:21–68:2). Since 2013, the terms and conditions of plaintiff's employment have been collectively bargained between the University and her labor organization, United Academics (Mayr Tr. 80:22–81:6; Sadofsky Decl. Ex. D). Her labor agreement provides

Page 19 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

a process for grievance adjustment and arbitration, and from the time there was such an agreement, plaintiff was required to assert any contract claims through that process. She did not use the bargained for grievance procedures. *See Huffman v. Scappoose Sch. Dist. No. 1 J*, No. 3:14-CV-00941-MO, 2015 U.S. Dist. LEXIS 97971, at *36-37 (D. Or. July 28, 2015), citing *Richard v. Portland Gen. Elec*, 83 Or. App. 59, 730 P.2d 578, 579 (Or. Ct. App. 1986) ("When an employee fails to utilize contractual procedures for grievances and arbitration, 'state and federal policy favoring the exclusivity of remedies provided in collective bargaining agreements bars any common law claim for breach of contract, unless plaintiff alleges facts that would establish an exception…'"). For the time before there was a bargaining agreement, she does not identify any contract that the University failed to honor (Freyd Tr. Vol. 1, 67:8–69:2).

## VII.   THE COMPENSATION DIFFERENTIALS AT ISSUE

The base salaries for full professors in the Psychology Department starting with the 2010-11 academic year are shown in detail in Exhibit A to the Declaration of Andrea Larson; the dates coincide with the respective statutes of limitations which restrict plaintiff's statutory claims to no earlier than March 2014, and her contract claim to March 2011.

The Equal Pay Act requires consideration of plaintiff as compared to the <u>average</u> male. For every academic year since 2010-11 (eight academic years), plaintiff's base salary has been higher than the average of male full professors in her department, sometimes by more than $20,000. As compared to Professor Mayr individually, plaintiff's base salary has been higher than his for five of the eight academic years, and lower in 2013-14, 2016-17, and 2018-19. She always earned more than Professor Mayr before he became Department Head. For those same eight academic years, plaintiff's base salary has been lower than Professor Fisher and Professor Hall. Professor Allen joined the department in 2013-14. His base salary has been lower than hers for three academic years and higher for two. (Larson Decl. Ex. A. *See also* Sadofsky Decl. ¶ 6.)

// 

Page 20 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

## VIII.   DISCUSSION

The Equal Pay Act and the other laws that plaintiff invokes in this lawsuit impose requirements that she does not meet.  From the outset, she must prove more than a difference in pay between her and male colleagues with the same general job title.  Variations in compensation among employees are not surprising, and such variations do not permit a presumption that they were caused by discrimination.  *Wood v. City of San Diego*, 678 F.3d 1075, 1086 (9th Cir. 2012).  *See also Spaulding* 740 F.2d at 700 ("That payments are different is insufficient alone to establish a prima facie case").  Instead, to prove a prima facie case under the Equal Pay Act and other laws, plaintiff must first show that the University pays different wages to men (not just a few selected individuals) and that it does so for equal work on jobs that require equal skill, effort, and responsibility, and which are performed under similar working conditions.  *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)).

**A.**      **Plaintiff Does Not Prove a Prima Facie Case Under the Equal Pay Act.  She Is Paid More Than the Average Male Full Professor and Her Work Is Not Substantially Equal to That of Professors Mayr, Hall, Fisher, or Allen.**

The Equal Pay Act does not permit a plaintiff to compare herself to a few select men and ignore the rest.  Instead, in order to prove a *prima facie* case, plaintiff must show she was paid less than the average paid to men in such positions. *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 916-17 (9th Cir. 1983) (Equal Pay Act requires comparison to employees (plural)); *Allender v. Univ. of Portland*, 689 F. Supp. 2d 1279, 1286 (D. Or. 2010) (a plaintiff may establish a prima facie case only if her wages are less than the average paid to her male counterparts).  Plaintiff agrees that it would not be surprising that during the last 10 years she was paid more than the average male full

//

//

//

//

Page 21 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

professors in the Psychology Department (Freyd Tr. Vol. 1, 61:20-25) (Larson Decl. Ex. A; Sadofsky Decl. ¶ 3).[10]

Plaintiff also fails to prove a prima facie case through individualized comparisons to Professors Mayr, Hall, Fisher, and Allen. Her day-to-day duties and her responsibilities and accountabilities, and the skills and effort required to carry them out, differ from those of Professors Allen, Fisher, Hall, and Mayr. Plaintiff does not do substantially equal work. It is "actual job performance requirements, rather than job classifications or titles, that is determinative." *EEOC v. Maricopa Cty. Cmty. Coll. Dist.*, 736 F.2d 510, 513 (9th Cir. 1984). Applying this rule, in *Thomson v. Mentor Graphics Corp.*, No. CV-03-1350-ST, 2004 U.S. Dist. LEXIS 23676, at *27-29 (D. Or. Nov. 12, 2004), this court granted the employer's motion for summary judgment on plaintiff's Equal Pay Act and related state claims because the male comparator spent about half his time, sometimes less, performing functions that the plaintiff never assumed. No Equal Pay Act claim lies in the face of a significant difference in duties because it is "the overall job, not its individual segments, that must form the basis of comparison." *Gunther v. Cty. of Wash.*, 623 F.2d 1303, 1309 (9th Cir. 1979), *aff'd*, 452 U.S. 161(1981), citing *Usery v. Richman*, 558 F.2d 1318, 1320 (8th Cir. 1977). *See also Nulf v. Int'l Paper Co.*, 656 F.2d 553, 560-61 (10th Cir. 1981), also cited by this court in *Thomson* and noting that "when significant amounts of time are spent on different tasks, equal work is not involved." There the plaintiff "performed some duties also performed by order desk employees" but not with the same frequency. *Nulf*, 656 F.2d at 560. "It is not sufficient that some aspects of the two jobs were the same." *Id.*

Many decisions inform how job comparability should be considered. *Stanley v. Univ. of S. Cal.*, held that the job of the head coach of the women's basketball team was not substantially

---

[10] Compensation data at a University is inherently complicated because of factors such as assignments outside a department, sabbaticals or other types of leave during which there may be a designated salary amount paid in different ways, and summer work. Because plaintiff speaks of full professors, defendants have provided data for all faculty shown as holding academic appointments as full professors in the Psychology Department regardless of external assignments, fellowships, sabbaticals, or leaves of absence.

