**Paula A. Barran,** OSB No. 803974
pbarran@barran.com
**Shayda Zaerpoor Le,** OSB No. 121547
sle@barran.com
**Donovan L. Bonner,** OSB No. 181929
dbonner@barran.com
Barran Liebman LLP
601 SW Second Avenue
Suite 2300
Portland, Oregon  97204-3159
Telephone: (503) 228-0500
Facsimile No.: (503) 274-1212
Attorneys for Defendants
University of Oregon and Hal Sadofsky

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Portland

JENNIFER JOY FREYD,

                                    Plaintiff,

            v.

UNIVERSITY OF OREGON,  MICHAEL H.
SCHILL and HAL SADOFSKY,

                                    Defendants.

**CV. 6:17-cv-448-MC**

**DECLARATION OF HAL
SADOFSKY IN SUPPORT OF
DEFENDANTS UNIVERSITY OF
OREGON AND SADOFSKY'S
MOTION FOR SUMMARY
JUDGMENT**

I, Hal Sadofsky, declare as follows:

1)        I am a defendant in this lawsuit and am the Divisional Dean for the Natural Sciences

which is part of the College of Arts and Sciences at the University of Oregon.  The college itself

is divided into three divisions (Humanities, Social Sciences, and Natural Sciences).  The three

divisional deans report to the dean of the college, Andrew Marcus.  My division, Natural Sciences,

includes Psychology and seven other departments.  I have been Divisional Dean since the 2014-

15 academic year (initially my title was Associate Dean). My title was changed to Divisional Dean

in July of 2016 without any other changes associated.  For simplicity going forward I will always

refer to my title as Divisional Dean.  Prior to that I was the head of the Department of Mathematics.

Page 1 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS
UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

Attached to this declaration as Exhibit A is a copy of the Divisional Dean position description for the College of Arts and Sciences which generally describes my duties. Although this draft was written in February 2017, these are generally the responsibilities I had since my initial appointment in July 2014.

2)    Generally speaking my role in determining faculty compensation changes is to assemble and review information from the departments that are part of the Natural Sciences, then make recommendations to the Dean, which are then passed on to the Provost if the Dean agrees with my recommendations. As relates to the Psychology Department I do not have a role in making the initial compensation decisions or recommendations; those are made within the department itself.

3)    Salary and Compensation: Faculty have base academic year salaries (covering the period September 16 to June 15), but for various reasons these salaries will not always perfectly match what they are paid. Here are some relevant examples.

- Don Tucker continues to have an academic appointment in the Psychology Department but has been on an extended leave without pay since March 2001. He continues to have an assigned base pay rate, but since he has been at 0% FTE that entire time, he has not been paid by U. Oregon during that period. The assigned base pay rate is the rate to which the faculty member on leave would return upon a return to 100% FTE.

- Paul Slovic also continues to have an academic appointment in the Psychology Department but has also been on an extended leave without pay. He continues to have an assigned base pay rate, but since he has been at 0% FTE while on this extended leave, he has not been paid by U. Oregon during that period.

- Faculty who teach during the summer receive additional pay for that teaching.

- Some faculty have research time paid by grant funding during the summer and receive pay for that from the grant, not from general university funds.

Page 2 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

- Jennifer Freyd in 2018-19 is at .5FTE at her request (see below). So while her base academic year salary is for full time employment at 1.0FTE, she will receive half of that during the 2018-19 academic year.

- Faculty members who are on sabbatical for the entire year (faculty may apply to do this for research purposes after six years of full time service) are paid 60% of their base academic year salary for that period.

