Jennifer J. Middleton, OSB No. 071510
jmiddleton@justicelawyers.com
Caitlin Mitchell, OSB No.123964
cmitchell@justicelawyers.com
JOHNSON JOHNSON LUCAS & MIDDLETON, PC
975 Oak Street, Suite 1050
Eugene, OR 97401-3124
Phone: 541-683-2506
Fax: 541-484-0882

Whitney Stark, OSB No. 090350
whitney@albiesstark.com
ALBIES & STARK, LLC.
210 SW Morrison Street, Suite 400
Portland, OR  97204
Telephone: 503-308-4770
Fax: 503-427-9292

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| JENNIFER JOY FREYD, | Case No.: 6:17-cv-00448-MC |
| Plaintiff, | PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| UNIVERSITY OF OREGON, MICHAEL H. SCHILL and HAL SADOFSKY, | ORAL ARGUMENT REQUESTED |
| Defendants. | |

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

## TABLE OF CONTENTS

I.    INTRODUCTION...................................................................................................1

II.   FACTS .................................................................................................................2

    A.   Professor Freyd Is a Highly Successful Scholar Deserving of Pay Equitable to Her Male Colleagues.................................................................................................................2

    B.   Defendants Are Aware of the Psychology Department's Glaring Salary Inequities, But Fail to Correct Them.............................................................................................................4

    C.   UO Has Funds And The Ability To Address Salary Inequities ...............................10

    D.   The Job Duties of a Full Professor in Psychology Apply to All Comparators ..........11

    E.   Professor Freyd Is Paid Less Than Her Male Colleagues ......................................12

    F.   Professor Freyd's Merit Ranking Is Equivalent to Her Comparators .......................14

    G.   Full Professors at UO Are Not Required to Obtain Grant Funding ..........................14

    H.   Mayr Confirmed To UO's Investigator That All Professors In The Psychology Department "Do the Same Work"..........................................................................................................15

    I.   UO Has Paid Significantly More Men Retention Adjustments Than It Has Given Women, Which Has Resulted In A Disparate Impact ...........................................................................16

    J.   Alternative, And More Equitable, Ways To Address Retention Exist .......................21

III.   ARGUMENT .......................................................................................................22

    A.   Material Questions Of Fact Exist Regarding Plaintiff's Federal Equal Pay Act Claim ...........22
        1.   Plaintiff Establishes A Prima Facie Case Under the Equal Pay Act Because She Has Male Comparators Who Are Paid More And Perform Substantially Equal Work ...............................22
        2.   Defendants Have Not Met Their Burden of Proving that the Pay Differential Is Based On A Factor Other Than Sex ...............................................................................................29

    B.   Material Questions Of Fact Exist Regarding Plaintiff's Additional Claims For Discrimination Based On Defendants' Disparate Treatment ....................................................................32
        1.   Oregon's Equal Pay Act And Constitution Require That Plaintiff Be Paid Equally For Work Of A Comparable Character, A Lower Standard Than The Federal Equivalent .............32
        2.   Defendants Violated Oregon's Unlawful Discrimination Act, Title IX, and Title VII ........35

    C.   Material Questions Of Fact Exist Regarding Plaintiff's Disparate Impact Claims Under Title VII And ORS 659A.030 ...............................................................................................38
        1.   Disparate Impact Exists Here ...........................................................................40
        2.   Defendants Present No Valid Defense.................................................................41
        3.   An Available Alternative Practice Would Have Less Disparate Impact and Meets Defendants' Needs ...............................................................................................44

    D.   Discretionary Immunity And "Academic Freedom" Do Not Protect Defendants.................46

    E.   Material Questions of Fact Exist Regarding Plaintiff's Claim for Breach of Contract............47

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

F.   A Jury Could Find That Sadofsky Violated The Equal Protection Clause ...............................48

   1.   Material Questions Of Fact Exist As To Whether Sadofsky Intentionally Discriminated On The Basis Of Sex ........................................................................................................................48

     a.   Sadofsky Decided Not To Give Plaintiff An Equity Raise ................................49

     b.   Evidence Shows that Sadofsky Intentionally Discriminated Against Plaintiff ..................50

G.   Plaintiff's Claims Are Timely ........................................................................................53

IV.   CONCLUSION ......................................................................................................................53

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

TABLE OF AUTHORITIES

Cases

*Ackerson v. Rector and Visitors of Univ. of Va.*, Case No. 17-cv-00011, 2018 WL 3209787 (W.D. Va.,
June 27, 2018).................................................................................................................31, 35, 36

*Adetuyi v. City & Cty. of S.F.*, 63 F. Supp. 3d 1073 (N.D. Cal. 2014) ......................................38

*Allender v. Univ. of Portland*, 689 F. Supp. 2d 1279 (D. Or. 2010).....................................23, 34

*Arizona v. Norris*, 463 U.S. 1073 (1983) ......................................................................................49

*Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477 (9th Cir. 1987).............................................31

*Bator v. State of Hawaii*, 39 F.3d 1021 (9th Cir. 1994)................................................................52

*Best v. U.S. Nat'l Bank*, 78 Or. App. 1 (1986) .............................................................................47

*Brock v. Georgia Southwestern Coll.*, 765 F.2d 1026 (11th Cir. 1985).......................................23

*Bureau of Labor & Indus. v. Roseburg*, 75 Or. App. 306 (1985) ................................................33

*Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115 (9th Cir. 2000) .........................38

*Clady v. County of Los Angeles*, 770 F.2d 1421 (9th Cir. 1986)..................................................39

*Contreras v. City of L.A.*, 656 F.2d 1267 (9th Cir. 1981) ............................................................39

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974)...............................................................22

*Dominguez–Curry v. Nevada Transp. Dep't*, 424 F.3d 1027 (9th Cir. 2005)..............................50

*EEOC v. Maricopa Cnty. Cmty. Coll. District*, 736 F.2d 510 (9th Cir. 1984) .............................22

*Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012) ............................................43

*Ewald v. Royal Norwegian Embassy*, 82 F.Supp.3d 871 (D. Minn. 2014) ..................................26

*Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130 (9th Cir. 2003) ..............................48, 53

*Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409 (9th Cir 1988) .........................................28, 33

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

*Garcia v. Spun Steak*, 998 F.2d 1480 (9th Cir. 1993) ...................................................................43

*Garrison v. Deschutes Cty.*, 334 Or. 264 (2002) .........................................................................46

*Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531 (9th Cir. 1982) .........................36

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) ..........................................................................39

*Gunther v. County of Washington*, 623 F.2d 1303 (9th Cir. 1979) ......................22, 23, 27

*Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977) ...................................................40

*Hein v. Or. Coll. of Educ.*, 718 F.2d 910 (9th Cir. 1983) ..........................................................28

*Johnson v. Duffy,* 588 F.2d 740 (9th Cir. 1978) ........................................................................50

*Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406 (9th Cir. 1987) ..................................................43

*Klein v. NYU*, 786 F.Supp.2d 830 (2011) ...............................................................................23

*LA v. Manhart*, 435 U.S. 702 (1978) ........................................................................................49

*Lanegan-Grimm v. Library Asso. of Portland*, 560 F. Supp. 486 (D. Or. 1983) ...................35

*Lewis v. City of Chicago*, 560 U.S. 205 (2010) .........................................................................39

*Logan v. West Coast Benson Hotel*, 981 F. Supp. 1301 (D. Or. 1997) .....................................35

*Lowrimore v. Dimmitt*, 310 Or. 291 (1990) ............................................................................46

*Maxwell v. City of Tucson*, 803 F.2d 444 (9th Cir. 1986) .......................................................22

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ........................................................36

*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004) ....................................36, 38, 51

*Melanson v. Rantoul*, 536 F. Supp. 271 (D.R.I. 1982) ............................................................24

*Miller v. Board of Regents of the Univ. of Minn.*, Case No. 15-CV-3740, 2018 WL 659851 (D. Minn. Feb.

1, 2018) .................................................................................................................................32

*Muzquiz v. Clackamas Cty.*, 165 F. App'x 503 (9th Cir. 2006) ...............................................50

*Nabozny v. Podlesny,* 92 F.3d 446 (7th Cir. 1996) ..................................................................48

PAGE - v  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

*O'Brien v. Sky Chefs, Inc.*, 670 F.2d 864 (9th Cir. 1982) ..............................................36

*Penk v. Or. State Bd. of Higher Educ.*, Case No. 80-436, 1985 WL 25641 (D. Or. Feb. 13, 1985)...........28

*Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000) ..............................35

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ..........................................................40

*Rizo v. Yovino*, 887 F.3d 453 (9th Cir. 2018)(*en banc*) ..................................... 29, 30, 31, 42

*Rose v. Wells Fargo Co.*, 902 F.2d 1417 (9th Cir. 1990) ........................................ 39, 40

*Signmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667 (S.D.N.Y. 1995) ......................32

*Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104 (9th Cir. 1991) ..................... 48, 52

*Smith v. Bull Run Sch. Dist.*, 80 Or. App. 226 (1986) ...........................................33

*Smoldt v. Henkels & McCoy, Inc.*, 334 Or. 507 (2002) ...........................................47

*Spaulding v. Univ. of Wash.*, 740 F.2d 686 (9th Cir. 1984) .......................................31

*Stanley v. Univ. of S. Cal. ("Stanley I")*, 13 F.3d 1313 (9th Cir. 1994)........................ 25, 31

*Stanley v. Univ. of S. Cal.*, 178 F.3d 1069 (9th Cir. 1999).................................... 22, 23

*Stender v. Lucky Stores*, 803 F. Supp. 259 (N.D. Cal. 1992)......................................39

*Stender v. Lucky Stores, Inc.*, 803 F.3d 259 (N.D.Cal. 1992) .....................................40

*Stevenson v. Koskey*, 877 F.2d 1435 (9th Cir. 1989) .............................................50

*Stout v. Potter*, 276 F.3d 1118 (9th Cir. 2002) ............................................... 39, 41

*Swenson v. Legacy Health Sys.*, 169 Or. App. 546 (2000).........................................47

*Three Rivers Educ. Ass'n v. Three Rivers Sch. Dist.*, 254 Or. App. 570 (2011)....................48

*Turner v. State*, 359 Or. 644 (2016)............................................................46

*Wachter-Young v. Ohio Cas. Grp.*, 236 F. Supp. 2d 1157 (D. Or. 2002) ...........................22

*Washington v. Garrett*, 10 F.3d 1421 (9th Cir. 1993)......................................... 37, 52

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977 (1988)........................................ 40, 41



*Winkes v. Brown Univ.*, 747 F.2d 792 (1st Cir. 1984) ...................................................................32

Statutes

29 U.S.C. § 206(d) ........................................................................................................................22

42 U.S.C. § 1983 ...........................................................................................................................52

42 U.S.C. § 2000e-2(a)(1) .............................................................................................................53

42 U.S.C. § 2000e-2(k)(1)(A) ........................................................................................................39

42 U.S.C. § 2000e-2(k)(1)(A)(i) ....................................................................................................39

42 U.S.C. § 2000e–2(k)(1)(A)(ii) ..................................................................................................40

42 U.S.C. § 2000e–2(k)(1)(C) .......................................................................................................40

ORS 30.265(6)(c) ...........................................................................................................................46

ORS 652.220 ........................................................................................................................33, 34, 35

ORS 652.220(2) .............................................................................................................................33

ORS 659A.030 ...........................................................................................................................33, 35

Other Authorities

B. Lindemann, P. Grossman & G. Weirich, Employment Discrimination Law 318 (5th ed. 2012)

..................................................................................................................................................40

Regulations

29 C.F.R. 1620.14-18 .....................................................................................................................22

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

## I.  INTRODUCTION

This case, at its core, is simple: the University of Oregon ("UO" or "Defendants") pays one of its most distinguished female professors, Dr. Jennifer Freyd, far less than men in her department who do the same job and are many years junior to her. That is the essence of pay discrimination.

The reason this happens is that UO has set up its salary system to reward those who threaten to leave for another school, deemed "retention adjustments." This practice may seem gender-neutral on its face, but in operation it is not. Nor are its effects. Indeed, Defendants admit there is a "gender equity issue" with salaries of full professors in UO's Psychology Department ("the Department"), where Dr. Freyd works. But evidence in this case plainly shows that women in the Department are less likely than men to engage in such negotiations, and when they do, Defendants make less attractive offers to them than they make to men. The practice is therefore not a "factor other than sex" that can excuse a pay gap under the Equal Pay Act. Nor is shopping oneself around on the academic market and negotiating a raise job-related for the position of being a full professor in Psychology, eliminating Defendants' other potential defense to Freyd's claims.

Freyd has brought ten claims that all allege discrimination in Defendants' handling of her salary relative to her male colleagues. Defendants argue that the four male professors who earn more than she does do not hold the same job. This defense rings hollow. They are all full professors of Psychology subject to the same job expectations that require the same skills, effort, and responsibility. Each is evaluated by the same criteria. What is more, the defense only applies to Freyd's Equal Pay Act claim. Neither her Title VII disparate impact claims, disparate treatment claims, nor her Oregon wage law claim requires a showing that jobs are equal.

Freyd submits declarations in support of her claims from nearly every female full professor in the Psychology Department, as well as from two former Department Heads, which dispute material facts submitted by Defendants.  This, along with ample additional evidence in the record, could lead a

PAGE - 1  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

reasonable jury to find in Freyd's favor on all of her claims. In addition, the evidence creates disputes of

material fact regarding how Defendants have implemented its retention raise policy in the Department,

what its effects have been on female faculty, whether Defendants intended those effects (after admitting

the problem but refusing to address it), and numerous other issues bar summary judgment.

## II.  FACTS

### A.  Professor Freyd Is a Highly Successful Scholar Deserving of Pay Equitable to Her Male Colleagues

Dr. Freyd has been a professor of psychology at the University of Oregon for more than 30

years, and a full professor for 26. Declaration of Jennifer Freyd ("Freyd Decl.") ¶1.  She is a leader in the

field of trauma and sexual violence research. Professor Ulrich Mayr, who currently serves as the

Psychology Department Head, wrote in Freyd's 2018 post-tenure review, "It is safe to say she can be

credited with originating an entire subfield that focuses on the specific implications of inter-personal

and, more recently, institutional trauma." Ex. 1.[1] She has authored hundreds of publications and three

books, is a Fellow or member of prestigious organizations, and has received numerous awards for her

work. *Id*; *see also* Declaration of Holly Arrow ("Arrow Decl.") ¶2 (describing Freyd as "one of the most

esteemed members" of the Psychology Department).

