Jennifer J. Middleton, OSB # 071510
jmiddleton@justicelawyers.com
JOHNSON, JOHNSON, LUCAS & MIDDLETON, PC
975 Oak Street, Suite 1050
Eugene, OR 97401-3124
Phone: 541/683-2506
Fax:    541/484-0882

Whitney Stark, OSB # 090350
whitney@albiesstark.com
Albies & Stark, LLC
210 SW Morrison Street, Suite 400
Portland OR 97204-3189
Phone: 503/308-4770
Fax:    503/427-9292

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| **JENNIFER JOY FREYD,**<br><br>Plaintiff,<br><br>vs.<br><br>**UNIVERSITY OF OREGON, MICHAEL H. SCHILL and HAL SADOFSKY,**<br><br>Defendants. | Case No. 6:17-CV-00448-MC<br><br>**DECLARATION OF LOUIS MOSES IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

I, Louis Moses, declare as follows:

1. I am a full professor in the Psychology Department at the University of Oregon. I joined the faculty in 1992 as an Assistant Professor, was promoted to Associate Professor in 1999, and became a Full Professor in 2008.

Page 1 -- Declaration of Louis Moses in Support of Plaintiff's Response

2. Professor Freyd is among the most distinguished members of our department, arguably the most distinguished. She is extraordinarily productive, her scientific work is of the highest quality in terms of methodological rigor, theoretical insight, and societal significance, its impact has been far reaching, and she has been honored with several prestigious awards. She is responsible for creating entire new fields within Psychology. As one example, her work on institutional betrayal has shifted the way the whole profession thinks about trauma by recognizing that the manner in which institutions respond to a traumatic event deeply affects an individual's experience of that event and ability to heal.

3. In my view, it is appalling that Professor Freyd is so grossly underpaid relative to some of her male colleagues, and that the university administration has allowed this inequity to persist for as long as it has. My view on these matters is overwhelmingly shared by members of the Psychology Department. The inequity is a deep running sore within the department, one that is demoralizing for many of us, especially for our female faculty members and, importantly, our graduate students, the next generation of psychological scientists.

4. I served as Department Head in Psychology from 2007 through 2013, as Associate Head prior to that, and as an elected member of our Executive Committee both before and after that time. In these roles, for a period of roughly 16 years, I was involved in performing or overseeing merit reviews of our faculty. Throughout that time, Professor Freyd was almost invariably at or near the very top of our reviews in every category (research, teaching, and service). Her whole career can be characterized as one of sustained excellence.

5. Underpinning the university administration's explanation for the salary discrepancy noted above, is the claim that full professors in psychology actually do different jobs, making salary comparisons inappropriate. In my view this is a spurious line of reasoning.

Page 2 -- Declaration of Louis Moses in Support of Plaintiff's Response

Yes, in a trivial sense, we could all be said to do somewhat different things. This is the nature of academia: We research different topics, teach different material, perform different service roles. Yet, we are all held to the same ultimate standard, which is to excel in research, teaching and service. While differing areas of study and ways of completing research can pose some challenges for comparisons, we nonetheless make these comparisons regularly in our documented merit review processes. In our Psychology Department governance documents, we have explicit, written criteria for merit evaluation that ensure that we all are evaluated by the same standards.

6. The university administration makes an additional claim that the four male faculty members who are paid substantially more than Professor Freyd have all taken on various administrative roles that demand a lot of time and effort, and that these additional roles partly account for the large salary discrepancies. What the administration entirely fails to acknowledge, however, is that Professor Freyd has taken on similarly time-consuming, effortful, and important roles. Among many possible examples, she serves or has served as (a) the editor of a pre-eminent peer-reviewed journal in our field, (b) a member of the Executive Committee of the University Senate, (c) a member of the Dean's Advisory Committee, and (d) the key member of an appointed committee to overhaul university policy on reporting of sexual assault. These roles entail the same or more skill, effort, and responsibility as the roles that her colleagues fulfill. As testament to that fact, Professor Freyd's extraordinary service contributions were recently recognized through the Wayne T. Westling Award for University Leadership and Service in 2017, the most prestigious award we give for service at the University.

7. Further, most of the additional roles that her four male colleagues have fulfilled have been compensated in various ways through stipends, course releases, and added summer

salary (often adding as much as 25% to their base pay in the case of grant funding). It is patently absurd then to cite those roles as explanations for *base* salary differences when they are compensated outside of base salary. As an aside, it is also worth noting that most of the additional roles that Professor Freyd has taken on have not been compensated in these ways, a further source of inequity.

