**Paula A. Barran,** OSB No. 803974
pbarran@barran.com
**Shayda Zaerpoor Le,** OSB No. 121547
sle@barran.com
**Donovan L. Bonner,** OSB No. 181929
dbonner@barran.com
Barran Liebman LLP
601 SW Second Avenue
Suite 2300
Portland, Oregon  97204-3159
Telephone: (503) 228-0500
Facsimile No.: (503) 274-1212
    Attorneys for Defendants
    University of Oregon and Hal Sadofsky

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Portland

| | |
|---|---|
| JENNIFER JOY FREYD, | **CV. 6:17-cv-448-MC** |
| Plaintiff, | |
| v. | **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT** |
| UNIVERSITY OF OREGON, MICHAEL H. SCHILL and HAL SADOFSKY, | |
| Defendants. | |

Page  –   REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF
          OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.    DEFENDANTS' EVIDENTIARY OBJECTIONS ..................................................2

    A.    Generally Applicable Rules ................................................3

    B.    Specific Objections .................................................5

          1.    Arrow Declaration ...........................................5
          2.    Hodges Declaration.........................................5
          3.    Moses Declaration ..........................................6
          4.    Freyd Declaration...........................................6
          5.    Baldwin Declaration .......................................8
          6.    Cahill Declaration ...........................................9

II.   DISCUSSION ......................................................................9

    A.    The Court Should Grant Defendants' Motion to the Extent Plaintiff Asserts
        Untimely Theories; Plaintiff's Assertion That She Does Not Agree with
        Defendants' Motion Is an Insufficient Response That Should Be Rejected...........9

    B.    Plaintiff Has Not Identified Specific Facts Showing a Genuine Issue for Trial
        on Her Claim for Breach of Contract.  The Court Should Dismiss the Claim ......10

    C.    Plaintiff's Disparate Impact Claim Should Be Dismissed; It Is a Disguised
        Treatment Claim, Fails to Identify the Specific Employment Practice at Issue,
        Is nor Supported by an Admissible Statistical Analysis, and Fails to Present a
        Legitimate Alternative Practice ...........................................11

          1.    Plaintiff's retention complaint is a disparate treatment claim ..................11
          2.    Plaintiff's impact theory also fails because she has not identified the
             "specific employment practice" that caused any impact .........................13
          3.    Plaintiff does not present a genuine issue of material fact by providing
             a statistical analysis that does not meet standards of admissibility ...........15
          4.    Retaining superior scholars is a legitimate and work related business
             reason that is justified here ......................................17
          5.    Plaintiff fails to meet her burden to demonstrate an equally effective
             alternative ..................................................18

    D.    Plaintiff Does Not Identify a Prima Facie Case or a Genuine Issue for Trial on
        Whether She Performs the Same Day-to-Day Duties as Professors Allen,
        Fisher, Hall and Mayr .............................................21

    E.    Plaintiff Argues She Does Important Work in an Efficient Manner; That Does
        Not Present an Issue for Trial on Whether Her Duties Are Substantially Equal
        or Comparable..................................................25

    F.    Plaintiff Does Not Present a Genuine Issue for Trial Regarding Professor
        Hall's Return to the Psychology Department .......................................26

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

G.     Grant Funding Is a Significant Differentiating Factor Because It Changes Job Duties ........................................................................................................27

H.     Retention Raises Are Nondiscriminatory and Permissible and Differentiate Plaintiff's Compensation from Her Male Colleagues ...........................................27

I.     Retention Negotiations Are Statutorily Protected as Discretionary Policy Choices About the University's Strategic Research and Educational Programs ...31

J.     Federal and State Law Comparability: Oregon State Law Applies Federal Standards ........................................................................................................32

K.     Plaintiff's Opposition Includes Many Erroneous Characterizations of the Factual Record Before the Court ...........................................................................33

L.     The Court Should Grant Defendant Sadofsky's Motion for Summary Judgment.  Plaintiff Has Not Properly Addressed His Qualified Immunity, Her Claims Against Him Are Untimely, and She Had Not Identified a Genuine Issue of Material Fact to Be Resolved at a Trial ....................................................35

1.     Sadofsky has Qualified Immunity.  Existing case law at the time of any of his decisions has not placed his actions "beyond debate" and "did not preclude" him from a reasonable belief in the lawfulness of his actions .............................................................................................35
2.     Plaintiff contends that Sadofsky violated her rights in 2015; her claims against him are untimely ...............................................................................37
3.     Plaintiff has not identified a genuine issue of material fact as to Sadofsky's intent .......................................................................................38

III.     CONCLUSION ....................................................................................................41

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

# TABLE OF AUTHORITIES

Page

**Cases**

*Adidas-Salomon Ag v. Target Corp.,* No. CV-01-1582-ST, 2002 U.S. Dist. LEXIS 2262
(D. Or. Jan. 17, 2002) ........................................................................................... 3

*Al-Amin v. State,* 278 Ga. 74, 597 S.E.2d 332 (2004) .................................................. 4

*Allender v. Univ. of Portland*, 689 F. Supp. 2d 1279 (D. Or. 2010)...................... 25, 27

*Alston v. Read*, 663 F.3d 1094 (9th Cir. 2011) ............................................................ 37

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................. 2

*Arnold v. Pfizer, Inc.,* 970 F. Supp. 2d 1106 (D. Or. 2013)..................................... 3, 38

*Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477 (9th Cir. 1987)............................ 22

*Auto. Ins., Co. v. Abel,* No. 08-CV-1004-AC, 2010 U.S. Dist. LEXIS 128830
(D. Or. Dec. 3, 2010) ............................................................................................ 3

*Bemis v. Edwards*, 45 F.3d 1369 (9th Cir. 1995).......................................................... 4

*Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267 (9th Cir. 1996)................................. 2

*Brock v. Ga. Sw. Coll.*, 765 F.2d 1026 (11th Cir. 1985).............................................. 24

*Butler v. Portland Gen. Elec. Co.*, 748 F. Supp. 783 (D. Or. 1990)........................... 16

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ................................................. 2, 10, 11

*Cerrato v. S.F. Cmty. Coll. Dist.*, 26 F.3d 968 (9th Cir. 1994).................................... 16

*Chao v. Westside Drywall, Inc.,* No. 08-6302-AC, 2010 U.S. Dist. LEXIS 48093
(D. Or. May 13, 2010) ...................................................................................... 3, 4

*Conroy v. Hewlett-Packard Co.,* No. 3:14-CV-01580-AC, 2016 U.S. Dist. LEXIS
44396 (D. Or. Mar. 31, 2016)......................................................................... 2, 32

*Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511 (9th Cir. 2011)....................... 16

*Dreyfuss v. Cory (In re Cloobeck)*, 788 F.3d 1243 (9th Cir. 2015)............................. 22

*Forest Grove Sch. Dist. v. Student,* No. 3:14-cv-00444-AC, 2018 U.S. Dist. LEXIS
61980 (D. Or. Apr. 12, 2018)............................................................................... 4

*Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409 (9th Cir. 1988)................ 22, 26, 36

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

*Garay v. Lowes Home Ctrs., LLC*, No. 1:17-cv-00269-MC, 2017 U.S. Dist. LEXIS 187715 (D. Or. Nov. 14, 2017) .................................................................. 13

*Gerhart v. Rankin Cty.*, No. 3:11-CV-586-HTW-LRA, 2018 U.S. Dist. LEXIS 168639 (S.D. Miss. Sep. 29, 2018) ...................................................... 4

*Hardie v. NCAA*, 876 F.3d 312 (9th Cir. 2017) ...................................... 18, 19

*Hess v. Multnomah Cty.*, 211 FRD 403 (D. Or. 2001) .................................. 4

*Hunt v. Tektronix, Inc.*, 952 F. Supp. 998 (W.D. N.Y. 1998) ...................... 12

*IBEW v. Miss. Power & Light Co*, 442 F.3d 313 (5th Cir. 2006) .................. 21

*Klein v. N.Y. Univ.*, 786 F. Supp. 2d 830 (S.D. N.Y. 2011) ................... 10, 24

*Kouba v. Allstate Ins. Co.*, 691 F.2d 873 (9th Cir. 1982) ......................... 29

*Kramer v. Cullinan*, 878 F.3d 1156 (9th Cir. 2018) ...................... 35, 36, 37

*Lane v. Franks*, 573 U.S. 228, 189 L. Ed. 2d 312 (2014) .......................... 36

*Lannaghan v. First Horizon Home Loans,* No. 10-6156-AA, 2011 U.S. Dist. LEXIS 83761 (D. Or. July 27, 2011) .......................................................... 4

*Leveroni v. United States*, No. C 05-04295 SI, 2006 U.S. Dist. LEXIS 75083 (N.D. Cal. Oct. 3, 2006) ...................................................................... 9

*Lopez v. City of Lawrence*, No. 07-11693-GAO, 2014 U.S. Dist. LEXIS 124139 (D. Mass. Sep. 5, 2014) aff'd  823 F3d 102 (1st Cir. 2016) ...................... 19

*Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106 (2d Cir. 1992) .............. 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................................. 11

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .................................................. 35

*Morgan v. Bend-La Pine Sch. Dist.*, No. CV-07-173-ST, 2009 U.S. Dist. LEXIS 9443 (D. Or. Feb. 6, 2009) ...................................................... 29

*Morita v. S. Cal. Permanente Med. Grp.*, 541 F.2d 217 (9th Cir. 1976), *cert. denied*, 429 U.S. 1050, 50 L. Ed. 2d 765, 97 S. Ct. 761 (1977) .......................... 16

*Nat'l Steel Corp. v. Golden Eagle Ins. Co.,* 121 F3d 496 (9th Cir. 1997) ...................... 3

*Oregon v. Spar Inv. Co.*, No. 99-959-MO, 2004 U.S. Dist. LEXIS 19415 (D. Or. Sep. 21, 2004) ...................................................................... 9

*Pena v. Hous. & Cmty. Serv. Agency*, No. 09-6150-TC, 2010 U.S. Dist. LEXIS 89743 (D. Or. Aug. 30, 2010) .................................................. 21, 33

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

*Penk v. Or. State Bd. of Higher Educ.*, 816 F2d 458 (9th Cir 1987) ...................................... 22, 36

*Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ........................................................ 29

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) .................................................................................. 35

*Redwind v. W. Union, LLC,* No. 3:14-cv-01699-AC, 2016 U.S. Dist. LEXIS
57793 (D. Or. May 2, 2016) ......................................................................................................... 5

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ..................................................................................... 19

*Rizo v. Yovino*, 887 F.3d 453 (9th Cir. 2018) .......................................................... 29, 34, 35, 36

*Rudebusch v. Hughes*, 313 F.3d 506 (9th Cir. 2002) .............................................................. 19, 37

*Russell v. Placeware, Inc.*, No. 03-836-MO, 2004 U.S. Dist. LEXIS 21465
(D. Or. Oct. 15, 2004) ........................................................................................................... 26, 27

*Scheidecker v. Arvig Enters.*, 122 F. Supp. 2d 1031 (D. Minn. 2000) ....................................... 13

*Scosche Indus. v. Visor Gear,* 121 F3d 675 (Fed. Cir. 1997) ...................................................... 3

*Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072 (9th Cir. 1986).......................................... 16

*Shutt v. Sandoz Crop Prot. Corp.*, 944 F.2d 1431 (9th Cir. 1991) ............................................ 16

*Smith v. City of Jackson*, 544 U.S. 228 S. Ct. 1536 (2005) ........................................................ 12

*Smith v. Xerox Corp.*, 196 F.3d 358 (2d Cir. 1999)..................................................................... 17

