**Paula A. Barran,** OSB No. 803974
pbarran@barran.com
**Shayda Zaerpoor Le,** OSB No. 121547
sle@barran.com
**Donovan L. Bonner,** OSB No. 181929
dbonner@barran.com
Barran Liebman LLP
601 SW Second Avenue
Suite 2300
Portland, Oregon 97204-3159
Telephone: (503) 228-0500
Facsimile No.: (503) 274-1212
   Attorneys for Defendants
   University of Oregon and Hal Sadofsky

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Portland

| | |
|---|---|
| JENNIFER JOY FREYD,<br><br>                   Plaintiff,<br><br>v.<br><br>UNIVERSITY OF OREGON, MICHAEL H. SCHILL and HAL SADOFSKY,<br><br>                   Defendants. | CV. 6:17-cv-448-MC<br><br>**SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT** |

I, Hal Sadofsky, declare as follows:

1.    I am one of the defendants in this matter.

2.    I have previously submitted a declaration in connection with the defendants' Motion for Summary Judgment. I submit this second declaration to address issues raised in plaintiff's opposition.

### 2018 Department Offers

3.    In her declaration, Professor Baldwin describes the recent (last year) hiring of five faculty members and recites that the starting salaries for the men are slightly higher than the

Page 1 – SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY
         MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF
         OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

00775903.1
**BARRAN LIEBMAN LLP**
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212

salaries for the women. Her declaration leaves out the credentials of the new hires and particularly the fact that the women, whom the university recruited, joined as Postdocs without faculty experience whereas the two men were further along in their careers with existing faculty appointments. Specifically, the three women hired last year by the Psychology are more recent Ph.D's who were working as Postdoctoral Scholars, commonly called "Postdocs." A Postdoc is a temporary position that allows the individual to continue mentored training as a researcher and gain skills to prepare for an academic career. In this case there were two male hires (a partner or spouse of two of the women who were hired). The two men had earned their Ph.D's earlier and were currently holding academic appointments as assistant professors at the time of hire. In the case of both males, they had greater seniority than typical for an assistant professor at the time of hire (measured by their current appointments as assistant professors elsewhere), and accordingly received one year's credit towards tenure which accounted for the $1,000 difference in their compensation. Specifically, Sarah DuBrow who was hired, is a 2016 Ph.D. and was a postdoc at time of hire. Benjamin Hutchinson (her partner) is a 2011 Ph.D. and was an assistant professor at Northeastern at time of hire. Hutchinson was given one year's "credit toward tenure" in recognition of his greater than typical seniority for an assistant professor hire. Sara Weston is a 2017 Ph.D. who was a Postdoc at time of hire. David Condon, her husband or partner, is a 2014 Ph.D. and was an assistant professor at Northwestern at the time of hire, and had been since 2015. Condon was also given one year's credit toward tenure in recognition of his greater than typical seniority for an assistant professor hire. The third woman hired is Kathryn Mills, who was also hired directly from a postdoctoral position.

4. Professor Baldwin raises additional points in her declaration that are similarly easily explained. For example, she includes in her declaration information about a sub award she received in 2018. (Baldwin Decl. ¶ 2.) I view that to be commendable. However, it is not relevant to decisions that were made a year earlier.

### Cambridge Offer

Page 2 – SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

5. Professor Baldwin describes her experience in interviewing at Cambridge University. In her declaration, at ¶¶ 4 and 5, she asserts that she takes issue with some of my statements in my initial declaration in this matter. One of her assertions is that Cambridge University is ranked higher than the University of Birmingham. That is correct, but the specific position for which Professor Allen was being recruited at Birmingham was in fact an important position because he was being sought to direct a University Institute of Youth Mental Health. I would also note that while being a professor at Cambridge is in fact a prestigious position, as Professor Baldwin states, the position she interviewed for came with a lower salary than what she is paid currently at the University of Oregon.

6. Professor Baldwin also states that I "disguise" differences between how Professor Allen and she were treated during their respective retention raise processes. I cannot speak to her conversations with her department chair, because I was not a party to those conversations, but there were key differences between Professor Baldwin and Professor Allen. First, Professor Allen is one of the most extraordinarily productive faculty members in the division over which I am dean. Professor Baldwin is productive in her own right, but not at the same level. (Numerical measures never tell the whole story, but Professor Allen is an author on roughly 87 scientific publications in the 2015-17 period, Professor Baldwin is an author on roughly 9 scientific publications in the same period. Professor Allen is the PI for several million dollars of external grant funding in this period, and Professor Baldwin is not PI on any external funding in this period. This is not intended to diminish Professor Baldwin's scholarship, just to explain that there is a distinction between the two scientists.) Second, all the information we had at the time was that the University of Birmingham was specifically targeting only Nick Allen—he was the only candidate in consideration for the position. In Professor Baldwin's case, she had progressed in the hiring process but it had not been narrowed down beyond the four candidates. Those are significant differences in addressing retention offers since it was apparent at least to me that if the University did not move quickly with respect to Professor Allen he would likely take the

