FREYD v. UNIVERSITY OF OREGON                    6:17-cv-448-MC
JENNIFER JOY FREYD                                    2/14/2018

1

                 IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF OREGON

                        Eugene Division


    JENNIFER JOY FREYD,          )
                                 )
          Plaintiff,             )
                                 )
    v.                           )  Case No. 6:17-cv-448-MC
                                 )
    UNIVERSITY OF OREGON,        )
                                 )
          Defendant.             )




    VIDEOTAPED DEPOSITION OF JENNIFER JOY FREYD

          Taken in behalf of the Defendant

             February 14, 2018

                                    Ex. A, Page 1 of 19
                    Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                    6:17-cv-448-MC
JENNIFER JOY FREYD                                    2/14/2018

---

**2**

1    BE IT REMEMBERED THAT, pursuant to Federal Rules
2  of Civil Procedure, the deposition of JENNIFER JOY FREYD
3  was taken before Tamara Aufdermauer Pearce, OR CSR No.
4  90-0199, WA CCR No. 2141, on Wednesday, February 14,
5  2018, commencing at the hour of 8:56 a.m., the
6  proceedings being reported at Johnson Johnson Lucas &
7  Middleton, 975 Oak Street, Suite 1050, Eugene, OR 97401.
8                    APPEARANCES
9  JOHNSON JOHNSON LUCAS & MIDDLETON
    Jennifer Middleton
10  jmiddleton@justicelawyers.com
    975 Oak Street, Suite 1050
11  Eugene, OR 97401
    541.683.2506
12    Counsel for Plaintiff
13  BARRAN LIEBMAN LLP
    Paula A. Barran
14  pbarran@barran.com
    Shayda Zaerpoor Le
15  sle@barran.com
    601 SW 2nd Avenue, Suite 2300
16  Portland, OR 97204
    503.228.0500
17    Counsel for Defendant
18
19
20  ALSO PRESENT: Zachary Hoover, Videographer
21
22            *   *   *
23
24
25

---

**3**

1              EXAMINATION INDEX
2                              Page
3  Examination by Paula Barran        5
4            *   *   *
5              EXHIBIT INDEX
6  No.     Description            Page
7  Exhibit 1  Collective Bargaining Agreement    212
              between The University of Oregon and
8             United Academics, AAUP/AFT, AFL-CIO,
              dated July 1, 2013, through June 30,
9             2015, UO-FREYD000852-2942
10  Exhibit 2  Department of Psychology Review,    225
              Promotion and Tenure Procedures and
11            Guidelines, Approved 3/29/2017,
              FREYD000341-352
12
     Exhibit 3  Department of Psychology: Policies   245
13            and Procedures, UO-FREYD003589-3602
14  Exhibit 4  Email from Jennifer Freyd to Ulrich   252
              Mayr dated 5/11/2017, re literature
15            on gender on salary negotiations,
              with attachments, UO-FREYD003465-3494
16
     Exhibit 5  Faculty Retention Salary Adjustment   263
17            dated 1/30/2014, FREYD000437-438
18  Exhibit 6  Letter dated 17 March 2005 from    272
              Jennifer J. Freyd to Marjorie and
19            Executive Committee re upcoming merit
              reviews and my salary,
20            FREYD000310-311
21  Exhibit 7  Email from Jennifer J. Freyd to    274
              Ulrich Mayr dated 5/4/2014, re
22            salary, UO-FREYD001065-1067
23
     Requested information:  NONE
24
     Instruction by counsel:  NONE
25

---

**4**

1              P R O C E E D I N G S
2
3     THE VIDEOGRAPHER:  We're on the record.  The
4  time is approximately 8:56 a.m. on Wednesday,
5  February 14th, 2018.  This begins the video
6  deposition of Jennifer Joy Freyd in the Matter of
7  Jennifer Joy Freyd versus University of Oregon,
8  being heard in the United States District Court,
9  District of Oregon, Eugene Division, Case No.
10  6:17-cv-448-MC.
11     This deposition is being held at 975 Oak
12  Street, Suite 1050, Eugene, Oregon, and is being
13  taken by counsel for defendant.
14     Your videographer is Zach Hoover and your court
15  reporter is Tammy Aufdermauer Pearce.  We're with
16  Aufdermauer Pearce Court Reporting.
17     Counsel, please introduce yourselves and your
18  affiliations, then the court reporter will
19  administer the oath.
20     MS. MIDDLETON:  Jennifer Middleton for
21  plaintiff.
22     MS. BARRAN:  Paula Barran for defendant.
23     MS. LE:  Shayda Le for defendant.
24  ///
25  ///

---

**5**

1              JENNIFER JOY FREYD,
2  having first been sworn by the Certified Court Reporter,
3  was examined and testified as follows:
4
5              EXAMINATION
6  BY MS. BARRAN:
7  Q.  Good morning, Professor Middleton.  This is the time
8  that we set -- boy, am I sorry for that.  Let me
9  start that all over again.  This is the case of the
10  Jennifers.
11     Good morning, Professor Freyd, I apologize for
12  that.  This is the time that we've set aside with
13  your counsel for the deposition in the lawsuit that
14  you've brought against the University of Oregon.
15     I want to give you a sense that we will
16  probably spend the day trying to help me understand
17  what your claims are, so it's very important for you
18  to give me as complete answers as you can because
19  this is my only chance to take your testimony prior
20  to trial in this case.
21     Will you do that for me?
22  **A.  Yes.**
23  Q.  When you look at compensation and you talk about the
24  compensation disparities about which you have been
25  complaining, can you tell me whether you are looking

---

2 (Pages 2 to 5)

Ex. A, Page 2 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                          6:17-cv-448-MC
JENNIFER JOY FREYD                                            2/14/2018

---

34

1  University of Oregon, was she the highest paid
2  faculty member?
3  **A. I don't -- I don't even know that. I only know from**
4  **2014 she was.**
5  Q. So at least from 2014 to the end of her employment
6  she was the highest paid faculty member?
7  **A. I believe so.**
8  Q. Did you ever in your research look at what her
9  compensation level was?
10  **A. Yes.**
11  Q. Why did you only go back to 2014?
12  **A. That was the data that I had in -- I was looking --**
13  **in 2014, I was looking at 2014 data. It didn't**
14  **occur to me to go back and look at her numbers in**
15  **the prior years.**
16  Q. You have from time to time presented graphs and
17  charts to the department in your discussions about
18  compensation. When is the first time you put such a
19  graph or chart together?
20  **A. I'm not sure.**
21  Q. Approximately how long ago were you starting to
22  present written objections about your compensation?
23  **A. I believe the first time was sometime in the late**
24  **eighties or early nineties. What I don't remember**
25  **is if I had a graph. I don't remember.**

---

35

1  Q. When you do -- when you have done graphs or charts
2  of compensation to present your view that you are
3  underpaid because of your gender, what factors have
4  you used for those graphs or charts?
5  **A. Seniority and salaries have generally been the**
6  **factors. And seniority, usually I think we looked**
7  **at -- or I looked at, depending on which one it was,**
8  **either years in rank or years since Ph.D., depending**
9  **on which one it was.**
10  Q. If you used different factors, your charts would
11  look different?
12  **A. A little bit, yeah.**
13  Q. If you used, for example, grant dollars into the
14  university, would they look very different?
15  **A. I have no idea. That would be a pretty strange way**
16  **to do it.**
17  Q. Tell me why you think it would be a strange way to
18  do it.
19  **A. Because it's not our job duty. Our job duties are**
20  **service, research, and teaching. That would be like**
21  **putting in somebody's height or body weight. It's**
22  **not our job duty.**
23  Q. Well, height or body weight is one thing, but if I'm
24  bringing in -- let's say I'm a faculty member and I
25  bring in a million dollars' worth of grant money

---

36

1  that funds the university, is it your belief that
2  that is irrelevant to compensation?
3  **A. Yes, because my job is to do research, it is**
4  **not to fund the University of Oregon. I have never**
5  **been told, and I would be astonished if I was told,**
6  **that it was my job duty to provide money to the**
7  **University of Oregon.**
8  **It is my job duty to do research, and to the**
9  **extent that I request grant money, which generally**
10  **is taxpayer dollars, that money needs to be to**
11  **support research. It needs to be to support**
12  **science. It would be, I believe, an ethical problem**
13  **if I requested money to support the University of**
14  **Oregon.**
15  Q. When money comes into -- from, say, a federal grant,
16  when you have a large federal grant that comes to
17  the department, what activities does that grant
18  fund?
19  **A. The -- it depends on the particular grant, and**
20  **the -- the funding that -- the spending for the**
21  **grant is determined by what the PI says they're**
22  **going to do. So it could be to hire a student to**
23  **help collect data, it could be to buy equipment, it**
24  **could be to pay participant costs. It is for the**
25  **cost of conducting scientific research.**

---

37

1  Q. During the period of time that that is happening, is
2  there a benefit to the university from these
3  external grant funds?
4  **A. The University of Oregon gets something called**
5  **indirect costs that are negotiated, and the**
6  **justification for those costs is to provide the**
7  **support necessary to do the research.**
8  **I believe that when professors do good research**
9  **the University of Oregon benefits because it is the**
10  **mission of the University of Oregon to produce**
11  **world-class research. So to the extent that those**
12  **indirect funds are actually leading to more**
13  **research, that's a benefit to the University of**
14  **Oregon.**
15  Q. What else -- what other benefits -- monetary
16  benefits come from attracting grant dollars?
17  **A. I don't think I understand your question. The**
18  **cost for -- some research projects cost money and**
19  **that money that comes in allows those research**
20  **projects to occur that might not otherwise be able**
21  **to occur.**
22  Q. Have you in your years with the University of Oregon
23  seen faculty members recruited to other institutions
24  because they have large grants that -- that they
25  control?