Page 22 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

equal to the job of the head coach of the men's basketball team; he was responsible for public relations and promotional activities, generated more revenue, worked to generate donations and endorsements, and had a "quantitative dissimilarity in responsibilities." 13 F.3d 1313, 1321 (9th Cir. 1994). Additionally, "the relative amount of revenue generated should be considered in determining whether responsibilities and working conditions are substantially equal." *Id.* at 1323. The court cited with approval *Horner v. Mary Inst.,* 613 F.2d 706, 713-14 (8th Cir. 1980) (male physical education teacher had a different job from a female physical education teacher because he was also responsible for curriculum). *Spaulding* affirmed the trial court's dismissal of claims by nursing faculty who compared themselves to associate hospital administrators. 740 F.2d at 691. Although both jobs required teaching, research and publication, committee work, advising and community service, and were performed in clinical settings in professional schools with a similar mix of degrees, one proposed comparator was responsible for more departments with greater complexity, and he filled in during the administrator's absence. The other proposed comparator had primary administrative responsibility for more departments, represented the administration in labor negotiations, and coordinated hospital planning and budgeting. The jobs were not substantially equal.

In *Forsberg,* this court ruled on summary judgment that the jobs of female maintenance administrators were not substantially equal to the jobs of male maintenance technicians; both groups tested equipment to find and diagnose telephone malfunctions, but one group used a device with a keyboard and screen that produced a readout while the other tested manually and consulted a scale. The results were identical, but the difference in equipment required "an appreciable variation in the level of skill, effort, and responsibility." *Id. at* 1414. The Ninth Circuit affirmed, looking "beyond the surface similarities" and concluding this was "a situation in which two jobs involving superficially similar tasks require qualitatively different skills in their performance" and that the employees performed the same overall function, but the tasks and underlying skills required were entirely dissimilar. *Id. at* 1416. And *see Szaley v. Pima Cty.*, 371 F. App'x 734,

Page 23 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

735 (9th Cir. 2010) (jobs dissimilar where male performed many additional duties including training and recruiting).

Day-to-day duties were at issue in the *Penk* litigation as well. *See Penk 2,* 1985 U.S. Dist. LEXIS 22624, at *160 (citing *Spaulding* 740 F.2d at 700) ("Ms. Furby has the burden of proving that the actual job content of the positions held by her and her comparators is substantially equal and not merely similar"). *See also Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 703 (7th Cir. 2003) (EPA and Title VII) ("it is significant that Dr. Quillen is responsible for a department that generates six times as much revenue as Dr. Cullen's and that is vital to the operation of SOAHS").

Plaintiff's day-to-day job duties and responsibilities differ in important ways from those of Professors Allen, Fisher, Hall, and Mayr.

Professor Mayr is plaintiff's department head, with a leadership and supervisory role over her. Professor Mayr has been department head since 2013, performing management duties that plaintiff has never had. Before Professor Mayr became department head in 2013, his base salary was lower than plaintiff's, so that earlier period of time is not even relevant to this lawsuit. Professor Mayr is not a member of the collective bargaining unit because he is a department head. His work time is filled with duties that plaintiff does not perform–supervising approximately 10 department staff including information technology, supervising junior faculty, overseeing evaluations of instructors, dealing with finances and preparing budgets, handling misconduct investigations and grievances, addressing personnel issues, running faculty meetings, implementing the faculty merit review process, managing the tenure process, preparing faculty progress reports, and evaluating department staffing. His responsibilities are broad and unlike the kind of work that plaintiff does. *See Stith v. Perot Sys. Corp.*, 122 F. App'x 115, 119 (5th Cir. 2005) ("Stith utterly failed to demonstrate that her proffered comparators were either payed more or that the males held positions of equal skill, effort, or responsibility. For example, Stith points to her *own supervisor* as one who purportedly holds an equal position" (spelling and italics in

Page 24 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

original).  Plaintiff faces the same impediment in attempting to compare herself to her own department head.

Professor Hall's day-to-day duties have also been strikingly different from plaintiff's.  In 2001, he was asked to take on interim leadership of the University's CoDaC and, starting in 2008, became its Associate Director of Research.  His role was not department-wide; it was university-wide.  His work was with minority faculty, and starting at the time the faculty unionized in 2013 his responsibilities included implementing a collectively bargained requirement that the faculty document their contributions to diversity, equity, and inclusion in their own dossiers.  His CoDaC work was about half his time.  Starting in 2010 and continuing to 2014, Professor Hall had a second appointment as Director of Clinical Training within the Psychology Department.  Plaintiff has never worked at CoDaC and she has never been Director of Clinical Training.  Professor Hall's position came at a time when the department was working through two separate accreditations, creating quite a different set of duties from plaintiff's work.  He was responsible and accountable for site visits, the self-study, overseeing the integrity of the training program, curriculum and staffing, and overseeing the student practica.  Professor Hall held his position at CoDaC until the end of 2017, serving as the interim director from 2015 to the end of the 2016-17 academic year; that position took more than half his time.  Plaintiff has not had CoDaC duties, has not been Director of Clinical Training, and has not managed accreditations.

Professors Fisher and Allen both have major external grant funding which brings with it responsibility and accountability for personnel management, and they conduct a different kind of research, using equipment such as scanners.

Professor Fisher is the director of the Center for Translational Neuroscience and extensively involved in the transition of that organization to a freestanding center for which he oversees the budget, makes strategic decisions about the overall direction of the work, and has the responsibility to address space, facilities, and equipment.  He works to attract faculty to the center, and supervises its administrative staff including project directors.  In addition to the center's

Page 25 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

responsibilities, he has supervisory responsibilities over about 15 grant-related staff.  From the time he joined the University, he has been heavily involved in federal grant-funded work as a principal investigator, co-principal investigator, or co-investigator.   His responsibilities and accountabilities include the scientific integrity of the work as well as meeting extensive federal requirements.  He also affiliates with Harvard University through which he has obtained funding for the University, including funding for his own salary.  From 2014 to the end of the 2016-17 academic year he served as Director of Clinical Training, finalizing the accreditation process that Professor Hall had largely managed and which ensures students receive the necessary quality of training.  Plaintiff does not share any of these roles or responsibilities.

Professor Allen, who has recently assumed the responsibilities of Director of Clinical Training, has been at the University since 2014.  He has attracted federal grant funding by preparing detailed submissions.  His administrative duties in managing the grant responsibilities are time consuming and impose a different kind of accountability from the work plaintiff does.  Even his research methodology differs, since he works with a brain scanner and wearable digital devices and collects biological samples.  He directs the Center for Digital Mental Health.  At the beginning of the 2017-18 academic year he accepted an appointment as Director of Clinical Training, and is responsible for working through a re-accreditation process.  In the first year alone he has spent hundreds of hours in preliminary work on that re-accreditation.

In brief, there is no dispute here.  Plaintiff does not do work that is substantially equal to Professors Mayr, Hall, Fisher, or Allen.  They all have spent time and effort on significant and substantial responsibilities that plaintiff does not have.  Professor Mayr heads the entire department and supervises faculty, including plaintiff.  Professor Hall has worked in a different area with a different focus, taking a leadership role university-wide in its diversity effort and has not once but twice been the Director of Clinical Training, leading the Psychology Department through detailed and time consuming accreditation processes. Professors Fisher and Allen bring in major external grant funding and administer the grant responsibilities, with accountabilities to the federal

Page 26 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

government.  Because the day-to-day work of the four colleagues plaintiff has identified is not substantially equal to hers, they are not proper comparators for an Equal Pay Act claim.