4)      Retentions: I am familiar with retention adjustments offered to personnel within the Psychology department during the time I have been Divisional Dean for the Natural Sciences. I also have more limited records going back to 2011 left by my predecessor. From 2011-2018, based on my memory and my limited historical records, Psychology retention adjustments have been offered to the following faculty (when there have been multiple retention offers, the recipient is listed in each applicable year):

2011 – Scott Frey

2012 – Cliff Kentros; Jane Mendle

2013 – Gordon Hall; Jennifer Pfeifer; Elliott Berkman

2014 – Ed Awh; Ed Vogel

2015 – Gordan Hall; Heidimarie Laurent; Phil Fisher

2017 – Nick Allen; Dare Baldwin; Nash Unsworth; Jennifer Pfeifer

2018 – Crystal Dehle; Phil Fisher

5)      Not all faculty accept the retention adjustments. For example, in 2014 Ed Awh and Ed Vogel found the offers they had in hand from University of Chicago more attractive than the University of Oregon's retention offers. Additionally, some retention offers do not result in salary adjustments at all. That was the case in 2015 with Gordon Hall and in 2018 with Phil Fisher. When salary is adjusted to retain a faculty member, it represents a positive effect for the individual being retained – that individual would typically but not always see an increase in compensation offered to retain a valuable scholar at risk of being lost to another institution. When there is a

Page 3 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

retention adjustment for a faculty member, the University typically does not increase the compensation for other faculty members, men or women.  Because of that, when one faculty member receives a salary raise in connection with a retention adjustment, that raise may increase the "spread" between the recipient in comparison to other faculty members (men and women) who are or have been earning a lower salary.  Sometimes the raise can increase the salary of the recipient above the salary of a faculty member who previously earned more than the faculty member being retained.  An example of this is Prof. Allen's retention salary increase in 2017-18.  Before that increase, Prof. Allen was paid less than Jennifer Freyd; after the increase he was paid more.  But before that increase Prof. Allen was also paid less than Ulrich Mayr whereas after the increase he was paid more than Ulrich Mayr.

6)      Prof. Freyd's request for an equity adjustment:  In January 2017, I met with Jennifer Freyd, David Cecil from the faculty union United Academics, and Dean Andrew Marcus to discuss Jennifer Freyd's specific request for a retroactive equity adjustment to her salary.  She had prepared certain charts or scatterplots which showed various faculty within the Psychology department plotted by different measures of seniority and compensation.  I was already aware that she had concerns about her salary because the department head of Psychology had raised those concerns earlier, in Fall 2016, and I had attended a faculty meeting where they were referenced.  At the faculty meeting, I responded to express concern even though I had not had done a complete analysis of the salary structure in the department.  I pointed out, both to the Psychology faculty and to the department head:

- Article 26, Section 11 of the CBA (Exhibit B) is a collectively bargained mechanism designed to look for and address concerns about gender equity in salary overall, and also

- Encouraged the faculty to press both the faculty union and the administration to allocating some of the salary increase funds in the next CBA to equity raises.

Page 4 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS
UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

00723895.1

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

After that faculty meeting, I had an opportunity to review the materials more carefully and I disagreed that they demonstrated gender discrimination. I reviewed the issues raised about Prof. Freyd's compensation carefully and ultimately concluded her compensation was not unfairly, discriminatorily or improperly set. I believed that to be the case regardless of whether one considers gender, internal equity, or external equity. Prof. Freyd did not present any new or different information at our January 2017 meeting that changed my opinion and I continue to hold that view today. My considerations include the following:

a. When I received materials from Prof. Freyd, I conducted my own analysis of salaries in the Psychology Department, in the College of Arts and Science and compared to other Psychology departments in the group of public university members of the American Association of Universities (this is a group to which the University of Oregon belongs, and is a set of comparators we use).

b. External equity within the Natural Sciences: Faculty salaries at the University of Oregon are generally toward the lower end of salaries at the group of AAU public universities. I believe this is most likely explained by the fact that the University of Oregon's state funding is also at the low end compared to other AAU public universities. As an example, the average salary for a full professor (including men and women) in the Natural Sciences at the University of Oregon in 2016-17 was $129,500. The average salary for a full professor in the Natural Sciences at AAU public universities (also including men and women) was $147,200. Prof. Freyd's salary that January was $155,237. That contrasted significantly with my observation that faculty salaries at the University of Oregon are generally on the lower side in comparison to the AAU public universities and the vast majority of full professors are paid less than the AAU average for full professors. Prof. Freyd is an exception to this, with a salary 5% higher than the AAU public average for full professors in the Natural Sciences. In other words, in my view the fact that the average full professors earned less than the