Mayr emphasized in Freyd's recent review that she is "highly productive," noting that since 2015

she has published 30 peer-reviewed manuscripts and that her H-index was 58 at that point.[2] Ex. 1. It is

currently 59, the second highest in the department. Freyd Decl. ¶8.  He went on to praise the

"substantial impact" of her work "within and beyond academia."  Ex. 1. He noted that a single 2014

article she wrote in American Psychologist laying the groundwork for the concept of institutional trauma

---

[1] All references to "Ex." herein are Exhibits attached to the Declaration of Whitney Stark in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Stark Decl.").
[2] H-index is a widely-used metric in academia "that attempts to measure both the productivity and citation impact of the publications of a scientist or scholar." *See* https://en.wikipedia.org/wiki/H-index.

PAGE - 2  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

has been cited over 100 times and led to entire conferences devoted to the topic, as well as a special issue of the Journal of Aggression, Maltreatment and Trauma. Ex. 1.

Mayr's review also praised Freyd as a teacher, extolling the excellent graduate students that she attracts to the department. *Id.* Among over 30 tenure-track faculty, she attracts 15-20 percent of all graduate student applicants. Freyd Decl. ¶13. Freyd has succeeded in helping many of the graduate students she mentors to secure funding that covers their tuition and stipends. *Id.*

The same review lauded Freyd's service contributions, including her service as a member of the University Senate, the Senate Executive Committee, and as an appointed member to several committees dealing with issues such as free speech and reporting policies. Ex. 1. "Dr. Freyd was instrumental in constructing the new reporting rules on sexual violence for our campus. It should be noted that the policy might very well become the model for reporting rules at institutions across the country." *Id.*

Freyd's peers on the University Senate honored her for this work with the highly prestigious Wayne T. Westing Award for University Leadership and Service in 2017. Freyd Decl. ¶15. This award recognized her leadership on behalf of sexual assault victims at the UO and nationwide and concluded, "While rigorously pursuing her scholarship (thousands of citations to her work in the research of others) and teaching (known as a role model and effective, collaborative teacher), Dr. Jennifer Freyd has been one of the most important leaders in service at the University of Oregon for years." Ex. 2.

Like her colleagues in the Psychology Department, Professors Nick Allen, Phil Fisher, and Gordon Hall, Professor Freyd is part of the clinical faculty. She runs the Freyd Dynamics Lab, which functions similarly to her colleagues' centers. She raises private donations for her lab, oversees its budget, and oversees all administrative work, including review, accounting, and approval for the grants or issues like her research on human subjects. Freyd Decl. ¶21. She supervises graduate students, undergraduates, and a lab manager, and she oversees their research. *Id.* at ¶5. She is the editor of a prominent journal in her field, which also entails significant administrative responsibilities, and she

PAGE - 3  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

supervises dozens of people in that capacity as well. *Id.* at ¶10.

Earlier in her career, when she focused on perception and cognition, Freyd received numerous federal grants from the National Science Foundation and National Institute of Mental Health. Freyd Decl. ¶2, Ex. 1. Currently, there is no clear source of funds for the research she does on trauma and sexual violence – an issue she and her colleagues have worked to highlight. Freyd Decl. ¶20. Yet she is able to do a high volume of high-quality work, because her research simply does not require the large dollar amounts that the research some of her colleagues demands. *Id.*

Freyd maintains a high public profile. Dean of the College of Arts and Science, Andrew Marcus noted that "she is widely cited in the popular press as a scholar, and so I've probably seen more references to her work than the majority of my other faculty," which he regards as a positive for UO. Ex. 3, Marcus Tr. 148:12-13; 147:22-148:13.  UO regularly features her on websites and newsletters that track media coverage of faculty accomplishments, and just this year she received the American Psychological Association's Award for Media Contributions to the Field of Trauma Psychology. Freyd Decl. ¶18.

### B. Defendants Are Aware of the Psychology Department's Glaring Salary Inequities, But Fail to Correct Them

In May 2014, Freyd provided Mayr with an analysis she had done of salaries for full professors in the psychology department. Ex. 4. It included a regression analysis[3] of all salaries by years since PhD.

---

[3] "A regression analysis is a common statistical tool . . . designed to isolate the influence of one particular factor – e.g. sex – on a dependent variable – e.g. salary." *Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1210 n. 9 (9th Cir. 2002) (*quoting E.E.O.C. v. Gen. Tel. Co. of NW, Inc.*, 885 F.2d 575, 577 n.3 (9th Cir. 1989)). Mayr explained that the regression analysis used by the department in considering raises "use[s] a predictor such as years since rank or years since PhD to predict where, for example, somebody's salary should be if that was the only defining factor… And because seniority is so much tied to … the typical progression of raises, it's a pretty good way of gauging whether somebody is approximately where you expect that individual to be. And then if you see deviations, you can discuss whether there are factors like a particularly high merit or other reasons in place that can or should be compensated." Ex. 6, Mayr Tr. 133:4-134:1.

PAGE - 4  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Id.* She wrote:

> Looking at the results I see two things. One is indication of a gender disparity. . . . If you look at full professors and categorize them by being over or below the regression line by gender you get this fairly striking effect:
>
> |                      | men | women | totals |
> |----------------------|-----|-------|--------|
> | above regression line | 6   | 1     | 7      |
> | below regression line | 2   | 5     | 7      |
> | totals               | 8   | 6     | 14     |
>
> The other thing I see is my position relative to other full professors. . .. I have over my 27 years a few times seen my salary relative to the regression line and it has always been below the line. In fact as far as I know this has been the case for 27 years. . . . In all the time this has been the case I have never received a merit report that was below the department mean. In fact I am routinely told by department heads that my merit reports have me above the department mean for merit. . . . [I]t is impossible not to consider gender as an explanation when one looks at the data for full professors and considers the larger contextual data of gender inequity in salary in the USA."

*Id.* Mayr responded that he was "quite aware of the salary spread and who is above and below the

regression line. Indeed I can provide at least partial explanations – fully aware that these are [sic] may

not 'explain away' a gender bias." Ex. 5. The explanation he gave was retentions. Ex. 6, Mayr Tr. 224:3-

4. He took "a hard look at the data" and concluded "that if you factor in the retention offers, then the

disparity essentially goes away." Ex. 6, Mayr Tr. 228:11-16.

Mayr did a "more complicated" regression analysis that involved multiple predictors. Ex. 6, Mayr

Tr. 235:6-25. His variables were years since PhD or years in rank, gender, and years since the professor's

last major salary/retention negotiation. *Id.* When he did that, he found that the gender difference either

dropped significantly or disappeared. Ex. 6, Mayr Tr. 239:1-6; Ex. 7. He did the analysis "over and over

again" at multiple points in time, noting that "people float in and out of that window you are looking at

through retirements, through new hires, promotions." Ex. 6, Mayr Tr. 240:2-20. Even so, "the

qualitative pattern essentially stays the same." Mayr's data showed that faculty who received retention

raises have higher salaries than those who did not, and that this has resulted in a gender differential. Ex. 6, Mayr Tr. 245:20-246:4.

Two of Freyd's female colleagues, Professors Dare Baldwin and Holly Arrow, were also concerned about the salary disparities and worked with Professor Freyd to prepare a memo to the department's executive committee. Arrow Decl. ¶6, Ex. 2.   In April 2015, they provided another set of regression analyses of full professor salaries in the department to the executive committee and department leadership. Ex. 8. They explained, "There are four versions of the analysis, but all display the same general phenomena: a) very real inequities in full professor salaries in our department, and b) gender appears to be a significant predictor of salary." *Id.* They asked department leadership to take immediate action to redress the inequities and offered to work with them toward solutions. *Id.*

The executive committee proposed changes to the Department's salary-related policies to require that retention raises trigger an evaluation of merit and an equity analysis. Ex. 9. The Department head then determines whether to ask the administration for money to address the inequity. *Id.* The policies were added in 2015. Ex. 6, Mayr Tr. 212:12-21.

Also in 2015, Freyd had her 6th-year post-tenure review. Ex. 10. The Dean's Office recommended an 8% raise (which is the maximum available, absent equity funds, and recognizes that her work exceeds expectations), but did not recommend anything additional to address equity. Ex.11, Ex. 12, Sadofsky Tr. 189:25-190:18. Hal Sadofsky, Divisional Dean for the Natural Sciences in UO's College of Arts and Sciences, explained the failure to recommend equity funds by saying Freyd's salary was not below Department or comparable university ("AAU") averages for her rank. Ex. 12, Sadofsky Tr. 190:4-18. Neither of Sadofsky's metrics takes seniority (or time in rank) into account. *Id.* Yet the Dean's policy regarding an extra 4% raise is "to address equity issues with faculty of comparable merit *and time in rank* within the department," which is also Dean Marcus' normal practice. Ex. 13 (emphasis added); Ex. 3, Marcus Tr. 43:21-44:9.

PAGE - 6  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Psychology Department undertook a required self-study in the spring of 2016. Ex. 14. The self-study found gender inequity in the salaries of full professors, noting that female full professors earn on average $25,000 per year less than their male counterparts. Ex. 14 at 001153. The department also directed an external review, which recommended that "[t]he department should continue pressing for gender equity in terms of pay at the senior levels of the faculty." Ex. 16.

The gender equity issue raised in the self-study sparked significant department discussion. Freyd wrote:

> "In written faculty job descriptions here I am aware of no requirement or even encouragement to pursue outside offers. The requirements I know about are to do excellent research, teaching, and service. It would seem we would want salary to be based on meeting stated job descriptions. Moreover, when a system of reward is inconsistent with the stated criteria for the job and it over time systematically disadvantages one gender, it would seem important to ask about the functionality of that reward system."

Ex. 17. Professor Arrow agreed, relating her own experience of being unwilling to engage in a retention negotiation and writing, "Accepting injustice is not a good value for the department, nor do I think encouraging all of our female faculty to aggressively seek outside offers is necessarily good for the department." *Id.*

The pay gap for women at the full professor level was "an issue that's been the topic of a lot of conversations over many meetings" with Sadofsky. Ex. 12, Sadofsky Tr. 198:12-15; Ex. 18. At a Department faculty meeting in 2016, Sadofsky acknowledged that Department Heads Mayr and Sanjay Srivastava had both talked to him about "the gender equity issues" with salaries. Ex. 12, Sadofsky Tr. 201:17-21; 202:18-25. He told the Department, "I can see that this is a real issue. And I, you know – I'm convinced that there's an issue there. The college is not in a position to address – address it right now because we would feel – I mean, the gender issue – the gender equity issue may be limited to some set of full professors in the psychology department." Ex. 12, Sadofsky Tr. 203:1-9. He told the faculty that their options for addressing it were on the individual level at the sixth-year review stage (which he had

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

not done for Freyd the year before), and through a university-wide equity study that he hoped would take place in early 2017. Ex. 12, Sadofsky Tr. 203:14-204:8. The study has yet to be completed. Ex. 19.

Sadofsky recognized that the retention raises that he and Dean Marcus recommended had disproportionately benefited the men in the psychology department. Ex. 12, Sadofsky Tr. 200:5-20. Yet, he did not see the Department's concern about gender equity to be an issue of discrimination, and he was not aware that UO's policy against discrimination includes practices that, though neutral on their face, have a disproportionate impact on protected groups. Ex. 12, Sadofsky Tr. 205:8-13, 206:1-6.

The Department went through its merit review process in the fall of 2016 in anticipation of merit raises in early 2017. Ex. 6, Mayr Tr. 139:15-25; Ex. 38, Srivastava Tr. 39:19-23, 49:8-13. Freyd submitted the Department's merit review form. Ex. 20. She reiterated her observations of salary inequity in the Department, offered her own, conservative, regression analyses, and wrote, "There are many different ways that women get blamed for the gender wage disparity. One is that women fail to ask for fairness. I'm hereby, and yet again, asking for fairness." Ex. 20.

On December 6, 2016, Mayr sent a memo to Deans Sadofsky and Marcus, titled "Gender pay equity in Psychology." Ex. 22. He wrote:

> As you know from conversations we had and our department's external review, we are trying to come to grips with a considerable gender inequality among our full professor salaries. When controlling for years in rank, men earn on average $30K more than women (see the Figure below--salaries include longer-term stipends, but not shorter-term administrative stipends). This difference has been remarkably stable across recent years that included substantial changes in our faculty roster (e.g., Awh and Vogel's departure, Neville, Taylor retirement). Also, the picture does not change fundamentally when taking out the highest-paid full professor (Phil Fisher) as an outlier (remaining gender difference- 22 k), when controlling for h-index (remaining difference=22 k), or for the 2016 merit ratings (remaining difference=18 k).



He went on to ask that they "immediately address our most glaring inequity case":

> Jennifer Freyd is currently the most senior faculty member in the department. She is a widely recognized leader in her field with impact beyond the academy (e.g., see her invitation to the White House 2 years ago). As the included figures show, her salary is 18k less than that of her male peer closest in rank (who is still 7 years her junior). When taking in consideration impact or merit, this difference further increases to 40-50 k (see figures).

*Id.* Mayr explained that in Freyd's most-recent post-tenure review, he was not aware of money available to address equity, and if he had known about it, "I would have made a strong case that Jennifer Freyd deserves an extra raise." *Id.* He asked for a 12% raise for her. *Id.* He reported back to the Department that he was lobbying to address the "blatant gender inequities" in salaries. Ex. 23.

Sadofsky refused Mayr's and Freyd's requests. He reviewed the salaries in the Department and determined that "we are paying Gordon Hall way too much," but did not see an argument for Freyd. Ex. 24. He viewed the issue as "a perceived inequity that resulted from retention offers." Ex. 12, Sadofsky Tr. 237:15-18. Mayr explained in his memo that "there are structural differences and actual biases that make it harder for women to participate in [retentions]. In this light, retentions should be viewed as one of the mechanisms that produce gender disparities." Ex. 22. But Sadofsky and Marcus did not consider structural differences that make it harder for women to participate in retention negotiations or reach any conclusions about them. Ex. 3, Marcus Tr. 128:8-129:7.

PAGE - 9  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Sadofsky and Marcus met with Freyd on January 18, 2017. Freyd Decl. ¶26. They emphasized to her that in comparison to UO's entire College of Arts & Sciences, she makes a relatively high salary. Ex. 12, Sadofsky Tr. 229:13-18. Sadofsky told her that "only three men" in the Psychology Department were paid more than she is, which was half the male full professors in the department. *Id.* They provided a number of excuses, but never said that her colleagues' grants were the reason they were paid more. *Id.*[4]

### C.  UO Has Funds And The Ability To Address Salary Inequities

In deciding what base salary to offer a newly-hired tenure-related faculty member, UO looks at the external market, considering data from AAU regarding salaries in public universities for the relevant department or subdiscipline, and competing offers. Ex. 12, Sadofsky Tr. 33:3-15, 52:22-25; 36:24-37:17.