8. The administration appears to lay the blame for the salary discrepancy on Professor Freyd, arguing that she should have sought out retention offers as her male colleagues have done. I would argue that it is contrary to the University's interest to effectively punish Professor Freyd for not going on the job market. In doing so, the administration sends a message to faculty that the only way to receive a large salary raise is to pursue an outside offer, thereby encouraging individuals to game the system by shopping themselves around as a way to negotiate an increase. Encouraging behavior of this kind is costly in terms of time, resources, and energy: not only for the faculty member involved and the competing universities, but also for the department and UO administration when they need to respond to the competition. And, of course, it is a dangerous game: We lose many talented faculty who end up taking offers elsewhere after the administration has left them little choice but to go down the offer-seeking road.

9. The heavy emphasis that the administration places on grant funding in its papers to the court is deeply problematic. It is certainly very much at odds with the way the Psychology Department has for many years weighted grant funding in its merit determinations for raises, as well as in its tenure and promotion guidelines. Certainly, external funding is highly valuable, indeed critical, for the functioning of the department, the university, and for many individual research programs. No one would suggest otherwise. That said, however, it is not the basis upon

Page 4 -- Declaration of Louis Moses in Support of Plaintiff's Response

which we evaluate or compensate *individuals*, or at the least it is but one of many factors. In our department, the ultimate criterion for merit is a program of high quality, ground-breaking scientific research published in the field's best peer-reviewed outlets. External funding can never substitute for that: It is simply a means to that end, albeit a very important means for many research programs. Professor Freyd's research program is exemplary in the way that it meets our merit criterion, even in the absence of large amounts of federal funding. Again, what matters is the quality of the research itself, and if some scientists can achieve that without major external funding, then the taxpayers should be thankful.

10. Relatedly, some areas of research are more fundable than others, dependent in part on the political priorities of the day. The Psychology Department, and presumably the university administration, would never want its research programs to be overwhelmingly driven by what government agencies decide are the most important areas to research. To the contrary, a fundamental goal of the academy is to reward and incentivize top-quality research in every field, irrespective of such external pressures.

11. A serious omission in the administration's salary comparisons is that it fails to factor in years in rank. Seniority is a critical component of salaries in academia. It is an important indicator of experience, ability, and accrued knowledge. It is a standard factor in salary comparisons that we make in our department: the relation between base salary and years in rank. Professor Freyd is our longest serving full professor and has substantially greater seniority by years in rank than any other full professor. For example, Professors Hall, Mayr, Fisher, and Allen are junior to her by a considerable distance: 9, 12, 16, and 21 years lower in rank, respectively. These are not minor differences. With this level of seniority, combined with her exceedingly

high merit, it is astonishing to me that she is not paid significantly more than these male counterparts.

12. It is well known that there are systemic gender biases in the workplace in general, and higher education, in particular, when it comes to pursuing and negotiating job offers and retention deals. Women are typically less willing to "play the game" and to play it as aggressively as men when they do so. This was certainly my impression in my time as Department Head: The vast majority of retention negotiations involved men. Women were less likely to go out on the market and less likely to be recruited by outside institutions. There continues to be something of an "old boys' network" in higher education such that women are much less likely to come to mind when the powers that be think of stars in the field who might be poached from rival universities. This, even though female professors' records are typically just as strong as those of their male counterparts. There is likely also implicit bias at work. One such bias is the assumption that women are less mobile than men because of family responsibilities, and/or because they are more likely than men to have partners who also work in academia (making recruitment challenging and expensive). In short, the deck is stacked against women with respect to securing strong retention offers that the university administration will consider matching.

13. There was a time during my Headship when the administration appeared to take equity considerations more seriously, in recognizing the salary disparities created by retention offers. For example, in 2011 Jane Mendle, an Assistant Professor, came to me with a competing offer from Cornell University. The retention offer we planned to give her would have had her leapfrog over other professors with similar or more years in rank and comparable merit. We argued to the administration that we should also include raises for the other professors whom she

Page 6 -- Declaration of Louis Moses in Support of Plaintiff's Response

would have leapfrogged. That package, which included a raise and research support for Professor Mendle as well as equity raises for others, was approved by the Associate Dean, the Dean, and the Vice Provost for Academic Affairs. In its governance documents, the Psychology Department has now formalized this process: Whenever a retention offer is being considered, the department's Executive Committee undertakes an equity analysis and, if the retention offer would create major discrepancies, we require that the Department Head argue to the administration in support of equity raises. To my knowledge, however, the current administration has failed to offer support for such raises in recent times. The case of Professor Freyd is far and away the clearest example of the administration's negligence in this regard.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 13, 2018

_____
Louis Moses