*Spaulding v. Univ. of Wash.*, 740 F.2d 686 (9th Cir. 1984)........................................................ 22

*Spencer v. Va. State Univ.*, Civil Action No. 3:16cv989-HEH, 2018 U.S. Dist. LEXIS
15773 (E.D. Va. Jan. 30, 2018).................................................................................................. 23

*Stanley v. Univ. of S. Cal.,* 178 F3d 1069 (9th Cir. 1999) ................................................... passim

*Stout v. Potter*, 276 F3d 1118 (9th Cir. 2002) ...................................................................... 14, 16

*Sullivan v. Dollar Tree Stores, Inc.,* 623 F.3d 770 (9th Cir. 2010) .............................................. 4

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
135 S. Ct. 2507 (2015)............................................................................................ 11, 12, 17, 19

*Towne v. Robbins*, 339 F. Supp. 2d 1105 (D. Or. 2004)............................................................... 9

*Tucker v. Reno*, 205 F. Supp. 2d 1169 (D. Or. 2002) ................................................................. 16

*U.S. v. Bennett*, 363 F.3d 947 (9th Cir. 2004).............................................................................. 5

*United Air Lines v. Evans*, 431 U.S. 553 (1977)........................................................................... 9

Page v – REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF
OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

*Vejo v. Portland Pub. Sch.*, No. 3:14-cv-01656-AA, 2018 U.S. Dist. LEXIS 205301 (D. Or. Nov. 30, 2018) ........................................................................................ 39

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............................................... 13

*Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988) ....................................................................................... 16

*Wheatley v. Wicomico County*, 390 F.3d 328 (4th Cir. 2004), *cert. denied*, 125 S. Ct. 2253 (2005) ..................................................................................................... 23

*White v. Pauly*, 137 S. Ct. 548 (2017) ..................................................................... 35

*Wood v. City of San Diego*, 678 F.3d 1075 (9th Cir. 2012) ...................................... 36

**Statutes**
ORS 30.265 ................................................................................................................. 31
ORS 30.265(3)(c) ....................................................................................................... 32

**Other Authorities**
Reference Manual on Scientific Evidence, Third Edition (Rubinfeld 2011) ................ 16

**Rules**
Fed. R. Civ. P. 56(a) .................................................................................................... 9
Fed. R. Civ. P. 56(c)(4) ............................................................................................... 3
Fed. R. Civ. P. 56(c), (e) ............................................................................................. 2
Fed. R. Evid. 1002 ...................................................................................................... 5
Fed. R.Civ. P. 12(f) ..................................................................................................... 4
OAR 839-005-0010 .................................................................................................... 13
OAR 839-008-0010 .................................................................................................... 33

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

Defendants University of Oregon and Hal Sadofsky file this Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment. In her Opposition, plaintiff attempts to raise questions of fact regarding the experiences of selected present and former colleagues, sidestepping the fact that plaintiff remains one of the highest paid members of the faculty, male or female; she is a successful scientist whose efforts have been steadily recognized including with salary increases over her 30 years at the University. Plaintiff has filed an individual lawsuit as the sole plaintiff. Her claims must arise from her personal experiences and present actionable theories that meet the requirements of the statutes upon which she relies. Those statutes cannot be used to ask the court to make academic or business judgments or evaluate the comparative worth of one scholar's work over another, or to tell academic institutions that they may not negotiate in an attempt to retain a much sought-after scholar. At the heart of plaintiff's case is her complaint that four male colleagues, whose job duties vary in significant ways, received pay raises that she did not, due in large part, according to plaintiff's theory, to the University's efforts to retain those faculty in the face of attractive offers they received from better-funded competitor institutions.

Plaintiff fails to present genuine issues of material fact that would otherwise permit this lawsuit to proceed to trial. For those claims that require her to prove, as a primary step, substantial equality or substantial comparability of her work to that of four colleagues, she instead relies on her academic stature and reputation. She fails to raise any questions of fact, however, about whether the genuinely different types of work she does on a day-to-day basis are actually comparable to those of her supervisor, or a professor with a different administrative assignment, or two faculty members doing the work of managing extraordinarily large and well-funded research programs. For those claims that require her to prove a discriminatory impact from an isolated and uniform practice, she instead provides a complex multivariable process which she says is <u>not</u> uniform, and presents a statistical analysis devoid of basic evidentiary foundation or supportable methodology. While conceding that the University has a legitimate business need to respond to outside recruitments with retention offers, she fails to meet her required burden to show

Page 1 – REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

that a feasible, less discriminatory alternative exists. For her single contract claim she states she has an agreement in parallel with the bargaining agreement, but the only colorable evidence she has presented is a document relating to her first appointment for a position she has not held in decades. For her individual untimely claim against Dean Hal Sadofsky she fails to meet her burden to demonstrate that he violated clearly established law, and asks the court to conclude he showed invidious bias against her because he asked a question about how she gathered data.

Personal opinions of competence or value do not raise a genuine issue of material fact. *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996). The University of Oregon has more than 2000 instructional employees and over 750 tenured and tenure track faculty. It must make strategic decisions what and how to instruct its 23,000 students in more than 70 majors and to maintain its programs when state funding is under pressure and tuition dollars threaten to put education out of reach. The record before the court shows that it has made its decisions in plaintiff's individual situation without violating the Constitution, the law, or any contract.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c), (e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Conroy v. Hewlett-Packard Co.,* No. 3:14-CV-01580-AC, 2016 U.S. Dist. LEXIS 44396, at *31 (D. Or. Mar. 31, 2016). If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, summary judgment must be granted. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## I.    DEFENDANTS' EVIDENTIARY OBJECTIONS

Pursuant to FRCP 56(c) and LR 56-1, defendants object to portions of the declarations filed by plaintiff to support her Opposition and identified below. Pursuant to LR 7-1(a) the parties have conferred regarding these objections and were not able to reach agreement.

Defendants' objections are based upon and informed by FRCP 56(c), the generally applicable evidentiary rules and other authorities and the discussion cited below.

Page 2 – REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

## A.  Generally Applicable Rules

Plaintiff's burden on summary judgment is to provide the court with admissible evidence. Her declarations fail to do so in several respects.  These generally applicable rules identify the key failings of plaintiff's supporting declarations, and are followed by specific objections to each declaration.

**Failure to provide foundation, competence, and lack of personal knowledge.**  *Arnold v. Pfizer, Inc.,* 970 F. Supp. 2d 1106, 1123 (D. Or. 2013) (as a general rule, affidavits submitted at summary judgment must be based on personal knowledge and not merely information and belief); *Adidas-Salomon Ag v. Target Corp.,* No. CV-01-1582-ST, 2002 U.S. Dist. LEXIS 2262, at *11 (D. Or. Jan. 17, 2002) ("FRCP 56(e) requires that 'sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.'"); *Auto. Ins., Co. v. Abel,* No. 08-CV-1004-AC, 2010 U.S. Dist. LEXIS 128830, at *12 (D. Or. Dec. 3, 2010) (an expert must back up his or her opinion with specific facts: "an expert opinion is admissible and may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit."); *Arnold,* 970 F. Supp. 2d at 1119 (an expert's bare assertion of validity is insufficient to satisfy this threshold requirement).

**Inadmissible opinion, conclusory, or speculation** [FRCP 56(c)(4); FRE 602, 701, 702]: *Scosche Indus. v. Visor Gear,* 121 F3d 675, 681 (Fed. Cir. 1997) (affidavits composed of opinion evidence do not satisfy Rule 56 and must be disregarded); *Nat'l Steel Corp. v. Golden Eagle Ins. Co.,* 121 F3d 496, 502 (9th Cir. 1997) ("Conclusory allegations of collusion, without factual support, are insufficient to defeat summary judgment."); *Chao v. Westside Drywall, Inc.,* No. 08-6302-AC, 2010 U.S. Dist. LEXIS 48093, at *7 (D. Or. May 13, 2010) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"); *Auto. Ins., Co. v. Abel,* No. 08-CV-1004-AC, 2010 U.S. Dist. LEXIS 128830, at *12 (D. Or. Dec. 3, 2010) (an expert's conclusory allegations are not sufficient to withstand a motion for summary judgment); *Lannaghan v. First Horizon Home Loans,* No. 10-

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

6156-AA, 2011 U.S. Dist. LEXIS 83761, at *13 (D. Or. July 27, 2011) (lay opinion not based on personal knowledge is improper).

**Irrelevant or immaterial** [FRCP 12(f); FRE 401, 402]: *Hess v. Multnomah Cty.*, 211 FRD 403, 407 (D. Or. 2001) ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *Forest Grove Sch. Dist. v. Student,* No. 3:14-cv-00444-AC, 2018 U.S. Dist. LEXIS 61980, at *6 (D. Or. Apr. 12, 2018) ("irrelevant evidence is inadmissible.").

**Confusion, misleading, waste of time, prejudicial** [FRE 403].

**Hearsay** [FRE 801, 802, 803, 804]: *Chao v. Westside Drywall, Inc.,* No. 08-6302-AC, 2010 U.S. Dist. LEXIS 48093, at *7 (D. Or. May 13, 2010) ("Hearsay statements in affidavits are inadmissible"); *Gerhart v. Rankin Cty.,* No. 3:11-CV-586-HTW-LRA, 2018 U.S. Dist. LEXIS 168639, at *8 (S.D. Miss. Sep. 29, 2018) (This court is aware that the exceptions under Rule 803 do not require the declarant to be available before the admission of the statement. Still, this court is not comfortable with an anonymous declarant who may not be able to lay a competent foundation for the recording's admissibility. Further, this court does not know "who" in the statement is the subject of the nebulous wishful involvement.); *Al-Amin v. State,* 278 Ga. 74, 90, 597 S.E.2d 332, 349 (2004) (there was absolutely no showing of reliability with respect to the statement of the anonymous declarant. Nor did the anonymous statement qualify as an excited utterance).  In *Sullivan v. Dollar Tree Stores, Inc.,* 623 F.3d 770, 778 (9th Cir. 2010), the Ninth Circuit found the trial court properly excluded a Department of Labor report under the public records exception to hearsay because the absence of an identified author made the document untrustworthy. In *Bemis v. Edwards*, 45 F.3d 1369, 1374 (9th Cir. 1995), the Ninth Circuit excluded an anonymous 911 call on the basis that there were "affirmative indications that the declarant lacked firsthand knowledge of the events he described" and so the declarant lacked personal knowledge.

Page 4 – REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

**Failure to comply with best evidence rule** [FRE 1002]: *Redwind v. W. Union, LLC,* No. 3:14-cv-01699-AC, 2016 U.S. Dist. LEXIS 57793, at *7 (D. Or. May 2, 2016) ("Where a proponent intends to prove the contents of a document, the document itself is the best evidence of that content. Fed. R. Evid. 1002. Typically, courts apply the best evidence rule to require a proponent to produce the original document. *U.S. v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004). However, courts also apply the rule to bar a witness from testifying to the contents of the document, and instead require the proponent to actually produce the document. *Id.* Therefore, the court should exclude all testimony by a declarant who seeks to prove the contents of a document. *Id.*").

## B.  Specific Objections

### 1.  Arrow Declaration.

Paragraph 3:  This statement lacks foundation, a showing of competence, and represents inadmissible opinion. The declaration provides no admissible factual support for the assertions.

Paragraph 5:  This statement is not relevant and is immaterial, confusing and misleading. This lawsuit is filed by a single plaintiff and Professor Arrow is not the plaintiff. Whatever occurred during her time at the London Business School is not relevant to any part of this litigation.