Page 3 – SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY
MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF
OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT
00775903.1
**BARRAN LIEBMAN LLP**
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212

Birmingham offer, whereas it did not appear to be the case that an offer would necessarily result to Professor Baldwin or that she would take it given the lower level of compensation. As it turned out, she did not receive an offer from Cambridge, but she had been given a retention offer from the University of Oregon which I understood to be greater than the compensation she would have had at Cambridge.

7. In paragraph 11, Professor Baldwin asserts that I made statements "that appear to mislead." My initial declaration filed in this matter was neither misleading nor intended to mislead.

8. Professor Baldwin also references a retention negotiation with Dr. Elliot Berkman. Professor Baldwin is not involved in these negotiations to my knowledge but I am. The associated salary increase negotiated is very similar to that for Professor Pfeifer, so that when he is promoted, his compensation would be comparable to, but below that of Professor Jennifer Pfeifer.

### Professor Freyd's Declaration

9. In her declaration, Professor Freyd expresses unhappiness that I did not immediately go to speak to her to discuss my questions about the possibility of data selection bias. At the time I first heard this data, it was because John Bonine made a presentation to the University of Oregon Board of Trustees (without specifying the source of the data). Therefore I approached John Bonine with my questions as he made the report. This action had nothing to do with Professor Freyd's gender or anything else about Professor Freyd. Additionally, my goal in seeking additional information was to confirm that the data presented was accurate since I recall being surprised at the report. Because I am a mathematician and teach statistics, I have some familiarity with the complexities of data collection and data interpretation. Professor Freyd also asserts that I refused to acknowledge the steps she took around the methodology. As the documented exchange demonstrates, I did not receive a response from her regarding the additional steps she took for close to three years. I responded to her the same day she sent the response to me, although I had

Page 4 – SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY
MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF
OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

not then had an opportunity to study her work. She sent me only a brief message (in a postscript) and it contained a link to a different publication.

10. In my initial declaration I observed that as department head, Professor Mayr is Professor Freyd's supervisor. Professor Freyd responds by constesting the description of the Psychology Department Head as her supervisor by reciting some limitations on his authority (specifically that "he alone" does not oversee or control teaching assignments, override determination on her grades and that "he alone" cannot hire, fire or discipline her). Regardless of how Professor Freyd considers those limitations on his authority (which would be true in many supervisory relationships), university personnel policy identifies department heads as holding supervisory roles both in personnel records and in governance policies. The department head has ultimate responsibility for service assignments, teaching assignments, disciplinary actions, first step grievance responses, and performance reviews.

11. Professor Freyd asserts that external funding is not part of her job. Nevertheless, the University derives benefit from faculty who obtain significant external funding (both financial and reputational). Faculty who have large external funding portfolios are also ripe for poaching and account for many of the external offers that come to University of Oregon's Psychology faculty, including both faculty who are retained, and faculty who leave. This is part of the reason that "Grants received" is listed as one of the categories under "Research" in the Psychology Department's Merit Raise guidelines and that external grants are also listed as one of the items to be included for review in the department's "Review, Promotion and Tenure Procedures and Guidelines."

12. While it is true that considerable scholarship occurs that is not externally funded, the cost of doing research is significant even when not externally funded. After supporting the basic infrastructure of the university (to which external research funding makes a contribution in the form of Facilities and Administration compensation), the biggest non-fixed research cost is for personnel. This takes the form of faculty salary (for the part of the faculty member's time that

Page 5 – SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

00775903.1

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

includes research engagement), graduate student support, research assistant salary, etc. For example, the cost of supporting a Ph.D. student in Psychology (stipend, benefits, tuition) is close to $40,000 for the academic year. These costs are either covered internally (by the University) or from external funds (typically grants). Because internal funds are limited, those faculty who obtain external funding for their research help to free up the limited internal resources for other faculty who do not have external funding. Professor Freyd is correct in being proud of her mentorship of students and of her productivity in the absence of external funding, but this does not mean that there is not a significant cost to supporting Professor Freyd's research time or to supporting the Ph.D. students who assist in her research. That cost is largely met by university funding. The university has the ability to provide such funding in part because of the overhead contributed by colleagues who obtain external funding.