---

10 (Pages 34 to 37)

Ex. A, Page 3 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                          6:17-cv-448-MC
JENNIFER JOY FREYD                                          2/14/2018

---

**38**

1  A. I have no knowledge of that. If that's a basis for
2     recruitment, nobody has told me that.
3  Q. Well, have you seen people who have controlled large
4     amounts of grant money go to other institutions?
5  A. Yes.
6  Q. Who -- who has -- in your experience, has controlled
7     a lot of grant money and gone to another
8     institution?
9  A. Oh, boy. There were -- well, I don't know exact
10    grant money they had at the time they left, but
11    there were two cognitive neuroscientists in my
12    department, both with the first name Ed, Ed Awh,
13    spelled A W H, and Ed Vogel, and they together left
14    and went to the University of Chicago a couple years
15    ago, and it is my belief that they had grant money.
16 Q. Were -- did you personally view their departure to
17    be a loss to the University of Oregon?
18 A. Yes.
19 Q. Tell me what -- what you personally perceived to be
20    the loss when the -- when Ed and Ed went to the
21    University of Chicago.
22 A. My personal belief was it was a loss because they
23    were world-class scientists and they were doing good
24    research, and the University of Oregon is an R1
25    institution, which means we are a research

---

**39**

1     university with ambitions to be one of the best in
2     the world. We want to be -- retain our membership
3     in the AAU, which is the Association of
4     University -- AAU, American Association of
5     Universities, and it's very important for these
6     goals and missions to have world-class scientists
7     doing world-class research, so losing two really
8     good scientists was a loss to the University of
9     Oregon.
10 Q. Did -- to your knowledge, did the grant money follow
11    Ed and Ed to the University of Chicago?
12 A. I don't know. Most grants would follow PIs, but not
13    all.
14 Q. Were there funds that had been expended at the
15    University of Oregon to -- as start-up costs for the
16    work that they were doing with their funding?
17    MS. MIDDLETON: Objection to the form of the
18    question.
19 A. I -- I actually just don't understand the question
20    or the objection. I just don't understand the
21    question.
22 BY MS. BARRAN:
23 Q. Okay. There's a grant that comes, the PI leaves.
24 A. Yeah.
25 Q. Has the University of Oregon had any start-up costs

---

**40**

1     for the grant when it came?
2  A. Start-up costs?
3  Q. Sure, build a lab, hire people, bring in graduate
4     students.
5     MS. MIDDLETON: Objection again.
6  A. When people are first hired, there's start-up costs.
7     I've never heard of a start-up cost for a new grant,
8     but maybe there are. I'm not aware of that.
9  BY MS. BARRAN:
10 Q. Have you brought in an external grant?
11 A. As a university professor, yes.
12 Q. And have there been things that you have had to do
13    to start up?
14 A. I just don't think I understand the question. I
15    mean --
16 Q. Sure.
17 A. There's lots I have to do to do research. So if I
18    get a grant for a new project, I might have to buy
19    some new equipment or I might have to post an
20    advertisement to hire somebody, so if that's what
21    you mean, then yes.
22 Q. How many people have you been in a supervisory,
23    employer/employee supervisory relationship to, let's
24    take it year by year. At present, do you have
25    employees that you supervise?

---

**41**

1  A. Yes.
2  Q. How many and who are they?
3  A. I have one employee that is consistently my employee
4     who is -- her -- her title is lab manager. I have
5     term by term different graduate students assigned to
6     me for different duties, and that varies term by
7     term.
8  Q. When the grad student -- when the grad students are
9     assigned to you, are they employees or are they
10    working on a scholarship or fellowship?
11 A. Well, they're -- they're graduate employees, so
12    usually. I mean I have also other graduate students
13    I supervise, but -- so they are paid by the
14    University of Oregon for some number of hours to do
15    work.
16 Q. Have you -- have you ever in your career in the
17    department of psychology supervised post doctoral
18    fellows?
19 A. Yes.
20 Q. When?
21 A. It was some time ago, and I don't know the exact
22    year.
23 Q. What were -- what was your supervisory relationship
24    for?
25 A. For?

---

11 (Pages 38 to 41)

Aufdermauer Pearce Court Reporting, Inc.
503-545-7365

FREYD v. UNIVERSITY OF OREGON                          6:17-cv-448-MC
JENNIFER JOY FREYD                                          2/14/2018

---

66

1   Q. Are there any more that you haven't told me about?
2   A. So I -- I -- you know, for a long time I've been in
3      the psychology department and we've talked many
4      times as a faculty about salaries, salary
5      compression, all sorts of things, and in every
6      single conversation it has been assumed that
7      seniority is a factor. And by that, I mean it's
8      been, when -- when there have been graphs, when
9      we've talked about it, seniority is always assumed
10     to be a factor.
11  Q. The question, again, is persons who set your salary
12     and what they have told you.
13  A. Right, so that -- I mean I don't know what you mean
14     by "set my salary," because I'm actually not sure
15     who does set my salary, but people who have some say
16     in sal -- apparently have some say in salary, for
17     instance the department executive committee, which
18     I've served on, the dean, the department head, in
19     all those instances that I can recall, the
20     discussions were occurring in the context in which
21     of course seniority was a factor. There wasn't a
22     need to say it was a factor any more than there
23     would be a need to say that doing your job well is a
24     factor.
25  Q. Does the bargaining agreement -- are you familiar

---

67

1      with your collective bargaining agreement?
2   A. I know it exists; I've looked at it. I don't have
3      it memorized because it's long.
4   Q. Do you know anything in the context of the
5      collective bargaining agreement that says how salary
6      is to be considered in compensation?
7   A. No.
8   Q. Do you know -- do you have any -- are there any
9      other agreements or promises that the university has
10     made to you about your compensation other than the
11     bargaining agreement?
12  A. Well, when I first came I signed a contract with the
13     university, and until the more recent bargaining
14     unit, I assumed that contract was what was guiding
15     things.
16  Q. What did that contract look like?
17  A. It was about a page.
18  Q. Did it say what your -- how your compensation was
19     going to be determined?
20  A. Not that I recall. I don't recall.
21  Q. Do you have any -- so we have, presently, bargaining
22     agreements, correct?
23  A. Correct.
24  Q. Do you know -- are you saying that you have some
25     side agreement with the university that is not the

---

68

1      bargaining agreement?
2   A. No, I'm not saying that.
3   Q. Okay. Had -- had you had some kind of a side
4      agreement with the university before the union came
5      in?
6   A. What do you mean? I don't even know what "a side
7      agreement" means.
8   Q. Well, an agreement about your compensation. So you
9      told me about the one-pager. Is there anything else
10     that you viewed as a contract, an agreement between
11     you and the University of Oregon?
12  A. I would say there was an understanding. So every
13     time we are asked to do -- prepare materials for a
14     merit review, it is communicated to us what -- what
15     is valued by -- by the assignment of what we are --
16     information we are to provide. And when I served on
17     the executive committee and I made ratings for
18     people, it was communicated what we are to value at.
19     We have certain policies that say what -- what
20     should be considered for merit raises, what should
21     be considered for promotion. Each of those
22     constitutes, in some sense of the word, agreement.
23        If that's what you mean, then those
24     conversations occur quite frequently and -- and all
25     the time.

---

69

1        If you mean some sort of quid pro quo, "If you
2      do X, you'll get paid Y," then no, I'm not.
3   Q. When you sat on the executive committee -- tell me
4      first what years you sat on the executive committee.
5   A. I don't remember.
6   Q. You said that you were rating people. Was that for
7      compensation analysis purposes?
8   A. I believe we did merit ratings that year, or one of
9      those years.
10  Q. So based on that experience, when you rated people,
11     tell me all of the factors that informed your rating
12     of your peers.
13  A. Service, teaching, and research.
14  Q. So how -- break those down for me, please.
15  A. So for service, we look at people's contributions to
16     the functioning and running of the department, the
17     university, and the field, and even the community.
18  Q. Would you look at how many other people might have
19     been reliant upon that individual?
20  A. No. We looked at contributions to the functioning
21     of these various entities, so being on a committee
22     that had a lot of work to create a new curriculum,
23     or serving as the convenor of a national conference,
24     those sorts of things.
25  Q. When you're looking at the importance to the

---

18 (Pages 66 to 69)

Ex. A, Page 5 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                         6:17-cv-448-MC
JENNIFER JOY FREYD                                         2/14/2018

---

78

1    contribution to the field or the University of
2    Oregon than Phil Fisher's.
3    Q.  Do you believe that his research contribution is
4        less than yours?
5    A.  I don't think he's quite as senior than me.  I don't
6        think he's had necessarily as much of an influence
7        in theory building, but I think he's made important
8        contributions, and I -- I feel we are -- we are on a
9        par is how I'd put it.
10   Q.  With respect to Phil Fisher, so over the course of
11       your career at the University of Oregon in terms of
12       dollars, how much external grant funding have you
13       brought into the University of Oregon?
14   A.  I don't actually have that information.
15   Q.  Give me a ballpark.
16   A.  In a time period, or what --
17   Q.  Tell me over the last 10 years.
18   A.  So I don't think I have had any -- well, I have had
19       something they now call a grant, and I've actually
20       had it for all 10 years but they changed it --
21       changed it and now call it a grant.
22          I have had private donations made to an account
23       in my name in the foundation, and I have been
24       involved in the -- in the acquisition of grants for
25       quite a number of my students.  Dollar values, I