These differences in duties that defeat any Equal Pay Act claim have the same effect on plaintiff's claims under Title VII, Title IX, and Oregon state law.  Each of these laws requires that plaintiff prove she does substantially equal work in comparison to a higher paid male.

**B.**    **Plaintiff's Title VII, Title IX, and Oregon State Law Claims Also Fail.  She Does Not Demonstrate a Prima Facie Case Under These Laws Because Her Work Is Not Substantially Equal to Professors Mayr, Hall, Fisher, or Allen.**

Plaintiff alleges that the pay differences described above are also violations of other laws. She identifies Title VII (the intent claim, her second claim for relief), Title IX, Oregon's Equal Rights Amendment (her sixth claim for relief), ORS 659A.030 (intent, her seventh claim for relief), and ORS 659.220 (her ninth claim for relief).  Each of these laws applies the same standards and analysis in comparing the equality of work as the Equal Pay Act discussed above.  Plaintiff's claims fail for the same reasons her Equal Pay Act claims fail:  she does different work from the four male colleagues she has selected for comparison.

**Title VII (intent)**.  Plaintiff's Title VII (intent) claim, her second claim for relief, alleges that the University has knowingly and intentionally, because of her sex, paid her less than men "in the same job."  Title VII requires as a prerequisite to suit the filing of a timely administrative complaint with the Equal Employment Opportunity Commission.  42 U.S.C. § 2000e-5.  Because plaintiff did not file her administrative complaint until February 13, 2017 at the earliest (Davis Decl. Ex. A), her Title VII claim is untimely to the extent she complains about anything before April 19, 2016; that is the date that is 300 days before her administrative filing.  *See* 42 U.S.C. § 2000e-5; *United Air Lines v. Evans,* 431 U.S. at 558. And *see Romero-Manzano v. Carlton Plants, LLC,* No. 3:15-CV-00508-BR, 2016 U.S. Dist. LEXIS 112738, at *19 (D. Or. Aug. 24, 2016) ("[A]n individual's failure to file a charge with the agency within [the] time frame [set out in § 2000e-5(e)(1)] will usually operate to bar that person from bringing a lawsuit for failure to

Page 27 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

exhaust their administrative remedies." *Ariz. ex rel Horne v. Geo Group, Inc.*, 816 F.3d 1189, 1202 (9th Cir. 2016) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393-94(1982))).

In order to establish a prima facie case under Title VII, plaintiff must meet the same requirements and standards that are imposed by the Equal Pay Act: the jobs must be substantially equal and the day-to-day responsibilities must be the same. *Forsberg,* 840 F.2d at 1418 (equal pay claims asserted under Title VII must satisfy the same substantial equality test applied to claims asserted under the EPA); *Jovanovich v. Sweeney*, No. 93-35372, 1993 U.S. App. LEXIS 31899, at *7 n.3 (9th Cir. Dec. 1, 1993) (if Equal Pay Act claim fails, then same theory under Title VII fails). And *see Penk 2*, 1985 U.S. Dist. LEXIS 22624, at n.153 (holding that individuals in different disciplines are not comparators for purpose of Title VII).

Because plaintiff and her four male colleagues do different work, the Title VII intent claims fail.

**Title IX.** For her fourth claim for relief, plaintiff asserts the same theories under Title IX, 20 U.S.C. § 1681,[11] stating once again that defendant "has knowingly and intentionally paid [Plaintiff] less than men in the same job because of her sex" (Amended Complaint, ¶¶ 43, 55). Defendant is entitled to summary judgment on plaintiff's Title IX claims. They are, first, displaced by Title VII. Even if that were not so, however, the claims fail because plaintiff does substantially different work from her four male colleagues.

The claims may not proceed side-by-side because where employees are concerned, Title VII is the controlling law. Although this issue has not yet been addressed by the Ninth Circuit, other courts have considered the issue and have concluded that Title VII and Title IX claims are

---

[11] The statute of limitations is different; a Title IX claim would be timely after March 21, 2015. Title IX adopts the state's personal injury statute of limitations, which is two years as established by ORS 12.110(1). *See Stanley v. Trs. of the Cal. State Univ.*, 433 F.3d at 1134; *Samuelson v. Or. State Univ.*, 162 F. Supp. 3d at 1134 (in Oregon, two year statute of limitations applies to Title IX). To the extent plaintiff asserts a Title IX claim, it is timely only from March, 2015. During the 2014-15 academic year, plaintiff's base salary was higher than Professor Allen and Professor Mayr. *See* Larson Decl. Ex. A.

Page 28 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

not independent, and that for employees Title VII displaces Title IX. Both laws prohibit gender discrimination and require the same proof, but Title VII imposes administrative requirements which must be exhausted prior to seeking judicial relief. Allowing a plaintiff to assert the same claims under a different additional legal theory bypasses the carefully considered administrative requirements. *Lakoski v. James*, 66 F.3d 751, 753 (5th Cir. 1995) (holding that "Title VII provides the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions"). To hold otherwise would be to assume that Congress intended Title IX to offer a bypass to the administrative exhaustion requirements established by Title VII. *Torres v. Sch. Dist.,* No. 8:14-cv-1021-T-33TBM, 2014 U.S. Dist. LEXIS 117254, at \*1 (M.D. Fla Aug. 22, 2014); *Cooper v. Ga. Gwinnett Coll.,* No. 1:16-CV-01177-TWT-JFK, 2016 U.S. Dist. LEXIS 147705, at \*15-17 (N.D. Ga. Sep. 16, 2016).

**Oregon State Law Claims.** Plaintiff has asserted discrimination theories under Oregon state law: the state Equal Rights Amendment (sixth claim for relief), ORS 659A.030 (seventh claim for relief), and ORS 659.220 (ninth claim for relief). All state claims are subject to the Oregon Tort Claims Act including the requirement to provide formal notice within 180 days after a loss or injury. Plaintiff provided her tort claims notice February 9, 2017,[12] so her claims are timely only after August 13, 2016. *See* ORS 30.260 to 30.300. ORS 30.275; *McCabe v. State*, 108 Or. App. 672 (1991), aff'd, 314 Or. 605, 607 (1992); *Griffin by & Through Stanley v. Tri-County Metro. Transp. Dist.*, 318 Or. 500, 503 (1994) (Tort Claims Act applicable to discrimination claims). *See also Juran v. Independence Or. Cent. Sch. Dist. 13J*, 898 F. Supp. 728, 730 (D. Or. 1995) (the appropriate remedy for constitutional violations by public bodies, officers, employees, and agents is the Oregon Tort Claims Act).

Oregon law requires the same proof as plaintiff's federal claims. *See Conroy v. Hewlett-Packard Co.*, 2016 U.S. Dist. LEXIS 44396, at \*35: "The standard for establishing a prima facie

---

[12] *See* Davis Decl. ¶ 2.