Page 5 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

AAU public average but Prof. Freyd earned more illustrated a more favorable result for her in comparison to her colleagues.

c. Internal equity within the Natural Sciences: Prof. Freyd's salary is 20% higher than the average Natural Science full professor salary at the University of Oregon. Of the approximately 90 full professors in the division, Prof. Freyd was the 16th highest paid, meaning her salary was higher than more than 80% of the full professors in the Natural Sciences.  Of the 15 full professors in the Natural Science division with a salary higher than Prof. Freyd's, three are in Computer Science (where salaries average about 20% higher than the rest of the Natural Sciences), two are members of the National Academy of Sciences (in which membership is by election and represents a great honor reserved for the most distinguished scientists), four are department heads or former department heads, two others  have signed up for retirement (which comes with a corresponding 6% pay boost for the last three years before retirement), one is a very senior faculty member with a distinguished scholarly record, and the remaining three are faculty with extensive external funding who have been recruited by other universities and for whom the University of Oregon has made the strategic decision to raise their salary in order to retain them (see my discussion of these individuals, below).

d. Internal equity within Psychology: In the Psychology Department, the average salary for a full professor in that year was $142,600.  Prof. Freyd's salary was 9% higher, and is higher than most other faculty members in the department (including most full professors, both male and female).  Prof. Freyd's assertion that her pay is not equitable relies on comparison with a subset of the department, a small and specific group of just four other faculty members.  This group is too small to make statistical inferences from. The salaries of these four faculty members reflect retention raises made to encourage these faculty members to remain at the University in the face of external offers.  If we examine the duties and responsibilities of these faculty members individually, as I do

Page 6 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

below, we also see that they are different from Prof. Freyd's in ways that may help explain why they have had external offers that the University has chosen to respond to with retention raises. I believe their external offers are partly based on the different nature of the work these faculty members do, and because the University also values this work very highly as a result of the University's strategic choices, the University responded to these external offers with retention raises. I summarize below what is special about the work of these four individuals that both attracted outside offers, and in my view justified the strategic decision to make retention raises to keep them.

- o Ulrich Mayr: Prof. Mayr is the department head. This is a leadership role which comes with a raft of responsibilities that are not shared by regular faculty in the department and are not and have not been shared by Prof. Freyd, including budgeting, adjustment of faculty grievances, staff supervision, overall supervision of junior faculty, and management of the tenure and faculty review process (see Exhibit C attached, which describes the responsibilities of the department head). In addition, as department head, Prof. Mayr has supervisory responsibilities over Prof. Freyd. Prof. Mayr has also brought in over $1 million in external funding to the University in the last five years, and is regularly well-funded. This makes him an attractive external target; the University has had to give him a retention raise in the past in order to keep him (as well as the funding he brings in, which benefits the department and the University) at University of Oregon. He has also had a raise in compensation for the responsibilities of serving as department head. Before Prof. Mayr accepted the position of department head, Prof. Freyd's compensation was higher than his.

- o Phil Fisher: Prof. Fisher is the director of the Center for Translational Neuroscience (CTN). He also has brought in an average of over $1.5 million

Page 7 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

per year in external funding in the last five years.   Besides three core faculty, the CTN currently has six affiliated faculty, four postdocs, 18 graduate students and five staff.  In addition to his duties as CTN director, the extensive grant funded research that Prof. Fisher conducts has duties and responsibilities that are very specific to the nature of the work that he does and include:

- Personnel employment and supervision of a number of employees.
- Compliance with federal research protocols, spending protocols and accountability rules, maintenance of documentation including technical and administrative reports.  Preparation of justifications, appropriate acknowledgement of federal support, and more.  There are about 150 pages of NIH requirements, for example.
- Continual efforts preparing lengthy grant applications (which can be over 100 pages long), competing for funding, spending funds at a rate that both accomplishes the necessary research and keeps the most valued research personnel employed, and bringing in grants that contribute to the overhead costs of the University and which also allow the University to provide internal funding to some faculty who do not themselves bring in such funding.