The faculty union has bargained annual raises that allocate a percentage across-the-board; in some years a percentage to go to merit; and, at times, a percentage to fund internal equity increases. Ex. 25. Each department has its own policies on how to evaluate its members for merit, makes its recommendations, and "everybody above the department generally follows those recommendations." Ex. 12, Sadofsky Tr. 50:6-17; Ex. 3, Marcus Tr. 50:9-11.

When a faculty member is promoted, they receive an 8% raise. Ex. 12, Sadofsky Tr. 47:11-18. Mandated six-year tenure review raises can be zero (not meeting expectations), 4% (meeting) or 8% (above expectations). Ex.12, Sadofsky Tr. 51:23-52:6. A raise of as much as 12% is available "if there is a strong case that this is necessary to address equity issues with faculty of comparable merit and time-in-rank within the department," or relative to AAU averages for the relevant discipline at comparable public universities. Ex. 13; Ex. 12, Sadofsky Tr. 196:1-18; Ex. 3, Marcus Tr. 46:1-9. Availability of the additional 4% to address equity is not described in the collective bargaining agreement ("CBA") and is

---

[4] Remarkably, even after denying Freyd equitable compensation, the Department continues to perpetuate its gender inequities.  In 2018, the department hired five new assistant professors, three women and two men. Baldwin Decl. ¶18. The two men are both spousal hires. *Id.* Base starting salaries are $83,000 for each of the women and $84,000 for the two male, spousal hires. *Id.*

PAGE - 10  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

not written anywhere; the deans do not rely on department heads to know it is available. Ex. 12, Sadofsky Tr. 196:10-11, 19-22; 197:15-17. Nevertheless, it is "what we agreed on in the dean's office was our policy on this." Ex. 12, Sadofsky Tr. 196: 16-18.

UO can increase a faculty member's base salary through endowed professorships and chairs. Ex. 26, Coltrane Tr. 15:4-8; 42:7-10; 49:13-24. Endowed chairs are primarily used to hire new faculty or to retain faculty with an outside offer. Ex. 26, Coltrane Tr. 40:24-41:4. UO is also free to give a faculty member a raise at any time. Ex. 27; Ex. 12, Sadofsky Tr. 58:7-59:17.

### D.  The Job Duties of a Full Professor in Psychology Apply to All Comparators

Full professors in Psychology are expected to pursue and publish a program of scholarship in peer-reviewed publications, teach, and serve the department, university, and profession. Ex. 12, Sadofsky Tr. 62:4-10. The job description for full professors is titled "Tenure-Track Faculty, Professional Responsibilities." Ex. 28; Ex. 12, Sadofsky Tr. 60:4-14. The standard course load expectation is four courses of at least 4 credit hours each during the academic year, but course loads may be reduced or increased in multiple circumstances. Ex. 28. Full professors advise and mentor students, and they serve actively on departmental, college, and university committees and in other roles to serve both the institution and the profession. Ex. 28. They are expected to contribute to the university's goals regarding equity and inclusion. Ex. 28.

The job description expressly contemplates that faculty may teach outside the Psychology Department; that they may be asked to take on overload assignments, including administrative work; and that their FTE allocation in the Department may change based on an assignment in another unit. Ex. 28. It provides substantial flexibility in job duties by allowing professors to obtain course releases in exchange for research and administrative duties, including those that come with a grant or service roles such as director of clinical training or department head. Ex. 28; *see also* Arrow Decl. ¶7. Faculty may "bank" course releases from one year to the next, and in some years teaching demands may go down to

PAGE - 11  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

zero. Ex. 28; Ex. 6, Mayr Tr. 13:7-16. Many of these extra duties are compensated through an added stipend beyond the base salary, in addition to course releases. Ex. 6, Mayr Tr. 49:18-21; Ex. 29.

Even with variation in what Freyd, Fisher, Allen, and Hall research, in how much they teach, how they conduct their research, whether in any given year they undertake extra administrative or service tasks and if so, which ones, they are still fulfilling the job duties of a full professor in the Psychology Department. Ex. 12, Sadofsky Tr. 126:10-12 (Freyd); Ex. 12, Sadofsky Tr. 84:13-15 (Fisher); Ex. 12, Sadofsky Tr. 86:2-4 (Allen); Ex. 12, Sadofsky Tr. 88:14-89:66 (Gordon Hall, but noting that Hall's "scholarship has tapered off" so he does not know if Hall's research meets expectations for a full professor currently).

### E.  Professor Freyd Is Paid Less Than Her Male Colleagues

Spreadsheets showing total compensation for psychology full professors from 2007-2017, as well as years in rank, show that Freyd is paid less than her male counterparts.  Ex. 29. Defendants' chart of the "base annual rate" from 2010-8, including "average male professor" amounts, is disputed.  *See* Dkt. #63, Ex. A to Decl. of Andrea Larsen. Freyd disputes both what constitutes the relevant base annual salary and who should be considered in the group of full professors in Psychology.

Defendants' base salaries do not include additional amounts from endowed chairs, even though that is "part of the base salary. I mean, it's part of their – the salary upon which they receive benefits and we do calculations and everything else. . . . It's their permanent salary." Ex. 26, Coltrane Tr. 49:13-24. This adds $15,000 to Allen's base salary for a total of $179,880 (Swindells Endowed Chair) as of January 1, 2018; $19,300 to Fisher's base salary for a total of $207,400 (Knight Endowed Chair), and $12,000 to Mayr's base salary, for a total of $176,142 (Lewis Endowed Chair). Ex. 29. Hall's base annual rate is now $185,364. *Id.* Freyd's is currently $159,939. *Id.* With 25 years in rank as of fall 2017, Freyd is substantially senior to each of the four men making more: Hall had 16 years, Mayr had 13, Fisher had 9, and Allen had 4 years' seniority. *Id.*

PAGE - 12  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' charts also include three people who are not proper comparators because they never performed the job of a full professor at any time since 2001. Kimberly Espy should not be included because she held a completely different job – her title was Vice President for Research and Innovation, and "her role was strictly administrative." [5] Ex. 29; Ex. 6, Mayr Tr. 70:22-71:6. Espy was assigned a "tenure home" in the psychology department but never undertook any job duties of a full professor. Ex. 6, Mayr Tr. 71:4-10. Paul Slovic and Don Tucker should not be considered because they have both been on indefinite leave from UO since 1999 and 2001, respectively. Ex. 29. Neither has performed the range of duties of a full professor since that time, and UO does not pay them any salary at all. Ex. 6, Mayr Tr. 55:18-57:16. The base salary numbers that remain on the books for them are not only unpaid, they are also "frozen in time" and "very low compared to all the others, which does not reflect [their] merit, but just the fact that it didn't increase with the regular increases, merit processes." Ex. 6, Mayr Tr. 56:23-57:7.

In addition, Defendants' chart omits seniority, a critical component of salaries at UO. Seniority is correlated with higher salaries. Ex. 31, Schill Tr. 61:23-62:9; Declaration of Louis Moses ("Moses Decl.") ¶11. It is "a component of how much full professors are paid because if you're more senior you've gone through more rounds of regular raises." Ex. 6, Mayr Tr. 75:13-18. Sadofsky's "preferred way of trying to analyze how far off things are from a sort of a linear progression is to look at salary plotted against years since promotion to full professor" (years in rank). Ex. 12, Sadofsky Tr. 198:19-24. When Sadofsky researched pay equity issues in Psychology, he considered years in rank relative to the salaries of individuals, among other factors. Ex. 3, Marcus Tr. 121: 12-22. Likewise, when Dean Marcus considers equity within a department, he looks at salaries, years in rank, and the quality and nature of the

---

[5] "[S]he was just perceived as a very heavy handed, not well communicating administrator who did go alone stuff that had bad effects on many of us." Ex. 6, Mayr Tr. 171:25-172:3. Department relations with her were so strained that it had "a major negative impact on our department" which was the loss of two key faculty, Ed Awh and Ed Vogel. Ex. 14; Ex. 6, Mayr Tr. 171:8-9, 171:18-172:13.

PAGE - 13  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

work they do. Ex. 3, Marcus Tr. 82:9-21. Years in rank is an important factor in determining whether

salaries are fair because senior full professors have experienced many merit increases over time. Ex. 3,

Marcus Tr. 82:22-83:8.

### F.  Professor Freyd's Merit Ranking Is Equivalent to Her Comparators

Merit ratings take place any year in which there is money available for merit raises.  *See* Ex. 32

(occurring in the decade prior to this suit in 2006-07, 2013, 2014, 2017 and 2018); Ex. 25; Ex. 12,

Sadofsky Tr. 35:10-13; Ex. 33. In determining the relative merit of each professor, the Department gives

equal weight to all three elements of the job (research, teaching, and service). Ex. 6, Mayr Tr. 26:3-22.

The policy requires each professor to submit a standardized report detailing accomplishments. Ex. 34.

The executive committee and department head then rate each professor on 0-4 scale as to each

element, Ex. 34, and the ratings are averaged to come up with a single merit score. *Id.* A chart showing

the Psychology Department's confidential merit rankings of full professors since 2006 is included as

Exhibit 33. Professor Lou Moses, who served as the Department Head or as an elected member of the

executive committee for roughly 16 years, was involved in performing or overseeing merit evaluations

throughout that time and notes that "Professor Freyd was almost invariably at or very near the very top

of our reviews in every category (research, teaching, and service)." Moses Decl. ¶4. This has continued

through the present. Ex. 33.

### G.  Full Professors at UO Are Not Required to Obtain Grant Funding

Securing grant funding is not a job requirement for being a full professor. Ex. 12, Sadofsky Tr.

147:3-4; Ex. 28. UO has no policy telling professors that grant funding will result in a salary raise. Ex. 3,

Marcus Tr. 74:2-6. Grant funding is taken into account during the merit review process and post-tenure

reviews, as part of the assessment of the faculty member's research accomplishments.  Ex. 6, Mayr Tr.

28:20-29:10, 31:11-12; Moses Decl. ¶9. The grants themselves often have their own mechanisms for

increasing faculty total compensation, such as by providing salary through the summer.[6] Ex. 6, Mayr Tr. 26:16-22.

The goal of grant funding is to conduct research, not to get money for the sake of getting money. Ex. 12, Sadofsky Tr. 22:12-18. Some disciplines in psychology do not require external funding at all. Ex. 12, Sadofsky Tr. 20:23-21:4; Arrow Decl. ¶3; Moses Decl. ¶10. A few areas of research in psychology require more funding, such as research that uses MRI scanning to assemble data, where it can cost a few hundred thousand dollars just to do the scans, but not all research requires such funding. Ex. 6, Mayr Tr. 32:12-33:2; Ex. 12, Sadofsky Tr. 20:23-21:4; *see also* Ex. 31, Schill Tr. 68:4-7. Simply because research is expensive does not mean it is high quality. Arrow Decl. ¶3. Indeed, "the amount of funding that is used in a given research product should not be the primary criterion to determine somebody's merit or contributions." Ex. 6, Mayr Tr. 32:9-11. UO recognizes that research has value, regardless of its cost. Ex. 31, Schill Tr. 69:10-11. Indeed, it is part of UO's mission to support research that federal grants are not available to support. Ex. 31, Schill Tr. 70:2-7.

Psychology Department policy recognizes that grant funding is more available in some areas than in others. Ex. 31, Ex. 35, *see also* Schill Tr. 65:23-66:1. When evaluating a tenure candidate's level of external finding, the Department takes into account the relative need for and availability of external funding for their area of research. *Id.*; Ex. 6, Mayr Tr. 28:20-29:10. The same is true when considering grant funding for purposes of merit reviews. *Id.*

### H. Mayr Confirmed To UO's Investigator That All Professors In The Psychology Department "Do the Same Work"

Freyd took her pay equity concerns to the Title IX office on May 3, 2016. Ex. 36.  UO's Title IX Officer confirmed that the issue "should be shared with AAEO [Affirmative Action Equal Opportunity]

---

[6] Faculty are on nine-month contracts, so summer salary for working on grant-funded research is in addition to the UO's base salary. Ex. 6, Mayr Tr. 49:4-11.

and myself as falling within the policy for reporting prohibited discrimination," and told Freyd that

someone from AAEO would be in touch. *Id.* No one was. Freyd Decl. ¶25. Nine months later, the day

after Freyd sent a tort claim notice to the University, AAEO's senior investigator Penny Daugherty

explained "[t]here have been unsufficient resources within OAAEO to be able to assign someone to

look into the pay equity concern in Psychology." Ex. 37.

After Freyd sent a tort claim notice, UO investigated her concerns. When Mayr received the

investigator's report (which found no discrimination because, it (wrongly) concluded, those who are paid

more do different jobs), he called the investigator to tell her he had concerns regarding her rationale. Ex.

39, Shipper Tr. 70:18-21; Freyd Decl. ¶25. According to her notes of the conversation, Mayr said:

> "Internally, there should be no one pulled from the group because we are all faculty, so
> we all have the same. [sic]. . . . [T]here is no reason to remove people. We all do the same
> work. Fisher and Allen do not have different job descriptions. There is no institutional
> mechanism that recognizes the difference of running a grant or being a director. . . . In
> fact, they get same rates of raises, so they are really treated the same. They get same
> raises in same way. They cannot be seen as different."

Ex. 40. At the same time, he explained that Tucker and Slovic should be excluded from the analysis

because neither has been on the faculty since at least 2001. *Id.*

## I.    UO Has Paid Significantly More Men Retention Adjustments Than It Has Given Women, Which Has Resulted In A Disparate Impact

Although UO is an easy place to retain faculty because of a high quality of life, and although it is

against UO's interest to encourage people to seek out competing offers, UO has a policy addressing the

process for offering retention raises to existing faculty. Ex. 41; Ex. 26, Coltrane Tr. 70:11-14, 79:21-80:3,

97:5-7. During Dean Marcus's five years as Dean of the College of Arts and Sciences, he has approved

approximately 40-45 retention raises throughout the entire College, of which approximately one-third

were female and two-thirds male. Ex. 3, Marcus Tr. 90:23-91:12. He experienced a "constant barrage" of

retentions in psychology. Ex. 42; Ex. 3, Marcus Tr. 109:19-22.