Paragraph 9:  This assertion lacks foundation, is a personal narrative unrelated to the plaintiff's claims, expresses a personal opinion without demonstrating any competence to address pay discrimination, does not identify the "regression lines", and is based on speculation.

### 2.  Hodges Declaration.

Paragraph 2:  This is irrelevant and immaterial, confusing, and misleading in plaintiff's individual lawsuit.  Plaintiff has never undertaken an administrative position as a dean of the graduate school nor negotiated an administrative salary.  The declaration does not identify by name any person involved so that any content of conversation is inadmissible hearsay which cannot be examined for any hearsay exception.

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Paragraph 3:  The declaration refers to statements of an unnamed representative of the Provost and any such statements are inadmissible hearsay.  The statement lacks foundation for assertions about faculty who take on administrative roles.

Paragraph 4:  The declaration lacks foundation and is not relevant to the plaintiff's lawsuit, and does not provide factual support for the assertion that women were paid less for substantially equal jobs.

Paragraph 5:  Statements of an unidentified declarant are inadmissible hearsay.  Additionally, this is not relevant to plaintiff's claims.

   3.  <u>Moses Declaration.</u>

Paragraphs 3, 5, 6, 7:  These assertions lack foundation, are inadmissible opinions of a lay witness, and conclusory.  Professor Moses' hyperbolic statement is not supported by any source or citations and his opinion and subsequent conclusions are inadmissible.  The assertions of others' opinions lack foundation and are not based on personal knowledge.  Speculation about the future is inadmissible and reference to unidentified "governance documents" lacks compliance with the best evidence rule.

Paragraphs 8, 9, 10, 11:  These statements are argument, not admissible factual statements.

Paragraph 12:  Statements that make assertions that are "well known" lack foundation and are not based on personal knowledge.  Statements in paragraph 12 are inadmissible argument.

Paragraph 13:  This is irrelevant and argumentative and lacks foundation.  It fails to identify individuals alleged to have contributed to conversations and the accusations of "negligence" purport to state a legal conclusion.

   4.  <u>Freyd Declaration.</u>

Paragraphs 1, 6, 8:  These paragraphs lack foundation and represent inadmissible opinion. They lack of personal knowledge and are conclusory and argumentative.

Paragraph 13:  This lacks foundation and personal knowledge, represents inadmissible opinion of a lay witness, contains irrelevant speculation, and is conclusory.  Plaintiff provides no

Page 6 – REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

citation or source for her statements regarding doctoral psychology students. Without having provided a foundation, this Court cannot evaluate plaintiff's statement.

Paragraph 18:  This lacks personal knowledge or foundation whether others have a public presence.

Paragraph 20:  This lacks personal knowledge or foundation whether any person wastes taxpayer dollars.

Paragraph 21:  These assertions are argumentative and speculative.

Paragraph 24:  These assertions do not comply with the best evidence rule or even identify what documents are being referenced.

Paragraph 25:  These assertions lack personal knowledge or foundation, are hearsay, inadmissible opinion of a lay witness, speculation, and are conclusory.

Paragraph 27: This is inadmissible argument.

Paragraph 28:  These assertions lack foundation and personal knowledge, and are speculative, inadmissible opinion.  Plaintiff provides no citation or source for her statements regarding that retention offers are more available to men than women.  In addition, she provides no foundation for her hyperbolic and argumentative statement about the "costly perception" of a woman or the two female professors, who are anonymous declarants. Without having provided a foundation, the Court cannot evaluate plaintiff's statement.

Paragraph 30:  These assertions lack foundation and are speculative and argumentative regarding what a person might think.  The statements about the existence and contents of the regression line run afoul of the best evidence rule.

Paragraphs 31, 32:  These assertions lack foundation and are not based on personal knowledge, are hearsay, and inadmissible opinion of a lay witness.  They are speculation and argumentative.  They do not comply with the best evidence rule.  Plaintiff provides no identification of the colleague mentioned in her statement and such testimony is inadmissible hearsay. Plaintiff's statements about a "lengthy email" run afoul of the best evidence rule.

Page 7 – REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's statement related to looking "for ways to minimize the sexual assault problem" is conclusory and inadmissible opinion.

Paragraph 33:  These assertions are argument rather than factual statements.

5.  Baldwin Declaration.

Paragraph 4:  Professor Baldwin lacks personal knowledge and there is no foundation for her assertions.  She offers opinion rather than fact.  Her statements include hearsay without identifying the declarant.  Her assertions are based on speculation.

Paragraph 5:  Professor Baldwin's statements present inadmissible argument rather than facts.  They lack foundation and are speculative.

Paragraphs 6, 7, 8, 9, 10, 11:  Professor Baldwin's assertions are argumentative.  They lack foundation and are not based on personal knowledge and do not comply with the best evidence rule in light of the reference to research or documentation.  They are irrelevant and express personal opinions. They speculate about motives and are accusatory without relying on admissible facts.

Paragraph 12:  These assertions include hearsay and are argumentative without being factual.

Paragraph 13:  Professor Baldwin's assertions about comparability lack foundation or personal knowledge, and comments about being "inappropriate" are argument rather than factual statement.

Paragraph 14:  Professor Baldwin's statements lack foundation and are not based on personal knowledge.  Her descriptions of communications are hearsay.

Paragraph 15:  These assertions lack foundation and the characterization of unethical conduct lacks citation to any authority.

Paragraph 16:  These assertions lack foundation and are speculative and not based on personal knowledge.

Page 8 – REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

Paragraph 17:  These assertions lack foundation and are not based on personal knowledge and are speculative.

Paragraph 19:  These assertions lack foundation and are not based on personal knowledge.

6.  <u>Cahill Declaration.</u>

Defendants object on the grounds more fully identified in the Declaration and Report of Dr. Debra Ringold and the legal authorities cited at pp. 15-17 below.

## DISCUSSION

**A.  The Court Should Grant Defendants' Motion to the Extent Plaintiff Asserts Untimely Theories; Plaintiff's Assertion That She Does Not Agree with Defendants' Motion Is an Insufficient Response That Should Be Rejected.**

Plaintiff's narrative extends from her own recruitment more than 30 years ago.  In their motion, defendants have presented the controlling statutes of limitation for each of plaintiff's ten claims.  (Motion at 4-5.)  Plaintiff does not respond other than to say she does not agree, and asks the court to defer this issue. Timeliness is a question of law, and important in order to define the claims that plaintiff can lawfully assert.   It is proper to address the statute of limitations on summary judgment, even if it is a partial rather than complete bar to the claim. Fed. R. Civ. P. 56(a) provides that a party may move for summary judgment, identifying each claim or defense – **or the part of each claim or defense** – on which summary judgment is sought (emphasis supplied).  See *Towne v. Robbins*, 339 F. Supp. 2d 1105, 1113 (D. Or. 2004), granting defendant's motion for summary judgment on timeliness grounds "to the extent" of the untimely part of the complained of events; *Oregon v. Spar Inv. Co.*, No. 99-959-MO, 2004 U.S. Dist. LEXIS 19415, at *32 (D. Or. Sep. 21, 2004) ("liability does not exist for releases prior to 1979");  *Leveroni v. United States*, No. C 05-04295 SI, 2006 U.S. Dist. LEXIS 75083, at *9, (N.D. Cal. Oct. 3, 2006) (claim for refund of taxes paid by installment untimely as to the first three of the installments).

Plaintiff's suggestion that the court wait to consider the statutes of limitation conflates remedy with violation.  See *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977), (discriminatory act which is not made the basis for a timely charge is legal equivalent of a discriminatory act which

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

occurred before statute was passed); *Klein v. N.Y. Univ.*, 786 F. Supp. 2d 830, 843 (S.D. N.Y. 2011), (dismissing plaintiff's individual allegations to the extent outside the limitations period). Otherwise the court would still need to address timeliness in motions in limine and other in-trial motions, and would be ignoring the principle that summary judgment is an integral part of the Federal Rules which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. at 327.

## B. Plaintiff Has Not Identified Specific Facts Showing a Genuine Issue for Trial on Her Claim for Breach of Contract. The Court Should Dismiss the Claim.

Plaintiff's Tenth Claim for Relief is a breach of contract claim that is missing its contract. The complaint alleges only that "plaintiff and defendant are bound by an employment contract." Defendants tried to fill in the blanks during plaintiff's deposition by asking her to identify what contract she had in mind; she described an appointment agreement from her first job, before she became a full professor,[1] and she denied that she had any side agreement once the collective bargaining agreement was in place. (See Motion at 41.) Plaintiff agrees her claim is not based on the collective bargaining agreement. (See Opposition at 48.)

Plaintiff argues this contract claim "is based on a separate contract from the CBA" (Opposition at 47). Her deposition says otherwise (Freyd Tr. 67:8-68:2). Unsupported allegations made in briefs are not sufficient to defeat a motion for summary judgment. *Stanley v. Univ. of S. Cal.*, 178 F3d 1069, 1076 (9th Cir. 1999). The bargaining agreements do not permit a separate agreement in any event. The union is "the sole and exclusive representative of all members of the bargaining unit" and it is "the exclusive representative" of the faculty in the unit "for purposes of

---

[1] Plaintiff's argument identifies "Ex. 54." (See Opposition at 47.) She has not submitted an Ex. 54. The single page appointment agreement from her first job appears at plaintiff's Ex. 15, but that document applies only to the position of Associate Professor which she did not hold after 1992 (Freyd Decl, ¶ 3). If this is the document plaintiff means, Plaintiff's Opposition at 47, it applies on its face to the position indicated above" which is the position of "associate professor."

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

negotiating the terms and conditions of their employment" (Sadofsky Decl. Ex. B, pp. 5-6; Ex. D, p. 5).

Plaintiff must present the "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate in light of plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317 at 322.

**C. Plaintiff's Disparate Impact Claim Should Be Dismissed; It Is a Disguised Treatment Claim, Fails to Identify the Specific Employment Practice at Issue, Is not Supported by an Admissible Statistical Analysis, and Fails to Present a Legitimate Alternative Practice.**

Federal and state law allow for disparate impact theories of discrimination, provided that strict criteria are met. Disparate impact liability "has always been properly limited in key respects." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2522 (2015), and the law does not mandate "the displacement of valid governmental policies." *Id.* Impact claims require "adequate safeguards at the prima facie stage" where courts must "examine with care" whether a plaintiff has made out a prima facie case of disparate impact. *Id. at 2523*. A proper first step here is to evaluate plaintiff's impact theory, which is without question a <u>treatment</u> claim in which she asserts that men and women are treated differently in retentions.