13. Regardless of how time consuming it is to apply for grants, managing a large externally funded research lab, and keeping funds coming in to support that lab is a very different sort of work than pursuing unfunded research.

14. Professor Freyd has been the beneficiary of unusual special treatment in several respects including examples where we have permitted course buyouts at a rate below the normal rate and in being provided partial salary for her fellowship year at Stanford.

15. While it is true that serving as journal editor is supervisory in some sense, it does not involve supervising University employees in the terms and conditions of their employment which is something that grant recipients do. Furthermore, work of this nature (while meritorious) is not unusual among senior faculty. For example, Mayr is Editor in Chief for *Psychology and Aging,* Allen serves on two editorial boards, Hall is a consulting editor on two journals. This work is substantially different from the work of supervising employees as well as contractors hired to work on grants, which is a particular responsibility of Professors Allen and Fisher in their grant administration work. That supervision is a day-to-day ongoing responsibility with hiring, firing,

Page 6 – SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

00775903.1

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

and disciplinary responsibilities and is both quantitatively and qualitatively distinct from the role of an editor of a journal.

**Chairs and Professorships**

17.     Professor Freyd speaks of the fact that Professor Mayr currently holds the Lewis Professorship in Psychology. She does not, however, explain that the Lewis Chair had been awarded to Professor Helen Neville, who held it for more than a dozen years until her 2016 retirement. Both were original gifts from the same donor. Professor Neville's was awarded several years before Professor Mayr's Professorship.

**Plaintiff's Proposed Retention Alternative**

18.     Plaintiff's filing proposes an alternative strategy for addressing recruitments, described as considering the raise offered to the retained faculty member and then also giving the department an equal amount of money to award in raises to other faculty members whose pay might seem inequitable after the retention raise is rewarded. There are a number of significant problems with this strategy. It doubles the cost of retaining the original faculty member who is being recruited. The university's funding comes primarily from tuition and from state funding, and the university has both a limited budget and an obligation to spend that budget responsibly. This proposal is inconsistent with that obligation. Additionally, retention raises often create perceptions of inequities, but those perceptions may not be accurate and in my experience they are often inaccurate. In light of that, plaintiff's proposal results in correcting a perceived problem that isn't a genuine problem. If there are many faculty members who perceive that the retention has created an inequity, then splitting these funds amongst those faculty is not likely to allay that perception. Finally, if the process of distributing the "extra" raises is done formulaically, it is unlikely to reflect merit. If it is done in a way that reflects merit (by the department head for

Page 7 – SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

00775903.1

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212

example), it is likely to lead to an outcome that still leaves many faculty feeling they have been treated unfairly (whether they are correct or not).

19. I am unaware that such a proposal has been tested. I know of no basis upon which it could be asserted that it would meet the needs of the University at the time of a retention.

## Retentions are Discretionary Decisions

20  The University of Oregon has more than 2000 instructional employees, and over 750 tenured and tenure track faculty. It must make strategic decisions what and how to instruct its 23,000 students in more than 70 majors.

When the University is faced with the possible loss of a valuable scholar, it must have a discretionary policy choice whether to negotiate to retain that scholar. Such decisions are really at the heart of the university's choices about how to preserve and advance its research and educational programs. We need to consider how to position the university for its future, the kinds of programs to support and develop, where to invest. These decisions are made with great care and purpose and set the path the university will take. When defendants write of discretion and academic freedom, they are not talking about individual merit raises (in fact these are calibrated to performance measures agreed on in individual departments), but about choosing key disciplines and recruiting and retaining world class scientists who will lead science in the future and harness the power of the sponsored research that is doing world class work life changing fields. As part of those decisions, the University must also identify who will lead in these key areas. Plaintiff's argument that these are just day-to-day inconsequential decisions mistakes how and why these decisions are made.

21. Making a decision to enter a negotiation for a faculty member who might leave the university requires individualized considerations and is informed by the opinions of many

Page 8 – SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

colleagues and administrators. There are evaluations of overall merit, productivity and expected trends into the future that take into account more information than the general merit raise process (which is typically based on performance over the period since the last merit raise, often just one year), as well as the way in which the faculty member's role in the institution and how real the threat is that the faculty member might depart. In this analysis the university would look at how close to an offer the faculty member really is, whether others are legitimate contenders for that job, whether the outside position is actually attractive, and other considerations that allow us to make the decision whether to negotiate and how to negotiate. These are considerations that differ qualitatively from the considerations that take place when the departments evaluate merit for purposes of departmental progress or individual merit raises when funds are available, involve more people, consider university-wide strategic goals, and consider possible reputational damage from losing such a scholar among other considerations that are not part of the typical merit evaluation.