---

79

1    really would have to go look on -- look on
2    something.
3    Q.  So Professor Freyd, when you were talking about the
4        foundation, is that the University of Oregon
5        Foundation?
6    A.  Yes, it is.
7    Q.  So that's -- and is that grant awarded by the
8        university?
9    A.  No, it's external philanthropy.
10   Q.  You said that you have had this for many years.
11       What's the dollar figure?
12   A.  The -- the dollar figure that has come in in total?
13   Q.  Yes.  Let's take a 10-year time period.
14   A.  I don't know in 10 years.  I don't know.
15   Q.  Tell me what you can tell me.
16   A.  I mean the total over the time this account has
17       last -- has been in existence has been over
18       $250,000, but I don't know what years those numbers
19       have come in.
20   Q.  It could just be $25,000 over --
21   A.  250.
22   Q.  But could it be $25,000 per year, or is it 250 per
23       year?
24   A.  No, it varies totally year by year.
25   Q.  Tell me the total number of grant dollars Phil

---

80

1    Fisher has brought into the university.
2    A.  I have no idea.
3    Q.  If I told you that it was dramatically higher than
4        yours, would you have any -- any way to -- to
5        contradict that?
6    A.  No.
7    Q.  If the University of Oregon considers external grant
8        dollars to be a factor in compensation, is it
9        possible that Phil Fisher exceeds you on that score?
10          MS. MIDDLETON:  Object to the form of that
11       question.
12   A.  I have never been told that the University of Oregon
13       is compensating us based on grant dollars.  As I've
14       explained to you, my understanding of grants is not
15       that they're an end, but they're a means, and that
16       they're a means specifically for scientific
17       research.
18          MS. BARRAN:  Can you read my question back,
19       please?
20          (The reporter read back as follows:
21          If the University of Oregon considers external
22          grant dollars to be a factor in compensation,
23          is it possible that Phil Fisher exceeds you on
24          that score?)
25          MS. MIDDLETON:  Same objection.

---

81

1          THE WITNESS:  So this is an if clause, and so
2    yes, if they consider that, then yes, it is
3    possible.
4    BY MS. BARRAN:
5    Q.  Did Professor Fisher have offers from other
6        institutions?
7    A.  I've been told so.  I don't have firsthand
8        information.
9    Q.  What have you been told about Professor Fisher's
10       offers from other institutions?
11   A.  Very little, that they existed.
12   Q.  Who told you?
13   A.  Rumor mill.
14   Q.  Did anybody tell you what the institution was?
15   A.  No.
16   Q.  Okay.  Do you know whether he received an offer from
17       the University of Oregon to retain him rather than
18       let him go to another institution?
19   A.  Again, I believe so, based on the rumor mill.
20   Q.  In the case of Phil Fisher, do you believe it was to
21       the value of the University of Oregon to retain him
22       as a faculty member in psychology?
23   A.  Yes.
24   Q.  Can you tell --
25   A.  But -- but I don't know -- I'm a little worried

---

21 (Pages 78 to 81)

Ex. A, Page 6 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                          6:17-cv-448-MC
JENNIFER JOY FREYD                                          2/14/2018

**82**

1  **about what do you mean by "to retain him." At any**
2  **cost, or that we got -- that he stayed? It was**
3  **certainly of value that he was -- stayed. I cannot**
4  **weigh in on whether a particular retention package**
5  **was -- was appropriate because I just don't have**
6  **that information.**
7  Q. Is that something that you would leave to others to
8  evaluate whether the retention package was
9  appropriate or not?
10 **A. I just don't know what the retention package was.**
11 Q. Let's -- let's go back to what you do know. Given
12 your understanding of the field and the university
13 at which you work, is the University of Oregon
14 psychology department better off with Phil Fisher or
15 without Phil Fisher?
16 **A. At a certain price, do you mean, or just in an**
17 **absolute sense?**
18 Q. Absolute sense.
19 **A. Yes, we're better off with him.**
20 Q. And tell me what factors would cause you to say that
21 we would want to keep Phil Fisher.
22 **A. Phil Fisher is a good colleague. He -- he is -- he**
23 **contributes to the intellectual life of the**
24 **department, he mentors -- he attracts good graduate**
25 **students, he mentors good graduate -- mentors them,**

**83**

1  **he publishes good research, he teaches, he**
2  **contributes, he's a good colleague.**
3  Q. If you were responsible for the department and Phil
4  Fisher was about to go someplace else, would you
5  consider it worth an effort to retain him at the
6  University of Oregon?
7  **A. Yes.**
8  Q. You have listed Ulrich Mayr as somebody that you
9  believe you are underpaid in relationship to. Is
10 that accurate?
11 **A. Yes.**
12 Q. And has that been, as far as you know, for the
13 entirety of your career as a full professor?
14 **A. Sorry, I don't know. I don't know.**
15 Q. Does Ulrich Mayr have a job that you don't have?
16 **A. He's currently serving as department head.**
17 Q. For what period of time has he been serving as
18 department head?
19 **A. Well, I believe this is his fourth year, although he**
20 **took one term off.**
21 Q. Have you ever been a department head?
22 **A. No.**
23 Q. Do you know what his duties as department head are?
24 **A. I have a pretty good idea.**
25 Q. Tell me what you understand his department head

**84**

1  duties to include.
2  A. He -- he writes reports, he runs faculty meetings,
3  he responds to personnel issues, probably lots more.
4  It's a busy job.
5  Q. Because a lot of faculty come in with a lot of
6  problems to the department head?
7  A. Yeah, one of the reasons.
8  Q. You would be one person who used his time on issues
9  relating to your status in the university?
10 A. Used his time? I guess you could say that.
11 Q. Do others come in and talk to him about their issues
12 or concerns at the university in their department?
13 A. I imagine they do. Ulrich has never told me in
14 detail about his experience, other department heads
15 have. I've heard at great length from some other
16 department heads about how much time they put into
17 personnel issues.
18     MS. MIDDLETON: If you don't know, don't guess
19 or speculate.
20     THE WITNESS: Okay. I don't know about Ulrich;
21 he's never told me.
22 BY MS. BARRAN:
23 Q. Tell me what your complaint is about your
24 compensation relative to Ulrich.
25 A. Ulrich is paid or was, and I think probably still

**85**

1  is, more than me, and his -- his contributions to
2  the field have not, in my opinion, merited his
3  getting paid more than me, considering my seniority.
4  Q. Do you think that your accomplishments and his
5  accomplishments are at parity?
6  A. I think that we have some different duties right
7  now. Department heads get teaching releases in
8  order to do their administrative service, and so
9  he's doing some things that are different than what
10 I'm doing, but this is also understood as a
11 temporary role that -- that he has, that he'll go
12 back to the faculty.
13 Q. Well, for the period of time that he has had this
14 department head duty, are you saying that it's not
15 really apples to apples?
16 A. It is my understanding that our base salary is --
17 and -- and stipends that have to do with research
18 are based on our standard job duties and that
19 administrative work is compensated through stipends
20 and teaching releases. So based on my understanding
21 there, I don't think that he has contributed more on
22 research, teaching, or service as a whole, given
23 that trade-off.
24 Q. In -- tell me first where you got that
25 understanding.

22 (Pages 82 to 85)

Aufdermauer Pearce Court Reporting, Inc.
503-545-7365

Ex. A, Page 7 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON
JENNIFER JOY FREYD

6:17-cv-448-MC
2/14/2018

---

86

1  **A.  From watching for 30 years how -- how department**
2  **heads and other administrators, including myself**
3  **when I did administrative duties, within the**
4  **department are -- are I don't even know if the**
5  **right word is "compensated" -- how -- how -- we are**
6  **given -- how the trade-offs are made.**
7  **    So sometimes one of us takes a job that**
8  **requires more time than others, and then some kind**
9  **of trade-off is made to make that possible.**
10  **    So one couldn't be a department head and also**
11  **still teach.  There just wouldn't be enough time.**
12  Q.  Do you have any sense of the approximate percentage
13  of Ulrich's time that is spent doing department head
14  duties?
15  **A.  No.**
16  Q.  I mean could it be 90 percent of his time is in his
17  role as department head?
18  **A.  It -- it's possible, but I also know that because**
19  **department head duties tend to take a toll on**
20  **people's research productivities that he had a term**
21  **in order to focus on research, and presumably during**
22  **that term that's mostly what he was doing.**
23  Q.  So when you're a department head, it -- you don't
24  have enough time to teach and you don't really have
25  enough time to do your research the way you want to.