Page 29 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

case of discrimination under Oregon law is identical to that used under federal law." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). That standard requires proof of substantially equal work. *E.E.O.C. v. Maricopa Cnty. Comty. College Dist.*, 736 at 513; *Stanley*, 178 F.3d at 1074.

See Forsberg v. Pac. Nw. Bell Tel. Co.*, No. 84-1401-FR, 1986 U.S. Dist. LEXIS 31238, at *22 (D. Or. July 21, 1986), aff'd, *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409 (9th Cir. 1988) (summary judgment on plaintiff's wage discrimination state law claims, asserted under ORS 659.030 (now renumbered as 659A.030), using the same analysis applied to her Equal Pay Act and Title VII claims). And *see Thomson v. Mentor Graphics Corp.*, 2004 U.S. Dist. LEXIS 23676, at *27-28 (dismissing ORS 652.220 discrimination claim because the jobs in question had a significant difference in duties).

Oregon added the Equal Rights Amendment to the state constitution by ballot measure voted on in the November 2014 election; the measure provides that equality of rights under the law shall not be denied or abridged on account of sex, with the legislature having the power to enforce the measure by appropriate legislation. *See* Article 1, section 46.[13] Oregon has not passed enforcing legislation that creates a standard different from previously existing law.

**C.    Providing Retention Adjustments to Ensure That Key Faculty Do Not Leave the University Is a Lawful and Proper Academic Decision Which Does Not Produce a Disparate Impact. Those Claims Which Challenge Such Adjustments (The First, Second, Third, Sixth, Eighth and Ninth Claims) Should Be Dismissed.**

Plaintiff complains of retention adjustments by which the University makes salary and other adjustments to retain key faculty who are being aggressively recruited by outside institutions

---

[13] Ore. Const. Art. I, § 46.

(1) Equality of rights under the law shall not be denied or abridged by the State of Oregon or by any political subdivision in this state on account of sex.

(2) The Legislative Assembly shall have the power to enforce, by appropriate legislation, the provisions of this section.

(3) Nothing in this section shall diminish a right otherwise available to persons under section 20 of this Article or any other provision of this Constitution.

Page 30 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

(Second Amended Complaint ¶¶ 41, 45, 51, 75, 76, 81).  She also asserts these adjustments cause a disparate impact on women.  These challenges fail.

This is not a case of first impression, and a robust body of case law supports that retention offers are a legitimate factor particularly where, as in this case, they are made to support the University's academic judgment and carry out the academic mission of the University.  Such decisions also fall within this public institution's discretionary immunity and are protected under state law.  They do not violate any of the laws upon which plaintiff's lawsuit is based, do not discriminate against women on the basis of their sex, and do not result in a disparate impact on women.

### 1.  Retention is a lawful factor other than sex.

A substantial body of case law holds that a university's practice of considering salary demands to retain faculty is a permissible and non-discriminatory practice.  *Stanley v. Univ. of  S. Cal.*, 13 F.3d at 1322 (an employer may consider the marketplace value of the skills of a particular individual when determining his or her salary); *Spaulding,* 740 F.2d at 708 (unequal wages that reflect market conditions of supply and demand are not prohibited by the EPA); *Penk 2*, 1985 U.S. Dist. LEXIS 22624, at *312-313 (male faculty member was not appropriate salary comparator because he had been recruited away but induced to return; market factors permissible consideration); *Winkes v. Brown Univ.*, 747 F.2d 792, 792 (1st Cir. 1984) (no violation of Equal Pay Act when university matched salary offered to professor by another institution in order to dissuade her from taking other employment);  *Miller v. Bd. of Regents of the Univ. of Minn.*, No. 15-CV-3740, 2018 U.S. Dist. LEXIS 17531, at *18-19 (D. Minn. Feb. 1, 2018)  (the market for coaches of men's hockey teams is more competitive than the market for coaches of women's hockey teams so that "*men* who coach women's hockey teams make less money than *men* who coach men's hockey teams").  *See also Suter v. Univ. of Tex. at San Antonio*, Civil Action No. SA-12-CV-969-OLG, 2013 U.S. Dist. LEXIS 182995, at *20-21 (W.D. Tex. Dec. 20, 2013) ("in choosing to match an offer, the University could direct more funds into one area of study–

Page 31 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Dopamine research, for example–rather than another to meet research and academic priorities); *Horner v. Mary Inst.*, 613 F.2d 706, 714 (8th Cir. 1980) ("[A]n employer may consider the market place value of the skills of a particular individual when determining his or her salary").

The same is true of employment outside of the academic context. *See Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 679 (S.D. N.Y. 1995) (paying male associate more in order to keep him from joining another firm lawful); *Sobol v. Kidder, Peabody & Co.*, 49 F. Supp. 2d 208, 220 (S.D. N.Y. 1999) (employer may pay higher wages to a male when it is necessary to do so in order to hire or retain employee with particular desired skills); *Reznick v. Associated Orthopedics & Sports Med., P.A.*, 104 F. App'x 387, 392 (5th Cir. 2004) (no prima facie case when a male was paid more because he was in greater demand); *Walter v. KFGO Radio*, 518 F. Supp. 1309, 1318 (D. N.D. 1981) (explaining education, experience, and marketplace value of an individual's skills are relevant factors in determining an employee's starting salary, and if a higher salary is necessary to hire the best person to do the job, that consideration is a valid "factor other than sex"). *Mazzella v. RCA Global Communications, Inc.*, 642 F. Supp. 1531, 1552 (S.D. N.Y. 1986) (paying a male employee a higher salary justified in part because he could not be induced into transferring without a salary match).

No law requires the University to be passive in the face of recruitment of its key faculty.

**2. Retention offers in the Psychology Department have been made to both women and men as a lawful exercise of the University's discretion and academic judgment.**

Plaintiff agrees that retention adjustments are necessary so that the University will not lose its valuable faculty (Freyd Tr. Vol. 1, 129:34–130:12), even if it means moving salaries "out of alignment" (Freyd Tr. Vol. 1, 101:10-13). The recruitment of Professors Ed Awh and Ed Vogel to the University of Chicago was a loss to the University (Freyd Tr. Vol. 1, 38:9-18). The University is "better off" with Phil Fisher than without him (Freyd Tr. Vol. 1, 81:20–82:19) and it is worth an effort to retain him (Freyd Tr. Vol. 1, 83:3-7). The University must compete with the outside market by making a retention offer to a valuable faculty member (Freyd Tr. Vol. 1, 129:24–

Page 32 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

130:5).  The University needs nationally-recognized faculty, and retention can be even more important than recruitment because the University might not be able to recruit a suitable replacement for a departing faculty member (Freyd Tr. Vol. 1, 266:9–267:8).  Plaintiff has no criticism of any particular offer to Professors Allen, Fisher, Hall, or Mayr (Freyd Tr. Vol. 1, 82:3-6).  The University needs to retain its grant funding, (Sadofsky Tr. 147: 2-19; Mayr Tr. 33:25–35:3; 35:18-25), and each of plaintiff's four male colleagues has obtained significantly more grant funding than plaintiff has (Conover Decl. ¶ 13).  Professors Fisher, Mayr, Hall, and Allen have all received retention adjustments, as have women faculty from the Psychology Department who were at risk of loss.  In each case of a credible threat of loss, the University made a strategic decision to fight to retain important faculty who might otherwise leave.