Prof. Fisher is also the leading member of a group of three high-performing faculty members (Fisher, Jennifer Pfeifer, Elliott Berkman) all of whom are successful at bringing in considerable external grant funding, all of whom are sought after by other universities, and all of whom do work that is strategically important to the University.  The University has made significant retention offers to all three of these faculty members in the face of recruitment by other universities.  As Prof. Fisher is the senior member of this group, retaining Prof. Fisher is also key to retaining Profs. Pfeifer and Berkman.  A further factor that

Page 8 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

distinguishes Prof. Fisher from Prof. Freyd and other faculty is that he has has succeeded in securing grant funding that pays for his own compensation. In the 2017-18 academic year, for example, 100% of Prof. Fisher's salary was provided by his external grant funding. In the preceding two academic years, 80% of his salary was provided by his external grant funding. In 2014-15 his external grant funding provided 49% or his salary. In 2013-14 his external grant funding provided 35% of his salary, and for the two academic years before that, his external grant funding provided 25% of his salary.

o Nicholas Allen

- Prof. Allen is Director of the Center for Digital Mental Health (10 affiliated faculty from multiple institutions, seven Ph.D. students at Oregon, three research personnel).

- Director of Clinical Training. Prof. Allen currently serves (as have Prof. Hall and Prof. Fisher) as the Director of Clinical Training, a time-and-responsibility intensive position that includes as well as the responsibilities referenced below in connection with Prof Hall:

  - Administer clinical training program.

  - Maintain APA accreditation.

  - Oversee graduate program and staff of clinical program.

- In addition to the duties above, Prof. Allen maintains an external funding program at about $200,000 per year. This includes the same set of duties listed above for Prof. Fisher. His overall grant funding is also remarkable because he has not been with the University for the length of time that other faculty have been and he made the transition to Oregon from Australia. He has been a target for recent external recruitment. I believe this is in response to his level of grant funding and level of

Page 9 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

productivity.  This has also made it important strategically for the University to retain him. I do not believe this would have been possible without an increase in compensation.

o   Gordon Hall

▪   Although not true currently, during the period 2003-2014 (with the exception of 2007-2010) Prof. Hall served as the Department's Director of Clinical Training.  He undertook that responsibility twice, and each time accepted the considerable responsibilities that went into managing the accreditation process.  The Director role is time consuming and imposes qualitatively different responsibilities than by faculty who are not in that role, and filling the Director role during the accreditation or re-accreditation process adds a greater level of complexity and accountability along with duties and obligations that occupy a great amount of the Director's time.

▪   During 2008-2015, Prof. Hall held an administrative position or positions with the Center on Diversity and Community (CoDaC) where he was Associate Director of Research.  This unit does not report to me so I know little of its day-to-day operation; however, work for CoDaC is by its nature different from the typical faculty duties of scholarship and teaching.

▪   During 2015-17, Prof. Hall served as Director of CoDaC.  As above, I do not know what the day-to-day duties are, though I know some of them since we shared efforts on some projects.  This is again work that is different from typical faculty duties.

Page 10 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

- In his CoDaC positions, Prof. Hall did not report in to the Department of Psychology (nor, by extension, to me) but rather worked under the direction of the Vice President for Equity and Inclusion.

- Prof. Hall has been externally recruited. I believe that to have resulted from his record of generous external funding and strong productivity in addition to his work as clinical director and possibly attention he has attracted through his work on university diversity efforts.

- Prof. Hall's current high salary is the result of many factors. He was recruited to the University of Oregon many years ago and like many outside recruitments the University had to pay enough to attract him to move to Oregon. He was the target of outside recruitments on at least two occasions because of the work he did at Oregon, he held administrative appointments with CoDaC doing work on which the University placed very high value and which was different from the kind of work he had done as a professor of Psychology.