According to the Department's self-study, over the last ten years, the Psychology Department

PAGE - 16   PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

has averaged two retention cases per year. Ex. 14 at 001166. The near-constant negotiations are a strain both to the Department and the college administration and have affected morale. *Id.*

At the time of the self-study the Department was 49% female, but only 4 of the 20 retention cases that it reviewed affected women (20%), and only one of those was successful (as of 2016). Ex. 14 at 001149.  Among 26 retention cases in the Department for tenure-track faculty from 2007 through 2017, only five involved women (19%). Only two of the five negotiations with women resulted in raises or research funds that caused them to stay[7] (40%), whereas 14 of 21 negotiations with men did (67%).[8] Ex. 43, Ex. 44, Ex. 45, and Ex. 46. At the full professor level, no woman has had a successful retention negotiation in the last ten years. Ex. 43.[9]

Economist Kevin Cahill has analyzed the data on tenure track faculty base salaries and the impact of retention raises. *See* Declaration of Kevin Cahill ("Cahill Decl."). He finds that female full professors earn, on average, thousands less than their male counterparts, controlling for years in rank and time trends. The gap is highly statistically significant below the one percent level (p-value of 0.004), i.e., with a 99 percent degree of confidence. Cahill Decl. ¶5. His findings further show that when controlling for retention raises, gender is no longer a statistically significant determinant of salaries, strongly suggesting that the gender disparity can be attributed to retention raises. *Id.*

---

[7] Both of these retention raises went to Jennifer Pfeiffer, who was not a full professor when they were negotiated. Ex. 43 and Ex. 29. Her most recent retention negotiation took place in September 2017, which was after this lawsuit was filed. Ex. 43. Giving a retention raise to Pfeiffer was an explicit demand of Fisher's when he initiated negotiations for his own retention, which he later received at the same time that Pfeiffer received hers. Ex. 48.

[8] Sean Laurent is excluded from this analysis because he was not tenure-track. Mayr Tr. 178:12-13.

[9] Defendants make much of offers they made to other women that were not high enough to keep them at UO or who are not tenure track faculty. Crystal Dehle is a practitioner who directs the psychology clinic; she is not a tenure-track faculty member and is not expected to research or publish. Arrow Decl. ¶ 8. None of the offers made to other women who were tenure-track faculty – Heidemarie Laurent and Jane Mendle – were enough to induce them to stay. Ex. 43.

PAGE - 17  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

The Department understood that retention raises were causing women to have disproportionately lower salaries than men, commenting in its self-study: "it is not obvious that the frequency of retention negotiations is a strong indicator of overall productivity. Rather, it is important to acknowledge that there is strong evidence of a gender bias both in the availability of outside offers and the ability to aggressively respond to such offers," citing studies. Ex. 14 at 001153.  The external reviewers also commented: "it is widely-recognized that there is a difference between the genders in terms of seeking outside offers, and if this holds at Oregon, then the bias does have a gender basis." Ex. 16 at 001085. Mayr agreed, telling Deans Sadofsky and Marcus that "there are structural differences and actual biases that make it harder for women to participate in [retentions]. In this light, retentions should be viewed as one of the mechanisms that produce gender disparities." Ex. 22.  Arrow provides an example: she declined to pursue an outside offer from London Business School because of the sexism she experienced teaching there. Arrow Decl. ¶5.  Men would not face this obstacle.

Since 2007 only one female full professor has initiated a retention negotiation, and she was treated differently from her male counterparts. *See* Ex. 49. Baldwin had previously declined many invitations, but after a highly prestigious institution pursued her, she informed the Department when she was one of four asked to interview, out of 200 applicants. *Id*; Declaration of Dare Baldwin ("Baldwin Decl.") ¶¶2-8.  Yet even while the Department aggressively responded to at least two other male professors who did not yet have offers ("pre-emptive" retention), there was no effort made by the Department to retain her. Ex. 49; Baldwin Decl. ¶4.  Baldwin raised this with Mayr, who told her that the reason there was no discussion of a retention effort for her was because she did not have an offer yet. *Id.* Baldwin objected that UO had initiated and given pre-emptive retention raises to other psychology professors. *Id.* Mayr and Sadofsky ultimately offered Baldwin a raise of $10,000, but no

research support, if she would drop out of the search. Baldwin Decl. ¶¶ 8-9. This was too little to tempt her to drop out of the position, and she declined. *Id.*[10]

Meanwhile, during the same period, Allen received a retention raise of over $23,000 *plus* an additional $400,000 in research funds and sponsorship of a Center, all before he had gone for a second interview with a lesser university that had only shown interest. Ex. 43, Ex. 50 and Ex. 51. Allen let UO know that "I really don't want to move right now," but he pursued the aggressive negotiation anyway, and so did UO. Ex. 51. A year prior, Fisher had received a retention raise of $20,000, an endowed Knight Professorship that increased his base salary by $19,300, plus a new Center for his research and accompanying significant research support. Ex. 44; Ex. 12, Sadofsky Tr. 146:21-23. In 2017, around the same time as Baldwin's retention situation, UO undertook a *second* retention negotiation with Fisher before he received an offer. Ex. 52; Ex. 6, Mayr Tr. 200:8-17, 201:16-19. Ultimately, UO committed $1.2 million more in new research funds to him. Ex. 46.

Hall had three retention negotiations in the 2007-2017 period. Ex. 43. In 2014, like Baldwin, he did not receive an actual offer from the competing school. Ex. 43 (Outcome column, "no offer"). Mayr "was not a fan of providing a strong retention offer at – to Gordon Hall at that point." Ex. 6, Mayr Tr. 164:1-5. Yet, Hall still received a raise of over $20,000 from the Psychology Department. Ex. 29; Ex. 26, Coltrane Tr. 137:19-138:2. Hall sought another retention raise in 2015. Ex. 43. Sadofsky testified, "from my perspective in the dean's office, this was not a retention offer that I wanted to respond to. I think it was at a lower salary than he was currently making. And sometime around 2013 his productivity started

---

[10] Notably, Sadofsky's Declaration in Support of Defendants' motion further exemplifies his differential treatment of Baldwin, in comparison to her male counterparts. *See* Dkt. #64. He identifies Allen by title, but not Baldwin, despite their having the same professional background. Baldwin Decl. ¶6. He also justified his support of Allen by claiming the institution recruiting him was "important," while neglecting to mention that Baldwin was recruited by one of the top five institutions in the world. *Id.* at ¶¶5-12. Indeed, Sadofsky fails to explain UO's two highly different responses. *See, e.g.,* Baldwin Decl. ¶2 (describing significant grant funding she has received, which UO does not acknowledge).

PAGE - 19  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

to lessen so I – you know, it seemed like a less worthwhile investment to make in retaining him." Ex. 12, Sadofsky Tr. 140:8-19. Mayr agreed, feeling that Hall's lower merit ratings and contributions to the Department made a retention raise inappropriate. Ex. 6, Mayr Tr. 168:24-169:6. Mayr sensed that Hall was seeking outside offers mainly for the purpose of increasing his salary. Ex. 6, Mayr Tr. 230:22-231:12. Yet Hall still received $190,000 in research funds in that negotiation. Ex. 43.

UO's written policy governing Faculty Retention Salary Adjustment lists five considerations for a retention raise. Ex. 41; Ex. 3, Marcus Tr. 78:7-21. Nothing in the policy, or in the five listed considerations, states that grant funding is a factor at all. *Id.*; Ex. 3, Marcus Tr. 81:16-23.

One of the listed criteria, however, is "implications for internal equity within the unit" (i.e., the department). Ex. 41. The Retention Salary Adjustment form should include a written narrative describing the justification for the retention increase that "acknowledge[s] any issues concerning compensation equity that may result if the increase is approved." *Id.* Dean Marcus, the "sign-off" for retention adjustments, has not seen a Retention Salary Adjustment form for the retentions in Psychology. Ex. 3, Marcus Tr. 84:20-85:10. Sadofsky admits that he did not receive or create any such narratives addressing equity. Ex. 12, Sadofsky Tr. 183:1-12. Mayr, who initiates and participates in the retention discussion, is not even aware that internal equity is a consideration in the formal university policy. Ex. 6, Mayr Tr. 186:3-18. Though Defendants have produced correspondence regarding retention negotiations, they have produced nothing that includes discussions of equity. Stark Decl. ¶54.

UO treats women negotiating for a raise outside of retention differently, as well. Professor Sara Hodges describes a salary negotiation she had in June 2017, when UO very much wanted her to serve as Associate Dean of the Graduate School. Hodges Decl. ¶2. She sought a significant raise to her base salary that would be permanent. *Id.* at ¶3. The Provost's office said that would create problems because it could cause her to earn more than a man in the Department, Eliot Berkman. *Id.* at ¶5. Berkman not

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

only is an Associate Professor (while Hodges is Full), but he is also 15 years her junior. *Id.* at ¶5. They

declined her request. *Id.*

### J.   Alternative, And More Equitable, Ways To Address Retention Exist

Former Interim President Coltrane described an earlier budget model that accounted for internal

equity in retention adjustments:

> The dean would make a proposal: Faculty member X who has an outside offer from this
> other place that's . . . $20,000 more than we would pay them. Let's offer them 10, but
> we're going to use another $5,000 to the two people that this person is going to leapfrog
> so that the equity – so the gaps don't get larger. So those would be individual proposals
> that a dean would make using her or his own money.

Ex. 26, Coltrane Tr. 82:14-19; 84:8-19; *see also* Coltrane Tr. 143:12-144:9. Coltrane explained that the

reason for requiring a consideration of internal equity when making retention offers is because the dean

needs to know how much it will cost to address internal equity in addition to the offer for the targeted

faculty member. Ex. 26, Coltrane Tr. 89:10-90:3. Even under the current budget model, the same could

be done, and Coltrane provided an example of when it happened when he was Provost. Ex. 26, Coltrane

Tr. 85:13-86:12. Psychology did the same thing under Department Head Lou Moses. Moses Decl. ¶13.

When Psychology has equity money to distribute, it already undertakes this kind of an

evaluation, considering who is below the regression line together with an assessment of their merit to

determine whether an equity raise is appropriate. Ex. 6, Mayr. Tr. 86:10-87:12. The Department's policy

on retention raises likewise endorses seeking additional money for affected faculty when retention raises

create inequities, which the self-study also recommended. Ex. 34 at 004085. The Psychology

Department "would expect much less retention activity and turnover in the department if there were

alternative ways of arriving at merit-adequate salaries." Ex. 14 at 001149. Yet UO now calls equity raises

for other faculty in connection with retentions "impractical" because of "transaction costs." Ex. 31,

Schill Tr. 139:22-140:4.

## III. ARGUMENT

### A. Material Questions Of Fact Exist Regarding Plaintiff's Federal Equal Pay Act Claim

1. Plaintiff Establishes A Prima Facie Case Under the Equal Pay Act Because She Has Male Comparators Who Are Paid More And Perform Substantially Equal Work

For an Equal Pay Act claim and a Title VII[11] act claim, Freyd must establish a prima facie case of discrimination by showing that the employer pays different wages to employees of different sexes for substantially equal work.[12] *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). Freyd need not establish intent. *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986). After establishing a prima facie case, the burden shifts to the defendant to prove one of the few statutorily prescribed affirmative defenses. *Id*; 29 U.S.C. § 206(d). In their motion, Defendants only assert that Freyd has not established a prima facie case because, they claim, she does not perform substantially equal work to male full professors in psychology who are paid more. *See* Defs' Mtn. at 21-27. Defendants are wrong.

Significantly, to be "substantially equal" the jobs being compared need not be identical. *Wachter-Young v. Ohio Cas. Grp.*, 236 F. Supp. 2d 1157 (D. Or. 2002) (citing *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1074 (9th Cir. 1999). Rather, Freyd can establish that the skill, efforts, responsibility required in the performance of the jobs is "substantially equal." *Gunther v. County of Washington*, 623 F.2d 1303, 1309 (9th Cir. 1979), aff'd on other grounds, 452 U.S. 161 (1981); 29 U.S.C. § 206(d); *EEOC v. Maricopa Cnty. Cmty. Coll. District*, 736 F.2d 510, 513 (9th Cir. 1984) (finding a prima facie case where the plaintiff's job required similar skills, efforts, and responsibility and that "minor differences" in responsibility do not render the job substantially different); *see also* 29 C.F.R. 1620.14-18 (providing information regarding the

---

[11] As explained in Section III.B.2, a Title VII claim for failure to pay equal wages may be considered under the same standard as an Equal Pay Act claim or there may be a separate violation of Title VII under a disparate treatment analysis. Freyd alleges both.

[12] Freyd also needs to establish that work is performed under similar working conditions. Defendants do not dispute this. All have an office in the Department and lab space; they all work at the Eugene campus; they face no physical safety hazards. Ex. 12, Sadofsky Tr. 68:2-69:6.

PAGE - 22  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

equality of skill, effort, and responsibility)  Further, it is the overall job, not any individual component of the job, that forms the basis of the comparison.  *Gunther*, 623 F.2d at 1309.  Courts typically consider whether the jobs share a "common core" of tasks and whether either job has so many additional tasks that it makes it "substantially different" from the other.  *Stanley*, 178 F.3d at 1074.

All Psychology full professors have the same job duties and expectations: they are expected to maintain a full spectrum of accomplishments in research, teaching, and service. *See* Freyd Decl. ¶19; Ex. 53, Freyd Tr. 35:1-36:14; Ex. 6, Sadofsky Tr. 62:4-10; Ex. 71; Moses Decl. ¶¶3-4. Defendants' position that they all do different jobs would render the Equal Pay Act meaningless in an academic environment. No college or university could ever compare professors who teach different courses or perform different research – even those within the same department – despite being paid based on the same expectations and ranked against each other based on the same criteria.  Courts have already rejected this argument.  *Allender v. Univ. of Portland*, 689 F. Supp. 2d 1279, 1285 (D. Or. 2010) (rejecting university's summary judgment motion because it found that professor positions "requires equal skill, effort, and responsibility" from those that plaintiff had proposed as comparators); *Brock v. Georgia Southwestern Coll.*, 765 F.2d 1026, 1033 (11th Cir. 1985) (finding that university teachers within the same academic division were appropriate comparators, even though they taught different types of courses because they had the "same talent and effort, and the same responsibility" and finding "[v]irtually all teachers in a higher education setting will teach different courses"); *Klein v. NYU*, 786 F.Supp.2d 830, 850 (2011) (holding that plaintiff had established that other professors in her department performed substantially equal work).