1. <u>Plaintiff's retention complaint is a disparate treatment claim.</u>

Plaintiff initially asserted that the University's neutral retention practice had a disparate impact on women. She adjusted her theory and now argues that the process is not neutral. For example, she illustrates that when Professor Baldwin initiated her negotiation "*she was treated differently* from her male counterparts" (Opposition at 18, emphasis supplied). In Professor Baldwin's singular and unusual discussions, she requested an offer when she was one of several candidates in discussions with Cambridge. The University considered her Cambridge prospects, evaluated whether her overall merit justified an aggressive response, and wanted to defer the discussion until it became clearer whether she was likely to receive an offer. She did not want to

Page 11 –  REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

defer, rejected the retention offer she received, but failed to receive an offer from Cambridge (Mayr Tr. 192:2–193:15; 196:22–197:8).  Such a "one-time decision may not be a policy at all."  *Tex. Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2523.  Plaintiff reinforces that Professor Baldwin shows differential treatment, stating "while the Department aggressively responded to at least two other male professors who did not yet have offers…there was no effort made by the Department to retain [Professor Baldwin]" (Opposition at 18) until there was an offer that was "too little to tempt her" (Opposition at 19), and the circumstances further exemplify the "differential **treatment**" of Professor Baldwin (Opposition at 19, note 10).  She says that "defendants **treat women differently** from men in the retention process" and that when women have sought retentions, "they have been **treated differently from men**" (Opposition at 30), and that "defendants have **treated men more favorably** than women" (Opposition at 37).  She also asserts that defendants **treat women** negotiating for a raise outside of retention differently (Opposition at 20) and she says that "none of the offers **made to tenure track women** were enough to induce them to stay (Opposition at 17, note 9).  Plaintiff's narrative forecloses any disparate impact theory here.    She cannot merge impact and treatment theories which are "either-or" alternatives.  A policy is either applied in a neutral manner or it is not.   Allowing the theories to coalesce "would simply provide a means to circumvent the subjective intent requirement in any disparate treatment case." *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 115 (2d Cir. 1992);[2] *Hunt v. Tektronix, Inc.*, 952 F. Supp. 998, 1009 (W.D. N.Y. 1998) (allegations that identify intentional discriminatory policy and assert it had a disparate impact cannot be the basis for a disparate impact claim); *Scheidecker v. Arvig Enters.*, 122 F. Supp. 2d 1031, 1043-44 (D. Minn.

---

[2] *Maresco's* consideration of whether the ADEA allows impact claims was a separate issue that was resolved later by *Smith v. City of Jackson*, 544 U.S. 228, 125 S. Ct. 1536 (2005).

Page 12 –  REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

2000) ("Plaintiffs have muddled two distinct causes of action. They cannot recast a disparate treatment claim to establish a disparate impact claim").[3]

Disparate impact is a legal theory with specific requirements and is distinct from disparate treatment. Plaintiff argues instead about treatment and asserts that the retention process is not neutral, but rather involves different treatment of men and women; but she has never tried to negotiate a retention raise herself.

> 2. Plaintiff's impact theory also fails because she has not identified the "specific employment practice" that caused any impact.

An impact claim must identify the *specific* employment practice which produces the impact. See *Garay v. Lowes Home Ctrs., LLC*, No. 1:17-cv-00269-MC, 2017 U.S. Dist. LEXIS 187715, at *4 (D. Or. Nov. 14, 2017) ("the employee is responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical discrepancies"). This requirement is not "a trivial burden," and the standards for a disparate impact claim are "exacting." *Id.* at *5.

Retention offers uniquely and individualistically involve the give and take of merit evaluation, consideration, involvement of various people and groups, negotiation, and are not the kind of narrow "specific employment practice" which can support an impact theory. The department head, as just the first step of this process, has to evaluate how serious the offer is (sometimes using "spies"), gauge the department's interest in retention, try to figure out what the individual really wants or whether he or she is leaving anyway, consider overall merit, and then convince the rest of the University (Mayr Tr. 151:11-152:23; 193:4-15).

Referring to something called "retention raise practices" does not demonstrate that this is a "specific employment practice" and the undisputed evidence confirms it is not isolated and not specific. See *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011), reiterating that merely

---

[3] As to plaintiff's state law impact claim, see OAR 839-005-0010 which emphasizes that proof of an impact claim under state law requires a showing that a standard or policy "is applied equally."

Page 13 –  REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

proving that a discretionary system has produced a disparity is not enough. "The plaintiff must begin by identifying the specific employment practice that is challenged;" *Stout v. Potter*, 276 F3d 1118, 1124 (9th Cir. 2002) (plaintiffs cannot use disparate impact theory to attack an overall decision-making process). "Retention" is an overall decision-making process.

As described here, retention is a complicated process with many steps, any of which can terminate or alter the path and lead to the ultimate decision. For example, the University does not normally make retention offers for candidates who have not progressed far enough (such as Professor Baldwin's "one of four" status), so such a variable affects the decision (Mayr Tr. 192:5-9; 193:1-3). Whether an external recruitment might cause a domino effect and result in the departure of other faculty is a different consideration that can result in a greater urgency and more-than-usual need to come to a retention agreement (Mayr Tr. 151:11-25; 154:21-25). Retention offers may include increased salary but not always; sometimes the need is for research funding (Mayr Tr. 162:15-163:6; 164:1-8; 202:2-4). The nature of the negotiations depends on "the signals" from the department (Mayr Tr. 158:25-159:2). Joint offers, such as to a couple can impact the process (Mayr Tr. 178:13-18). Timing may be important, and may have affected Professor Baldwin: "I think she would have stood a better chance as the single, lone remaining candidate" (Mayr Tr.305:21-306:3). Negotiations might take place directly with the President in some cases (Mayr Tr. 204:19-24). Some retention discussions involve consideration of how the offer might pay for itself, such as in the case of Professor Fisher, whose grant and other external funding pay his salary (Mayr Tr. 54:22-25; Sadofsky Decl. ¶ 6(d)). Plaintiff's focus on the bottom line does not satisfy her legal burden. *Stout v. Potter,* 276 F.3d at 1122 *(*whether disparate impact was shown must address the results of screening decisions, not simply the bottom line promotion decisions).

Plaintiff does not identify, for example, whether Professor Fisher's retention offer related to his extraordinary grant funding and the fact he pays for himself, or to the fact that defendants feared that if he left, his close colleagues Professors Pfeiffer and Berkman might also leave. Plaintiff does not identify whether the offer Professor Baldwin found insufficient was a result of

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

her overall merit, her being in "a holding pattern" (Mayr Tr. 193:11-14), or the fact that she was one out of four rather than a single finalist for a Cambridge position. Plaintiff does not identify whether Professor Hall's retention offer was a result of his wanting just research funding or because the administration felt him to be too important to his administrative position with the division of Equity and Inclusion to take a chance on losing him (Mayr Tr. 164:3-8; 164:23-165:3). She does not identify whether Professor Allen's offer was due to his being "one of our sort of central people that a lot of other people rely on" (Mayr Tr. 181:21-25), or because of Professor Mayr's "very high confidence in his value for the university" (Mayr Tr. 183:18-25), or because of the factors that caused him to be recruited to Oregon in the first place for a newly established Chair (Mayr Tr. 76:6-10), or because he is "almost insanely productive" (Mayr Tr. 193:9-12).

3. Plaintiff does not present a genuine issue of material fact by providing a statistical analysis that does not meet standards of admissibility.

As part of her burden to demonstrate a statistical disparity, plaintiff has offered a brief declaration from research economist Kevin E. Cahill. Defendants have separately objected to the admission of this analysis and have provided the report of Dr. Debra Ringold on the deficiencies of this statistical methodology. This declaration does not meet the reliability standards of the Reference Manual on Scientific Evidence, Third Edition (Rubinfeld 2011, pp. 311-317), and does not provide critical information that the court needs in order to evaluate the methodology he followed. He does not sufficiently describe the data he reviewed or its sources, stating merely that he has "records and files" and "materials." He states that he plotted "all" professors in the psychology department while at the same time and with no explanation, says he removed two from consideration. His attached chart says he removed three. He does not describe how his data were compiled, does not identify his regression theory, does not discuss the suitability of his model nor provide a rationale for the choice of his independent variables. He provides no report. His declaration is five paragraphs and he attaches two charts that do not identify the names of the people he says he evaluated. See *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 520 (9th

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Cir. 2011), (in any large population a subset can be chosen that will make it appear as though the complained-of practice produced a disparate impact).  The court is not obliged to assume that plaintiffs' statistical evidence is reliable.  See *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d at 519; *Tucker v. Reno*, 205 F. Supp. 2d 1169, 1174 (D. Or. 2002) (when evaluating disparate impact claims, the court may point out fallacies or deficiencies in the data, such as small data sets, inadequate statistical techniques, or using small random samples when all disputed employment decisions could have been evaluated).  *Butler v. Portland Gen. Elec. Co.*, 748 F. Supp. 783, 790 (D. Or. 1990) (plaintiffs' statistical analysis flawed and unreliable; impact claim failed).

No legally meaningful statistical inferences of discrimination can be drawn from so small a data set as plaintiff presents.  See *Cerrato v. S.F. Cmty. Coll. Dist.*, 26 F.3d 968, 976-77 (9th Cir. 1994), holding that "the district court rejected precisely the kinds of 'fallacies and deficiencies' that must be excluded as unreliable"; *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 996-97, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988) (statistical evidence may not be probative if it is based on a "small or incomplete data set"); *Shutt v. Sandoz Crop Prot. Corp.*, 944 F.2d 1431, 1433 (9th Cir. 1991) ("statistical evidence may not be probative if the data are 'small or incomplete'"); *Morita v. S. Cal. Permanente Med. Grp.*, 541 F.2d 217, 220 (9th Cir. 1976), *cert. denied*, 429 U.S. 1050, 50 L. Ed. 2d 765, 97 S. Ct. 761 (1977) (statistical evidence derived from an extremely small universe has little predictive value and must be disregarded).  See also *Stout v. Potter*, 276 F.3d at 1123 (pool of 38 applicants "likely too small to produce statistically significant results"); *Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072, 1076 (9th Cir. 1986) (department of 28 employees "too small").

The rebuttal declaration of Dr. Debra Ringold in in accord.  Dr. Cahill's declaration does not meet the standards of the Reference Manual on Scientific Evidence, Third Edition (Rubinfeld 2011, pp. 311-317), does not provide the information the court needs to evaluate his methodology, does not describe his "records and files" and "materials," or the sources or how they were compiled, admits with no explanation that he removed two individuals from consideration but

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

attaches a chart that says he removed three, does not identify his regression theory, does not discuss the suitability of his model nor the rationale for choosing his independent variables.  His removal of two, or three, people from his analysis illustrates the Second Circuit's warning: "in any large population a subset can be chosen that will make it appear as though the complained of practice produced a disparate impact."  *Smith v. Xerox Corp.*, 196 F.3d 358, 369 (2d Cir. 1999).

  4. <u>Retaining superior scholars is a legitimate and work related business reason that is justified here</u>.

   Even if plaintiff had presented reliable and admissible statistics, her claim would still fail. An employer "may maintain a workplace requirement that causes a disparate impact if that requirement is a "reasonable measure[ment] of job performance," *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2523.

   Plaintiff does not dispute this need.  As to Professor Fisher, for example, she admits that "it was certainly of value that [Professor Fisher] stayed (Freyd Tr. 82:2-4), and that the department is "better off with him," and that he contributes to the intellectual life of the department, mentors, attracts good graduate students (Freyd Tr. 82:19–83:2), and that if she had departmental responsibility she would consider it worth an effort to retain him (Freyd Tr. 83:3-7).  Professor Mayr is a "good colleague" and she has no criticism that the University wanted to retain him as a faculty member, and he contributes to the reputation of the institution; his absence would be felt if he were to leave (Freyd Tr. 89:8–90:7).  When other faculty left because they had a better outside offer it was "tragic to see" (Freyd Tr. 98:2-9).  It is appropriate for the University to make retention offers to valuable faculty members where the University would suffer a loss should that person leave (Freyd Tr. 129:24–130:5).  Professor Gordon Hall had great value because of his efforts in his administrative role and Professor Nick Allen was "almost insanely productive" and a central person for others who depended on him.  (See above at pp. 9-10.)  Decisions whether to enter into retention negotiations are informed by the collectively bargained terms and conditions of employment, the actual current and historical performance and work behavior of the faculty

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

member in question, expected productivity and potential and strategic goals, the external funding awarded to that individual, whether that individual's work involves close collaboration with others, and factors of past performance that might be predictive of future performance. (Stark Decl. Ex. 25 at p. 14; Ex. 41.) Each such individual is evaluated on what he or she has and will contribute to the work of the University. An individual who leaves the University cannot contribute his or her substantive work. In the case of Professors Fisher and Allen, the duties of Director of Clinical Training would be left on the table. Existing research labs would be idled until a replacement might possibly be found. Graduate students might have to be reassigned or could leave. External funding, which pays for their work and funds some of the other faculty such as plaintiff, could transfer to another university. In the case of Professor Mayr, the department would be without a head until someone could be persuaded to take on the role, grievances would not be adjusted, promotion and compensation recommendations would not be made, and course assignments would not be addressed. The loss of important and productive faculty causes reputational damage.