22. As a negotiation proceeds there are many discussions and it is not uncommon for proposals and counterproposals to pass back and forth. In most cases the goal is to retain a valued scholar but spend only so much as is necessary to do so. That means that negotiations are highly individualized. At times we have found that we have had to draw the line and stop negotiating because at that time we are unable to find appropriate funding or we reach a point where we do not believe we can justify offering more. That has happened to men and to women. The nature of retention negotiations means that they are very dissimilar from each other. Some may be determined by considering the likelihood that an outside offer will be extended. Others may implicate the potential loss of other interdependent faculty or the possible loss of significant funds

Page 9 – SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

00775903.1

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212

or the inability to find a suitable replacement to take on work for which the university has funded infrastructure. At times we have had to consider whether the university's reputation might suffer with the loss of a key scholar.

**Kevin E. Cahill Calculations**

23. Because Dr. Cahill does not supply information about the specific analyses he conducted, it is hard for me to comment on his conclusions. Nevertheless, by examining the plots and trendlines that Dr. Cahill supplies I have two concerns where he seems to have made assumptions that aren't merited and affect the meaning of his conclusions.

A. Typical statistical analyses comparing attributes of two groups proceed by asking the question "If these two groups were chosen randomly, how likely would we be to see the differences we see?" This is problematic in two different ways in this example (full professors in the University of Oregon Psychology Departments). First the group size is very small (4-6 faculty typically in each category of male full professors and female full professors – depending on the year). This is normally an obstruction to statistical significance such as the 99% confidence interval that Dr. Cahill reports. Second, of course the faculty are not chosen randomly. In fact faculty like Helen Neville, Phil Fisher, and Nick Allen were recruited as senior faculty precisely *because* of their stature in the field and have disproportionate effects on averages.

B. Without reviewing the steps of Dr. Cahill's work, I cannot be certain about this, but he *seems* to be treating salaries of the same faculty member from different years as independent observations. That would make sense if, for example, faculty salaries are reassigned every year. But this is not the case and except in cases where there are

Page 10 – SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY
MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF
OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT

00775903.1

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212

promotions or retentions, there is very strong correlation between the salary of a particular faculty member in one year, and the salary of that same faculty member in the next year. If Dr. Cahill is ignoring this fact, that is a fundamental analytical error.

C. As a fairly straightforward alternative analysis, I will point out the following. Dr. Cahill looked at base salaries for full professors in the Psychology Department from 2007 until 2017. This is a period of eleven academic years. If I calculate the average base salary for the men in this group during each year, and calculate the average base salary for the women in this group for each year, and (like Cahill) omit Espy, Slovic and Tucker, then for 7 of the years women have higher average base salaries and for 4 of the years men have higher base salaries. If I do the same analysis *including* Espy, Slovic and Tucker, then for 10 of the years women have the higher average base, and for 1 of the years men have the higher average base. I do not believe this reflects bias against either men or women. Rather it reflects evolution of salaries based on promotions, retirements, retention offers, recruitments, etc.

**I declare under penalty of perjury that the foregoing is true and correct.**

DATED this 3rd _ day of January, 2019.

_____
Hal Sadofsky

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212
00775903.1

# CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of January, 2018, I served the foregoing **SECOND DECLARATION OF HAL SADOFSKY IN SUPPORT OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS UNIVERSITY OF OREGON'S AND SADOFSKY'S MOTION FOR SUMMARY JUDGMENT** on the following parties at the following addresses:

| | |
|---|---|
| Jennifer J. Middleton<br>Caitlin V. Mitchell<br>Johnson Johnson Lucas & Middleton, PC<br>975 Oak Street, Suite 1050<br>Eugene, OR 97401-3124<br>jmiddleton@justicelawyers.com<br>cmitchell@justicelawyers.com<br>Attorneys for Plaintiff | Whitney Stark<br>Albies & Stark, LLC<br>210 SW Morrison Street, Suite 400<br>Portland, OR 97204-3189<br>whitney@albiesstark.com<br>Attorneys for Plaintiff |

Stephen F. English
Cody Weston
Nathan R. Morales
Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
senglish@perkinscoie.com
cweston@perkinscoie.com
nmorales@perkinscoie.com
Attorneys for Defendant Michael H. Schill

by the following indicated method or methods set forth below:

- [x] **Electronic Filing using the Court's ECF System**
- [ ] **First-class mail, postage prepaid**
- [ ] **Hand-delivery**
- [ ] **Overnight courier, delivery prepaid**
- [ ] **E-mail**

*s/Paula A. Barran*
_____
Paula A. Barran
Shayda Zaerpoor Le

Page 1 – CERTIFICATE OF SERVICE

00775903.1

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212