---

87

1  Is that -- am I understanding that?
2      MS. MIDDLETON:  Objection to the form of the
3  question.
4  **A.  Yeah, I don't know, but it is my understanding that**
5  **because being department head is -- is historically**
6  **taxing on people's research, that -- that Ulrich and**
7  **perhaps others have requested as part of the way --**
8  **the trade-off plan protected research time.**
9  BY MS. BARRAN:
10  Q.  Is being a department head, to your understanding,
11  also taxing on your stamina or internal
12  relationships?
13      MS. MIDDLETON:  Objection to the form of the
14  question.
15  **A.  I just don't know.**
16  BY MS. BARRAN:
17  Q.  Is it a different kind of job from what you do
18  when -- when you're doing your particular duties?
19  **A.  It's -- me personally, or --**
20  Q.  Yes, you personally.
21  **A.  Yeah, okay.  So it -- we -- each of us contribute to**
22  **service in different ways, and numerous service jobs**
23  **are taxing on one.**
24  **    It's my understanding that the -- that the**
25  **service requirements of a department head take more**

---

88

1  hours and that's why there are these trade-offs
2  to -- to even it out.
3  Q.  Do they -- are they also more taxing in -- in other
4  ways, to your understanding?
5  **A.  I just don't know.  I -- I think, for instance, it**
6  **depends on one's emotional makeup how they feel.**
7  **Some people I think thrive as department heads and**
8  **others find it draining.**
9  Q.  Do you know some who find it very burdensome?
10  **A.  Not currently.**
11  Q.  In terms of the compensation paid to Ulrich Mayr, is
12  it your position in this lawsuit that you should be
13  at parity with him, or should you make more than
14  Ulrich?
15  **A.  I think that my salary should be more, to the extent**
16  **I have more seniority.**
17  Q.  If seniority is taken out of the equation, do you
18  think that you should be paid more or less or equal
19  to Ulrich?
20  **A.  I -- putting aside his administrative stipend and**
21  **taking salary our of the equation, I think I should**
22  **be paid equally -- I'm sorry, taking seniority out**
23  **of the equation.**
24  Q.  Did Ulrich Mayr receive an offer from another
25  institution to your knowledge?

---

89

1  **A.  I believe he did.**
2  Q.  Tell me what you know about that.
3  **A.  I believe it was some years back, and -- at least**
4  **what I'm aware of.  There could have been one I'm**
5  **not aware of.  And it was somewhere in Europe, and**
6  **he went and he checked it out and decided to come**
7  **back.**
8  Q.  <u>Do you -- do you have any criticism of the</u>
9  <u>university for wanting to main -- to retain Ulrich</u>
10  <u>Mayr as a faculty member?</u>
11  **<u>A.  No.</u>**
12  <u>Q.  Tell me why you say that.</u>
13  **<u>A.  He's a good colleague.</u>**
14  <u>Q.  And when you say somebody's a good colleague, can</u>
15  <u>you tell us -- because we want to be as precise as</u>
16  <u>we can in the information that is presented in this</u>
17  <u>deposition, tell me what factors roll into your</u>
18  <u>statement that somebody is a good colleague.</u>
19  **<u>A.  Okay.  So we are -- we are a very strong department,</u>**
20  **<u>and being a good colleague is contributing to the</u>**
21  **<u>strength of that -- of the department through the</u>**
22  **<u>three domains, service, research, and teaching.  And</u>**
23  **<u>when I say he's a good colleague, I mean that I</u>**
24  **<u>believe he contributes to -- to the department in</u>**
25  **<u>those ways.  So he's a good researcher, he's a good</u>**

---

23 (Pages 86 to 89)

Ex. A, Page 8 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                          6:17-cv-448-MC
JENNIFER JOY FREYD                                          2/14/2018

---

**90**

1   **teacher, and he's a good citizen.**
2   Q. Is he somebody who contributes to the reputation of
3       the institution?
4   **A. As far as I know, yes.**
5   Q. Is he somebody whose absence would be felt if he
6       were to go to some other European institution?
7   **A. Yes.**
8   Q. Have -- and let's take the last 10 years. Have you
9       been recruited by any other institution?
10  **A. I have received initial probes from some colleagues**
11      **about whether I would consider other institutions.**
12          **One of the things that I think is really**
13      **important to understand is that the most common way**
14      **as far as I know this occurs is there is an initial**
15      **probe, and if that probe is rejected, that tends to**
16      **be the end of it, and I rejected those probes.**
17  Q. Have you ever in the last 10 years sought an
18      opportunity at another institution?
19  **A. For faculty employment?**
20  Q. Yes.
21  **A. No.**
22  Q. What keeps you at the University of Oregon? What is
23      it that keeps you from looking elsewhere?
24  **A. Well, until five years ago, I was married to a man**
25      **who was employed by the University of Oregon, and it**

---

**91**

1   **seemed unlikely that it would work for both of us to**
2   **move, and we had -- we were raising a family, and we**
3   **were settled, and our priorities were to focus on**
4   **our work and our family, and I was able to do my**
5   **research. I was not impeded in my ability to do my**
6   **research, to teach, or contribute to the**
7   **institution, which is what my goals were. I was not**
8   **impeded in by ability to have a good family life or**
9   **raise my family.**
10  Q. And was this desire to stay in Eugene something that
11      was a shared decision between you and your husband?
12  **A. Yes.**
13  Q. And it was for your career as well as his career?
14  **A. Yes.**
15  Q. And at that time, you were the primary wage earner
16      in the family?
17  **A. No, we were probably comparable.**
18  Q. When you say "comparable," tell me how you mean
19      that.
20  **A. I think our salaries were similar.**
21  Q. What does similar mean?
22  **A. Similar. I mean it varied probably year by year,**
23      **but we were paid about the same amount of money.**
24  Q. Had there been a time in your career at the
25      University of Oregon where you were the primary wage

---

**92**

1   earner?
2   **A. I think over time my wage -- his wage probably**
3       **didn't rise as much as mine so he probably wasn't**
4       **paid more than me, but I don't remember.**
5   Q. But you had previously moved institutions as a
6       married person, correct?
7   **A. Correct.**
8   Q. So what -- what caused you to leave Cornell to come
9       to University of Oregon?
10  **A. Well, at the time we had -- we had one very, very**
11      **young child. We were -- it was very easy to move,**
12      **we didn't have schools involved, and the University**
13      **of Oregon made an extremely attractive offer for us**
14      **as a family. I was offered a tenured position and**
15      **my husband was offered a very good job at the**
16      **University of Oregon. It was one of the best**
17      **psychology departments in the country and I wanted**
18      **to be on the west coast, so all those factors came**
19      **together.**
20  Q. So you say you have had some initial probes in the
21      last 10 years. Do you remember approximately how
22      many initial probes you received from other
23      institutions?
24  **A. Nope.**
25  Q. Do you have any idea?

---

**93**

1   **A. No. These come up about -- maybe once a year.**
2   Q. Can you remember them coming up more frequently than
3       once a year?
4   **A. No, I -- I have always -- always handled these by**
5       **dismissing them as quickly in the process as I**
6       **possibly can and putting it out of my mind.**
7   Q. So you -- you told me about the time up until you
8       lost your husband. What about in the years since
9       that time, have you continued to dismiss initial
10      probes?
11  **A. So for the first couple years after my husband died,**
12      **it's pretty much a blur, and I don't think I have**
13      **the greatest memory of such things because I didn't**
14      **know what I was going to do with my life. So I --**
15      **I'm not sure, honestly. It's possible, but I also**
16      **think people might have been giving me some space.**
17  Q. Subsequent to that, so let's take the last three
18      years, have you received initial probes?
19  **A. I believe so.**
20  Q. Okay.
21  **A. I believe there was at least one, but I -- I -- I**
22      **have, at this point, no interest in pursuing such**
23      **probes.**
24  Q. Why aren't you interested in considering a move?
25  **A. I have devoted my career to the University of**

---

24 (Pages 90 to 93)

Ex. A, Page 9 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                          6:17-cv-448-MC
JENNIFER JOY FREYD                                               2/14/2018

---

98

1  what you mean.
2  **A. I have seen -- I'm aware of two cases of people who**
3  **entertained outside offers and -- and were hoping**
4  **that the University of Oregon would retain them, but**
5  **the University of Oregon failed to give them a**
6  **retention package that they felt they could accept.**
7  **And so they left, even though in some sense they**
8  **didn't want to, and, I mean, that was pretty tragic**
9  **to see.**
10 Q. Which -- who were those two people?
11 **A. One was Sandy Morgan, who then actually came back**
12 **later, and the other was actually -- now that I**
13 **think about it, was in psychology a long time ago,**
14 **and that was Morton Gernsbacher.**
15 Q. Who?
16 **A. Morton, but it's a woman, Morti, she went by, but**
17 **it's Morton, M O R T O N, Morton Gernsbacher.**
18 Q. And when did the situation with Sandy Morgan happen?
19 **A. Oh, well, it was the first -- she's -- she's since**
20 **deceased, but she left the University of Oregon the**
21 **first -- and then came back. I don't know, I'm bad**
22 **on dates, maybe 10 years ago.**
23 Q. Did she get a retention offer but she just didn't
24 like it?
25 **A. I -- I'm not sure, but I would assume, but I don't**

---

99

1  **know.**
2  Q. And Morton Gernsbacher, what was that -- when did
3  that take place?
4  **A. That was around -- probably around 1990.**
5  Q. And did Morton Gernsbacher get a retention offer but
6  just decide not to take it?
7  **A. It's -- you know, I don't know in detail, she never**
8  **gave me detail, but as I recall, she did not feel it**
9  **was sufficient to keep her given what outside offer**
10 **she was getting.**
11 Q. Have you also been aware of male faculty who have
12 gotten retention offers and not accepted them?
13 **A. Yes.**
14 Q. And can you tell me the names of some?
15 **A. Well, the two Eds I mentioned.**
16 Q. They didn't get enough from University of Oregon to
17 stay?
18 **A. I don't know in their case what their -- they -- I**
19 **have no knowledge on what the factors were; I just**
20 **know they left.**
21 Q. Can you think of anybody else who was recruited by
22 another institution and left?
23 **A. There was Azim Shariff I think left, and there was a**
24 **person named Cliff something who I think left.**
25 Q. In the department of psychology, has there ever been