   3. **Plaintiff personally decided not to entertain the kinds of inquiries that begin a recruitment conversation; she cannot complain if some colleagues make different decisions and any complaints based on retentions lack causation.**

   Plaintiff has received the kinds of inquiries that are the beginning of an external recruitment conversation.  She has declined to follow up on those conversations (Freyd Tr. Vol. 1, 90:8-21, 92:20–93:23).  She did not want to discuss employment with other institutions because of reasons personal to her–she and her husband both had careers in Oregon, her family was settled in the community, and she was able to do the research she wanted (Freyd Tr. Vol. 1, 90:22–91:9).  She did not want to leave her graduate students, or the place where her friends resided (Freyd Tr. Vol. 1, 93:24–94:5).

   Her gender did not stop the conversations; her lack of interest did.

   4. **Other women faculty in the Psychology Department are sought after and the University has made retention offers in response to their external recruitments.**

   Plaintiff agrees that her female colleagues are not disadvantaged:

   A. I don't think there's anyone in my department who wouldn't be able to -- to get an outside offer if that was their -- their particular goal.

   Q. Is that because they're all meritorious and another institution would be willing to hire them?

Page 33 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

A.  Yes.  (Freyd Tr. Vol. 1, 151:15-24.)

\* \* \* \* \*

Q.  Do you believe that every pro -- are you telling me you believe that every full professor in the psychology department could, if he or she wished, obtain an outside offer?

A.  I believe so, yes.

Q.  Okay. And that includes you?

A.  Yes.

Q.  Okay. And that includes all the women in the department?

A.  Absolutely.  (Freyd Tr. Vol. 1, 152:12-21.)

The undisputed evidence shows that when women from her department have received outside offers, the University has responded with retention adjustments to keep them in Oregon. That includes Crystal Dehle, Dare Baldwin, Heidemarie Laurent, twice to Jennifer Pfeifer, and Jane Mendle (Sadofsky Decl. ¶ 4).  Plaintiff is unable to identify any woman from her department who was denied a retention offer as a response to external recruitment (Freyd Tr. Vol. 1, 127:19-24), and she cannot name any women in the last 10 years who left the University because they did not receive a satisfactory retention offer (Freyd Tr. Vol. 1, 127:25–128:11), although she knows of at least two men who were not satisfied with their retention offers and chose to leave (Freyd Tr. Vol. 1, 99:11-15).  Dare Baldwin, a woman, "got the first really big retention raise ever, ever done in our department," one that was "huge" for the time (Mayr Tr. 236:13-19, 237:22-25).

The undisputed evidence, and the applicable law, are an insufficient basis to challenge the University's necessary and nondiscriminatory retention process.

**5.  The University's retention adjustments do not result in a disparate impact against women, and have not affected plaintiff personally because of her gender.**

Plaintiff asserts discriminatory impact theories based on retention adjustments, arguing that they violate federal and state law.  The law and the undisputed facts bar these claims for three reasons:  first, retention adjustments do not have a disparate impact on a minority group of women.

Page 34 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

They affect other faculty, men and women, in the same way. Second, plaintiff made a personal decision to opt-out of considering a move to another institution; her decision was not imposed on her by the University and accordingly there is no evidence of causation. She cannot base a claim on a decision that she made. Third, there is no disparate impact on women in the Psychology Department.

(1)    A disparate impact theory requires a plaintiff to show that an event or decision adversely affects a protected group that is in the minority. It does not permit a claim where the event or decision affects employees in general. When plaintiff complains that retention adjustments put salaries out of alignment, she speaks of "people," men and women alike, being affected (Freyd Tr. Vol. 1, 134:7–135:1), creating a "lasting enduring inequity across **people**" (Freyd Tr. Vol. 1, 101:14-16, emphasis supplied). Department head Mayr agrees that "what is openly discussed is that people are unhappy about the range of disparity in the department" (Mayr Tr. 211:20-23) but "most people also recognize that it would be tough to be or stay a top department if we simply gave up on retention situations" (Mayr Tr. 211:23–212:1). So, when Phil Fisher received a recent pay increase to encourage him to reject Harvard's offer, other faculty–women AND men–did not receive the same pay increase. A retention offer to one faculty member affects all men and women who did not receive the same offer in the same way; that does not support an actionable theory of disparate impact discrimination. A disparate impact theory is a theory of discrimination, not a way to complain of unfairness or generalized inequity. *See Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486 (9th Cir. 1993) ("[T]he plaintiff must prove *** that the employee population in general is not affected by the policy to the same degree"). *See also Stockwell v. City & Cty. of S.F.*, 749 F.3d 1107, 1115 (9th Cir. 2014) ("In whatever procedural guise a disparate impact claim appears, the party asserting it must demonstrate a statistical disparity affecting members of the protected group. Absent such a group-based disparity, the claim fails, whether it is articulated by an individual or a class"). And, *see Pena v. Hous. & Cmty. Serv.*

Page 35 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

*Agency*, No. 09-6150-TC, 2010 U.S. Dist. LEXIS 89743 (D. Or. Aug. 30, 2010), addressing impact claims under Title VII and ORS Ch. 659A and stating:

> A claim of disparate impact challenges "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977). To establish such, Pena must show a significant disparate impact on a protected class caused by a specific, identified, selection process.

2010 U.S. Dist. LEXIS 89743, at *28.

Nick Allen's 2017-18 retention adjustment is a compelling illustration of how retention offers affect men and women alike. When his compensation was increased from $132,216 to $160,000 to encourage him to remain with the University, that increase meant Professor Allen was paid more than plaintiff, but it also meant he was paid more than male Ulrich Mayr for the first time, and it further increased the distance between the higher paid Professor Allen and the lower paid males, Professors Moses and Saucier (Mayr Tr. 181:15-25; Larson Decl. Ex. A).

(2)    Plaintiff's personal decision not to entertain the possibility of moving from the University of Oregon is a second reason her impact theory fails. A disparate impact theory cannot be asserted by an employee who has not been personally adversely affected. *See Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir. 1987) (employee could not assert disparate impact claim to challenge English-only order because he was fluently bilingual and could easily conform to the order), *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1487 (9th Cir. 1993) (there is no disparate impact with respect to a privilege of employment "if the rule is one that the affected employee can readily observe and nonobservance is a matter of individual preference"); *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749-50 (9th Cir. 2003) (plaintiff must actually have been adversely affected by the practice complained of). And *see Pena v. Hous. & Cmty. Serv. Agency*, No. 09-6150-TC, 2010 U.S. Dist. LEXIS 89743, at *30 (D. Or. Aug. 30, 2010) ("Here, the base population is the number of receptionists who have applied for promotion. Receptionists who have not applied for promotion are not a relevant part of the base population"). In similar fashion, plaintiff elected not

to look at what other institutions might offer her, so took herself out of consideration for a retention adjustment.