- Dr. Hall recently rejoined the Psychology Department. He has announced his retirement which puts in place a 6% compensation increase. This is so for all faculty.

e. There are certain important common features of all four of these faculty members identified by Prof. Freyd in her lawsuit (Mayr, Fisher, Allen, Hall):

   o They had significant external funding which dramatically changes the nature of their day-to-day work. For the period of time I reviewed in considering Prof. Freyd's compensation concerns, she had no external funding (my review at the time went back through 2013). In Prof. Fisher's case, his external grant funding paid a substantial part of his salary and currently funds all his salary.

Page 11 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

- o They had significant administrative duties, some outside the department, which also dramatically changed the nature of their day-to-day work. Prof. Freyd does not have similar significant administrative duties.

- o They attracted outside offers (I believe largely because of their significant external funding combined with their scholarly record and demonstrated administrative ability).

- o The University made the strategic choice to offer them raises in order to retain them and protect the value to the University of both their administrative contributions and the external funding being brought into the University.

While it is true that these four faculty members are paid more than the other full professors in Psychology (which I believe results from special circumstances applicable to their individual situations and contributions), I also believe that the remaining full professors in the Psychology Department (a mixture of men and women) are nevertheless still compensated well within the University in comparison to faculty generally, and they have received all the normal raises in the University promotion, post-tenure review, across-the-board and merit processes. There are additional factors that influence my conclusion, following my study, that Prof. Freyd was not improperly compensated. These factors all also influenced my conclusion that Prof. Freyd's compensation was not a result of gender discrimination.

f. Instability over time and limited department data: In evaluating Prof. Freyd's complaint, I also considered how compensation varies in a university system from year to year, as well as whether there could even be meaningful information from so small a group.

- o Had Prof. Freyd brought this complaint a year earlier (2015-16), the highest salaries would have been that of a woman, Helen Neville, followed by Gordon Hall, Phil Fisher and Jennifer Freyd. In fact, at that time (2015-16) many of the

Page 12 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS
UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

lowest paid full professors were men. I did not consider this to be evidence of bias against men any more than the salary structure of 2016-17 is evidence of bias against women. A short time earlier, 2012-2014 Kim Espy, a woman, held an appointment in the Psychology Department but (like Gordon Hall) did day to day work in an administrative role. She was paid substantially more than all the other faculty in the department. If Gordon Hall, who held an appointment in the Psychology Department but worked largely at CoDaC, is to be considered in salary comparisons, so should Kim Espy who also held such an appointment but did an administrative role. The number of faculty involved, however, is too small to view as statistically representative of any trend; instead we are simply seeing individual faculty being compensated differently for individual reasons, not because of a class that they belong to.

o Had Prof. Freyd brought this complaint in 2012-2013, the top salaries in her department would have been in descending order Kim Espy, Helen Neville, Gordon Hall, Phil Fisher, Marjorie Taylor, Edward Awh, and Jennifer Freyd. From that I saw no evidence that her gender was a negative factor in her compensation.

o Were Prof. Freyd to bring forward this complaint in 2018-19, we would see, at the junior end of the full professor spectrum, that Jennifer Pfeifer (a newly promoted full professor with an excellent external funding record who was strongly recruited externally and for whom the University made a raise to retain) is at a salary $20,000-$40,000 more than (mostly male) faculty equivalent in seniority or even senior to Prof. Pfeifer by as much as a decade. This will not be evidence of bias against men, rather it is a consequence of the strategic decision to retain Prof. Pfeifer (and the associated external funding).