Full professors' job descriptions provide flexibility to determine how to meet their common expectations. For example, the teaching expectation is at least 4 credit hours during an academic year, but may be reduced or increased based on various circumstances. *See* Ex. 28; Freyd Decl. ¶10 (describing having an annual one-course release from teaching based on her contributions to an influential Journal);

PAGE - 23  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Arrow Decl. ¶7. Service assignments may also justify relief from some teaching. *Id.* These kinds of trade-offs, which change from year to year, do not alter the common core of responsibilities that are expected of all full professors in psychology: research, teaching, and service.

Many of the duties that Defendants argue distinguish Freyd's male comparators from her are compensated separately above and beyond their base salary.  Moses Decl. ¶6; Ex. 29; Ex. 28 at 004058 (addressing "overload assignments.").  The additional duties paid for separately are not relevant to a comparison of the common duties that the base salary compensates. *See, e.g., Melanson v. Rantoul*, 536 F. Supp. 271, 289 (D.R.I. 1982) (holding that the Chairman duties of a fellow professor were not relevant because he received a separate stipend for that work, and that she correctly compared their base salaries). The department head role, for example, receives extra compensation through a stipend, course releases, and additional summer pay.  Ex. 29. When Hall held the Director of Clinical Training position, he was paid separately for those duties, just as he was paid separately for his CoDaC duties. *Id.* The differences in the day-to-day tasks of Freyd's comparators, which are so heavily emphasized by Defendants, are already accounted for because the job description, as well as non-base salary compensation, accounts for such differences.

Defendants argue that Professors Fisher and Allen are different because they receive significant grant funding, as if that is an end in itself. *Compare* Baldwin Decl. ¶2.  But, in fact, the reason to secure grant funding is to be able to do research – which is the same core task that Freyd does. Though Fisher's and Allen's research requires them to attract grant funding in order to be able to do it, they are still expected to maintain the same set of accomplishments in research, teaching, and service as Freyd. Ex. 53, Freyd Tr. 77:10-78:2. Administering those grants may involve administrative work and supervision of employees, but Freyd also supervises employees, oversees a budget, and performs administrative work as part of her research. *See also* Moses Decl. ¶6 (describing that Freyd has taken on "similar time-consuming, effortful and important roles").  This includes the significant paperwork of a

PAGE - 24  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

review and approval process for human subjects research, which is also part of Allen and Fisher's administrative tasks. Freyd Decl. ¶5; Ex. 53, Freyd Tr. 40:22-41:19; 42:2-43:23. Further, federal grants often include a budget for administrative assistance, which reduces this workload on recipients. *See* Freyd Decl. ¶21.

Defendants go on to assert that "the relative amount of revenue generated should be considered" in determining the equality of two jobs. *See* Defs' Mtn. at 23 (citing to *Stanley v. Univ. of S. Cal. ("Stanley I")*, 13 F.3d 1313, 1321 (9th Cir. 1994)). Yet Defendants have not identified any document that instructs that full professors must obtain grant funding, that it is a consideration separate from the general research requirement, or that administration of a grant means that they are no longer doing the same job as the other full professors in their department. Freyd Decl. ¶¶19, 29; Ex. 53, Freyd Tr. 80:7-17. Defendants have *never* told Freyd that she must receive grant funding to deserve a raise. Freyd Decl. ¶¶19, 29. Indeed, they cannot point to any such evidence because it is inconsistent with what Defendants actually consider when evaluating the skill, effort and responsibility required in the performance of a full professor job. Nor does *Stanley I* hold that revenue generation should be a consideration when comparing academic jobs. Rather, that case involved basketball coaches. One of the core duties of the men's coach was revenue generation, but it was not a significant expectation for the women's coach. *Stanley I*, 13 F.3d at 1321. The court found that that difference in job duties rendered the positions unequal. *Id*. Here, by contrast, securing a grant or generating revenue is not a job duty for *any* Psychology professor.

Defendants argue that Hall should not be a comparator because he previously worked part-time outside of the Department and also previously served as Director of Clinical Training. But Hall was paid separately for both assignments, beyond his base salary. *See* Ex. 29 at 10762-70 (showing Hall's reduced FTE in Psychology and/or "other compensation" for assignment to CoDaC; also showing stipend for clinical training role at 10764-66, 10768). Furthermore, the job description contemplates such out-of-

PAGE - 25  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

department assignments, noting that the FTE allocation in the Psychology Department may change for an assignment in another department. Ex. 28 at 004059-60. Even so, Hall remained subject to the Department's expectations for research, teaching, and service, and was reviewed for it by Psychology. *See, e.g.*, Ex. 30. Moreover, he currently has neither of those assignments and is working full time with the Department. Ex. 29. There is no reason not to consider him an appropriate comparator. *Id.*

Professor Mayr is also a suitable comparator even though he has administrative duties because he remains subject to the same job description. Instead, to compensate him for his administrative work as department head, he receives a stipend during the time period he is acting as the department head and he is released from teaching. The department head is a rotating, temporary position, which different professors assume at different times. *Id.* He also is not Freyd's supervisor. He does not oversee or control faculty teaching assignments, he cannot hire her, fire her, or discipline her, and he does not perform her reviews. Freyd Decl. ¶22.

The fact that the comparators perform different research and accomplish that research through different means is not determinative of substantial equality where the job expectations and the skills, efforts and responsibilities are the same. For example, in *Ewald v. Royal Norwegian Embassy*, the defendant hired two different experts to work at the Norwegian consulate. 82 F.Supp.3d 871, 929-930 (D. Minn. 2014). In that case, the individuals had different backgrounds and different areas of focus (one on education and the other on business) and therefore their day-to-day work differed based on their respective focuses. *Id.* The court, however, found that the two positions were substantially equal because the defendant's expectation of the two comparators was the same and the job descriptions include similar expectations. *Id.* at 941-44 (finding evidence showed some differences in day-to-day functions, but jobs required equal skill, effort, and responsibility). Likewise, here, because Freyd's comparators use substantially equal skill, effort and responsibility in the performance of their jobs, their work is substantially equal.

PAGE - 26  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In addition, all Psychology Department professors are subject to extensive and regular reviews (merit, promotion, tenure, and post-tenure reviews) based on identical criteria. Specifically, the Department sets salaries and gives raises solely on three criteria: research, teaching, and service. Grant funding is not considered as a separate criterion; rather, it is accounted for in the merit reviews when evaluating research. Ex. 53, Freyd Tr. 35:1-36:14; *see also* Freyd Decl. ¶¶19-21 (stating "apply for a grant is not more time consuming, nor is it qualitatively different, from much of the other work that academic faculty do."). In any event, like her comparators, Freyd has received numerous public and private grants. *Id.* Professors who receive more grant funding are not considered to be doing such different work that they cannot be compared to those who receive less. To the contrary, the department compares each full professor to each other by rating them on a five-point scale. This process admits that all of the Psychology Department professors do substantially equal work because it already compares their work based on their research, teaching and service. And, again, the Department accounts for the variables in grant funding and the day-to-day tasks in its internal rankings – where service is increased through more administrative duties, teaching is decreased.

Significantly, Professor Mayr *agrees* with Freyd that these internal comparisons are dispositive on the question of whether Freyd has identified apt comparators. He told Defendants' investigator that there is "no reason to remove people" from the comparison set because "[w]e all do the same work. Fisher and Allen do not have different job descriptions." Ex. 40. He confirmed that there is "no institutional mechanism that recognizes the difference of running a grant or being a director" and that they are treated the same in terms of merit review, salary increases, and raises. *Id.* This admission creates, at a minimum, a material dispute of fact about whether all full professors do equal work.

Because of the highly fact-specific nature of the analysis, the Ninth Circuit has instructed that "each suit must be determined on a case-by-case basis." *Gunther*, 602 F.2d at 887. For this reason, Defendants' additional cases (considering different jobs, different facts, and different employers)

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

provide no support here. *See* Defs' Mtn. at 23-24 (citing *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409 (9th Cir 1988) (comparing the job of test desk technicians to maintenance administrators); *Penk v. Or. State Bd. of Higher Educ.*, Case No. 80-436, 1985 WL 25641, at *2 (D. Or. Feb. 13, 1985) (considering in a class action trial under Title VII (no equal pay claim) whether "female regular teaching faculty" were discriminated against at eight different institutions).

Finally, Defendants claim that Freyd fails to prove a prima facie case because she agreed "it would not be surprising" if over the last 10-year period she was paid more than the average male professors in psychology. Defs' Mtn. at 21. This is not the law. The proper test is whether the plaintiff is paid less than the average wages paid to all employees of "the opposite sex performing substantially equal work *and similarly situated with respect to any other factors, such as seniority, that affect the wage scale*." *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 916-17 (9th Cir. 1983) (emphasis added). Seniority, or years in rank, is a critical component of professors' salaries at UO; Defendants' "preferred way" of analyzing them is to look at salary plotted against years in rank. Ex. 12, Sadofsky Tr. 198:19-24. Economist Cahill found that Freyd's salary is "far below that of the average male faculty member in the department, conditional on years in rank." *See* Cahill Decl. ¶5. The Department's own analyses showed this disparity when years in rank are accounted for, as did Freyd's request for a raise. Ex. 22, Ex. 20 at 10-12. What is more, Defendants' evidence of the average salary not only ignores years in rank, it erroneously includes two males who are not acting as full professors and have not been on the faculty since 2001.

The relevant question here is, viewing in the light most favorable to Freyd and resolving all inferences in her favor, does a genuine issue of material fact exist regarding the substantial equality of the work performed by professors in the Psychology Department. As discussed herein, the evidence presented establishes that it does.

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

2. Defendants Have Not Met Their Burden of Proving that the Pay Differential Is Based On A Factor Other Than Sex[13]

Once Freyd establishes that Defendants paid her differently than male employees for substantially equal work, Defendants can prove they did not violate the Equal Pay Act by establishing one of four statutory exceptions, which operate as affirmative defenses. *Rizo v. Yovino*, 887 F.3d 453, 459 (9th Cir. 2018)(*en banc*). Defendants have the burden of proving one of the defenses applies. *Id.*

Defendants contend that payment of unequal wages is lawful because retention is a lawful factor other than sex, but Defendants have not met their burden here. Critically, Defendants ignore the requirement that a factor other than sex, "*mus*t be one that is job related, rather than one that effectuates some business policy." *Rizo*, 887 F.3d at 468 (emphasis in original) (citations omitted). Defendants have not proven that retention is job-related and, indeed, they cannot. Instead, they argue that payment of a retention adjustment is a "strategic decision" about whether to "fight for key faculty and programs." Defs' Mtn. at 32-33, 39. Yet, that strategic decision is exactly what the Ninth Circuit has determined does not qualify as a factor other than sex: a business policy.

Defendants have offered *no* evidence of a specific job-related reason to pay a retention adjustment. To the contrary, although Defendants assert that it needs to be able to retain nationally recognized faculty, they provide only business-related reasons (such as the need to retain grant funding or the inability to recruit a suitable replacement). Such a business-related decision does not qualify for the defense. The *Rizo* court considered whether a difference in pay based on prior salary constitutes a factor other than sex and, expressly rejecting a business-related justification, found that it did not fit

---

[13] Defendants' motion argues that Freyd is paid a differential based on a factor other than sex, but it does so only in response to her disparate impact claims, not her Equal Pay Act claim. *See* Defs' Mtn. at 30. Therefore, if Freyd establishes that material question of fact exists regarding whether she performs substantially equal work (which she does), Defendants' motion for summary judgment on her equal pay and Title VII claims should be denied because Defendant has not properly raised any defense. To the extent Defendants argument is construed as an application of the affirmative defense, however, it fails for all of the reasons discussed herein.

PAGE - 29   PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

within the exception. Prior salary, the court held,

> is not a legitimate measure of work experience, ability, performance or any other job-related quality. It may bear a rough relationship to legitimate factors other than sex, such as training, education, ability, or experience, but the relationship is attenuated. More important, it may well operate to perpetuate the wage disparities prohibited under the Act.

*Id.* at 466-67. Likewise here, retention adjustments are unrelated to any job-related quality. Instead, Defendants' policy provides that they are done to "prevent the loss of a valued faculty member." Ex. 41; *see, e.g.*, Ex. 3, Marcus Tr. 100:15-25 (confirming that Hall was given a retention adjustment because "this was someone who is really important to us in terms of our national profile" among other factors). Furthermore, like prior salary, retention raises serve to perpetuate the wage disparities prohibited under the Act. This is both because of the "structural differences and actual biases that make it harder for women to participate in [retentions]," (Ex. 22) and because defendants treat women differently from men in the retention process.

A jury could also find that retention is not a factor other than sex because of the gendered way it operates in this case. *See, e.g., Rizo*, 887 F.3d at 466 (rejecting the "market forces theory" as a valid basis other than sex). Though the department is close to half and half women and men, far fewer women engage in retention negotiations than men do. Former Department Head Louis Moses points to implicit biases that meant women were recruited away less often, as well as a price that women paid internally that was not there for men. Moses Decl. ¶12. Evidence also shows that when women have sought retentions, they have been treated differently from men. Baldwin describes her experience in detail – and raises numerous factual disputes with Sadofsky's rendition of her retention negotiation. *See* Baldwin Decl. ¶¶3-13 and Ex. 2. In short, UO offered Baldwin only $10,000, without research funds, when she was pursued for one of the most prestigious positions in the country, and that was only after Baldwin herself initiated the request and persistently sought a retention. *Id.* In sharp contrast, UO preemptively gave Allen a raise of $23,000 and $400,000 in research funds when he was vying for a post at a lesser

PAGE - 30  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

school, that he admittedly was not even interested in accepting. Professor Fisher received a raise of

$20,000, plus an endowed chair of $19,300 and research funds, and then in a second negotiation

received a commitment of $1,200,000 in research funds. Professor Hall was involved in two retention

negotiations during that same period and he received a raise of $20,000 from the Psychology

Department and a commitment of $190,000 in research and post-doctoral funds – even though the

Department did not support giving him these raises. This evidence shows the extreme disparity in the

way Defendants engage in retention offers for male professors as compared to female professors.

A jury could also find that Defendants fail to meet their burden to show a factor other than sex

because of the way they handled Freyd's complaints. *See Ackerson v. Rector and Visitors of Univ. of Va.*,

Case No. 17-cv-00011, 2018 WL 3209787, at *8 (W.D. Va., June 27, 2018) (holding that the defendant

could not show as a matter of law that a factor other than sex accounted for the salary difference where

plaintiff had "persistently voiced frustration" with the salary inequity and the defendant continued to

pay her less than her male comparator).