Defendants have satisfied their responsibilities at this stage of the analysis by showing that retaining faculty serves, in a significant way, its legitimate goals. *Hardie v. NCAA*, 876 F.3d 312, 320 (9th Cir. 2017). Defendants are not required to show that retention is "essential" or "indispensable" so long as it is something more than "insubstantial." *Id.* Moreover, "[t]he ultimate burden of proving that discrimination against a protected group has been caused by a specific . . . practice remains with the plaintiff *at all times*." *Id.*, emphasis in original.

5. Plaintiff fails to meet her burden to demonstrate an equally effective alternative.

Plaintiff also argues that the University could take a different approach, gather retention funds, offer the potentially departing individual half of what he or she would be receiving from the other institution, and distribute the remainder to others who would be leapfrogged (plaintiff's argument appears to earmark the extra funds for women). (Opposition at 44-45.) This is not a meaningful demonstration and fails to satisfy plaintiff's legal burden.

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

A proposed alternative "must be 'equally effective' as the defendant's chosen policy" in serving the defendant's interest, taking into account the cost or other burdens that alternative policies would impose, and plaintiff must demonstrate that her proposed alternative policy would reduce the overall disparity and result in less disparate impact. *Hardie v. NCAA*, 876 F.3d at 323. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2518; *Ricci v. DeStefano*, 557 U.S. 557, 578, 589-91 (2009). Additionally, alternative proposals must be "equally effective" for the employer, taking into account costs and administrative burdens. "While we recognize that the plaintiff's burden at the alternatives stage is a demanding one, courts must take caution before displacing reasonable business judgments." *Hardie v. NCAA*, 876 F.3d at 323 (costs and administrative burden weighed in employer favor and plaintiff failed to adduce sufficient evidence that his proposal would be equally effective in achieving employer's goals).

*Ricci v. DeStefano*, 557 U.S. at 589-91, rejected a proposed alternative that did not show it would be equally valid in determining qualifications of candidates, and because the suggested alternative could have resulted in illegal preferences. The Ninth Circuit raised the same consideration in *Rudebusch v. Hughes*, 313 F.3d 506, 516 (9th Cir. 2002): "adjustments depend upon a regression analysis that does not account for performance factors such as academic credentials, performance, merit, teaching, research, or service--factors that are the major criteria for faculty compensation on campuses across the country--the failure to make some sort of more individualized determination of what sort of adjustments are warranted in any given case will not satisfy strict scrutiny." And see also *Lopez v. City of Lawrence*, No. 07-11693-GAO, 2014 U.S. Dist. LEXIS 124139, at *76-78 (D. Mass. Sep. 5, 2014) aff'd 823 F3d 102, 121 (1st Cir. 2016) ("what [plaintiffs] have not been able to show is that there was a particular alternative selection method available for the years in questions about which it could confidently be said that it would have reduced adverse impact."). Nothing in plaintiff's description provides any clue to whether such a practice – offering half of the recruitment – would suffice to retain a faculty member with a strong recruitment offer. Professor Baldwin, for example, was disappointed in a retention offer

Page 19 –  REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

that would have paid her *more* than Cambridge (Baldwin Decl. ¶ 9; Sadofsky Second Decl. ¶5).
Scott Coltrane, whose testimony is plaintiff's source for this alternative proposal, explained that it
was tried once in the past, under a different budgetary model, in a hiring rather than retention
situation, and that "[n]obody was happy in the end because it was not as much as they thought they
deserved. And in my estimation the productivity of the other faculty member was not as strong as
the – the newer hire's" (Coltrane Tr. 84:8-23; 86:12–87:8). Plaintiff cannot say with any
confidence that her proposal would resolve inequities she sees. In her hypothetical scenario, the
recruited faculty member would receive a raise of $10,000 and two other faculty members would
each receive an increase of $5,000. There is no mention about any other individuals in the
department with comparable merit and seniority beyond these two, and even the two individuals
who received the $5,000 would not catch up, if that is to be the goal. The proposal would also
double the cost of retention (Sadofsky Second Decl. ¶ 18).

Retention raises often create perceptions of inequities, but those perceptions may not be
accurate; in such a case, the University might be "correcting" a perceived problem that is not a
genuine problem (Sadofsky Second Decl. ¶ 18). If there are many faculty members who perceive
a retention-created inequity, splitting the already scarce funds into many small pieces has not been
shown to be a way to allay that perception. *Id*. A formulaic manner of distribution may not be
available to members of the collective bargaining unit in light of restrictions in the bargaining
agreement that plaintiff does not discuss.

This proposed alternative occupies less than a page in plaintiff's Opposition. It is neither
fully articulated nor tested in any way. It has a cost, including that the one experience left everyone
involved unhappy, and faculty received rewards "for not being productive" (Coltrane Tr. 86:12–
87:8; Coltrane Decl. ¶ 5.) (See also Sadofsky Second Decl. ¶¶ 11-19.) Plaintiff's proposed
alternative does not meet her burden.

This is not even the proposal that plaintiff originally offered. She said that retention offers
would not be necessary if the University just raised the pay of all faculty to their market value

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

(Freyd Tr. 135:2-136:6), and that the long-term solution "is to figure out how to compensate for bias and remove inequity" (Freyd Tr. 141:5-6).  In general, she would reward people for their accomplishments to the University's mission in an "equitable" way more comparable to other universities' departments of a similar stature and she would achieve "equity" by paying faculty based on their seniority, allowing for job performance related departures, and she would "figure out how to correct any bias in the quantitative information" (Freyd Tr. 139:18-23).  However, "I'm not going to say what the answer would be.  There should be an answer" (Freyd Tr. 141:24-25).

"The burden of demonstrating the existence of acceptable alternative business practices rested and continues to rest squarely upon Title VII *plaintiffs*."  *IBEW v. Miss. Power & Light Co*, 442 F.3d 313, 318 (5th Cir. 2006).  Plaintiff's belief that "there should be an answer" and the suggestion in her Opposition that the University should try something more costly that did not work before does not meet her burden.

Plaintiff's state law impact claim (her eighth claim) fails for the same reasons.  See *Pena v. Hous. & Cmty. Serv. Agency*, No. 09-6150-TC, 2010 U.S. Dist. LEXIS 89743, at *27-28 (D. Or. Aug. 30, 2010) holding that "the federal standard for establishing a prima facie case, including the burden shifting frame-work, is used to analyze a disparate impact claim under Oregon law."

**D.  Plaintiff Does Not Identify a Prima Facie Case or a Genuine Issue for Trial on Whether She Performs the Same Day-to-Day Duties as Professors Allen, Fisher, Hall and Mayr.**

As discussed in defendant's Motion at 6-15, plaintiff's required first step for her treatment claims is to identify her day-to-day duties and compare that to appropriate male colleagues; she must do this before she can turn to other issues such as sources or types of pay.  Plaintiff skips this mandated process and instead focuses on her scholarship and achievements.  See *Stanley v. Univ. of S. Cal.*, 178 F.3d at 1074 (prima facie case should compare the jobs in question not individuals).  Plaintiff may not turn to how salaries are calculated before establishing that the day-to-day duties meet the legal standard of equality or comparability, and she does not meet that standard by generalizing the general responsibilities of a psychology professor.  (See Motion at 22-24.)  In

Page 21 –  REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

spite of her arguments, she admits that the job description of a tenure-track faculty in the psychology department expressly contemplates differing duties and "substantial flexibility" (Opposition at 11).

Legally appropriate comparators are identified based on the core of tasks actually performed, not on the basis of generalized descriptions of job duties, particularly those which are by their nature flexible enough to allow a given professor to choose whether or not (or how much) to perform those tasks. The legally determinative factor is actual job content. *Spaulding v. Univ. of Wash.*, 740 F.2d 686, 698 (9th Cir. 1984) (the contention that "teaching is teaching," although superficially appealing, lacks merit). The court "will not, therefore, infer intent merely from the existence of wage differences between jobs that are only similar." *Spaulding* at 700.[4] Plaintiff's arguments that her job description is the same, or that her job description does not require that she procure grant funding do not assist her: "In assessing a plaintiff's claim of substantial equality between jobs, a court should rely on actual job performance and content rather than job descriptions, titles, or classifications." *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1414 (9th Cir. 1988).

Flexibility is inherent in the academic freedom of a full processor. (See Motion at 6-7.) Plaintiff's repeated assertions that her colleagues "are still fulfilling the job duties of a full professor," is no more than the "high level of generality" that does nothing to illuminate whether the day-to-day duties are the same. Her legal burden requires more than "a comparison of job functions from a bird's eye view" or an "overly generalized depiction" *Spencer v. Va. State Univ.*,

---

[4] Plaintiff argues that *Spaulding*, is unreliable because it has been overruled. (Opposition at 31.) The opinion she references, *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1482 (9th Cir. 1987), was itself overruled by the Supreme Court. 490 U.S. 642 (1989), and *Spaulding* has continued to be cited including by the Ninth Circuit after *Atonio*. See *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1074 (9th Cir. 1999); *Penk v. Or. State Bd. of Higher Educ.*, 816 F2d 458 (9th Cir 1987) (decided after *Atonio)*; *Dreyfuss v. Cory (In re Cloobeck)*, 788 F.3d 1243, 1247 (9th Cir. 2015).

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Civil Action No. 3:16cv989-HEH, 2018 U.S. Dist. LEXIS 15773, at *25 (E.D. Va. Jan. 30, 2018), citing *Wheatley v. Wicomico County*, 390 F.3d 328, 332 (4th Cir. 2004), *cert. denied*, 125 S. Ct. 2253 (2005) ("We decline to accept the argument, however, that employees with the same titles and only the most general similar responsibilities must be considered 'equal' under the EPA. In actuality, plaintiffs present a classic example of how one can have the same title and the same general duties as another employee, and still not meet two textual touchstones of the EPA - equal skills and equal responsibility.").

Plaintiff has not provided the court with the kind of specific detail that could create a genuine issue whether her work can be legally compared to her colleagues. She compares herself to the psychology department instead of other faculty because they are the "**most similar**" to her (Freyd Tr. 203:23-204:8) and she describes her desired "**equity**" as focusing on "**similar achievement and seniority**" (Freyd Tr. 157:20-24). Her lab **functions "similarly"** to her colleagues' centers (Opposition at 3) and she has taken on "**similar time-consuming, effortful and important roles**" (Opposition at 24).