---

100

1  a woman who has received an offer from another
2  institution and the University of Oregon has not
3  made a retention offer?
4      MS. MIDDLETON: Objection to the form of the
5  question.
6  **A. Not to my knowledge, but I don't have any -- I**
7  **wouldn't have any knowledge of that either.**
8  BY MS. BARRAN:
9  Q. But you have known of retention offers within your
10 department?
11 **A. I have heard about them. You have to understand**
12 **that I'm not -- nobody gives me this information,**
13 **it's -- it's rumor mill. I don't get copies of**
14 **letters.**
15 Q. Is part of your lawsuit a complaint that there are
16 retention offers?
17 **A. No, my lawsuit is about my pay compared to my -- my**
18 **peers.**
19 Q. If the offer comes as a -- if your peer is
20 differentiated from you because of a retention
21 offer, is that part of your lawsuit?
22 **A. No. I don't -- I don't really understand the**
23 **question.**
24 Q. So if Phil Fisher got a big retention offer at a
25 time he was going to leave and that accounted for a

---

101

1  disparity in compensation, are you suing over that
2  disparity even though it came because he was
3  retained by the university?
4  **A. So my lawsuit's not trivial. I'm not suing over any**
5  **one moment. I'm suing over a pattern that's across**
6  **people and across time. I would, like any faculty**
7  **member, live with an inequity for some period of**
8  **time with the understanding that things would be**
9  **made right.**
10 **So if Phil Fisher was retained in a way that**
11 **put his salary out of alignment with mine, I**
12 **wouldn't go sue because I would trust that in the**
13 **years ahead things would be made right.**
14 **My -- my issue is that there's a -- a lasting,**
15 **enduring inequity across people, and things are not**
16 **right.**
17 Q. When that happens, when somebody -- when the
18 university has to retain somebody and, therefore,
19 give them a salary increase, what's the period of
20 time, in your view, that the inequity should be made
21 right?
22 **A. I don't have a -- you know, a fixed, rigid number.**
23 **I would expect over a couple of years to see**
24 **progress being made.**
25 **Back many years ago, when Gordon Hall was hired**

---

26  (Pages 98 to 101)

Ex. A, Page 10 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                          6:17-cv-448-MC
JENNIFER JOY FREYD                                           2/14/2018

---

126

1  **A. I don't recall anyone saying anything about my**
2  **husband's salary to me.**
3  Q. Do you recall anybody making a comment to you about
4     compensation that you thought was disrespectful of
5     your gender in the last 10 years?
6  **A. Can you say what you mean by "disrespectful"?**
7  Q. A comment to which you took affront that --
8     regardless of whether or not you had expressed it,
9     that you thought was speaking to you negatively
10    about your value or your accomplishments because of
11    your gender.
12 **A. Defined that way, no.**
13 Q. Were you thinking about something that you -- that
14    you thought might have been responsive?
15 **A. There's two kinds of disrespect that -- about gender**
16    **that I have observed and read about.  One of them is**
17    **to be very explicit and say, "Because you are a**
18    **woman, you're less qualified in some way."  Another**
19    **kind is to deny the reality of a woman's experience**
20    **and often in a -- in a factually incorrect way.**
21         **So, for instance, I might have a conversation**
22    **with a colleague who says, "Well, the reason women**
23    **are paid less is because they don't negotiate as**
24    **well as men."**
25         **I would consider that -- I experience that as**

---

127

1     **disrespectful and factually incorrect.**
2  Q. Because in your experience women do negotiate as
3     well?
4  **A. Because in my experience when women do negotiate**
5     **well, they are often not successful, so.**
6  Q. So can you tell me the experience that informs the
7     statement that you just made?  You said "in my
8     experience," so I'm interested in what your -- what
9     that experience is.
10 **A. Well, for instance, my own experience.**
11 Q. Which is what?
12 **A. Requesting to have an equitable salary and seeing**
13    **year after year it's not.**
14 Q. Anything else?
15 **A. Well, it's secondhand, but from what Dare Baldwin**
16    **described to me.  I think she's a very competent**
17    **person, and from what she described, she competently**
18    **attempted to negotiate her salary.**
19 Q. Do you know -- do you know any women who got outside
20    offers and didn't get a retention offer from the
21    university?
22 **A. Any retention offer or -- I mean --**
23 Q. Any.
24 **A. No.**
25 Q. How many woman do you know who -- women faculty who

---

128

1     have left the University of Oregon out of
2     dissatisfaction with a retention offer?
3  **A. I don't recall.  I think that there are -- I've been**
4     **at the university for 30 years and I don't recall**
5     **all the po -- all the woman who've left and why**
6     **they've left.**
7  Q. Let's go back just 10 years.  Can you tell me any
8     women who left the university to go to another
9     institution where you thought the University of
10    Oregon could have retained them with a better offer.
11 **A. Not at this moment.**
12 Q. Okay.  When we were talking about the disrespectful
13    comments, you've actually not seen Professor Keele
14    for a very, very long period of time, right?
15 **A. That's correct.**
16 Q. Because I actually did my math wrong, so he's been
17    gone 20 years, right?
18 **A. Possibly.**
19 Q. Okay.  And in those 20 years, did anybody -- does
20    any person come to mind as making comments that are
21    of a similar flavor to the one that you put in your
22    complaint?
23       MS. MIDDLETON:  Objection to the form of the
24    question.
25 **A. Yeah, I'm -- I'm hard-pressed to say what "similar**

---

129

1     flavor" means.
2  BY MS. BARRAN:
3  Q. Okay.  Well, you complained about his comment as
4     being -- would you have called it misogynist?
5  **A. Yes.**
6  Q. Okay.  Has anybody made a misogynist comment to you
7     in the past 20 years since -- since Professor Keele
8     has been gone?
9  **A. Yes.**
10 Q. Tell me the misogynist comments you've heard.
11 **A. I don't recall an example right now.**
12 Q. Any from -- can you recall any from a person in a
13    position of authority over you?
14 **A. Not at this moment.**
15 Q. Okay.  I'm trying to make sure I understand how the
16    question of retention offers folds into your
17    lawsuit, and if I am understanding your testimony
18    correctly, and please correct me if I'm wrong, your
19    view is not that the university should not do
20    retention offers.  Is that accurate?
21 **A. That's a double negative.**
22 Q. Okay, let me see if I can do it in something that's
23    not a double negative.
24    <u>You, as the plaintiff in this lawsuit, agree</u>
25    <u>that it is appropriate for the university to do</u>

---

Aufdermauer Pearce Court Reporting, Inc.
503-545-7365

FREYD v. UNIVERSITY OF OREGON                          6:17-cv-448-MC
JENNIFER JOY FREYD                                           2/14/2018

---

130

1    retention offers?
2    **A. In some circumstances.**
3    Q. What would those circumstances be?
4    **A. A valuable faculty member for whom the university**
5    **would suffer a loss should that person leave.**
6    Q. Can you think of any way to retain those potentially
7    departing faculty at the University of Oregon that
8    does not involve a retention offer?
9    **A. So when you say "retention offer," there's two**
10   **meanings that come to mind. One is very specific to**
11   **salary and one is the whole package.**
12        **So if you mean specific to salary, then yes.**
13   **If you mean that there be no -- no response from the**
14   **University of Oregon to indicate the value -- their**
15   **support and value of that faculty member, I doubt**
16   **that the faculty member would stay.**
17   Q. Do you believe that making a -- that re --
18        Do you believe the University of Oregon should
19   be limited to responding to a threat of departure by
20   expressing love and affection but not more money?
21   **A. I didn't say that.**
22   Q. Okay. I want to -- I want to make sure I understand
23   your position.
24        Is it your understanding that in most
25   circumstances retaining a faculty member with

---

131

1    another offer will require the University of Oregon
2    to pay them more?
3    **A. I don't even know that. There are many -- my**
4    **understanding is that there are many factors that**
5    **determine whether somebody wants to stay at an**
6    **institution or not, and each individual case -- the**
7    **relative weighting of those factors is likely to**
8    **vary, and, therefore, in each individual case what**
9    **the university -- how the university responds more**
10   **or less may match what matters.**
11   Q. In the case of retention offers in general, is it
12   your understanding that they are widely varied?
13   **A. Yes.**
14   Q. And some factors may or may not persuade somebody to
15   stay?
16   **A. Correct.**
17   Q. And if you were to try to evaluate or analyze, you
18   would have to look at a multitude of factors to
19   decide what motivated the faculty member's behavior?
20   **A. Well, I'm not sure a multitude, because it would**
21   **depend, but it -- it -- and for some people it**
22   **really may be one factor, but for many people it may**
23   **be more than one factor.**
24   Q. So as an empirical researcher, how would you study
25   something like that, what matters in a retention

---

132

1    offer? How would you study that?
2    **A. I'd do a survey.**
3    Q. And your survey would seek out what?
4    **A. Faculty members that experienced contemplating**
5    **retention offers, engaging in retention**
6    **negotiations, and ask them what factors mattered.**
7    Q. Have you ever seen such research done?
8    **A. No.**
9    Q. Given your expectation as a professional in this
10   field, what factors do you think would be listed in
11   response?
12   **A. Well, first of all, I should say, as a researcher,**
13   **the first step I would do before designing a survey**
14   **is I would conduct some interviews with people and**
15   **gather their experience and firsthand information.**
16   **So I haven't -- don't have the benefit of those**
17   **interviews, and won't -- won't design as good a**
18   **survey without that, but I would certainly ask about**
19   **salary, lab space, spousal hire, teaching load, if**
20   **they're untenured when they're going to come up for**
21   **tenure.**
22        **I mean there's any number of factors that are**
23   **going to be important to different individuals in**
24   **different times and in different ways that the**
25   **university can respond on. Parking spaces.**