(3)    A third reason plaintiff's impact claim fails is her own testimony about the breadth of options available to her women colleagues in the Psychology Department, each of whom could, if she wished, attract an outside offer (Freyd Tr. Vol. 1, 152:12-21).  The undisputed evidence supports that belief:  in 2017 two of the four retention offers were made to women and two to men (Sadofsky Decl. ¶ 4).  The department also made a retention offer to Heidemarie Laurent, but not to her employed husband (Mayr Tr. 178:8-18), and has made offers to Jennifer Pfeifer, Dare Baldwin, and Chrystal Dehle.  See the discussion supra.

To establish a prima facie case on a disparate impact theory, plaintiff must: (1) show a significant disparate impact on a protected class; (2) identify the specific employment practices at issue; and (3) show a causal relationship between the challenged practices and the disparate impact. *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1190 (9th Cir. 2002); 42 U.S.C. § 2000e-2(k). The prima facie case does not, however, mean the practice is unlawful.  Admissible and reliable evidence is a necessary element to an impact claim and the statistics must be appropriately comparable.  *Budnick v. Town of Carefree*, 518 F.3d 1109, 1118-19 (9th Cir. 2008) (national statistics not relevant to dispute related to city; appropriate comparables must focus on local market).  Plaintiff must also identify the specific employment practice or selection criteria being challenged, and must prove causation, "that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988)).  The statistical disparities "must be sufficiently substantial that they raise such an inference of causation." *Id.*

Plaintiff admits she lacks this proof.  She has not seen any statistics showing that retention adjustments result in a departmental impact (Freyd Tr. Vol. 1, 150:22–151:7).  She believes, but

Page 37 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

cannot support, that recruitment and/or retention is more difficult for her women colleagues (Freyd Tr. Vol. 1, 148:4-25).  She does not know of any external offers that were based on gender (Freyd Tr. Vol. 1, 145:10-16), and knows of no data about the effect of retention offers on women as opposed to men at the University (Freyd Tr. Vol. 1, 147:14-22).

In short, plaintiff falls short of meeting her burden to show a prima facie case of disparate impact discrimination based on retention adjustments.  The practice affects men and women equally, plaintiff has not personally been affected given her choice not to entertain external offers, and she admits she does not show that there is an impact.

### 6. Principles of discretionary immunity and the academic freedom of a public entity preserve the right of the University to determine its priorities and how to allocate the University's scarce resources.

Discretionary immunity protects University decisions involving policy choices about what concentrations and academic disciplines the University and its leadership will support.  Oregon law commits the overall oversight, management, and administration of the University's academic programs and budget to the University's leadership, including the Board, President, Provost, and Deans.  As set out in ORS Ch. 352, including 352.033, 352.054, 352.089, 352.096, and 352.146, they are responsible for making decisions about which academic programs to introduce, retain, and support; how to support the education of the undergraduate and graduate student body; how to maintain the University's R1 status; how to allocate scarce operating resources to best serve the University community; and how to judge the importance of introducing and supporting institutes, programs, and grant activities.  Those decisions extend to the recruitment of prominent or promising faculty and to decisions about whether and how to respond to recruitments of University faculty by other institutions.  They are made, as they should be, by those persons who best know the University, understand the fiscal plans, and have the critical knowledge to evaluate the kind of damage that could result from a loss of a faculty member or program.

The Tort Claims Act, ORS 30.260 to 30.300, supports those decisions by decreeing that public bodies are immune from liability for "any claim based upon the performance of or the failure

Page 38 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

to exercise or perform a discretionary function or duty, whether or not the discretion is abused."
ORS 30.265(3)(c) [now 30.265(6)(c)].  A determination of whether a governmental entity enjoys
immunity is a question of law.  *McDowell by & Through McDowell v. Evey*, No. 97-35422, 1999
U.S. App. LEXIS 1216, at *9 (9th Cir. Jan. 26, 1999).  Whether to make retention adjustments to
retain certain faculty is such a discretionary policy decision that involves a policy choice whether
to fight for key faculty and programs or let them leave, whether an academic area is linked to a
single person or can be taught by others in the field, and whether the loss of faculty who have
attracted important external funding might strike a critical blow to a program. *See Turner v. State*,
359 Or. 644, 652-53, 375 P.3d 508 (2016) ("As this court explained in *McBride v. Magnuson*, 282
Or. 433, 437 (1978), 'insofar as an official action involves both the determination of facts and
simple cause-and-effect relationships and also the assessment of costs and benefits, the evaluation
of relative effectiveness and risks, and a choice among competing goals and priorities, an official
has "discretion" to the extent that he has been delegated responsibility for the latter kind of value
judgment'").

These same considerations are accorded great respect in decisions reflecting academic
freedom.  In *Sweezy* v. *New Hampshire*, Justice Frankfurter summarized these principles as his
four essential freedoms:

> It is the business of a university to provide that atmosphere which is most conducive
> to speculation, experiment and creation. It is an atmosphere in which there prevail
> "the four essential freedoms" of a university -- to determine for itself on academic
> grounds who may teach, what may be taught, how it shall be taught, and who may
> be admitted to study.

354 U.S. 234, 263 (1957).  And *see Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985),
further articulating "a reluctance to trench on the prerogatives of state and local educational
institutions and our responsibility to safeguard their academic freedom" and cautioning the
exercise of "great respect for the faculty's professional judgment" when the question is the
substance of a genuinely academic decision.

Page 39 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR
SUMMARY JUDGMENT

The same overarching principles of academic freedom that allow plaintiff to decide how she wishes to devote her work time and energy also protect the University's decisions about how to build and sustain this institution.

Plaintiff is not required to do the kind of day-to-day work that her four male colleagues do–direct clinical training, manage accreditation, serve as department head, manage large federal grants, work with brain scanners, serve in a leadership role at CODAC, obtain funding from Harvard, or any of the other activities that differentiate her work from her colleagues.  But neither is the University required to ignore the different work and the monetary contributions that some of plaintiff's colleagues perform.  "Courts must take caution before displacing reasonable business judgments."  *Hardie v. NCAA*, 876 F.3d 312, 323 (9th Cir. 2017) (court properly declined to disturb employer judgment about the administrative burden of changing its screening of coaching applicants).

**D.    Since 2013 Plaintiff's Employment Has Been Covered by the Terms of a Collective Bargaining Agreement; She Cannot Have a Separate Contract and She Cannot Sue for Breach of the Bargaining Agreement.**

Plaintiff sues in contract because she has been paid less than some of her male colleagues. Plaintiff's breach of contract claim requires consideration in two discrete timeframes because United Academics was certified as the exclusive representative for collective bargaining on April 27, 2012 and a collective bargaining agreement was negotiated effective July 1, 2013 (Sadofsky Decl. ¶ 8, Ex. D).