Page 13 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

g. Adjustment for retention raises: I used Prof. Freyd's own data but prepared my own analysis in which I corrected for retention adjustments. When I did that evaluation, the charts presented a very different picture and a plot of salary against years since promotion to full professor shows data generally lined up along the regression line. Stated in very general terms, that chart supported the hypothesis that pay correlates strongly with seniority for full professors in Psychology except for those individuals who the University retained through a retention adjustment. I do not believe that evidences gender discrimination.

h. A plot showing seniority and compensation, like what Prof. Freyd supplied, is too simplistic to expect it to explain salary completely in several respects. Retention raises have a distorting effect, but are needed if the University is to retain faculty who bring in substantial external funding and who are important for strategic reasons. Another way such plots are too simplistic is that they do not take into account variation over time of starting salary. Generally speaking, people hired later in time start at a higher salary than people who are hired earlier. If the starting salaries increase during a time when faculty salaries have been stagnant (as happens at the University when there is a freeze on salary increases), then someone hired later would benefit from the inflation of starting salaries needed to remain competitive enough to hire successfully, while faculty who have been at the University for a longer period of time would have seen their salaries rise more slowly because of our state government's lower investment in higher education at this University. That is a factor that affects men and women across the board and results from the stresses on the University budget in times of strained state resources.

i. As I have alluded to above, and also important in my consideration is that at various times Prof. Freyd has been paid more than people about whom she complains. For example, she was paid more than Nick Allen for three of the five years that he has been

Page 14 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

at the University, for 2014-15, 2015-16, and 2016-17. His current base salary is $160,000, meaning he is paid $4,763 more than Prof. Freyd. That is due to a retention offer. I cannot see a gender pattern in paying a woman, Prof. Freyd, more than Prof. Allen for all years except when he has been aggressively recruited by an outside institution and the university concluded that his retention was important to its mission and goals. In such case the University made a considered judgment of the importance of retaining Prof. Allen. Prof. Allen is not the only person in a similar situation. Prof. Freyd was paid more than Ulrich Mayr in 2012-13, 2014-15 and 2015-16. That kind of back and forth, with Prof. Freyd being paid sometimes more and sometimes less than the principal men about whom she complains, does not in my view support a suggestion that her compensation is biased against her on the basis of gender.

7)      Prof. Freyd's department head and colleagues have been strong advocates for her and I did not see any indication that her raises were handled improperly within her department due to any gender-based considerations within the department.

8)      In one case a departmental request with respect to Prof. Freyd's salary was not acted on. Prof. Freyd had received an 8% increase in Fall of 2015 as part of the regular 6-year post-tenure review process described in the collective bargaining agreement, Articles 20 and 26 of the 2013-2015 University of Oregon Collective Bargaining Agreement (Exhibit D), and in line with the Psychology Department Head recommendation. This is the highest normal increase available. Sometime during the next year, Prof. Mayr (the Psychology department head) came to me asking if it was possible to retroactively give a larger increase than the 8% that the department had recommended and that the University had given for Prof. Freyd's post-tenure review. My answer at the time was that since I am not the final decision-maker on this, I could not tell him if it was possible to do this retroactively. I also explained to Prof. Mayr that Prof. Freyd's salary was at a level that did not trigger the criteria we use to request "above scale" increases in truly exceptional cases. Those criteria are that either the faculty member is paid significantly less than the average

Page 15 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

full professor in their department with no good explanation, or that the faculty member is paid significantly less than the average full professor in the discipline within the AAU public universities with no good explanation. Neither of these factors applied. Prof. Freyd's salary is (and was at that time) above the average both for full professors in her department and for full professors in Psychology at AAU public universities. I did not then, and I do not now, believe that it was affected by any gender bias.

9)    To summarize, I studied the information Prof. Freyd provided, but I found the analysis to be too simplistic and incomplete and I carried out a considerable analysis of compensation within the department and of Prof. Freyd specifically. Faculty pay is based on many factors other than seniority, and Prof. Freyd is well and fairly compensated by standards of her department, the college, the University, and even the profession. I did not then, and I do not now, believe that her compensation was adversely affected by gender bias. The pay inequalities in Psychology affect men and women and are a consequence of other factors (including retention raises) and not a consequence of gender. It happens that in the year Prof. Freyd filed (2017), Prof. Allen benefited from a retention raise (though the group not benefitting from such raises included both men and women). In other years, as I have shown, the salary situation looks different.