Defendants cite to a host of decisions that they say hold that retention adjustments are

"permissible and non-discriminatory." Defs' Mtn. at 31. Most do not involve retentions at all, and none

stands for a general proposition that retention payments cannot violate the Equal Pay Act. *Stanley I*, for

example, does not involve retention raises and instead holds that men's coaches and women's coaches

are in different labor markets – which is not the case here. 13 F.3d at 1316. *Spaulding v. Univ. of Wash.*,

740 F.2d 686 (9th Cir. 1984) not only is factually distinct, it has been overruled. *See Atonio v. Wards* Cove

*Packing Co.*, 810 F.2d 1477, 1482 (9th Cir. 1987). Moreover, the notion for which defendants cite it –

that unequal wages reflecting discriminatory market conditions do not violate the EPA – was expressly

rejected by the *en banc* court in *Rizo*. 887 F.3d at 466-67. *Miller v. Board of Regents of the Univ. of Minn.*

likewise does not involve retention raises. Rather, like *Stanley I*, it involves employees with different jobs

who were hired out of different markets. Case No. 15-CV-3740, 2018 WL 659851, at *7 (D. Minn. Feb.

PAGE - 31  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1, 2018).[14] *Winkes v. Brown Univ.* also presents unique facts and announced no general rule. 747 F.2d

792, 794 (1st Cir. 1984). There, a male professor alleged that a female professor was paid more. *Id.*

Unlike here, there was no evidence in *Winkes* that retention raises resulted in more widespread gender

inequities, or that one sex was treated worse than another in the process. The court found no violation

for a number of reasons different from those that exist here. *Id.* at 794-95.[15]

In citing to these cases, Defendants suggest that their choice to pay men more is permissible

because Freyd's "market value" is significantly lower than that of her colleagues. But Defendants have

presented no evidence that this is true, nor could they. Defendants' effort to avoid responsibility for its

unequal pay by contending that retention is *per se* a lawful factor other than sex is unavailing.

### B.  Material Questions Of Fact Exist Regarding Plaintiff's Additional Claims For Discrimination Based On Defendants' Disparate Treatment

Defendants assert that all of Freyd's additional claims fail by applying the "same standards and

analysis" as the Federal Equal Pay Act claim. *See* Defs' Mtn. at 27.  This assertion, however, grossly

oversimplifies the law and claims asserted by Freyd.  Instead, the claims require different standards of

proof and different legal analysis, which, in turn, require the court to look at different disputed facts.

Freyd discusses each of these different claims below.

1.  Oregon's Equal Pay Act And Constitution Require That Plaintiff Be Paid Equally For Work Of A Comparable Character, A Lower Standard Than The Federal Equivalent

Oregon's law barring discrimination in wages prohibits discrimination between the sexes for

---

[14] Freyd also respectfully assert that *Miller* is wrongly decided to the extent it held that unequal wages arising from market conditions are not prohibited by the Equal Pay Act. The Ninth Circuit's *Rizo* decision severely undermines this argument and *Miller* also does not reflect Ninth Circuit law in that it fails to consider whether the pay differences are job-related.

[15] Defendants' string citations to cases outside the university context, all of which have remarkably different facts and are outside of the Ninth Circuit, also provide no support for its claim that payment of different wages based on retention is per se lawful.  *See* Defs' Mtn. at 32; *see also, e.g., Signmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 679 (S.D.N.Y. 1995) (finding that plaintiff did not establish a prima facie case under Equal Pay Act because all of the comparators except one had received salaries equivalent to their experience and the plaintiff was paid higher than some males with equal experience).

"work of a comparable character, the performance of which requires comparable skills." ORS 652.220. To establish a prima facie case under the Oregon law, Freyd need establish that she was paid less and she was performing *comparable* work. *Smith v. Bull Run Sch. Dist.*, 80 Or. App. 226, 229 (1986) (emphasis added). The burden then shifts to Defendants to show that the pay differential was on a particular factor other than sex. *Id*; ORS 652.220(2).

Oregon's law requires only "comparable work, which is a more inclusive term" than substantially similar. *Smith v. Bull Run Sch. Dist.*, 80 Or. App. 226, (1986); *see also Forsberg*, 840 F.2d at 1421 (affirming district court decision not to assert pendent jurisdiction over an ORS 652.220 claim because the court "refused to assume the Oregon legislature intended the state act to parallel the federal act"). Another Oregon Court of Appeals decision recognizes that "substantially similar work," the federal standard, is a stricter test than "comparable work," the state standard. *Bureau of Labor & Indus. v. Roseburg*, 75 Or. App. 306, 310 (1985) (recognizing that "'[w]ork of comparable character' is broader than 'equal work.' 'Comparable' does not require equality but that two items have important common characteristics").

Defendants assert the two laws require the exact same standard, overlooking the difference in the plain language of the statutes and the case law recognizing the distinction between comparable and equal work. Additionally, while it is true that Oregon's Unlawful Discrimination in Employment Act (ORS 659A.030) is analogous to federal law, Defendants cite no authority holding that ORS 652.220, a separate statute in a separate chapter, applies the same standard as the Equal Pay Act. Thus in determining whether Freyd has established a prima facie case under Oregon's equal pay law, the Court should consider only whether Freyd engages in work of a comparable character to that of her relevant comparators.

Oregon's Equal Rights Amendment, Article 1, Section 46 of the Oregon Constitution was passed in 2014. No legislation or regulations have been adopted to create a standard and Freyd is unaware of any cases interpreting this provision of the Constitution or determining the burden of proof.

PAGE - 33  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Freyd believes that a claim for pay discrimination under Article 1, Section 46 should follow Oregon's previously existing law regarding equal claims and here, specifically, should follow ORS 652.220.

Freyd performs work of a comparable character to the other full professors in Psychology. Although research may be focused on different subjects, all professors are required to perform research and the time allocated to research is comparable to the amount of time Freyd spends on hers. Professors Allen and Fisher's time spent on their grant administration, for example, is a part of their overall time spent doing research, which is also true for Freyd. Thus, although the specific methods of research may differ from Freyd's, their work is of the same character. The expectation for their research is the same, and the outcome of their research is comparable (for example, through the merit ranking process or the H-index score). Likewise, all professors are expected to teach and mentor students – work of comparable character – and to perform service. Though particular service assignments may differ, they have the same character.

Similarly, as the Psychology Department's merit review process itself proves, the performance of the work of full professors requires comparable skills. When a merit review is conducted, the Department has each full professor submit a standardized report detailing their accomplishments in these three categories and then ranks them by relative merit. All professors' research is peer-reviewed and publishable, which is then compared to other professors' scholarship. All professors teach students and are evaluated based on their teaching skills. Finally, all professors are rated on their contributions to service, such as mentoring students and active service on committees. Thus, the skills required to be a full professor in the Psychology Department are comparable because the Psychology Department, in fact, compares them. *See, e.g., Allender*, 689 F. Supp. 2d at 1285 (finding that plaintiff met her burden of showing male colleagues in the economics discipline were comparable because they taught classes, did research, and provide service to the university).

PAGE - 34  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

For all of these reasons, as well as all of the reasons discussed in Section III.A, Freyd's work is of a comparable character, the performance of which requires comparable skills, as that of her identified male comparators. They are all the same in rank, in the same department, have the same job expectations, and are ranked on a comparative scale that takes into account the same considerations of research, teaching, and service. Because Mayr, Hall, Allen and Fisher do comparable work to Freyd, she has established a prima facie case under ORS 652.220 and the Section 46 of the Constitution.

    2.  <u>Defendants Violated Oregon's Unlawful Discrimination Act, Title IX, and Title VII</u>

Freyd's claims under Title IX[16], ORS 659A.030, equal protection, and Title VII[17] require a different analysis then her equal pay act claims. *See, e.g.*, *Lanegan-Grimm v. Library Asso. of Portland*, 560 F. Supp. 486, 490 (D. Or. 1983) (discussing the standard applicable to Title VII claims); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000) (citation omitted) (describing intentional discrimination claim under equal protection); *Logan v. West Coast Benson Hotel*, 981 F. Supp. 1301, 1319 (D. Or. 1997) (Oregon state law claims under Chapter 659 is construed to the extent possible consistent with Title VII); *Ackerson*, 2018 WL 3209787, at *8 (applying the same standard for Title VII and Title IX claims).

---

[16] Defendants wrongly claim that Freyd cannot assert both Title IX and Title VII claims. Defendants' argument rests on a theory adopted in one circuit, which has been rejected by numerous courts and never adopted by the Ninth Circuit. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 563 (3rd Cir. 2017) (rejecting theory that Title VII is the exclusive remedy for alleging employment discrimination in federally funded educational institutions); *Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203 (4th Cir.1994); *AB ex rel. CD v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144, 153 (S.D.N.Y. 2004).

[17] A plaintiff can establish a violation of Title VII by showing a violation of the equal pay act **or** through proving a Title VII disparate treatment claim. Where a "plaintiff who does not succeed in establishing a prima facie 'equal pay' case -- for example, because of a failure to prove that the jobs being compared involve substantially equal work -- may nevertheless be able to prove intentional sex discrimination under Title VII." *Lanegan-Grimm v. Library Asso. of Portland*, 560 F. Supp. 486, 490 (D. Or. 1983); *see also County of Wash. v. Gunther*, 452 U.S. 161, 179 (1981) (holding that a violation of Title VII may occur even where no violation of the equal pay act exists, for example, if there are no comparators). Therefore, if the Court denies Defendants' motion for summary judgment on Freyd's Equal Pay Act claim, it should also deny it on her Title VII claim. However, if the court granted that (which it should not), it should still separately consider whether her Title VII claim exists under the standard discussed herein.

PAGE - 35  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Each of these laws prohibits an employer from treating an employee differently because of their sex (e.g. disparate treatment discrimination). Here, Freyd can prove her case by showing that "a discriminatory reason more likely than not motivated defendant" by producing direct or circumstantial evidence. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004). This burden is "not onerous" and can be met by showing "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such action was based" on gender. *Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 538 (9th Cir. 1982); *McGinest*, 360 F.3d at 1124 (holding "very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive" because "any indication" of discriminatory motive may raise a question of fact that can only be resolved by a fact-finder). In addition, compared to the Equal Pay Act claim, such claims require a "relaxed standard of similarity between male and female-occupied jobs." *Ackerson*, 2018 WL 3209787, at *8 (internal citations omitted).

Here, Freyd, who is a member of a protected class, establishes a prima facie case of disparate treatment by proving facts supporting an inference that the difference in compensation for compared jobs results from the employer's intentional discrimination. *O'Brien v. Sky Chefs, Inc.*, 670 F.2d 864, 866 (9th Cir. 1982) (holding that factual questions existed regarding whether the defendants had a "regular practice" of preventing women from being promoted through practices like failing to announce job openings, and that to establish a prima facie case a plaintiff may "offer statistical evidence showing a disparity" between the sexes).

To rebut Freyd's prima facie case, Defendants must articulate a legitimate, non-discriminatory reason that justifies the disparity. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Defendants did not engage in this analysis and therefore did not offer a legitimate non-discriminatory reason (because they wrongly assumed the same analysis applied to all of Freyd's claims). Freyd will presume that Defendants would assert that retention is a non-discriminatory reason. But, as discussed at Section

PAGE - 36  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

III.A.2, supra, retention raises should not be considered a "non-discriminatory" reason for the salary inequity. The retention negotiation process is more available to men than to women, and Defendants have treated men more favorably than women when women engage in the negotiations. The burden then shifts back to Freyd to provide that Defendants' proffered reasons are pretextual.

Freyd meets her burden here. Although subject to the exact same review process and considered on the exact same grounds (research, teaching, and service), Freyd was paid less than her male peers, who all are junior to her, because of her sex.

On recognizing that she was paid less than her male peers, with less seniority, and comparable merit recognition, Freyd requested a raise. In doing so, Freyd presented significant evidence of the gender disparity. First, Freyd met with Mayr, giving him a regression analysis that showed she was underpaid relative to her male peers. In response, Mayr acknowledged the gender bias in the numbers. Ex. 5. Professor Freyd's female full professor colleagues joined her in analyzing the salary disparities and submitting a memorandum to the Department's Executive Committee. Ex. 8. The Department's self-study and external review also recognized the gender inequity in full professor salaries. Freyd then met with Deans Sadofsky and Marcus who declined her request for a raise. In doing so, Defendants ignored substantial evidence of the pay disparity that left Freyd with unequal pay. In contrast, when male professors in the Department sought a raise, they were granted – even though Defendant's own policy requires consideration of equity when granting these raises. *See, e.g.*, Ex. 43, Ex. 50.

Freyd readily establishes pretext. In their meeting with Freyd to explain their reasons for declining her request, the Deans compared her to people in other departments and said she makes more. Freyd Decl. ¶26. They never raised the explanations that they are asserting now: that men in her department are paid more because they do different jobs, or because they receive grant funding. These shifting rationales show pretext. *Washington v. Garrett,* 10 F.3d 1421, 1434 (9th Cir. 1993) (holding that "fundamentally different justifications for an employer's action would give rise to a genuine issue of fact

PAGE - 37  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason.").

Defendants were indisputably on notice that retention resulted in unequal pay among the genders and that retention adjustments were the reason for gender inequity in salaries. *See also* Section III.C.1 (discussing evidence of the disparate impact); *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000) (holding that a plaintiff need not provide additional evidence beyond that constituting her prima facie case "if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons"). Despite being on notice that its policy resulted in unequal pay, Defendants disregarded this evidence and refused to provide Freyd a raise. *See, e.g., McGinest*, 360 F.3d at 1123 (9th Cir 2004) (recognizing that pretext can be shown through treatment of the employee, as well as through the employer's general policy and practice toward the protected class of employees).

Freyd can also show pretext here because she had an exceptional H-index, which is reflective of the high academic value and impact of her work within her field. *See* Freyd Decl. ¶¶6-8 (describing that she currently has the second highest H-index in the Psychology department, which demonstrates her "scientific and scholarly impact" in her field); *Adetuyi v. City & Cty. of S.F.*, 63 F. Supp. 3d 1073 (N.D. Cal. 2014) (evidence of a plaintiff's superior qualifications, standing alone, may suffice to show pretext). Defendants' failure to compensate Freyd in accordance with her superior qualifications is further evidence of pretext.