Plaintiff's has had many successes as a scholar and her Opposition shows that defendants have provided her recognition for her successes, hold her in high regard, and she has received positive evaluations (Freyd Decl. ¶ 29). That does not provide evidentiary support for her contention that the court should accept her "bird's eye" view and hold that a teacher is a teacher. Plaintiff summarizes her leadership, her positive employment reviews, her authorship, her membership in prestigious organizations, her citation or H-index, her public profile, and her ability "to do a high volume of high-quality work, because her research simply does not require the large dollar amounts that the research some of her colleagues demands." Her declaration and Opposition underscore how different her day-to-day work is. She has never been the Department Head or Director of Clinical Training, has never managed the accreditation or reaccreditation process, and never held a senior director position in CODAC. She does not have the level of responsibility and accountability imposed by federal funding requirements. Her employee supervision is limited to

Page 23 –  REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF
OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

her lab manger in contrast to federal grant staff or department administrative staff. Her colleagues who are Principal Investigators on federal grants spend an average of 42% of their time on the federal requirements, and she does not have the duties imposed by NIH grants including the public access requirements and new NIH PI or Co PI reporting obligations and responsibilities or federal whistleblower responsibilities. She has not founded and does not have administrative duties for a center or institute. She does not adjust faculty grievances or do misconduct investigations. (See Motion at 6-15.) Her response discusses her different work. See *Stanley v. Univ. of S. Cal.*, 178 F.3d at 1074, prima facie case involves a comparison of the jobs in question, not the individuals who hold the jobs.

In apparent acknowledgement that these many differences separate plaintiff's day-to-day work from her four colleagues, plaintiff asserts without authority, that whether her four male colleagues have the same job duties applies only in the case of her Equal Pay Act claim. (See Opposition at 1). Considerable authority from the Ninth Circuit and this court, discussed in defendants' Motion at 4-5, rejects such an argument.

Plaintiff's continued response that all faculty do the same job is not only legally unsupported (Motion at 6), it is a logical fallacy as well. If it applied, plaintiff would have to compare herself to the much lower paid faculty in other disciplines (Freyd Tr. 204:9-20) as well as to much lower paid assistant and associate faculty in her own department. Applying her "birds eye" test, they all perform teaching, research, and service as well.

The three decisions plaintiff cites to support her argument all show that the decisions were made not by stating a general principle (i.e. that faculty are faculty), but rather by what was in the respective records before those courts. See *Klein v. N.Y. Univ.*, 786 F. Supp. 2d 830, 850 (S.D. N.Y. 2011) ("The evidence would permit a conclusion that they all performed the same job…"); *Brock v. Ga. Sw. Coll.*, 765 F.2d 1026, 1033 (11th Cir. 1985) ("the record, however, substantiates appellee's claim that any additional duties are accurately characterized as ephemeral," "Appellants are not arguing that the jobs that Parks and Faircloth performed were different, only that the

Page 24 –  REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF
OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

individuals holding the same jobs had different titles," "we find the record supports the conclusion that Reeves was properly compared with Voight"); *Allender v. Univ. of Portland*, 689 F. Supp. 2d 1279, 1285 (D. Or. 2010) (basing analysis on facts in record and lack of evidence distinguishing group of assistant professors from one another, noting that full professors differed). This case is different and the court has a detailed record.

Plaintiff's additional arguments are similarly misdirected. She has been at the University long enough to experience rounds of regular raises and her merit rankings are high. But seniority and raises are not the same as day-to-day duties, and defendants have not disputed that plaintiff does her work well. The record in this case, however, provides undisputed evidence of the significant ways in which the work of the four male colleagues differs from plaintiff's work.

## E. Plaintiff Argues She Does Important Work in an Efficient Manner; That Does Not Present an Issue for Trial on Whether Her Duties Are Substantially Equal or Comparable.

Plaintiff's presentation of the importance and efficiency of her work assumes the court should be tasked with evaluating her position or her compensation in terms of the value of her interests and the economy of her research. The federal and state laws that address discrimination in pay strike a different balance, one that contemplates leaving those decisions to the judgment of her public employer, and the question of intentional gender discrimination under the statutes to the court. *Wheatley v. Wicomico County*, 390 F.3d at 334. Fidelity to the statute's text does not allow for an argument that she does research that "simply does not require the large dollar amounts" her colleagues require, or that she has learned how to choose work that does not waste the taxpayer's money (Freyd Decl. ¶ 20; Opposition at 4), and she presents no evidence that any of her distinguished colleagues waste taxpayer money. Moreover, she omits any discussion of how her work is funded. All work in the University, hers included, requires financial support. Money has to be found to pay faculty and any staff, provide infrastructure, fund labs, and provide financial support for graduate students. The funding plaintiff has been able to find contributes, but she cites no evidence that she does not require additional University funding. Her funding "doesn't go far"

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

in light of the expensive funding needed for graduate students (Mayr Tr. 195:9-16). Those faculty who can bring in large scale external funding free up internal resources to provide such funding to those who do not (Sadofsky Second Decl. ¶ 12).

Plaintiff protests that she was never told that obtaining funding was a job requirement, but she misses the point of defendants' discussion of external grant funding. The former is not a meaningful legal argument; actual job content and performance of duties matters, not job descriptions, titles, or classifications. *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d at 1414. Moreover, it is not disputed that "Grants received" is listed as one of the categories under "Research" in the Psychology Department's Merit Raise guidelines and that external grants are also listed as one of the items to be included for review in the department's "Review, Promotion and Tenure Procedures and Guidelines" (Sadofsky Second Decl. ¶ 11). Regardless of whether a professor is "required" to seek and obtain external funding, such funding is beneficial to the University, makes the jobs of the recipients substantially different, and is in large part the kind of success that leads to poaching that, in turn, requires the University to address retention.

## F. Plaintiff Does Not Present a Genuine Issue for Trial Regarding Professor Hall's Return to the Psychology Department.

Professor Hall has recently rejoined the psychology department (Sadofsky Decl. ¶ 6(d)). Plaintiff argues that pay should be adjusted as a result. First, plaintiff presents no evidence of Professor Hall's current day-to-day duties and responsibilities, or hers since she is on a fellowship at Stanford (Sadofsky Decl. ¶ 16). Second, Professor Hall initiated his retirement phase-down which is subject to separate University retirement adjustments (Sadofsky Decl. ¶ 6(d)). Plaintiff has not notified the University that she is initiating a similar retirement phase down. Third, an employer may legitimately have a practice of maintaining higher pay for employees who step down from management positions. *Russell v. Placeware, Inc.*, No. 03-836-MO, 2004 U.S. Dist. LEXIS 21465 at * 31 (D. Or. Oct. 15, 2004) (gender-neutral reason for a former manager's higher wages where policy allowed employee who accepted lower-level position to maintain prior salary);

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

*Allender v. Univ. of Portland*, 689 F. Supp. 2d 1279, 1287 (D. Or. 2010) (applying *Russell v. Placeware, Inc.* to faculty).  Such a policy is in effect at the University to protect faculty who step out for an administrative position (Sadofsky Tr. 99:23–100:5).

**G.  Grant Funding Is a Significant Differentiating Factor Because It Changes Job Duties.**

Applying for, obtaining, running, overseeing, and maintaining a significant federal grant is fundamentally different from how plaintiff describes her own research.  Plaintiff's colleagues have had major external grant funding which carries major responsibilities for personnel management, administration, legal obligations, reporting requirements, and many other duties which are not required in the absence of such grants.  Plaintiff trivializes the importance that securing grants has in this dispute, and misreads how and why defendants address such funding (Opposition at 24).  The grant funding that Professors Allen and Fisher, in particular, have secured has led to dramatically different day-to-day duties, and responsibilities.  Because grant requirements impose time-consuming duties, they change job content.  Plaintiff's Opposition admits she does different research and has different administrative duties and responsibilities.  She does not work with federal funding, the kind of funding that occupies more that 40% of a grant holder's time with unique, time consuming, and sometimes non-delegable responsibilities (Conover Decl. ¶ 3), and which impose rigorous oversight, reporting, administration, cost management, payroll and other compliance requirements, personnel management, and certifications.  Grant funding is a likely reason for the poaching attempts made by other institutions (Mayr Tr. 92:13-22), and is one of the reasons whether the University will fight to retain a professor who is being recruited to leave.

**H.  Retention Raises Are Nondiscriminatory and Permissible and Differentiate Plaintiff's Compensation from Her Male Colleagues.**

Plaintiff's Opposition implies, without any evidence, that her colleagues have done something dishonorable by putting "themselves on the market" to negotiate raises.  (See Opposition at 1, 43 n. 18; Freyd Decl. ¶ 27.)  Plaintiff testified, however, that she could not name a single person who had "gamed the system" – not by name, not by example, not even someone

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

she believes "in her heart" has gamed the system (Freyd Tr. 143:8-22).  With the evidence entirely

to the contrary, this unpleasant suggestion should be disregarded.  Professor Hall did not seek out

the offer he received from the University of Michigan (likely because of his expertise in managing

accreditations), nor did he seek out the most recent offer, in 2015, from DePaul University which

was professionally attractive to him in light of his specialty in cultural diversity and personally

attractive because of its tuition exchange program[5] (Hall Decl. ¶¶ 12-13).  Similarly, Professor

Mayr was targeted by Humboldt University under a German government program to recruit

scholars back to the country (Mayr Tr. 160:16–162:4), and the offer was very attractive financially

and in terms of his children's education (Mayr Tr. 162:1-4).  Plaintiff cites no evidence sufficient

to imply that Professor Fisher or Professor Allen engaged in a sham process.  She also implies that

men are recruited more than women, but cites no evidence to support the suggestion that the

recruitments of Professors Allen, Fisher, Hall, or Mayr were biased.  Nor do the circumstances

suggest that could be true.  Professor Mayr was asked to consider Humboldt because of a program

seeking to repatriate scholars.  Professor Fisher has deep ties to Harvard University where he does

cooperative programs (and from which the University of Oregon receives funding for his work).

Professor Hall had developed a narrow specialty in accreditation which just happened to be needed

by another institution.   Professor Allen's productivity is extraordinary (almost insane, in his

department head's view) (Mayr Tr. 193:9-10; Sadofsky Second Decl. ¶¶ 5-6).  Plaintiff admits she

has no data to suggest that her male colleagues were recruited under circumstances she thought

showed gender bias (Freyd Tr. 145:10-16).  Since she has no such data, and since it is undisputed

that Professors Allen, Fisher, Hall, and Mayr did not play dishonorable games in pretending to

consider an outside offer, their recruitments in her individual lawsuit cannot be considered to be

anything more than what they seem – legitimate efforts by legitimate institutions to recruit scholars

known to be valuable.

---

[5] Similar to Professor Baldwin's experience the retention offer he received and accepted "was not what I had requested" (Hall Decl. ¶ 13).

Page 28 –   REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF
OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

The retention process has already been addressed in the context of plaintiff's impact theory; she also argues that retentions are a way to discriminate intentionally as well (Opposition at 32, 37). She does not present a genuine issue for trial that there was discrimination against her individually (as contrasted to women in general), and she lacks standing to complain that she was harmed by a practice in which she was not involved and which she voluntarily decided to eschew. How she would have been treated requires only speculation.

Plaintiff's intentional discrimination theory fails for a second reason. Discriminatory intent "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (footnote omitted). Plaintiff offers no evidence that the University chooses to negotiate retentions "because of" adverse effects on women. And see *Morgan v. Bend-La Pine Sch. Dist.*, No. CV-07-173-ST, 2009 U.S. Dist. LEXIS 9443, at *66-67 (D. Or. Feb. 6, 2009) ("Morgan must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the individual defendants' conduct was motivated by gender or disability discrimination.").

Plaintiff argues that retentions represent a capitulation to market factors, citing *Rizo v. Yovino*, 887 F.3d 453 (9th Cir. 2018).[6] The evidence in this record, which describes the lengthy and evaluative retention process, does not support such a theory. Additionally, the events in question all predated April 2018, when *Rizo* overruled the prior *Rizo* decision and the 1982 decision in *Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 878 (9th Cir. 1982), which had held that use of prior salary was not a per se violation of the Equal Pay Act.