---

133

1    Q. And even drawing on your own experience, there were
2    factors that mattered to you when you moved and
3    factors that didn't matter to you when you shut off
4    conversations over the course of your tenure,
5    correct?
6    **A. Right.**
7    Q. Is there -- do you have any data to suggest that
8    there is a common denominator to the -- to what
9    makes a retention offer attractive?
10   **A. No.**
11   Q. If you were re -- responsible for designing an
12   appropriate retention offer for the university to
13   use, are there considerations or factors that would
14   go into your plan to respond to a departure threat?
15   **A. Presumably.**
16   Q. What would those --
17   **A. This is a -- very hypothetical.**
18   Q. Mm-hm, sure.
19   **A. So are you asking me to speculate about --**
20   Q. Sure. I want -- I want to know -- I mean you're a
21   trained empirical researcher --
22   **A. Uh-huh.**
23   Q. -- and you have a lawsuit, and there is at least a
24   suggestion in your lawsuit that retention offers are
25   a point of contention for you. I mean if they're

---

Aufdermauer Pearce Court Reporting, Inc.
503-545-7365

Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                    6:17-cv-448-MC
JENNIFER JOY FREYD                                    2/14/2018

---

134

1  not, you can tell me you have no complaint about any
2  retention offers and I'll go on to another subject.
3       MS. MIDDLETON:  There's no question pending.
4       MS. BARRAN:  There is a question pending.
5  A. What's the question?
6  BY MS. BARRAN:
7  Q. Sure.  Do you have a com -- do you have no complaint
8  about retention offers at the University of Oregon?
9  A. My complaint is about the equitability of our
10 salaries, and to the extent that the university is
11 using an argument that retention enter -- retention
12 offers are the determinant of salaries, then yes, I
13 have a complaint.
14 Q. If you were designing the retention offer, how do
15 you think the university can manage the retention of
16 an important faculty member, somebody like Professor
17 Fisher, somebody like Professor Mayr, somebody like
18 Professor Neville, who you think is important to the
19 university, what would you do other than give them
20 more money?
21 A. I would -- I would find out how much it mattered to
22 them that their salary be equitable in the
23 department, because I would know that no matter what
24 raise I got them to keep them, I would also have the
25 opportunity to raise other people's salary to an

---

135

1  equitable level.
2  Q. Is there any other mechanism you can think of that
3  would address the concerns that you have about the
4  university's use of retention offers?
5  A. So I believe the university could be doing something
6  that would be preventative.  Retention offers come
7  about in large part because people either are gaming
8  the system, they're doing it explicitly to get a
9  higher salary, or because they're not fully happy
10 and they're considering going somewhere else.
11      I -- I would support a system that provided
12 resources to people such that they did not feel the
13 need to game the system and that they did not feel
14 the need to entertain external offers or pursue
15 them.
16 Q. What would that system be?  Tell me what it would
17 look like.
18 A. To reward people for their accomplishments to the
19 mission of the university and fulfilling their core
20 job duties in an equitable way and one that was at
21 more -- comparable to other universities'
22 departments of a similar stature.
23 Q. You mean external market?
24 A. Well, I mean comparable to other departments.  So
25 the University of Oregon psychology department is,

---

136

1  on one of the rankings -- national rankings I looked
2  at, around 21, 22 in the country, and it's tied with
3  some other institutions at the same ranking, so to
4  have salaries at the University of Oregon psychology
5  department on average similar to salaries at those
6  other comparable universities.
7  Q. So you would try to peg compensation for faculty by
8  looking externally at similarly ranked departments?
9  A. I would -- I'm talking about creating the context in
10 which people would be satisfied at the University of
11 Oregon, and it's not just salary.  It's the whole --
12 it's the whole experience.
13      I would try to make a situation where people
14 were getting rewarded for their fulfillment of their
15 job duties at the University of Oregon rather than
16 having to go get -- involve the time of other people
17 to get an outside offer to get paid.  So I would
18 create a system that was based on doing the job well
19 and rewarding it for doing the job well.
20      Now, I do think that because we are a very
21 strong department, it makes sense to be paying our
22 faculty in a way similar to other strong
23 departments.
24 Q. Would you allocate the dollars within the department
25 any differently from your current merit system?

---

137

1  A. There would -- if -- yes, there would be equity.
2  Q. And what does that mean?
3  A. That means that we would all be more or less on the
4  regression line.
5  Q. Based on time in -- time in position?
6  A. Yes.  And to the extent we -- we're departing --
7  departing from that regression line, we would
8  understand in what ways we had exceeded or failed to
9  meet the department standards.
10      So, for instance, somebody who always got an
11 average or better-than-average merit rating would
12 not be below the merit line.  That's a for instance.
13 Q. So -- but -- but you would start with, as a
14 baseline, a lockstep seniority time in service?
15 A. I didn't say lockstep.  I was -- I would -- I would
16 include a regression line with seniority, and then
17 demand that any departure from that regression line
18 be clearly related to the -- the job performance.
19      Now, I grant you that there can be a temporary
20 period where something's out of alignment.  That's
21 the nature of the business.  I'm talking about, over
22 time, the pattern.
23 Q. When you sat on the executive committee and you
24 personally were a determinant of salaries, were the
25 decisions of the executive committee, in your view,

---

Aufdermauer Pearce Court Reporting, Inc.
503-545-7365

Ex. A, Page 13 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                    6:17-cv-448-MC
JENNIFER JOY FREYD                                    2/14/2018

---

138

1  equitable?
2  A. So I -- I don't know if I was personally a
3  determinant of salaries. My job as an executive
4  committee member was to submit ratings on people,
5  and I believe -- I could be wrong, I think we wrote
6  little reports, but I could be wrong about that. We
7  might have just done it numerically. And those
8  numerical ratings were then used by the department
9  head to make recommendations which were then sent
10  on, I believe, for further analysis. So I was never
11  in charge of awarding dollars.
12  Q. When you did that evaluation as a member of the
13  executive committee, was it your view that the final
14  decision when it came down was equitable?
15  A. Yes and no.
16  Q. What's --
17  A. So it is my view, because there is a longstanding
18  research literature on this, that many of the
19  metrics we use to make evaluations are subject to
20  bias, and it is my view that the University of
21  Oregon fails to structurally correct for this bias.
22      An example is teaching evaluations. It's very
23  well documented that women and male -- female and
24  male teachers of comparable quality, on average, get
25  different teaching evaluations from students.

---

139

1      Teaching evaluations are one of the ways that the
2  numerical amount for teaching quality is determined
3  in the merit process.
4      I believe there's bias occurring across
5  different domains and that there is no compensation
6  for that bias. In that sense, I don't think it was
7  equitable.
8  Q. In -- in your case, did you evaluate your colleagues
9  based on their teaching evaluations?
10  A. That was one of the factors that I was instructed to
11  use in determining my evaluation of their teaching
12  quality.
13  Q. And when you did your personal evaluation, did you
14  correct for what you believed to be subjective bias?
15  A. I don't know -- I don't know. I don't know if you
16  can even answer that question in an individual. You
17  need a structural fix.
18  Q. What would that structural fix be, in your view?
19  A. So for one thing, we would take the quantitative
20  information we have on bias, and we would, as a
21  community, figure out how to correct for it in some
22  quantitative way, because bias is occurring outside
23  of my conscious awareness or intentions.
24      The research is clear, we all tend to be
25  biased -- biased on a number of demographic

---

140

1  variables, and no matter what enlightened values
2  people hold, these biases tend to show up. So I
3  don't think this is a matter of will power and
4  sitting there and saying, "I'm going to personally
5  correct for bias I can't even consciously monitor."
6  I think this is structural. We know the bias is
7  there, it's well documented, and so far nothing has
8  been done to correct for that bias.
9  Q. Is there any institution of which you're aware that
10  has such a structural correction?
11  A. Yes --
12  Q. Who?
13  A. -- although maybe not as wonderful of a structural
14  correction as I think we need.
15      So a number of universities have simply given
16  across-the-board raises to women who have been paid
17  less than comparable men just based on salary, just
18  fix it, just put them in line with the men.
19  Q. So you would take out evaluations entirely as a
20  factor?
21  A. No, I'm not saying that. You asked me if I know of
22  any, and I'm telling you what some universities do.
23  Q. Yeah. So you would -- how many institutions do
24  something like you just suggested?
25  A. I have no count. I've read about particular

---

141

1  institutions that do that.
2  Q. And do you personally think that that's an optimal
3  system for the concern that you have about the
4  University of Oregon's evaluations?
5  A. I think that the long-term solution is to figure out
6  how to compensate for bias and remove inequity. I
7  don't think we want to get rid of evaluations
8  because I think we do want to be rewarding people
9  for doing a worse or better job, so I don't want to
10  remove that.
11      In the short-term, I admire the university --
12  the courage of those universities to fix
13  longstanding existing problems.
14  Q. And in your view, in your fix to the University of
15  Oregon's problems, would you just give raises to
16  women because of the belief that their teaching
17  evaluations are biased?
18  A. I never said that.
19  Q. I'm asking.
20  A. I don't know. I'm --
21  Q. Would that be something you would -- you would
22  recommend considering?
23  A. Considering? Sure. I'm not saying that I would --
24  this is -- I'm not going to say what the answer
25  should be. There should be an answer.