Plaintiff has not had the kind of duties that have kept others out of the bargaining unit. Oregon's Public Employee Collective Bargaining Act ("PECBA") requires collective bargaining over terms and conditions of employment which include direct and indirect monetary benefits (ORS 243.650(7)), and the specifically enumerated ORS 243.650(7) subjects are *per se* mandatory subjects for bargaining.  *Eugene Educ. Asso. v. Eugene Sch. Dist.*, 58 Or. App. 32, 35, 648 P.2d 56, 58 (1982).  Plaintiff cannot sue for breach of the bargaining agreement which has its own grievance provisions and is subject to Oregon's Employment Relations Board which is responsible

Page 40 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

for implementing the terms of the Act. *Ahern v. Or. Pub. Emples. Union*, 329 Or. 428, 434 (1999). *See Huffman v. Scappoose Sch. Dist. No. 1 J*, No. 3:14-CV-00941-MO, 2015 U.S. Dist. LEXIS 97971, at *36-37 (D. Or. July 28, 2015), citing *Richard v. Portland Gen. Elec.*, 83 Or. App. 59, 730 P.2d 578, 579 (Or. Ct. App. 1986) ("When an employee fails to utilize contractual procedures for grievances and arbitration, 'state and federal policy favoring the exclusivity of remedies provided in collective bargaining agreements bars any common law claim for breach of contract, unless plaintiff alleges facts that would establish an exception…").  Plaintiff does not have a separate agreement alongside of the bargaining agreement (Freyd Tr. Vol. 1, 67:21–69:2).  She has never filed a grievance (Freyd Tr. Vol. 1, 199:16-19).

Plaintiff has not identified any pre-union agreement that the University failed to honor. Her only possible agreement is her initial 1987 "notice of appointment and contract" (Freyd Tr. Vol. 1, 67:8–69:2).  That document, however, was limited to her first position with the University, her untenured associate professor position.  She left that role a long time ago and has been a full professor since 1992 (Freyd Tr. Vol. 1, 61:2-3).

"To state a *prima facie* claim for breach of contract under Oregon law, a complaint must allege (1) the existence of a contract; (2) its relevant terms; (3) plaintiff's full performance and lack of breach; and (4) defendant's breach resulting in damage to plaintiff." *Ewing v. Country Mut. Ins. Co.*, No. 2:11-cv-968-SU, 2012 U.S. Dist. LEXIS 68556, at *7 (D. Or. Apr. 25, 2012), citing *NW Nat. Gas Co. v. Chase Gardens Inc.*, 333 Or. 304, 312-13 (2002).  Plaintiff has not met her burden to prove those required elements.

**E.      The Individual Claims Against Hal Sadofsky Should Be Dismissed.  There Is No Equal Protection Violation, He Did Not Discriminate Against Her, and He Is Protected by Qualified Immunity.**

Plaintiff sues Sadofsky, a divisional dean, alleging that he violated the Equal Protection Clause of the Fourteenth Amendment when he did not raise her pay.  There is no actionable claim against Sadofsky because she does not have an actionable claim against the University.  Her compensation was not the product of sex discrimination.  Even if it were, such a claim against

Page 41 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

Sadofsky requires proof of his personal intentional discrimination. Sadofsky was not a decisionmaker in setting plaintiff's compensation (Sadofsky Decl. ¶ 2). When she complained, he did a thorough review and concluded, reasonably, that there had been no discrimination. Moreover, to the extent any differential is a result of retention adjustments, Sadofsky's decisions are shielded by qualified immunity because there was not, and is not, a clearly established law that holds that a public employer is forbidden from raising an employee's pay to encourage him or her to turn down a competing offer.

The claim against Sadofsky should be dismissed for the same reasons that the underlying claims against the University should be dismissed: plaintiff was not compensated in a discriminatory manner, and absent proof of intentional discrimination there is no violation of the Equal Protection clause of the Fourteenth Amendment. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (whether there is a constitutional violation is a proper initial inquiry). Plaintiff compares herself to males who do substantially different work. Professor Mayr is department head and her supervisor with different duties, responsibilities, and accountabilities. Professors Fisher and Allen run major external federal grants, supervise a number of employees, prepare and manage grant budgets, are accountable to the federal government for their research and the work of those under their supervision, carry out their research with physically invasive methods, and they have added responsibilities in their work at directing clinical training. Professor Hall had a separate appointment with CoDaC assisting other faculty with their research, and directing clinical training in psychology along with managing its accreditation. Plaintiff has not done those duties. Her claims, instead, rest on the disfavored theory that she and her four male colleagues are all faculty and therefore do equal work.

In order to proceed to trial in this claim, plaintiff is required to prove Sadofsky's intentional discrimination. *Lee v. City of L.A.*, 250 F.3d 668, 686-87 (9th Cir. 2001) (a discriminatory purpose "implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"); *Chavez*

Page 42 – DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

*v. Tempe Union High Sch. Dist.*, 565 F.2d 1087, 1095 (9th Cir. 1977) (because section 1983 incorporates terms of the constitution itself, an action relying on the Equal Protection Clause requires proof of discriminatory intent); *Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214, 1227 (D. Or. 2016) (same).  The claim cannot be established by "mere indifference." *Thornton v. City of St. Helens,* 425 F.3d 1158, 1167 (9th Cir. 2005).

Plaintiff lacks evidence to allow this claim to proceed to trial.  Sadofsky, who is a mathematics professor and not a member of the Psychology Department, did not set plaintiff's salary (Sadofsky Decl. ¶¶ 2, 12).  Plaintiff alleges that as divisional dean he did not address gender-based inequities in compensation.  The undisputed facts show the opposite–that Sadofsky conducted a careful and thoughtful analysis and evaluation of plaintiff's compensation complaints.

Plaintiff had expressed her own concerns that there was a gender disparity within her department, looking to her own data analysis which evaluated salary in terms of seniority only.  The issue was raised in a faculty meeting that Sadofsky attended; he heard the complaint, took the information, and then evaluated it (Sadofsky Decl. ¶ 6).  He met with plaintiff personally, studied plaintiff's data and charts, considered the small size of plaintiff's data set, and considered that plaintiff's analysis improperly disregarded important factors other than seniority (Sadofsky Decl. ¶ 6).  Using plaintiff's own data, he corrected the analysis to consider retention adjustments.  He concluded her hypothesis was faulty and believed that her data, graphs, and scatterplots did not provide evidence of gender bias (Sadofsky Decl. ¶ 6).  *See Rudebusch v. Hughes*, 313 F.3d 506, 517 (9th Cir. 2002) (no compelling government interest in adjusting salaries when the differences in pay are neither statistically significant nor conspicuously out of balance overall).