10)    As I do not believe the differences are caused by gender, and this was not presented to me as a case of discrimination but rather as one of generalized equity, I think my response (pointing out that these differences are due to retention raises and related factors) was appropriate and within University policies and the law.

11)    I understand that Prof. Freyd is also critical of my role in retention offers made to her colleagues Dare Baldwin and Nicholas Allen. As context, retention raises (quoting from University policy) "are for faculty who are being actively recruited by other institutions, or where there is compelling evidence that a preemptive action is necessary to prevent the loss of a valued faculty member." Individual requests for retention raises have to be evaluated according to the above sentence. The authority to make retention offers rests with the Provost. I am often the main

Page 16 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

negotiator if the faculty member is in the Natural Sciences, and the Dean and I will certainly discuss the main points and our opinions with the Provost, but we do not have final decision making authority.  During the time I have been in the Dean's office, the University has made retention offers for both men and women in the Psychology department when convinced this was necessary to retain the faculty member. There are levels to how compelling the evidence is that we are presented with:

- Most compelling: a written offer from a strong program at a salary that is higher than the faculty member's salary.

- Moderately compelling: negotiations toward an offer or invitations for a second visit at an institution that is recruiting one of our faculty members.

- Modestly compelling: a job interview at another institution.

- Evidence at different levels receives different responses.  The salary offered by the competing institution can also affect the response.  Other factors include the reputation of the competing institution, the amount of forgone income from grants and other external funding that the University will lose if the faculty member leaves, the replacement cost of the faculty member.

12)      As indicated above, I was not the decisionmaker in these cases.  However I did not consider the handling of these two very different situations to be in any way biased.  Prof. Allen had major external funding for his work and we learned that he was the leading candidate for an important position at University of Birmingham (England).  He is a core member of the clinical psychology faculty here, and his department head describes him correctly as "insanely productive."  It was critical to retain him and we made an offer requiring him to withdraw from consideration at Birmingham.  Dare Baldwin was also under consideration for a position in England, but was one of several candidates under consideration at that time. The University made a more modest retention offer at that point (also requiring her to withdraw from consideration with the other institution, a requirement that is the norm in retention discussions).  She declined to

Page 17 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

withdraw from consideration with the other institution and so did not accept the Oregon offer. The other institution did not proceed with an offer to her. The considerations, and the generosity of the offers, were different for several reasons:

- The University believed that Prof. Allen was a finalist, and he was the only person then being considered, and close to receiving an offer, while Prof. Baldwin was one of several being considered early in the process. That meant, in our view, that Prof. Allen's potential departure was imminent. Prof. Baldwin's was not. In contrast, earlier in her career Prof. Baldwin had been close to leaving the university and it is my understanding that she received a very substantial retention offer and elected to remain with the University.

- Prof. Allen's role in the clinical program, his outstanding productivity, and his external funding profile all increase his value to the University. This is not to diminish the value of Prof. Baldwin's work, which is considerable, but it is on a different scale.

13)    I understand that in Prof. Freyd's lawsuit against me, she asserts that I exhibited gender bias against her because of an email exchange in 2015. This lawsuit is the first time she has made this opinion known to me. The exchange was in writing so it is available for review in its entirety and I maintain that does not exhibit any gender-related bias against her. I am, in fact, surprised that she would say so in her lawsuit. I summarize in the paragraphs below.

14)    Prof. John Bonine, in public comment to the University's Board of Trustees had asserted on June 4th that 20 students per week were victims of sexual assault at the University. I asked Prof. Bonine where this data came from, and he referred me to a survey done by Prof. Freyd and some of her students. I had an email exchange with Prof. Bonine about whether the sample used for the survey might be biased and thus skew inferences about the entire population; my question reflected my interest in understanding the technical sampling. I did not speak to Prof. Freyd about this issue, so I believe that Prof. Bonine must have sent my email to her.