Defendants' failure to give Freyd an equity adjustment thus constitutes disparate treatment.

### C.  Material Questions Of Fact Exist Regarding Plaintiff's Disparate Impact Claims Under Title VII And ORS 659A.030

Freyd's disparate impact claims challenge Defendants' retention raise practices because they cause a disparate impact on the salaries of women in the Department. Though the practice is facially neutral, in fact it "fall[s] more harshly on one group than the other." *Rose v. Wells Fargo Co.*, 902 F.2d

PAGE - 38  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1417, 1423 (9th Cir. 1990).

Disparate impact claims under Title VII were first recognized in 1971 in *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). *Griggs* challenged the employer's requirement of a high school diploma because it had the effect of screening out a disproportionate number of Black candidates. The Court found that without a showing that a high school diploma was necessary to perform the job, the practice violated Title VII. "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Id.* Congress later codified disparate impact claims in Title VII at 42 U.S.C. § 2000e-2(k)(1)(A).

To establish a prima facie disparate impact claim, the plaintiff shows that the employer "*uses a particular employment practice that causes a disparate impact.*" *Lewis v. City of Chicago*, 560 U.S. 205, 212 (2010)(emphasis in original). Plaintiff shows disparate impact by identifying the specific employment practice, showing that it has a disparate impact on a protected group, and showing a causal relationship between the challenged practice and the disparate impact. *Rose*, 902 F.2d at 1424. No showing of discriminatory intent is required. *Stout v. Potter*, 276 F.3d 1118, 1123 (9th Cir. 2002) ("The rationale, intent or motive underlying a challenged employment practice plays no part in a prima facie case of disparate impact").

The burden then shifts to the defendant to show that no disparity exists or that the employment practice has a "manifest relationship to the employment in question." *Clady v. County of Los Angeles*, 770 F.2d 1421, 1427 (9th Cir. 1986) (quoting *Griggs*, 401 U.S. at 431); *see also* 42 U.S.C. § 2000e-2(k)(1)(A)(i) (to overcome a showing of disparate impact the employer must show the practice is "job related for the position in question and consistent with business necessity"); *Contreras v. City of L.A.*, 656 F.2d 1267, 1280 (9th Cir. 1981) (holding that tests with disparate impact are unlawful unless shown to be "relevant to the job"). This is a burden of proof in addition to a burden of persuasion. *See Griggs*, 401 U.S. at 431-32; *Stender v. Lucky Stores*, 803 F. Supp. 259, 321 (N.D. Cal. 1992). A showing that "the employer refuses

PAGE - 39  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs" will also establish an unlawful employment practice based on disparate impact. *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009); 42 U.S.C. §§ 2000e–2(k)(1)(A)(ii) and (C).

    1.  <u>Disparate Impact Exists Here</u>

A plaintiff may show a disparate impact by showing, through statistical proof, population comparisons, regression analysis, or other kinds of evidence, that an observed disparity in outcomes is sufficiently large that it is highly unlikely to have occurred by chance. *See generally* B. Lindemann, P. Grossman & G. Weirich, EMPLOYMENT DISCRIMINATION LAW 318 (5th ed. 2012); *c.f. Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307 (1977). The "significance" or "substantiality" of numerical disparities is judged on a case by case basis. *Rose*, 902 F.2d at 1424 (citing *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994–95 (1988)) ("Our formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation").

Labor economist Kevin Cahill has analyzed Defendants' data regarding base salaries of full professors in psychology from 2007 through 2018 and has determined that women are paid thousands below men in the department, and that the gap only widens with years in rank. *See* Cahill Decl., Exh. A. This is a highly statistically significant gap (P-value 0.004) – i.e., it is highly unlikely that it would occur by chance. Cahill Decl. ¶ 5; *see generally Stender v. Lucky Stores, Inc.*, 803 F.3d 259, 323 (N.D.Cal. 1992) (explaining P-values and statistical significance). This is consistent with the findings of the self-study, which found an average salary gap of $25,000 plus associated benefits.

Cahill's analysis goes on to show that a particular employment practice caused the disparate impact: retention raises. Once he controlled for whether or not a professor received a retention raise, the statistical significance of the gender variable declined to near zero, and instead the retention raise factor was the significant predictor of salary. Cahill Decl. ¶5.

PAGE - 40  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Cahill's conclusions are consistent with the Department's own analyses. Mayr engaged in a complicated regression analysis that considered several relevant factors over time, but he found the "qualitative pattern essentially stays the same": faculty who receive retention raises have higher salaries than those who do not, and the result of that is a disparate impact on women's salaries.

Defendants' data also shows that far fewer female tenure-track faculty engage in retention negotiations, and fewer still have received offers large enough to cause them to stay. Of five retention negotiations with a woman, only two resulted in raises or research funds that caused them to stay (40%), whereas 14 of 21 negotiations with men did (67%). One way of showing disparate impact is the "four-fifths" rule, by which disparate impact can be inferred if women are selected at a rate that is less than four-fifths of the rate men are selected. *See Watson*, 487 U.S. at 1011; *Stout*, 276 F.3d at 1124 (applying "four-fifths rule" and calling it "rule of thumb" courts use when considering disparate impact of selection procedures). Offering enough to keep only 40% of the women who asked for a raise is below four-fifths of the 62% of men who were offered enough to keep them.

This data meets Freyd's burden of showing that Defendants' retention practices have a disparate impact on the salaries of female full professors in Psychology.

    2.  Defendants Present No Valid Defense

To overcome Freyd's prima facie showing, Defendants must establish that their use of retention adjustment is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-(2)(k)(1)(A)(i). Defendants do not even make this argument, much less provide any evidence to meet their burden of proof on this issue.

Instead, evidence supports a reasonable jury's finding that retention raises are not job-related for the position of a psychology professor. It is not a part of a psychology professor's job duties to seek outside offers. Ex. 26, Coltrane Tr. 107:11-16. Doing so takes up significant time of the faculty member and the department that could otherwise be spent doing research or teaching. *See, e.g.*, Arrow Decl. Ex.

2. The near-constant negotiations in Psychology are a strain both to the Department and the college administration and have affected morale. Ex. 14. Mayr agreed that "[a]ggressive retention activity should not be the only way to maintain a market-adequate salary." Ex. 22. And Defendants admit that encouraging faculty to seek outside offers is against their interest. Ex. 26, Coltrane Tr. 79:21-80:3.

Rather than addressing the only available defense – job-relatedness – Defendants make numerous irrelevant arguments. These are baseless distractions that should be dismissed. Specifically, Defendants assert:

(1) <u>Retention is a factor other than sex</u>. This argument is misplaced. A "factor other than sex" is a valid defense to an Equal Pay Act claim, but not to a disparate impact claim. Here, Defendants must show that retention raises are job related and consistent with business necessity, which they have not.

(2) <u>Retention offers are a lawful exercise of Defendant's discretion</u>. Defendants repeat numerous arguments about why retention raises are business-related decisions, like UO's need to compete with the outside market, to recruit nationally-recognized faculty, and to keep grant funding. While this evidence might suggest business necessity, none of it shows that retention raises are job-related for the position in question. *See* Section III.A.2. Rather, for the same reasons that an employee's prior salary is not a job-related factor in determining their salary, neither is the amount that defendants might need to offer to stave off a competitor. *See Rizo*, 887 F.3d at 467 (holding that prior salary "is not a legitimate measure of work experience, ability, performance, or any other job-related quality"); *see also* Ex. 14, finding that "it is not obvious that the frequency of retention negotiations is a strong indicator of overall productivity."

(3) <u>Freyd could have sought a retention raise but has not</u>. This argument merely proves that retention raises are *not* job-related, because Freyd has always excelled in her job without seeking a retention raise. It also rests on the bizarre premise that in order to be paid equitably in her job, Freyd should have tried to leave it – something that defendants admit is not a part of her job, is against their interest for her to do, and is disruptive to the department and the administration. Moreover, it would

PAGE - 42  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

require her to represent falsely to another institution that she was prepared to leave Oregon and represent falsely to UO that she was prepared to leave. Freyd is unwilling to engage in such deceptions.[18] *See also* Baldwin Decl., ¶15. Ultimately, Freyd's complaint is about her salary, and there is no dispute that she asked for a raise and was turned down.

Moreover, Freyd does not need to have sought a retention increase to show that the practice has a disparate impact on her as a female full professor in the department. The data above shows it. Mayr identified Freyd as "our most glaring inequity case" – the member of the department most affected by the disparate impact of retentions. At the very least, this evidence creates a dispute of material fact on whether Freyd has shown a disparate impact on her, precluding summary judgment for Defendants.

(4) *Defendants have made retention offers to women*: Again, this argument does not show that retention raises are job-related. It also misconceives what disparate impact is. Disparate impact does not require that *all* of the members of the protected group are excluded, it requires a showing that they are *disproportionately* affected by the employment practice in question. *See, e.g., Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486 (9th Cir. 1993) (holding that the fact that some Hispanic workers were not affected by the challenged policy is irrelevant because "[i]f the adverse effects are proved, it is enough under Title VII that Hispanics are disproportionately impacted.").

Furthermore, half of the retention offers for women that they cite (Pfeiffer, Dehle, Baldwin) took place after this lawsuit was filed, rendering them of little probative value. *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 529 (N.D. Cal. 2012) (holding that post-filing conduct is less probative than pre-filing conduct because employer may be improving its practices to avoid liability in its pending discrimination case). In addition, Dehle is not even a tenure-track faculty member so any offer

---

[18] For this reason, cases that Defendants cite, *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406 (9th Cir. 1987) and *Garcia v. Spun Steak*, 998 F.2d 1480 (9th Cir. 1993), are inapposite. Freyd cannot "readily" or "easily" put herself on the job market disingenuously or use an offer procured under false pretenses to demand higher pay from the UO.  See Freyd Decl. ¶27 ; Baldwin Decl. ¶15.

Defendants made to her is irrelevant. Arrow Decl. ¶ 8.  Among the others, three received offers so low they were rejected (Mendle, Laurent, Baldwin 2017). The earlier raise that Baldwin received, which Defendants now tout, occurred so long ago that Defendants refused to produce data showing the raise, calling it irrelevant.  Stark Decl.¶55.

(4) Retention adjustments affect men and women in the same way: This argument is belied by the facts. Dean Sadofsky admits that retention raises have a disparate impact to the *benefit* of men, which is simply the converse of saying they have an adverse impact on women. Data above shows the disparate impact on women in the Department. *See* Cahill Decl. ¶5. Defendant's argument simply ignores those men who are receiving the big pay increases – they clearly are not affected the same way that women in the department are.

In summary, none of the arguments advanced by Defendants meet their burden to prove that their retention raise practices are job-related for the position of full professor in Psychology

3. An Available Alternative Practice Would Have Less Disparate Impact and Meets
Defendants' Needs

Former UO Interim President and Provost Scott Coltrane, who was also Defendants' designated corporate witness on UO's retention raise practices and policies, described an alternative way of handling retention that was in effect while he was Provost:

> The dean would make a proposal: Faculty member X who has an outside offer from this other place that's . . . $20,000 more than we would pay them. Let's offer them 10, but we're going to use another $5,000 to the two people that this person is going to leapfrog so that the equity – so the gaps don't get larger.

Ex. 26, Coltrane Tr. 82:14-19; 84:8-19; *see also* Coltrane Tr. 143:12-144:9.

Coltrane admitted that this could still be done. Ex. 26, Coltrane Tr. 85:13-18. It is consistent with Defendants' university-wide policy on retention raises, which requires a written consideration of internal equity, so that the Deans know how much the total package will cost. Ex. 26, Coltrane Tr. 89:10-90:3. It is consistent with the Department's policies on retention raises, which also require a

PAGE - 44  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

consideration of equity together with merit and, in appropriate cases, a request for added funds to correct inequities. Ex. 34. It meets the business needs that Defendants have identified -- having to make salary adjustments to retain high-quality faculty.

Evidence supports a jury finding that the practice would be effective in reducing the disparate impact on female full professors' pay. As Coltrane explained, it ensures that "the gaps don't get larger." Women of comparable merit and years in rank who have been unable to engage in retention negotiations, or unsuccessful in doing so, would receive adjustments where merited. Indeed, the Psychology Department would expect much less retention activity and turnover in the department overall if there were ways to increase salaries apart from seeking an outside offer, which this alternative practice would achieve. Ex. 14.

Despite this viable alternative practice, Defendants refuse to adopt it. Their retention policy requires a written consideration of internal equity, but they have consistently ignored that requirement in the Psychology Department.[19] And even though considering the impact on other professors is a mandatory part of their retention policies, Defendants now say that comparing faculty when extending retention offers is "impractical." Ex. 3, Schill Tr. 139:22-140:4.

In summary, Freyd has met her prima facie case of identifying an employment practice that results in a disparate impact on female full professors; Defendants have failed to meet their burden of proof on the only available defense, job-relatedness; and Freyd has offered a viable, alternative practice that would reduce the disparate impact. Defendants' motion to dismiss the disparate impact claims should be denied.

---

[19] Deans Marcus and Sadofsky admitted they have not seen the required forms; Professor Mayr was not even aware of the required consideration; and Defendants have produced no emails or other communications addressing equity in connection with retention offers in Psychology.

PAGE - 45  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### D.  Discretionary Immunity And "Academic Freedom" Do Not Protect Defendants

Defendants claim they are entitled to immunity for Freyd's state law claims pursuant to Oregon's Tort Claims Act, ORS 30.265(6)(c), because whether to retain a certain faculty member is a "discretionary policy decision."  Defs' Mtn. at 39.  Defendants are wrong: the law simply does not give them discretion to discriminate.  Government conduct warrants discretionary immunity only where it is "the result of a choice among competing policy considerations, made at the appropriate level of government."  *Garrison v. Deschutes Cty.*, 334 Or. 264, 273 (2002).  Simply labeling a routine function a "policy decision" is not enough.  Discretionary immunity applies only to "policy judgments" and does not extend to "routine decisions made by employees in the course of their day-to-day activities, even though the decision involves a choice among two or more courses of action."  *Lowrimore v. Dimmitt*, 310 Or. 291, 296 (1990).  Deciding which faculty members in the Psychology Department to give a raise, how much to pay them, when to make such an offer, and what other funds to offer are everyday decisions that are part of the day-to-day functions of an Academic Dean's job.  *See, e.g. Turner v. State*, 359 Or. 644 (2016) (finding that Oregon Department of Transportation was not entitled to discretionary immunity for choosing whether to act on a particular safety hazard); *Lowrimore*, 310 Or. at 296 (finding that a police officer engaging in a high-speed chase was not entitled to discretionary immunity).