Plaintiff, who admits that retention is important, fails to present evidence that challenges Defendants' need to retain its productive faculty against external poaching. In each case, the

---

[6] The *Rizo* decision was about using a former salary to set a salary at hire for an employee who has no record of performance with it. On its facts, as well as in its analysis, it does not apply to an employer faced with the possible loss of someone presently working for it with whose qualifications and abilities the employer is deeply familiar.

Page 29 –  REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

faculty receiving external offers had special skills or major funding, was likely to take the outside offer, and would have been a significant loss to the University and the department. "The university derives benefit from faculty who obtain significant external funding (both financial and reputational). Faculty who have large external funding portfolios are also ripe for poaching and account for many of the external offers that come to University of Oregon's Psychology faculty, including both faculty who are retained, and faculty who leave" (Sadofsky Second Decl. ¶ 11). Losing such faculty risks loss of its R1 status and harms the University's overall mission "to produce world class research and to meet the university's goals" for which it is "very important" to have world-class scientists doing world-class research (Freyd Tr. 37:1-14; 39:2-9). The University must try to retain its world-class scientists (Freyd Tr. 39:2-9; 81:20-23; 83:3-7; 266:9-14); and it must respond to these external recruitments so that the University will not lose its valuable faculty (Freyd Tr. 129:24–130:12).

Plaintiff says that in spite of the intricacy of her discussions about seniority, years in rank, citations to work, merit and regular raises, and evaluations and external or internal praise, the entirety of the salary differential of which she complains is a function of retention-related raises. She asserts that the gender disparities she sees in the department come entirely from retention raises (Opposition at 17).

In addition, the figures and terms which plaintiff provides relating to her four proposed comparators, which she submits as examples of differential offers as between men and woman, in fact differ considerably amongst *themselves*. Namely, the four proposed male comparators who all received retention offers from the University in fact received widely varying offers even amongst the four, not simply in comparison to female faculty members. This is because each retention offer is an evaluation of the circumstances of the outside offer as much as it is an evaluation of the known value of the individual faculty member to the University.

Critically, plaintiff never argues that her four male colleagues received offers they did not deserve (Freyd Tr. 129:24–130:12), even if it means moving salaries "out of alignment" (Freyd

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Tr. 101:10-13), and agrees that the University is "better off" with Professor Fisher than without him (Freyd Tr. 81:20–82:19) and it is worth an effort to retain him (Freyd Tr. 83:3-7).

**I.    Retention Negotiations Are Statutorily Protected as Discretionary Policy Choices About the University's Strategic Research and Educational Programs.**

Contrary to plaintiff's assertion (Opposition at 46), defendants do not argue that they have been accorded discretion to discriminate.  Defendants' point is different and addresses how Oregon law protects the decision-making process in analyzing and determining how to position this state university for its future.  That includes which programs to develop, which facilities to build and invest in, where to find staff, which faculty can best grow the programs of the future, and even how to maximize external funding to address the funding shortfalls from the state budget and inability of students to bear further tuition hikes.  These are not everyday ministerial choices that fall outside the protection of ORS 30.265.  They establish the path the University will take into the future and emanate from the institution's purpose and vision.  The University is a Tier 1 national Public Research University at which a large percentage of students are engaged in research activity with many millions in competitive research awards.  The University's sponsored research and innovation activity contribute tens of millions of dollars to Oregon's economy each year and its research creates jobs for the community.  This University is one of the top public research universities in the nation, and the only member of the Association of American Universities in Oregon.  Its vision drove the Knight Campus for Accelerating Scientific Impact, which is designed to reshape the state's public higher education landscape by training new generations of scientists, engaging in new interdisciplinary research, forging tighter ties with industry and entrepreneurs, and creating new educational opportunities for graduate and undergraduate students (Coltrane Decl. ¶ 6;  Sadofsky Second Decl. ¶¶ 20-22).  Large external funding can contribute to keeping the lights on in these difficult economic times, whereas even meritorious unfunded work cannot.

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

This is the discretion that the University discusses in its motion.  When defendants write of discretion and academic freedom, they are not talking about individual merit raises, but rather about what are the key disciplines and who are the world class scientists who will lead science in the future and harness the power of the sponsored research that is doing world class work in life changing fields.  As part of those decisions, the University must also identify who will lead in these key areas as well as how to enhance the University's reputation academically and educate the next generation of Oregonians including by leveraging federal research grants (Schill Tr. 11:1-6).  Increasing federal funding is one of the President's top objectives "because this school ranks very low among our peers in federal research funding" (Schill Tr. 14:20-24).  This is about the discretion to value federal research grants because of what they say about the quality of the institution.  They are peer reviewed, "you don't get them unless your peers, who are typically the top people in the field, determine that you deserve them" (Schill Tr. 17:12-17).  Defendants also speak to the kinds of discretion needed to ensure that the University is accessible to the students who wish to attend, keep them through a timely graduation, and ensure they can afford their future in a state that is not wealthy (Schill Tr. 11:14-20), as well as the University's campus diversity action plans and how to support that goal (Schill Tr. 11:21-12:20).  Plaintiff's argument that these are just day-to-day inconsequential decisions mistakes defendants' argument.  These are precisely the kinds of policy choices contemplated by ORS 30.265(3)(c).  They are choices that go to the heart of the academic judgments of this institution (Coltrane Decl. ¶ 6).

**J.  Federal and State Law Comparability: Oregon State Law Applies Federal Standards.**

Case law establishes that Oregon state law applies federal standards.  *Conroy v. Hewlett-Packard Co.*, No. 3:14-CV-01580-AC, 2016 U.S. Dist. LEXIS 44396, at *35 (D. Or. Mar. 31, 2016) ("The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used under federal law").  This case law holds in spite of the fact that the federal and state laws use different wording.  And see *Pena v. Hous. & Cmty. Serv. Agency*, No. 09-6150-

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

TC, 2010 U.S. Dist. LEXIS 89743, at *27-28 (D. Or. Aug. 30, 2010) (federal standards apply in a state law impact claim).

To the extent that plaintiff's argument is that some statutes use different phrases, she still fails to show how any substantial comparability standard would change the analysis. Professor Mayr is the department chair, Professor Hall has performed much of his work outside of the psychology department, Professor Fisher has been paid by Harvard, and Professor Allen has an array of day-to-day duties that differ from plaintiff. Federal funding is still important, and retention situations were never adopted for the purpose of discriminating but because they are the only viable tool available that can reliably retain faculty.

See also OAR 839-008-0010, defining "work of comparable character" to include complexity of tasks performed, accountability, impact of an employee's exercise of job functions on employer's business, significance of job tasks, exercise of supervisory functions, and extent to which employee's work exposes employer to risk and amount of mental exertion. Those same factors have been in use to determine whether jobs are equal or substantially similar and apply in the analysis that defendants used in their Motion.

## K. Plaintiff's Opposition Includes Many Erroneous Characterizations of the Factual Record Before the Court.

- Plaintiff's Opposition suggests that her male colleagues are less than honorable in that they use or "game" the process of seeking outside offers in order to get a raise (Freyd Decl. ¶¶ 27, 28; Moses Decl. ¶ 12 (asserting the "women are typically less willing to 'play the game'")). Plaintiff, however, expressly denies having any evidence to support such an allegation. She cannot name a single person who she believes to have "gamed the system" by trying to get an outside offer (Freyd Tr. 143:8-22).

- Plaintiff argues that the department did not want to support Professor Hall's second retention. However, Professor Mayr testified that Professor Hall's second retention was in light of his administrative role (through CODAC) (Mayr Tr. 164:1-165:3; 178:1-4).

Page 33 –  REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

- Plaintiff argues that the department is discriminatory in its pay of new female hires as well, pointing to two males who were hired with higher starting salaries. The male new hires at issue came to the department with greater years of experience, and this is the reason for the $1,000 difference in their levels of pay (Sadofsky Second Decl. ¶ 3).

- Plaintiff has asserted throughout that women are less able to seek out opportunities in part because of family responsibilities. However, this assertion does not hold true in connection with Professor Freyd, who asserts that husband made sacrifices in his own career and moved across country so she could be at the University (Freyd Decl. ¶ 27).

- Plaintiff has argued that she did not know to ask for a higher salary when she was first hired at the University, and yet she was able to seek and bargain for an entirely additional job for her husband.

- Plaintiff offers the recently decided *Rizo* case, which she argues as if it had been the law all along rather than a decision from April 2018.

- Plaintiff complains about the investigation done by Jody Shipper, but does not describe any dispute with the results of her report (Freyd Decl. ¶ 25).

- Plaintiff argues, without citation of any evidence, that the environment of sexism at the London Business School that Professor Arrow describes would not have been an obstacle to men. assuming without proof that men all find sexism in the workplace to be acceptable (Opposition at 18).

- Plaintiff supports her claim by offering the potential problems of other women, when these were not her own experiences. This is an individual lawsuit with individual claims.

  //

  //

  //

Page 34 –   REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

**L. The Court Should Grant Defendant Sadofsky's Motion for Summary Judgment. Plaintiff Has Not Properly Addressed His Qualified Immunity, Her Claims Against Him Are Untimely, and She Had Not Identified a Genuine Issue of Material Fact to Be Resolved at a Trial.**

1. Sadofsky has Qualified Immunity. Existing case law at the time of any of his decisions has not placed his actions "beyond debate" and "did not preclude" him from a reasonable belief in the lawfulness of his actions.

Qualified immunity is not a "mere defense" to liability, but rather an immunity from suit and should be resolved at the summary judgment stage unless there is a genuine issue concerning whether defendant's acts violated clearly established law. *Mitchell v. Forsyth*, 472 U.S. 511, 526-7 (1985); *Kramer v. Cullinan*, 878 F.3d 1156, 1162 (9th Cir. 2018). Plaintiff must show not just that the law prohibits discrimination, but that the "contours" of that law were clearly established so that a reasonable government official would know his or her specific actions were a violation of the law. *Plumhoff v. Rickard*, 572 U.S. 765, 778-791 (2014) explains:

> And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Id.*, at 741, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149, 1159. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." *Ibid.* In addition, "[w]e have repeatedly told courts . . . not to define clearly established law at a high level of generality," *id.*, at 742, 131 S. Ct. 2074, 2084, 179 L. Ed. 2d 1149, 1160), since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

See also *White v. Pauly*, 137 S. Ct. 548, 552-53 (2017) (the clearly established law must be "particularized" to the facts of the case because otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights").

The complexity of the laws under which plaintiff sues illustrates the importance of *Plumhoff's* lessons, including its instruction that "existing precedent" must have placed the question "beyond debate," 572 U.S. at 779. Plaintiff does not show a question that is "beyond debate." For example, plaintiff relies upon *Rizo v. Yovino*, 887 F.3d 453 (9th Cir. 2018), but upon the decision that was written in April 2018 and which reversed a decision that had been written by

Page 35 – REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

a three judge panel, which had relied upon case law that had been in place for decades.  *Rizo v. Yovino*, 854 F.3d 1161 (9th Cir. 2017).  Judge Reinhardt, writing for the majority in 2018, stated that prior to April 2018 the law (regarding consideration of prior salaries) "was unclear" and the court had accepted *en banc* review to clarify it.  887 F.3d at 456.  Before April 2018, that part of the law plaintiff now relies upon was far from being "beyond debate" – in fact, a three judge panel of the Ninth Circuit had held it was the opposite of what plaintiff argues.  Other similarly long-standing legal interpretations show that "a reasonable government official" such as Sadofsky would not have had reason to know his decisions were a violation of the law.  *Wood v. City of San Diego*, 678 F.3d 1075, 1086 (9th Cir. 2012), holds that the mere fact that there are differences in compensation does not permit a presumption that the differences were caused by discrimination.  *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 at 1418, wrote that differences in day-to-day duties mean that jobs are not substantially equal in a pay discrimination analysis even in the face of the same titles or job descriptions, and *Stanley v. Univ. of S. Cal.*, 13 F.3d at 1323, acknowledges that an employee who generates more revenue may have different job duties and greater pressure.  *Penk v. Or. State Bd. of Higher Educ.*, No. 80-436 FR, 1985 U.S. Dist. LEXIS 22624 at *161 (D. Or. Feb. 13, 1985), aff'd 816 F2d 458 (9th Cir 1987), disagrees with the premise that teachers have the same job.  For years the Ninth Circuit has approved looking at the external market to explain unequal wages.  *Stanley v. Univ. of S. Cal.*, 13 F.3d at 1322, held employers may consider an employee's marketplace value, and *Rizo v. Yovino* (which is now the subject of a pending petition for certiorari) did not address or forbid consideration of market value in retention situations.  Plaintiff in this case has championed using the market as a way to reduce faculty recruitments (Freyd Tr. 135:18-22; 136:20-23).