---

36 (Pages 138 to 141)

Ex. A, Page 14 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                          6:17-cv-448-MC
JENNIFER JOY FREYD                                          2/14/2018

---

142

1   Q. Have you known -- have you learned of any
2      institution that has what you believe to be the
3      answer for this issue of subconscious bias?
4   **A. I think some institutions have a process for fixing**
5      **inequities even if they don't know how to stop them**
6      **from arising, and fixing them faster, as opposed to**
7      **letting them grow and accumulate over time.**
8   Q. Who would those institutions be?
9   **A. Well, these ones that have -- just have used the**
10     **pure salary fix, which I'm not sure is the best**
11     **solution.**
12         **But I -- I recently learned about a procedure**
13     **at a university involving when faculty detect an**
14     **inequity based on gender, race, or other protected**
15     **class, a very specific way they can submit that**
16     **information and a very specific process to -- to**
17     **investigate and, I've been told, then to -- to make**
18     **adjustments.**
19  Q. Do you know which institution this is?
20  **A. Wayne State.**
21  Q. Is anybody else doing something like that?
22  **A. I don't know.**
23  Q. It sounds -- and correct me if I'm wrong. It sounds
24     like these are things that are being tried right
25     now. Is that an accurate summary?

---

143

1   **A. Tried?**
2   Q. They're -- they're new?
3   **A. Oh, I have no idea how long they've been doing that.**
4   Q. It's your belief that there is a structural fix of
5      some kind that has been tested by time and the
6      collection of data?
7   **A. I don't know.**
8   Q. You said that some people gamed the system. Can you
9      tell me the names of the people who have gamed the
10     system?
11  **A. No.**
12  Q. Do you know that there are people who have gamed the
13     system?
14  **A. I have heard it discussed in conversation many**
15     **times, but I don't have firsthand information.**
16  Q. Have you heard any names attached to the idea of
17     gaming the system?
18  **A. No.**
19  Q. As -- as you sit here today in your lawsuit, can you
20     tell us anybody you believe in your heart has gamed
21     the system by trying to get an outside offer?
22  **A. No.**
23  Q. When Dare Baldwin went out and was negotiating, did
24     you have any sense that she was gaming the system
25     just to get a raise?

---

144

1   **A. No.**
2   Q. Any of your colleagues in the psychology department
3      who have had outside offers, did you think any of
4      those colleagues weren't legitimately considering an
5      outside offer?
6   **A. I -- I didn't think they were or they weren't. I**
7      **don't have that level of information about what they**
8      **were thinking.**
9   Q. When -- when somebody says something accusatory like
10     "gaming the system," have you ever said, "Let's find
11     out first if it's true that people are really doing
12     that"?
13  **A. No. I have read that people say that their**
14     **department heads have told them if they want a**
15     **salary raise they have to get an outside offer.**
16  Q. And do you know whether -- do you know any names
17     associated with that?
18  **A. No.**
19  Q. Has anybody told you that?
20  **A. I have read that, but I don't have recollection of**
21     **names.**
22  Q. I mean has anybody ever told you, when you have --
23         When you have talked about your compensation,
24     has anybody specifically told you that you needed to
25     go get an outside offer?

---

145

1   **A. I don't recall.**
2      MS. BARRAN: Let's go off the record for a
3      second. What's your pleasure?
4      THE VIDEOGRAPHER: Off the record at 12:34.
5      (A recess was taken from 12:34 to 1:22.)
6      THE VIDEOGRAPHER: Back on the record at 1:22.
7   BY MS. BARRAN:
8   Q. Professor Freyd, we're back on the record after a
9      short recess for lunch.
10         Do you know of any data to suggest that
11     psychology professors from University of Oregon are
12     being recruited under circumstances that you think
13     constitute gender bias?
14  **A. Recruited to come into the department?**
15  Q. Either, recruited in or out.
16  **A. Not that I know of.**
17  Q. You were testifying prior to the break about how to,
18     in your view, handle some of the salary concerns
19     that emanate from the retention needs or concerns of
20     the university, and we had been talking about your
21     thoughts about making people feel like they don't
22     need to leave.
23         I want to ask you this question. For -- for
24     those faculty members who want the money, do you
25     have an alternate plan for the University of Oregon

---

37 (Pages 142 to 145)

Aufdermauer Pearce Court Reporting, Inc.
503-545-7365

FREYD v. UNIVERSITY OF OREGON                    6:17-cv-448-MC
JENNIFER JOY FREYD                                    2/14/2018

154

1   teaching in broad ways, and then there's specific
2   ways that that gets fulfilled.
3        And a way that the university could decide how
4   much to pay me is to evaluate the quality of my
5   contributions and the way I'm assigned to do them
6   and determine what I should be paid based on my
7   seniority and the quality of my contributions.
8   Q. And under those circumstances, is it your contention
9        that the university would no longer have to make
10       retention offers?
11  A. I -- I would assume they would not have to do it as
12       much. I can't -- I can't say they'd never have to,
13       but I would assume it would reduce the number of
14       times they have to do it.
15  Q. And when you say that the university would have to
16       compensate people based on the performance on the
17       job duties, what in the last year has the university
18       not done that would deviate from what you think they
19       should do?
20  A. So we go through a process of merit evaluation
21       where, in theory, they are evaluating us based on
22       these job duties. Every time I've ever been told --
23       I went through a merit evaluation I've been told I
24       had an above average for the department merit
25       rating.

155

1        So if merit -- if this process was actually
2   what we were doing as our determinant of our
3   salaries, my salary would not be below that
4   regression line. So they're doing it, but they're
5   doing something else, aren't they, in order to
6   actually change people's compensation? They're
7   doing something that's not determined by the stated
8   process for evaluating merit.
9   Q. What is, in your belief, the reason that your salary
10       falls below -- strike that. Let me ask you it this
11       way.
12       What regression line are you speaking of? What
13       are the -- what are the components of the regression
14       line that you were just testifying about?
15  A. Well, of course, as you know, we've looked at it
16       various different ways, we now being -- including
17       the department itself. Some measure of seniority
18       and salary on the Y axis, seniority on the X axis,
19       and a regression of those -- those two variables.
20  Q. Does that say to you that the university is using a
21       different variable from the ones you were plotting?
22  A. Well, if it was just seniority everybody would be on
23       a -- on a straight line.
24  Q. Does the result you just described speak to you in a
25       way that says the university uses a factor that is

156

1   different from what you are plotting?
2   A. Well, at least one factor, yeah.
3   Q. Do you know what that factor is?
4   A. No.
5   Q. Have you ever tried to do your charts and your
6        analysis using different charts to see if there is a
7        factor that puts you right on the regression line?
8   A. And I wouldn't -- that's not the way analysis works.
9   Q. I'm just asking if you've ever done that.
10  A. No, that would be working from the result and trying
11       to -- no.
12  Q. When you -- if you worked from the result, might you
13       be able to predict what was used to get there?
14  A. I wouldn't know how, because I'd have to know
15       what -- what variables to be regressing. You -- you
16       predict an outcome based on variables. I wouldn't
17       know what variables to put into it.
18  Q. When you look at the compensation of the people that
19       you have been speaking of, the males you've been
20       speaking of, when you plot the regression, do you --
21       do you control for the fact that you are a member of
22       the bargaining unit and Phil Fisher is not?
23  A. No.
24  Q. Do you control for the fact that you are a member of
25       the bargaining unit and Ulrich Mayr is not?

157

1   A. No.
2   Q. It is true that neither of those faculty members are
3        members of your bargaining unit?
4   A. At this moment the bargaining unit has a very
5        strange role, and so people can move in and out of
6        the bargaining unit.
7   Q. I understand that. Can you answer my question?
8   A. What was the question?
9   Q. Sure. Is Phil Fisher in the bargaining unit?
10  A. I don't think so, but I don't know for sure.
11  Q. And is Ulrich Mayr in the bargaining unit?
12  A. No, department heads cannot be in a bargaining unit.
13  Q. You have also asked for full back pay, compensatory
14       damages, and some additional relief. Can you tell
15       me, what is the amount of back pay that you believe
16       that you are entitled to in this lawsuit?
17  A. I can't give you a dollar figure.
18  Q. Can you tell me for the last calendar year what
19       amount you think that you are entitled to?
20  A. I can't do that either. I want an equitable salary.
21  Q. What does that mean?
22  A. That means one that is not divergent from my
23       colleagues who have similar achievements and
24       seniority as me.
25  Q. Does that mean you are asking for exactly what Phil

                              40 (Pages 154 to 157)

                              Ex. A, Page 16 of 19
                    Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                    6:17-cv-448-MC
JENNIFER JOY FREYD                                      2/14/2018

---

202

1      THE VIDEOGRAPHER: Back on the record at
2   approximately 3:02.
3   BY MS. BARRAN:
4   Q. Professor Freyd, in your complaint, you have alleged
5      that the university is paying you at a rate less
6      than it pays to men for work of comparable
7      character. When you speak of "work of comparable
8      character," are you speaking about the faculty in
9      the psychology department?
10  A. Yes.
11  Q. And do all the faculty in the psychology department
12     do work of comparable character to you?
13  A. Well, I was speaking about full professors.
14  Q. So thinking generally, though, do all the faculty in
15     the department of psychology do work of comparable
16     character to you regardless of their status?
17  A. Broadly --
18      MS. MIDDLETON: Objection to the extent it
19   calls for a legal conclusion.
20  A. Oh, yeah, I -- I -- this may be a technical phrase,
21     but broadly we all have the same job duties.
22  BY MS. BARRAN:
23  Q. And that would include even associate professors all
24     the way up to full professors, you would do
25     basically the same things?