Sadofsky also considered the overall compensation of her department, noting that plaintiff's salary was 9% higher than the average of all full professors.  He considered that for some periods of time she had been paid more than her identified male comparators.  He evaluated her compensation to see if she was an outlier by comparison to the entire division, finding that her salary was actually 20% higher than average and that she ranked sixteenth (out of a total of about

Page 43 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

90) in the entire division (Sadofsky Decl. ¶ 6). He evaluated the impact of retention raises on specific comparators. He compared her compensation to peer institutions within an established external comparison set, finding that plaintiff was paid significantly more than average, even though the University's salaries typically fall behind those comparators. He evaluated her complaint that department head Ulrich Mayr was paid more, but considered also that Professor Mayr had substantial management and administrative duties that she did not share, that he had secured substantial external grant funding, and that he had been provided a retention increase at the time of an outside recruitment that could have resulted in the loss of the funding he brought into the University. He evaluated her complaint that Professor Fisher was paid more, and considered that Professor Fisher had substantially different day-to-day responsibilities including personnel management, and that he had secured major external grant funding. He considered that Professor Allen had materially different duties and maintained substantial external grant funding with the duties, responsibilities, and accountabilities that entails. He considered that Professor Hall had a very different position, reporting to the Vice President for Equity & Inclusion. He considered that Professors Saucier and Moses, both males, were also dissatisfied with their compensation and expressed feeling underpaid (Sadofsky Decl. ¶ 6). Nothing in his analysis evidences intentional gender bias.

The only other information plaintiff supplied in support of her argument that Sadofsky failed to resolve her pay complaint is that once Sadofsky asked her about her research data when she was looking into the extent of assaults on campus. The entire exchange was in writing (Sadofsky Decl. ¶¶ 13-16) and its discussion about research techniques, ending with plaintiff's thanks for his contribution, cannot plausibly be re-characterized now as evidence of an overarching gender bias (Sadofsky Decl. Ex. E). Nothing in their exchange has anything to do with pay.

Even if plaintiff had somehow gotten over these hurdles, her claim against Sadofsky is precluded because Sadofsky plainly has qualified immunity. To proceed to trial on this theory,

Page 44 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

plaintiff must demonstrate that Sadofsky knowingly violated clearly established constitutional law. *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir. 1998).

Plaintiff must also demonstrate not only that the constitutional right in question was clearly established, but that its contours were sufficiently definite so that any reasonable official would have understood them. *Kramer v. Cullinan*, 878 F.3d 1156, 1163 (9th Cir. 2018). Here, Sadofsky's analysis showed that plaintiff's complaints were about four men who did different work, that plaintiff was paid above the external market comparators typically used by the University, that her charts and graphs were deficient in that they looked only at one factor, seniority, and that her male comparators had received raises to persuade them not to leave in the face of attractive offers from other universities which she never pursued. "Clearly established law" supports Sadofsky's considerations, not plaintiff's. The applicable legal standard "allows ample room for reasonable error" on his part, *Knox v. Southwest Airlines*, 124 F.3d 1103, 1107 (9th Cir. 1997), and it protects a public employee from personal liability when he reasonably believes that his or her conduct complies with the law, *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). His diligent and thoughtful work when plaintiff complained meets that standard.

## IX. CONCLUSION

Plaintiff is and has been a valued scholar in the University's Psychology Department. That was the case three decades ago when the University recruited her with a package that included everything she asked for, and it has been true over the years and manifested by the internal research funding the University has provided her from its own budget. Nothing in this written argument is meant to imply anything to the contrary. This lawsuit, however, is about her specific claims–the reasons for the differential between her compensation and that of her colleagues Professors Mayr, Allen, Fisher, and Hall.

Many factors contribute to the level at which a faculty member at the University is compensated and how one scholar might be differentiated from another; gender is not one of them. In the case of Professor Freyd, those factors start with the differences in day-to-day duties. As the

Page 45 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

law requires, employee compensation comparisons start with comparing like to like.  The four men Professor Freyd has chosen for comparison do different work, in different ways, and have different responsibilities.  If she had chosen to compare herself to some of the other men in her department, the wage differential would have shown her being paid more than her male colleagues.  If she had evaluated her compensation based on averages, the data would have shown her earning more than the average of the male full professors.

One of the factors that differentiates Professor Freyd's work from the four men she has named, just like it separates those same men from their other male colleagues, is that they are and have been prolific in bringing in federal research funds to the University.  They have had great success in this funding activity, and that success makes them key to the University's strategic plans.  Getting those external and federal grants in the first place is hard and specialized work, and managing them to completion is a complex undertaking that fills a significant percentage of their work days.  The University rightfully needs to retain them because they allow the important research work of this University to proceed.  They also provide operating funds for the University so that it can offset the impact of lower public funding of education, which happens in Oregon, and can operate this University without placing a greater burden on the finances of its students.

Grant funding, so important to this University, is also important to other institutions.  When key funded faculty are targeted by other institutions, the University has had to make hard decisions about where to allocate its spending, what areas of research to fund, and what scholarship will best serve the institution and its students.  That can mean, as it has in the case of some of the faculty in the Psychology Department, that the University pays a raise to keep someone from leaving.  That happens with men, and it happens with women.

//

//

//

Page 46 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

The federal and state pay equity laws are important to the University.  On the undisputed facts, as the evidence and this memorandum show, the University has honored those laws and has not breached them in setting plaintiff's compensation.

DATED this 16th day of November, 2018.

BARRAN LIEBMAN LLP

By *s/Paula A. Barran*
_____
Paula A. Barran, OSB No. 803974
pbarran@barran.com
Shayda Zaerpoor Le, OSB No. 121547
sle@barran.com
Donovan L. Bonner, OSB No. 181929
dbonner@barran.com
Attorneys for Defendants University of Oregon and Hal Sadofsky

Page 47 –DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of November, 2018, I served the foregoing **DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT** on the following parties at the following addresses:

Jennifer J. Middleton
Caitlin V. Mitchell
Johnson Johnson Lucas & Middleton, PC
975 Oak Street, Suite 1050
Eugene, OR 97401-3124
jmiddleton@justicelawyers.com
cmitchell@justicelawyers.com
Attorneys for Plaintiff

Whitney Stark
Albies & Stark, LLC
210 SW Morrison Street, Suite 400
Portland, OR 97204-3189
whitney@albiesstark.com
Attorneys for Plaintiff

Stephen F. English
Cody Weston
Nathan R. Morales
Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
senglish@perkinscoie.com
cweston@perkinscoie.com
nmorales@perkinscoie.com
Attorneys for Defendant Michael H. Schill

by the following indicated method or methods set forth below:

☒ **Electronic Filing using the Court's ECF System**

☐ **First-class mail, postage prepaid**

☐ **Hand-delivery**

☐ **Overnight courier, delivery prepaid**

☐ **E-mail**

*s/Paula A. Barran*

Paula A. Barran
Shayda Zaerpoor Le

Page 1 – CERTIFICATE OF SERVICE

00723895.1