Page 18 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

15)     On June 5th, I received what read to me as a friendly email from Prof. Freyd on this subject.  This and related emails are attached as Exhibit E.  In this email she stated (in agreement with my point) "You are absolutely right that generalizability is an important concern" and she told me that "thanks to thinking about your exchange with John" she planned to do further work on the sampling issue.  I did not read her message to me as being in any way insulted; rather, it appeared to me that she acknowledged that I had asked a question that was worthy of follow-up.  I responded to her that same evening, furthering the discussion on the statistical question of atypical samples, but ended my email by commenting on what I had said to Prof. Bonine in the first place, pointing out that sexual violence on campus was a real problem and that we needed to take real steps to improve it, and that regardless of the possibility of sample bias, the survey indicates an alarming rate of sexual assault, while noting that steps taken to improve things depend to some extent on the details of the problem.   My response email is also in Exhibit E.

16)     I heard nothing back from Prof. Freyd on this subject for three years.  Then, in March 2018, she sent me another cordial email.  This one was directed to me and Dean Andrew Marcus thanking us for supporting her in a fellowship application, was signed "with appreciation" and had a postscript to me that said: "PS Hal, I keep forgetting to alert you to a new publication from my lab that directly assesses the role of self-selection in campus victimization estimates based on climate surveys. (You may remember we discussed this a few years ago.) My team took advantage of how well the UO psychology department structures its own human subject pool in order to get a sample in which self-selection is greatly reduced and we were thus able to compare estimates of victimization rates."  I understood her message to mean that she had considered my question about how sampling could affect the generalizability of survey results, and was pleased to tell me that she had in fact been able to provide evidence that her earlier sampling was likely to be representative.  Again, as I had done three years earlier, I responded that same day, thanking her and indicating I was looking forward to reviewing the information about data collection and analysis.  We had no further communications on the subject.

Page 19 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS
UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

It was not until July, 2018 that I was made aware that Prof. Freyd is now stating in this lawsuit that these email exchanges with her – the entirety of which are supplied with this declaration as Exhibit E – is in her view an expression of bias and discrimination. I disagree. There is a further irony in that the March 2018 exchange is occasioned by Prof. Freyd's acknowledgement of Dean Marcus and me taking the extraordinary step of agreeing to her request for 50% pay during the academic year 2018-19 which she plans to spend entirely at Stanford's Center for Advanced Study in the Behavioral Sciences and therefore non-resident at the University. Agreeing to 50% pay during a year of non-residency is a highly unusual benefit which we agreed to provide to Prof. Freyd to promote her work.

**I declare  under penalty of perjury that the foregoing is true and correct.**

Executed, on November $\underline{13}$, 2018.

_____
Hal Sadofsky

Page 20 – DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS
UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of November, 2018, I served the foregoing **DECLARATION OF HAL SADOFSKY IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT** on the following parties at the following addresses:

Jennifer J. Middleton
Caitlin V. Mitchell
Johnson Johnson Lucas & Middleton, PC
975 Oak Street, Suite 1050
Eugene, OR  97401-3124
jmiddleton@justicelawyers.com
cmitchell@justicelawyers.com
Attorneys for Plaintiff

Whitney Stark
Albies & Stark, LLC
210 SW Morrison Street, Suite 400
Portland, OR  97204-3189
whitney@albiesstark.com
Attorneys for Plaintiff

Stephen F. English
Cody Weston
Nathan R. Morales
Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
senglish@perkinscoie.com
cweston@perkinscoie.com
nmorales@perkinscoie.com
Attorneys for Defendant Michael H. Schill

by the following indicated method or methods set forth below:

☒    **Electronic Filing using the Court's ECF System**

☐    **First-class mail, postage prepaid**

☐    **Hand-delivery**

☐    **Overnight courier, delivery prepaid**

☐    **E-mail**

*s/Paula A. Barran*
_____
Paula A. Barran
Shayda Zaerpoor Le

Page 1 – CERTIFICATE OF SERVICE

00723895.1

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212