Similarly, Defendants' assertion of "academic freedom" lacks merit.  Defendants provide no authority in support of their remarkable assertion that "academic freedom" exempts it from the application of state or federal anti-discrimination laws.  Like discretionary immunity, "academic freedom" does not give Defendants license to act in a discriminatory manner.

Defendants have not established that the retention adjustments in the Psychology Department are high-level policy judgments that warrant immunity.  Nor have they shown that the right to academic freedom excuses them from discriminatory acts.  These arguments should be rejected.

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

### E. Material Questions of Fact Exist Regarding Plaintiff's Claim for Breach of Contract

All contracts include an implied covenant of good faith and fair dealing. *Best v. U.S. Nat'l Bank*, 78 Or. App. 1, 13 (1986). When that covenant is breached, as Freyd alleges here, the non-breaching party can bring a claim for breach of contract. Critically, whether a party breached the covenant of good faith and fair dealing "is a question of fact." *Id.* (denying summary judgment on claim alleging breach of covenant of good faith and fair dealing because even where a contract term expressly permitted a bank to set its own fees, whether those fees were set too high was a question of fact).

Defendants assert that Freyd has not established a prima facie case because she has not identified a contract. Freyd, however, has identified a contract that expressly incorporates by reference UO's administrative rules, regulations, and policies, providing "The position indicated above is subject to the provisions of…all other now existing administrative rules, regulations, and policies of the University of Oregon which are incorporated by reference herein." *See* Ex. 54. Based on this plain language, the terms and expectations of the parties are that they will follow UO's policy against discrimination. It is certainly within the clear expectations of the parties that UO would exercise good faith and make deals fairly, in compliance with all policies and laws against pay discrimination. Freyd alleges that Defendant breached that implied duty of good faith and fair dealing by paying her less than her male colleagues, which a jury could surely find. *See, e.g., Swenson v. Legacy Health Sys.*, 169 Or. App. 546, 555 (2000) (reversing a summary judgment decision because a jury could find that the defendant's actions frustrated plaintiff's expectations under the contract).

Defendants assert that Freyd's claim fails because she cannot sue for breach of the CBA. But Freyd's breach of contract claim is based on a separate contract from the CBA, which is permissible. *Smoldt v. Henkels & McCoy, Inc.*, 334 Or. 507, 513 (2002) (holding that a CBA does not prevent an individual from bringing a claim for a contract that includes terms not in the CBA).

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

Further, Defendants misapply the concept of mandatory subjects of bargaining. Parties to a collective bargaining agreement must bargain over all mandatory subjects of bargaining, but that is the extent of the requirement – to bargain "before making a decision on the subject." *Three Rivers Educ. Ass'n v. Three Rivers Sch. Dist.*, 254 Or. App. 570, 574 (2011). Therefore, whether wages or non-discrimination is a mandatory subject of bargaining is irrelevant; it does not stand for the proposition that Freyd cannot have a separate contract from the CBA that includes relevant terms and conditions. Finally, since Freyd is not seeking to enforce the CBA, Oregon's Employment Relations Board does not have jurisdiction and she was not required to file a grievance.

### F. A Jury Could Find That Sadofsky Violated The Equal Protection Clause

Relying on many of the same arguments they made with respect to Freyd's claims under the EPA and Title VII, Defendants seek dismissal of Freyd's Equal Protection claim against Sadofsky. Defendants' attempts to defeat this claim should fail.[20]

> 1. <u>Material Questions Of Fact Exist As To Whether Sadofsky Intentionally Discriminated On The Basis Of Sex</u>

To hold a state official personally liable for deprivation of equal protection, a plaintiff must show that the defendant, acting under color of state law, intentionally discriminated against the plaintiff as a member of an identifiable class. *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134-35 (9th Cir. 2003), citing *Nabozny v. Podlesny,* 92 F.3d 446, 454 (7th Cir. 1996) (determining that there was "sufficient evidence for a jury to reasonably find that plaintiffs were treated differently"). Defendants argue that Sadofsky "was not a decisionmaker in setting plaintiff's compensation," and that his response to plaintiff's concerns of discrimination did not "evidence[] intentional gender bias." But the evidence is to the contrary.

---

[20] Where plaintiff presents evidence of intentional discrimination sufficient to defeat summary judgment for purposes of Title VII, that evidence is sufficient to create a genuine issue of material fact for purposes of § 1983. *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1112–13 (9th Cir. 1991).

PAGE - 48  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Intent to discriminate based on sex does not require a showing of personal animus against women or specific sexist comments made by the defendant to the plaintiff. Rather, a finding of discriminatory intent can be inferred where an official decision or policy compensates women less than men because of sex. *See, e.g., LA v. Manhart*, 435 U.S. 702, 711 (1978) (requirement that female employees make larger contributions to pension fund than male employees constituted differential treatment on the basis of sex for purposes of Title VII); *Arizona v. Norris*, 463 U.S. 1073, 1084 (1983) (employer pension plan paying lower monthly benefits to women constitutes discrimination on the basis of sex in violation of Title VII).

    a.   <u>Sadofsky Decided Not To Give Plaintiff An Equity Raise</u>

Since 2014, Sadofsky has been the Dean of the Natural Sciences Department, where the Psychology Department is housed. Ex. 12, Sadofsky Tr. 9:12-9:24, 10:10. In that capacity, he receives recommendations regarding raises for Psychology faculty from Mayr; he then has the ability to "alter" those recommendations before referring them to the Provost's office. Ex. 12, Sadofsky Tr. 50:6-50:24; 51:23-52:2; 109:17-110:2 (the Dean's office can "change" the merit increases suggested by Psychology); Ex. 3, Marcus Tr. 50:3-51:11 (Dean Marcus "sign[s] off" on merit recommendations from the divisional deans and has "never" made an adjustment to a merit allocation in any department).

In the case of a 6th-year post-tenure review, Sadofsky and Marcus determine if a faculty member is meeting expectations and base their salary increase recommendation on that assessment. Ex. 12, Sadofsky Tr. 51:23-52:6;53:6-10. A raise of as much as 12% is available "if there is a strong case that this is necessary to address equity issues with faculty of comparable merit and time-in-rank within the department." Ex. 13; Ex. 12, Sadofsky Tr, 196:1-18. Sadofsky also makes recommendations to the provost regarding retention raises. Ex. 12, Sadofsky Tr. 51:14-51:22. Dean Marcus' role has been to review and "sign off" on Sadofsky's recommendations. Ex. 3, Marcus Tr. 76:2-76:6.

PAGE - 49 PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Sadofsky's influence over Freyd's salary is evident from the role he played in determining her 2015 6th-year post-tenure review raise. Sadofsky did not recommend that Freyd receive the additional 4% for equity, and when Mayr later approached Sadofsky and explicitly requested a retroactive raise for Freyd, Sadofsky refused that request. Sadofsky met with Freyd, along with Marcus, to explain that he "didn't intend to pursue a salary change." Ex. 12, Sadofsky Tr. 229:19-24. Sadofsky clearly was a key decisionmaker regarding whether to provide her an equity raise. Sadofsky also had the authority to review and make changes to all of the Psychology Department's salaries and raises.

Freyd need not prove Sadofsky was the only individual with the power to influence or control her salary. Instead, a person "subjects" another to the deprivation of a constitutional right for § 1983 purposes if that person "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Stevenson v. Koskey*, 877 F.2d 1435, 1438–39 (9th Cir. 1989) quoting *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir. 1978). Liability can be based on "personal participation" in the act or omission; it can also be established "by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id*; *see Muzquiz v. Clackamas Cty.*, 165 F. App'x 503, 505 (9th Cir. 2006) (sufficient evidence of supervisor's intentional discrimination, even where a second supervisor also took part in the termination decision); *Dominguez–Curry v. Nevada Transp. Dep't,* 424 F.3d 1027, 1031(9th Cir. 2005) (reversing district court's grant of summary judgment on failure-to-promote claim, where the defendant was one of two individuals who participated in the hiring decision). At the very least, Sadofsky personally participated in the decision to deny Freyd an equity raise. Defendants' argument that he is not liable because he "was not a decisionmaker in setting plaintiff's compensation" therefore fails.

  b. <u>Evidence Shows that Sadofsky Intentionally Discriminated Against Plaintiff</u>

As with a Title VII claim, "[v]ery little evidence is necessary to raise a genuine issue of fact

ALBIES & STARK
ATTORNEYS AT LAW
210 SW MORRISON ST., SUITE 400, PORTLAND, OR 97204
TEL 503.308.4770 |FAX 503.427.9292

regarding an employer's motive." *McGinest*, 360 F.3d at 1124 (internal citations and quotation marks omitted). When an employer's justification for differential treatment is not supported by documentation or is otherwise "unworthy of credence," that can be sufficient to raise a genuine factual dispute as to the employer's intent. *Id.* at 1123, citing *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097 ("Proof that the defendant's explanation is unworthy of credence is [a] form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

During Sadofsky's tenure as Dean – and as a result of raises that were awarded and denied with his input – female full professors in the Psychology Department have been paid significantly less than their male counterparts. Sadofsky admits that the Department has gender pay inequity among full professors, calling it a "real issue" – but also one that he was unwilling to address. Ex. 12, Sadofsky Tr. 203:1-203:9. And, he acknowledged that one "mechanism" for addressing gender inequity is on a "person by person level," through the provision of raises at six-year post-tenure reviews. *Id.* Despite this, Sadofsky did not recommend that Freyd receive a raise that would reduce the inequity. Instead, he denied her request, while during the same time period awarding significant raises to male colleagues through the retention process.

This is consistent with his general attitude of disregard toward gender equity. *See* Freyd Decl. ¶¶31-32; Baldwin Decl. ¶¶5-13. University policy requires retention documents to include a written narrative that "acknowledge[s] any issues concerning compensation equity that may result if the increase is approved." Ex. 41. Yet Sadofsky admitted that that requirement had been ignored for all of the retention raises that he approved in the Psychology Department. Ex. 12, Sadofsky Tr. 183:12-184:12.

Further, Sadofsky's explanation for not recommending that Freyd receive an equity raise in 2015 is "unworthy of credence." Sadofsky claimed that Freyd's salary was not below Department averages for her rank or AAU averages for her rank, ignoring the fact that the comparators he used to create those "averages" were significantly junior to her. In doing so, Sadofsky failed to take into account

PAGE - 51 PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

seniority, which is a well-established factor in determining salary at UO.  Ex. 12, Sadofsky Tr. 190:4-18.

His justification for denying Freyd an equity raise was inconsistent with Office of the Dean's own policy,

which states that the purpose of such raises is "to address equity issues with faculty of comparable merit

*and time in rank* within the department."  Ex. 13 (emphasis added)).

Further, Sadofsky's claimed reasons for denying Freyd a raise have changed over time. When he

and Marcus met with her, Sadofsky gave her different reasons from those Defendants offer now, which

is further evidence of pretext. *Washington v. Garrett,* 10 F.3d at 1434. Sadofsky's assertion that the gender

inequity identified by Freyd and others could be explained by retention raises is a similarly inadequate

justification.  In making that assertion, Sadofsky ignored the glaring fact that the University's policies

and practices around retention raises *produce* gender disparity in pay.  He also disregards the substantial,

and remarkable, differences in the way in which he responds to male professors with outside offers in

comparison to female professors.  *See, e.g.*, Balwin Decl. ¶¶5-13.

In sum, the evidences shows that Sadofsky treated female faculty differently from male faculty

and a reasonable jury could find that he intentionally discriminated on the basis of sex.

2.  <u>Sadofsky Is Not Entitled To Qualified Immunity</u>

As a state actor, Sadofsky is bound to follow the United States Constitution in his treatment of

Freyd, which includes respecting her constitutional right to be free from invidious sex discrimination in

the workplace.  *See Bator v. State of Hawaii*, 39 F.3d 1021, 1027-29 (9th Cir. 1994) ("subjecting a woman to

abuse on the job is exactly the kind of sex discrimination prohibited by the Equal Protection Clause").

Sadofsky is not entitled to qualified immunity.  For decades, it has been clearly established that

the Constitution prohibits sex discrimination in government employment.  *Bator*, 39 F.3d at 1028; *Sischo-*

*Nownejad v. Merced Cmty. Coll.* Dist., 934 F.2d 1104, 1112 (9th Cir. 1991) (finding a claim under 42 U.S.C.

§ 1983 when the plaintiff alleged that her employer, a community college, discriminated against her on

the basis of gender).  That prohibition extends to sex-based discrimination in compensation.  42 U.S.C.

PAGE - 52  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

§ 2000e-2(a)(1) ("it is an unlawful employment practice for an employer . . . to discriminate against any individual with respect to . . . compensation . . . because of such individual's . . . sex").

In light of this clearly established law, a reasonable government official would have known that compensating Freyd substantially less than her similarly-situated male peers -- and refusing to give her a raise that would remedy that "glaring" example of inequity -- violated plaintiff's clearly established rights. *See also Flores v. Morgan Hill*, 324 F.3d 1130, 1136-37 (9th Cir. 2003) (holding that it is not necessary to find a prior case with identical or even "materially similar" facts to defeat qualified immunity; the question is whether preexisting law provided "fair warning" that conduct was unlawful). Sadofsky thus is not entitled to qualified immunity on Freyd's Equal Protection claim.

### G. Plaintiff's Claims Are Timely

Defendants inform the court of the respective timelines for filing each of Plaintiff's claims in their motion, but they do not (and cannot) assert Plaintiff's claims are untimely. Though Plaintiff does not agree with all of Defendants' timelines, no dispute exists that Plaintiff's claims are timely. Defendants' arguments are better suited to the question of damages and are no ground for dismissal at summary judgment.

## IV. CONCLUSION

For all of the above reasons, Freyd respectfully requests that this Court deny Defendants' motion in its entirety.

Dated:  December 14, 2018

By:  _____s/ Jennifer Middleton_____

Jennifer J. Middleton, OSB No. 071510
jmiddleton@justicelawyers.com
JOHNSON JOHNSON LUCAS & MIDDLETON, PC
975 Oak Street, Suite 1050
Eugene, OR 97401-3124
Phone: 541-683-2506
Fax: 541-484-0882

PAGE - 53  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Whitney Stark, OSB No. 090350
whitney@albiesstark.com.com
210 SW Morrison St., Suite 400
Portland, OR  97204
Telephone: (503)384-2070
Fax: (503)894-5022

*Attorneys for Plaintiffs*