"So long as existing caselaw 'did not preclude' an official from reasonably believing that his or her conduct was lawful, the official has a right to qualified immunity.  *Kramer v. Cullinan*, 878 F.3d 1156, 1163 (9th Cir. 2018), citing *Lane v. Franks*, 573 U.S. 228, 243, 189 L. Ed. 2d 312 (2014).  In other words, the question must be 'beyond debate.'"  *Id.*  Plaintiff has not identified

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

case law that existed at the time of any decision that would have instructed Sadofsky beyond debate that his analysis and decisions were wrong.  In each case, as more fully discussed in defendants' Motion, there is ample precedent that his actions were not unlawful.  He could reasonably and permissibly have based his decisions on differences on the day-to-day duties he saw, or benchmarked against external averages and believed them lawful.

In *Rudebusch v. Hughes*, 313 F.3d at 519, the Ninth Circuit observed that "pay equity law is not sufficiently developed to deprive an official of qualified immunity" particularly when a decision must be made "based on questionable or insufficient data such as an arguably imperfect regression analysis."  The court declined to "play the role of uber-statistician" and observed that qualified immunity allows ample room for reasonable error on the part of the official including mistakes of fact and of law. The individual defendant might have been legally mistaken "as to the degree of statistical certainty required to demonstrate actual discrimination" or factually mistaken "as to the true extent of disparity" but "neither the law nor the facts were so clearly established at the time of his decision that Hughes reasonably should have known he was violating Rudebusch's constitutional rights."  *Rudebusch* at 514.  The plaintiff "bears the burden of demonstrating that the right at issue was clearly established"; *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011); *Kramer v. Cullinan*, 878 F.3d 1156, 1164 (9th Cir. 2018).  Plaintiff has not met that burden here.

2. Plaintiff contends that Sadofsky violated her rights in 2015; her claims against him are untimely.

Plaintiff did not join Sadofsky as a party to this suit until May 8, 2018, so her claims against him are untimely if they occurred before May 8, 2016. (See Motion at 5.)  Plaintiff argues that Sadofsky discriminated against her in 2015 when he played some role in her 2015 raise in connection with her post-tenure review (Opposition at 50-51).  Even if there were no immunity, plaintiff cannot proceed with this untimely theory.

Page 37 –   REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

3.   <u>Plaintiff has not identified a genuine issue of material fact as to Sadofsky's intent.</u>

Plaintiff does not dispute that she is required to prove that Sadofsky intentionally discriminated against her.  She must, therefore, identify specific facts that show there to be a *genuine* issue for trial, not just a mere scintilla, and not just a record which taken as a whole "could not lead a rational trier of fact to find for the nonmoving party."  *Arnold v. Pfizer, Inc.*, 970 F. Supp. 2d 1106, 1130 (D. Or. 2013).

In her Opposition, plaintiff asserts that Sadofsky has a "general attitude of disregard toward gender equity," citing two declarations which do nothing to support the accusation of intentional discrimination.  Plaintiff's own declaration at ¶¶ 31-32 admits that she had few interactions with Sadofsky except for the exchange about her research which has been supplied to the court in full in connection with Sadofsky's initial declaration.  She thought that he was polite, but he had concerns about her data sampling and she disagreed with him, and "it felt" to her that he was looking for ways to minimize the problem of campus assaults, though perhaps unconsciously. Later, he responded to her follow-up, which she did not provide for nearly three *years* and, when she did, she sent it as a postscript to a different message (Sadofsky Decl. Ex. E).  He said he was looking forward to trying to understand it, but she thought he did not engage "in any meaningful way."  The court has this full interaction and can review it objectively.  Plaintiff's first message to Sadofsky (June 2015) agrees "you are right that we cannot be sure from the one study" and Sadofsky responded promptly with what he thought and reinforced his own view of campus assaults: "this is a real problem and we need to take real steps to improve it."  Then plaintiff waited nearly three years before she sent him a link to a publication. A rational trier of fact could not find that this evidence presents a genuine issue of fact that Sadofsky intentionally discriminated against plaintiff in her compensation because of her gender.

Plaintiff also cites the declaration of Professor Baldwin at ¶¶ 5-13, referencing it as also providing evidence that Sadofsky has a "general attitude of disregard toward gender equity"

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

(Opposition at 51).  The content of those paragraphs similarly fail to present a genuine issue of fact of intentional discrimination:

- She is critical of Sadofsky's declaration filed with the Motion because he did not fully describe the Cambridge position she sought but was not offered (¶¶ 5, 10, 11, 12) and she thinks he should have provided a more negative description of the Birmingham position that Professor Allen was offered.  She criticizes his description of the process because she had never learned precisely how the University knew Professor Allen was the leading candidate (¶¶ 5, 10, 11, 12).  She disagrees with Sadofsky's description of the discussions between her and Professor Mayr (¶ 7) as well as how best to characterize her decision to remain a candidate for the Cambridge position (¶¶ 8, 10, 11).  She also disagrees with how Professor Allen's retention was handled (¶¶ 9, 10, 11) and with the manner in which Sadofsky describes the admittedly "very substantial retention" offer she had earlier received at a time when Sadofsky would not have been a dean (¶ 13).

- She notes that in part of his declaration, Sadofsky uses "Prof." when he refers to Professor Allen but does not use the same title when he refers to her (¶ 6).  However, the strict use of honorifics appears to be unique to Professor Baldwin:  plaintiff uses names without titles almost exclusively in her declaration (¶¶ 8, 22, 25), but uses a title for Sadofsky (¶ 31). Professor Arrow also uses full names throughout, but Professor Hodges uses names for the women she mentions, and a title for her male colleague Professor Berkman.  Sadofsky refers to both men and women by their full names at times (¶¶ 3, 4, 5), uses a title for plaintiff repeatedly (¶¶ 6, 7, 8, 9, 11), and in the particular paragraph that bothers Professor Baldwin (¶ 12), he refers to her once by her full name, but and four times as "Prof. Baldwin."

One cannot infer gender bias from Professor Baldwin's complaints or from plaintiff's reliance on them or from the email exchange between plaintiff and Sadofsky.  See *Vejo v. Portland Pub. Sch.*, No. 3:14-cv-01656-AA, 2018 U.S. Dist. LEXIS 205301 (D. Or. Nov. 30, 2018),

Page 39 –  REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

dismissing an equal protection claim against an individual defendant who questioned the Russian judgment in preventing the participation of gay athletes in the Olympics and said plaintiff was also judgmental (plaintiff had self-identified as a Russian Christian).  That evidence was insufficient to allow her bias claim to proceed to trial.  It was far more than plaintiff offers here.

Finally, plaintiff argues that Sadofsky was "unwilling to address" gender inequity in the department.  In that, she fundamentally misrepresents the evidence in this record.  Specifically, plaintiff cites nine lines of text excerpted from a faculty meeting (Opposition at 51), immediately after Sadofsky was handed some documents and questioned before he could even read them.  His first declaration fills in the rest of the story:  he pointed out to the group that there was a collectively bargained mechanism to address gender equity, encouraged the faculty to press the union and administration to allocate funds in the next bargaining agreement (Sadofsky Decl. ¶ 6), and then after the meeting was done he was finally allowed an opportunity to evaluate the documents he had been handed:  "After that faculty meeting, I had an opportunity to review the materials more carefully and I disagreed that they demonstrated gender discrimination" (Sadofsky Decl. ¶ 6).  Plaintiff picked out only a small part of this longer event, leaving out the part that contradicts the impression she tries to create.  Plaintiff similarly asserts that in testimony Sadofsky "admitted" that a University policy had been "ignored" "for all the retention raises that he approved" (Opposition at 51).  The cited excerpts (Sadofsky Tr. 183:12–184:12) do not say that.  They do, however, discuss how much time and energy he spends dealing with retentions.  Plaintiff represents (Opposition at 51) that University policy **requires** retention documents to include a written narrative acknowledging compensation equity issues that may result (emphasis supplied), and criticizes Sadofsky for ignoring a University requirement.  *Id.*  The document (Stark Decl. Ex. 41) actually does not impose a requirement.  It uses the word "should," whereas other references use "must."

Defendants have gone through these allegations in more detail than they deserve, but have done so because these accusations reflect poorly on plaintiff's decision to sue Sadofsky.  She would

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

not have filled her Opposition with inconsequential, inaccurate complaints if she had evidence of discrimination. She has accused Sadofsky of serious wrongdoing; but she has not backed up those accusations with probative evidence.

### III.    CONCLUSION

Plaintiff's arguments in response have broadly discussed the experiences of other women at different institutions, the value of differing contributions to an institution, generalizations about societal gender roles, and opinions about how and when and why to conduct research. She has not, however, sufficiently addressed the deficiencies to her ten legal claims. They are largely untimely. They fail to identify a contract for a contract claim, or a specific practice for an impact claim. They fail to show a genuine issue of intent to discriminate, contradict positions she took in her own testimony, and do not meet the fundamental requirements of the statutes that start with the requirement that she identify a male who does the same work on a day to day basis. Defendants ask the court to grant their motion in all respects.

DATED this 4th day of January, 2019.

BARRAN LIEBMAN LLP

*s/Paula A. Barran*
By _____
Paula A. Barran, OSB No. 803974
pbarran@barran.com
Shayda Zaerpoor Le, OSB No. 121547
sle@barran.com
Donovan L. Bonner, OSB No. 181929
dbonner@barran.com
Attorneys for Defendants University of Oregon
and Hal Sadofsky

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of January, 2019, I served the foregoing **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT** on the following parties at the following addresses:

Jennifer J. Middleton
Caitlin V. Mitchell
Johnson Johnson Lucas & Middleton, PC
975 Oak Street, Suite 1050
Eugene, OR  97401-3124
jmiddleton@justicelawyers.com
cmitchell@justicelawyers.com
Attorneys for Plaintiff

Whitney Stark
Albies & Stark, LLC
210 SW Morrison Street, Suite 400
Portland, OR  97204-3189
whitney@albiesstark.com
Attorneys for Plaintiff

Stephen F. English
Cody Weston
Nathan R. Morales
Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
senglish@perkinscoie.com
cweston@perkinscoie.com
nmorales@perkinscoie.com
Attorneys for Defendant Michael H. Schill

by the following indicated method or methods set forth below:

☒ **Electronic Filing using the Court's ECF System**

☐ **First-class mail, postage prepaid**

☐ **Hand-delivery**

☐ **Overnight courier, delivery prepaid**

☐ **E-mail**

*s/Paula A. Barran*

_____

Paula A. Barran
Shayda Zaerpoor Le

Page 1 – CERTIFICATE OF SERVICE