---

203

1   A. Yes.
2   Q. But your particular lawsuit relates to full
3      professors in the psychology department?
4   A. Yes.
5   Q. Okay, thank you.
6      Just as a corollary to that, is there anybody
7      else at the University of Oregon outside of the
8      psychology department that you think does work of
9      comparable character to you?
10  A. Is this some technical term, "comparable character,"
11     that I have to have defined?
12  Q. I can define it for you.
13  A. Okay.
14  Q. Does it -- does it require the same skill, effort,
15     responsibility, general duties?
16      MS. MIDDLETON: Again, I'm going to object to
17   the extent it calls for a legal conclusion, but you
18   can answer the question.
19  A. Okay. I mean there's particular skills in the field
20     of psychology that only my colleagues in psychology
21     have.
22  BY MS. BARRAN:
23  Q. Okay. So as you think back as a layperson, the only
24     people who could be divined as having a job that is
25     comparable to yours are psychologists?

---

204

1      MS. MIDDLETON: Same objection.
2   A. Yeah, my problem is "comparable" is such a ranging
3      thing, so, I mean --
4   BY MS. BARRAN:
5   Q. Yeah, it's -- it's in your complaint.
6   A. Okay. I mean there -- the department of
7      psychology -- my colleagues in the department of
8      psychology have the most similar job to mine.
9   Q. You would not compare our wages, for example, to
10     somebody in economics?
11  A. Not in particular to economics, no.
12  Q. Biology?
13  A. I wouldn't in any -- any one department, that
14     wouldn't make any sense at all.
15  Q. Humanities?
16  A. No.
17  Q. And they make less than you anyway.
18  A. Yeah.
19  Q. Dramatically less, right?
20  A. Right.
21  Q. So I just -- I want to make sure that we're all
22     clear that we are talking about the department of
23     psychology at University of Oregon.
24  A. Correct.
25  Q. Okay, thank you.

---

205

1      You say that you have suffered emotional
2   distress for which you are seeking recovery in this
3   lawsuit. I want you to describe for me what you're
4   talking about. What -- what is your emotional
5   distress for which you believe you're entitled to
6   compensation?
7   A. Well, being paid less than my male colleagues is
8      embarrassing, it's humiliating, and it's painful.
9   Q. Have you had any kind of treatment at all for any of
10     the embarrassment, humiliation, or pain that you
11     believe that you have experienced from being paid
12     less than males?
13  A. No.
14  Q. Have -- have you had that -- do you think that the
15     males who earn less than you have the same reaction
16     to earning less than you?
17  A. I have no idea how they feel.
18  Q. Do you think that, in the end, all the faculty
19     should just earn the same amount of money?
20  A. I think that we should be paid commensurate with our
21     seniority and our contributions.
22  Q. Are there any male faculty in the department of
23     psychology who you believe should be paid more than
24     others who perform comparable work?
25      So as you look at the department of psychology,

---

Aufdermauer Pearce Court Reporting, Inc.
503-545-7365

Ex. A, Page 17 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                    6:17-cv-448-MC
JENNIFER JOY FREYD                                    2/14/2018

266

1    might want to move to other institutions?
2    A. Mm-hm.
3    Q. You have --
4    A. Yes.
5    Q. In -- in that regard, are you able to tell me any of
6       the institutions that you might have been able to
7       get an offer for?
8    A. No.
9    Q. Do you disagree that the University of Oregon needs
10      to retain nationally competitive faculty?
11   A. I believe that the University of Oregon needs to
12      have on its staff nationally recognized faculty, and
13      it can do that either by retaining those faculty who
14      are here or hiring new faculty who are that capable.
15   Q. When you hire new faculty, is there a start-up cost
16      associated with bringing them to the university?
17   A. There can be.
18   Q. And can that sometimes be the building of a lab and
19      equipping of a lab?
20   A. It can be.
21   Q. Do you have any idea what the cost of equipping a
22      lab can be?
23   A. It ranges tremendously.
24   Q. Would there be circumstances where paying more money
25      to an existing faculty member would be cheaper than

267

1    recruiting and bringing in a new faculty member to
2    do something similar?
3    A. Well, yes, and also we also are always hoping to
4       have the best faculty we can get, and so, equally,
5       if not a more important consideration besides just
6       the pure cost, is can we -- are we in a position to
7       recruit a faculty member of this caliber should this
8       other one leave.
9    Q. When you are recruiting faculty of the caliber of
10      your current psychology department, given its
11      ranking, to get somebody of that caliber, do you
12      find that other institutions typically pay them more
13      than the University of Oregon scale?
14   A. Often, yes.
15   Q. Do you know any -- do you have any information
16      whether the University of Oregon goes through a
17      process to review the validity of the offer that a
18      salary -- that a faculty member presents?
19   A. You mean like whether there's -- the outside offer
20      is really serious?
21   Q. Right, and whether they're really serious about it.
22   A. I don't know of any -- I don't know what they do.
23   Q. Do you know one way or the other the process that,
24      for example, Dr. Fisher has gone through?
25   A. No.

268

1    Q. Do you know one way or the other the process that
2       Nick Allen may have gone through?
3    A. No.
4    Q. When you've talked about your other colleagues in
5       the department, is it your belief that all of the
6       women who are full faculty -- who are full
7       professors in the psychology department could move
8       to institutions that have higher compensation levels
9       for psychology professors if they wanted to?
10   A. I don't know enough about the different compensation
11      levels at different universities to be able to
12      answer that question.
13   Q. So who are the -- who are the other women presently
14      who are full faculty --
15   A. Sara Hodges --
16   Q. -- full professors?
17   A. Sara Hodges, Dare Baldwin, and Holly Arrow.
18   Q. Of those, how many of them have had outside offers
19      already?
20   A. I'm aware that Dare Baldwin has.
21   Q. Do you have any belief that Holly Arrow would have
22      difficulty obtaining an outside offer?
23   A. From -- no. I mean she -- she's described having
24      approaches as well. I -- you know, I don't know.
25   Q. Has she ever expressed to you why she hasn't

269

1    followed up on those?
2    A. Yes.
3    Q. Can you tell me what's -- tell me what circumstances
4       she has told you argue against her moving.
5    A. So I believe she had an interest in the London
6       School of Economics, and I believe she decided she
7       wanted to come back -- she was visiting there, she
8       wanted to come back to Oregon. I don't remember
9       why. I just don't remember.
10   Q. Was it something that related to her -- do you know
11      whether it was something that related to her work?
12      Was it something related to the weather in London?
13      What?
14   A. I just don't know. She was married at the time.
15      I -- I don't know.
16   Q. Is that the only time you've ever spoken to her
17      about the possibility of her taking an offer
18      someplace else?
19   A. That's the only time I remember.
20   Q. Okay. And Sara has -- has or has not had an offer?
21   A. I don't know; she's not told me.
22   Q. Have you had any conversations with her about
23      whether she would seriously entertain an offer from
24      another institution?
25   A. No.

68 (Pages 266 to 269)

Ex. A, Page 18 of 19
Decl. of P. Barran in Support of Reply Memo

FREYD v. UNIVERSITY OF OREGON                6:17-cv-448-MC
JENNIFER JOY FREYD                                2/14/2018

---

302

1    answer that question and then I'll terminate.
2    **A.  I -- I see no basis for my salary to be less than**
3    **all those men's salary, considering seniority.**
4         MS. BARRAN:  Okay.  I'm at seven hours.  I am
5    not ending the deposition.  I may, given the scope
6    of the lack of knowledge on some things, request the
7    Court for additional time, but I understand that we
8    are at seven house at this point.
9         MS. MIDDLETON:  Terrific.  Why don't we take a
10   break and go off the record.
11        THE VIDEOGRAPHER:  Off the record at 5:40.
12        (A recess was taken from 5:40 to 5:43.)
13        MS. MIDDLETON:  Back on the record.
14        We'd like to have Professor Freyd read and sign
15   the deposition.
16
17
18        (DEPOSITION ADJOURNED at 5:43 p.m.)
19
20
21
22
23
24
25

---

304

1         FREYD vs. UNIVERSITY OF OREGON
2         DEPOSITION OF JENNIFER JOY FREYD
3    PAGE  LINE       CORRECTION TO TRANSCRIPT
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16
17        I hereby certify that I have read the
18   deposition transcript of my testimony, and that the
19   transcription, together with any corrections noted
20   above, is a true and accurate record of my testimony
21   given at the time and place noted.
22
23
24        _____
25        JENNIFER JOY FREYD

---

303

1         C E R T I F I C A T E
2
3         I, Tamara Aufdermauer Pearce, Oregon CSR No.
4    90-0199, Washington CCR No. 2141, do hereby certify
5    that JENNIFER JOY FREYD personally appeared before
6    me at the time and place mentioned in the caption
7    herein; that the witness was by me first duly sworn
8    on oath and examined upon oral interrogatories
9    propounded by counsel; that said examination,
10   together with the testimony of said witness, was
11   taken down by me in stenotype and thereafter reduced
12   to typewriting; and that the foregoing transcript,
13   pages 1 to 302, both inclusive, constitutes a full,
14   true and accurate record of said examination of and
15   testimony given by said witness, and of all other
16   proceedings had during the taking of said deposition
17   and of the whole thereof, to the best of my ability.
18        Witness my hand at Portland, Oregon, this 26th
19   day of February, 2018.
20
21        _____
22   TAMARA AUFDERMAUER PEARCE
23   OCSR No. 90-0199    Expires: 12/31/2020
24   WCCR No. 2141    Expires: 12/01/2018
25

---

77 (Pages 302 to 304)

Aufdermauer Pearce Court Reporting, Inc.
503-545-7365