*Ulrich Mayr*

*Volume 1 & 2*

*Freyd v University of Oregon, et al*

*June 13th, 2018*



CC REPORTING AND VIDEOCONFERENCING
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

JENNIFER JOY FREYD,            )
         Plaintiff,            ) No.
    v.                         ) 6:17-CV-00448-MC
UNIVERSITY OF OREGON, MICHAEL H.) Volume 1 of 2
SCHILL and HAL SADOFSKY,       ) Pages 1-118
         Defendants.           )
                               )

DEPOSITION OF ULRICH MAYR
June 13th, 2018
Wednesday
10:03 A.M.

THE VIDEOTAPED DEPOSITION OF ULRICH MAYR was commenced at Ford Alumni Center, 1720 East 13th Avenue, Room 340, Eugene, Oregon, before Deborah M. Bonds, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

## Page 2

APPEARANCES

For the Plaintiff:
    JOHNSON JOHNSON LUCAS & MIDDLETON
    975 Oak Street, Suite 1050
    Eugene, Oregon 97401
    541/484-2434
    BY: MS. JENNIFER MIDDLETON
    jmiddleton@justicelawyers.com

For Defendants U of O and Hal Sadofsky:
    BARRAN LIEBMAN LLP
    601 SW 2nd Avenue, Suite 2300
    Portland, Oregon 97204
    503/228-0500
    BY: MS. PAULA BARRAN
    pbarran@barran.com
    BY: MS. SHAYDA ZAERPOOR LE
    sle@barran.com

(continued)

## Page 3

APPEARANCES (continued)

For Defendant Michael Schill:
    PERKINS COIE LLP
    1120 NW Couch, 10th Floor
    Portland, OR 97209
    503/727-2000
    BY: MR. NATHAN R. MORALES
    nmorales@perkinscoie.com

Also Present:
    ROBIN CASSIDY-DURAN, CLVS, VIDEOGRAPHER
    JENNIFER JOY FREYD

Reported by:
    DEBORAH M. BONDS, CSR-RPR
    CC REPORTING & VIDEOCONFERENCING
    EUGENE       541/485-0111

## Page 4

INDEX

| WITNESS | | PAGE |
|---|---|---|
| ULRICH MAYR | | |
| BY MS. MIDDLETON | | 8,304 |
| BY MS. BARRAN | | 282 |

| EXHIBITS | | | PAGE |
|---|---|---|---|
| Exhibit 1 | Department of Psychology Review, Promotion, Tenure Procedures and Guidelines | | 7 |
| Exhibit 2 | Psychology Department Salary Policy and Procedures | | 83 |
| Exhibit 3 | Department of Psychology Policies and Procedures | | 87 |
| Exhibit 4 | Merit Report Guidelines | | 101 |
| Exhibit 5 | Merit Scores Spreadsheet | | 102 |
| Exhibit 6 | Ratings to Dollar Amounts Spreadsheet | | 104 |
| Exhibit 7 | July 2013 Final Spreadsheet | | 112 |
| Exhibit 8 | Spreadsheet | | 125 |
| Exhibit 9 | July 2014 Final Spreadsheet | | 126 |
| Exhibit 10 | June of 2014 Spreadsheet of Merit Equity Raises | | 130 |
| Exhibit 11 | Merit Raise Calculations 2018 | | 140 |
| Exhibit 12 | 2018 Final Spreadsheet | | 142 |
| Exhibit 13 | List of Retention Situations | | 159 |
| Exhibit 14 | Mayr Equity Package | | 162 |
| Exhibit 15 | Thumb Drive | | 165 |

(continued)

53

1  also editor of a journal and, you know, we consider
2  those contributions as service as well.
3      Q.   Uh-huh.
4      A.   Or, you know, things that I do for the
5  community, things like that, so they don't cease
6  necessarily because I'm department head.
7      Q.   I'm sorry.  I missed that.
8      A.   Things that I might do for the community.
9  So we distinguish between internal and external
10 service, and external service can go on even though
11 I'm department head.
12     Q.   I see.  Uh-huh.  And who evaluates you as
13 department head in those merit evaluations?
14     A.   The -- it's sort of a two-stage process
15 where my research and the little teaching that I
16 do -- and I'm not actually sure to what degree the
17 department also evaluates my service.  Probably it
18 does so I'm -- I'm evaluated in all of these three
19 aspects, I believe.  I'm not hundred percent sure
20 about the service component right now.
21          And then the -- the -- probably the
22 associate dean together with the dean, they also
23 evaluate my -- so from their level, my contribution
24 as department head.
25     Q.   So they --

54

1      A.   So they have the final say, but they use
2  input from the departments of regular merit review
3  process to, you know, make the judgment.
4      Q.   Okay.  So you do go through the regular
5  department merit review process?
6      A.   Yes.  Yes.
7      Q.   And then the two deans have their final --
8      A.   Well, one dean -- I don't actually know.
9  I'm sorry.  Impulse control.
10     Q.   And my understanding is that sometimes
11 people have outside sources of funding that pay a
12 portion of their base salary --
13     A.   Uh-huh.
14     Q.   -- is that right?
15     A.   Uh-huh, uh-huh.
16     Q.   Can you just describe how that works to
17 the extent you know?
18     A.   Pay a portion of their base salary.  So it
19 can happen if you buy out of teaching through
20 external grant funding.  And so that's the most --
21 that's the standard way in which this works.
22          <u>We have one individual, Phil Fisher, who</u>
23 <u>has a really odd construction because he is also</u>
24 <u>funded to some degree -- I forget how much it is --</u>
25 <u>30, 25, 20 percent through Harvard University.</u>

55

1          And so they essentially pay a part of his
2  base salary for doing part of his work for Harvard.
3      Q.   What does he do for Harvard?
4      A.   I don't -- I mean, he's directing a center
5  there or a unit or -- I don't exactly know.  It has
6  to do with policy, advising, research coordination,
7  so because I don't have to oversee that work, I
8  don't need to have an exact description.
9          But it's very much overlapping with work
10 that he's doing for the university as well, so it's
11 not necessarily seen as a negative that he is --
12 there's sort of some -- some synergy between what
13 he's doing here and what he's doing at Harvard.
14     Q.   Besides Professor Fisher's arrangement,
15 are you aware of anybody else who has some other
16 outside source of funding paying their base salary
17 other than through a course buyout?
18     A.   Well, we have two people who I really
19 don't know how to characterize them within our
20 department because whether you should really count
21 them as actual department members or not is up to --
22 up for question.
23          It's Don Tucker who has created a --
24 funded a company and has been for many years
25 essentially funded completely outside the company

56

1  and is not -- you know, for many years we still had
2  him as on the books as regular professor and
3  basically keeping his salary as something that he
4  could come back to if he ever decided not to do the
5  company anymore, but at some point he had
6  relinquished that.
7          And so in some ways he probably should be
8  considered no longer department member even though
9  we -- for some purposes even list -- still list him.
10     Q.   He's not actually performing the job of a
11 full professor, is he?
12     A.   No.  He -- I think the only thing he does
13 still is every once in a while is take graduate
14 students.
15     Q.   And the department doesn't actually pay
16 his salary --
17     A.   No.
18     Q.   -- does it?
19     A.   No.
20     Q.   Does anybody pay his base salary --
21     A.   Well, it's --
22     Q.   -- meaning the base salary --
23     A.   No, no.  I think the base salary -- that's
24 why it's also frozen in time.  You know, it is
25 basically -- it's very low compared to all others,

```
                                           73
 1  level in the past.  It's just it's a big burden and
 2  you want to protect people who still need to work
 3  towards their promotion from undue overburdening.
 4       Q.   So this is a broad question, but maybe you
 5  can just give me an overview to the extent you know.
 6            How are salaries determined in the
 7  department of psychology?  And let's focus on base
 8  salaries.
 9       A.   On any level?
10       Q.   What do you mean?
11       A.   Well, we -- so far we have been mainly
12  focused on the full professor range.
13       Q.   Oh, yeah.  Let's talk about full
14  professors and maybe I'll be a little more specific.
15            What -- what criteria are salaries based
16  on for full professors?
17       A.   So of course you cannot disassociate the
18  full professor salary from the history that got them
19  there.  And so then we need to distinguish between
20  those people who came up through the ranks at the
21  university or who might have come in from the
22  outside at some point because there are certain --
23  somewhat different mechanisms involved or criteria
24  probably also involved.
25            When somebody becomes full professor,
```

```
                                           74
 1  that's -- the salary at that point will be
 2  determined by -- completely by the history of what
 3  they did as assistant professor and associate
 4  professor plus the amount of the promotion raise
 5  they received when they became full professor which
 6  typically is 8 percent, but I think as of a year --
 7  since a few years can in principle go higher if
 8  somebody makes the argument for you.
 9            The primary sort of regular mechanism for
10  then how salaries -- and let's leave people coming
11  from the outside for that -- for later --
12       Q.   Uh-huh.
13       A.   -- come back to that.  The primary
14  mechanism that determines the progression of
15  salaries are the regular raises that are very
16  heavily constrained in their amounts.  You get a
17  total amount of dollars into the department, and
18  there's a very strict CBA sort of -- you know, the
19  collective bargain agreement mandated way in which
20  the salaries are spent out.  Usually some of it is
21  across the board, some of it is merit.
22            And the merit is a heavily scripted
23  procedure that involves the executive committee
24  reviewing all faculty members and providing ratings
25  on the different components that then are translated
```

```
                                           75
 1  directly into absolute dollar amounts, which is sort
 2  of an important aspect that we do it in absolutely
 3  dollars not percentage-wise, which has sort of --
 4  you know, very -- I find -- I think very unwelcome
 5  consequences when it comes to the full professor
 6  range.
 7            And then sometimes -- every once in a
 8  while -- once in a blue moon we get a few dollars
 9  that we can use for equity.  And with equity, I
10  mean, sort of counteracting dispersion in the salary
11  that are not merited by merit.  Those are rare
12  cases.
13       Q.   Would you agree that seniority in the
14  department is one component of how much people are
15  paid?
16       A.   Simply by the -- simply because if you're
17  more senior you have gone through more rounds of
18  regular raises.  So that's the regular procedure.
19  And then, of course, there are the retentions and
20  there are people coming from the outside.
21       Q.   Let's talk about the people coming from
22  the outside.  How -- how is it different for them?
23       A.   First of all, it's important to state that
24  at least in our department these are very rare
25  cases.  We usually do not go around -- we just don't
```

```
                                           76
 1  have the resources and the money -- and poach people
 2  from other universities.  It's also something that
 3  we usually probably don't really want to do.  We
 4  want to have sort of an ethos of grow -- growing our
 5  own people.
 6            But we had one recent case -- that was
 7  Nick Allen -- where we had a donation that created a
 8  named professorship that mandated us going out to
 9  hire a high caliber clinical professor.  And so that
10  resulted in Nick Allen's hiring and --
11       Q.   Were you involved in negotiating his
12  starting salary?
13       A.   Not at all.  It was -- I think it was in
14  the year before I became department head.
15       Q.   Can you think of any other examples of
16  hiring in a full professor?
17       A.   Not in recent history.
18       Q.   Okay.
19       A.   Oh, actually, Gordon Hall might have --
20  I'm not sure where Gordon -- Gordon Hall was,
21  whether he was an associate or a full professor.
22       Q.   And did you have any involvement in
23  negotiating his initial salary?
24       A.   No.
25       Q.   And for anybody hired in from outside once
```

Page 89

1  twiddle with it, which I've never done, but it's --
2  the main thing is that it's a suggestion to the
3  college.  So the dean level could in principle
4  change things around, which again I don't really
5  recall has ever happened.
6       Actually, I should be careful.  I mean,
7  not -- not in my -- not under my headship.
8   Q.   Uh-huh.  And then at 1.6 it says
9  (reading):  The actual merit awards will be
10  based on funding availability and university
11  criteria.
12       What do you understand that to mean?
13   A.   I think that was something that --
14  because, you know, this document was -- is based on
15  a framework provided by the college.  And so my best
16  guess is that this was one of the wordings suggested
17  by the college to basically give them a way out if
18  suddenly the money is gone or whatever so --
19   Q.   Or --
20   A.   So that nobody can basically say, oh, from
21  merit ratings, I now have a right to that particular
22  raise.
23   Q.   I see.
24   A.   Yeah.
25   Q.   So it leaves --

Page 90

1   A.   It leaves some amount --
2   Q.   -- some wiggle room -- uh-huh.
3       And that would be at the dean level?
4   A.   Yes, or even higher.
5   Q.   1.7 requires that merit ratings will be
6  retained for at least seven years --
7   A.   Uh-huh.
8   Q.   -- so they may be taken into account.
9       How is that data retained?
10   A.   On -- both on my computer and on my
11  assistant's computer or probably also paper files.
12   Q.   So do you retain both the merit scores and
13  the ultimate dollar amounts?
14   A.   Yes.
15   Q.   Has anybody asked you for that data in
16  this case?
17   A.   Some of it.  I'm not sure how far back --
18  you know, I don't remember -- I don't remember the
19  details, but it's -- I think it was part of -- some
20  of it was at least part of the information that I
21  was asked to collect.
22   Q.   Let's flip over to page 15 of the
23  policies.  That appears to describe the guidelines
24  for how people write up their reports.
25   A.   Uh-huh.

Page 91

1   Q.   Is that right?
2   A.   And I'm not a hundred percent sure that
3  that's the current one.
4   Q.   Okay.
5   A.   But if there are changes, they are
6  relatively minor.
7   Q.   Okay.  And so if I'm reading this right,
8  all of that conversation we had about grants and how
9  that factors into the merit determination -- let me
10  rephrase that question.
11       This policy appears to show that
12  consideration of a full professor's grant funding is
13  one component of the merit component of research for
14  consideration of merit raises.  Right?
15   A.   Uh-huh.
16   Q.   Is there any other way that grant funding
17  figures into an individual's base salary?
18   A.   Oh, well, not unless you want to talk --
19  start talking about retentions.
20       (Reporter clarification.)
21   A.   Not unless you want to start talking about
22  retentions or bringing people in from the outside.
23  BY MS. MIDDLETON:
24   Q.   Okay.  And you just described bringing
25  people in from the outside in the role of grants and

Page 92

1  that.
2   A.   Uh-huh.
3   Q.   Is there -- do you have more to say about
4  that or you're referring to your prior testimony?
5       MS. BARRAN:  Objection.  Vague.
6  BY MS. MIDDLETON:
7   Q.   Do you follow me?
8       MS. BARRAN:  Go ahead.  If you know
9  what the question is, go ahead.
10       MS. MIDDLETON:  That was poorly
11  worded.  Let me start again.
12  BY MS. MIDDLETON:
13   Q.   <u>So how do grants figure into the base</u>
14  <u>salary of bringing -- of someone who you bring in</u>
15  <u>from the outside?</u>
16   A.   <u>I think it is one of the -- one of the --</u>
17  <u>probably for somebody on the full professor range</u>
18  <u>bringing in from the outside, it probably would be</u>
19  <u>one of the key factors that determines whether the</u>
20  <u>university considers that individual worthy of</u>
21  <u>bringing in and how much they're willing to pay to</u>
22  <u>bring them in.</u>
23   Q.   Does the grant funding actually pay their
24  base salary in any way other than through a course
25  buyout?

Page 117:

```
1    A.  No.
2    Q.  Okay.
3            THE VIDEOGRAPHER:  Stand by, please.
4    We're off the record at 12:48 p.m.
5            (The deposition was adjourned at
6             12:48 and resumed at 1:22 p.m.)
7            (End of Volume 1.)
```

Page 118:

```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF OREGON
                        EUGENE DIVISION

JENNIFER JOY FREYD,            )
        Plaintiff,             ) No.
    v.                         ) 6:17-CV-00448-MC
UNIVERSITY OF OREGON, MICHAEL H.) Volume 2 of 2
SCHILL and HAL SADOFSKY,       ) Pages 118-311
        Defendants.            )
                               )

                  DEPOSITION OF ULRICH MAYR
                      June 13th, 2018
                         Wednesday
                        10:03 A.M.

        THE VIDEOTAPED DEPOSITION OF ULRICH MAYR
was resumed at Ford Alumni Center, 1720 East 13th
Avenue, Room 340, Eugene, Oregon, before Deborah M.
Bonds, CSR-RPR, Certified Shorthand Reporter in and
for the State of Oregon.
```

Page 119:

```
                          APPEARANCES

    For the Plaintiff:
        JOHNSON JOHNSON LUCAS & MIDDLETON
        975 Oak Street, Suite 1050
        Eugene, Oregon 97401
        541/484-2434
        BY:  MS. JENNIFER MIDDLETON
        jmiddleton@justicelawyers.com

    For Defendants U of O and Hal Sadofsky:
        BARRAN LIEBMAN LLP
        601 SW 2nd Avenue, Suite 2300
        Portland, Oregon 97204
        503/228-0500
        BY:  MS. PAULA BARRAN
        pbarran@barran.com
        BY:  MS. SHAYDA ZAERPOOR LE
        sle@barran.com

                                        (continued)
```

Page 120:

```
                    APPEARANCES (continued)

    For Defendant Michael Schill:
        PERKINS COIE LLP
        1120 NW Couch, 10th Floor
        Portland, OR 97209
        503/727-2000
        BY:  MR. NATHAN R. MORALES
        nmorales@perkinscoie.com

    Also Present:
        ROBIN CASSIDY-DURAN, CLVS, VIDEOGRAPHER
        JENNIFER JOY FREYD

    Reported by:
        DEBORAH M. BONDS, CSR-RPR
        CC REPORTING & VIDEOCONFERENCING
        EUGENE        541/485-0111
```

Page 149

1  Q.   -- the 1.9 percent would be 1.15 plus .75.
2  Correct?
3  A.   Uh-huh.
4  Q.   So let's look at Exhibit 12.
5  A.   Uh-huh.
6  Q.   In Exhibit 12 his base salary is now
7  $181,907. Do you see that?
8  A.   Is that the new or the old one?
9  Q.   It's the old.
10 A.   181, yep. That's quite a bit higher.
11 Q.   First, do you have any understanding where
12 that difference came from?
13 A.   Not precisely, but he is a very
14 complicated case because he had a lot of duties
15 outside the department as a -- I don't even know
16 what his job title was, but he was something like a
17 vice president for the university and the office for
18 diversion -- for diversity and inclusion and -- or
19 vice provost, something of that kind.
20      And so my best guess is that that aspect
21 was factored in beyond our unit and certainly not
22 something that we did internally so you -- I
23 think --
24 Q.   But that wouldn't change his base rate,
25 would it -- or would it?

Page 150

1  A.   I don't know. I really couldn't tell. I
2  mean, his -- his base -- his salary was always a
3  mystery to me. I mean, you could always see our
4  department component, but what happened outside the
5  department was just fuzzy to me. I'm going to have
6  to say it very honestly.
7  Q.   Does he still hold that role with the
8  diversity entity now?
9  A.   No.
10 Q.   When did he step down from that role?
11 A.   Probably the beginning of this academic
12 year.
13 Q.   So the beginning --
14 A.   Oh, oh, oh
15 Q.   -- of '17-'18?
16 A.   Actually, I don't know. I mean, it could
17 also be the calendar year. I don't -- I really
18 don't know when that -- when that happened.
19 Q.   Do you have any recollection if he was
20 holding that diversity position in the fall of '17
21 when you were doing the merit raises?
22 A.   I actually don't know.
23 Q.   Okay.
24 A.   But should be easy to find out.
25 Q.   What source would you consult to find out?

Page 151

1  A.   I would probably go to his office and ask
2  him.
3  Q.   So are you familiar with any pay raise
4  that Gordon Hall received in the past academic --
5  academic year? Did you have anything to do with a
6  pay raise?
7  A.   Huh-uh, no.
8  Q.   Okay. Let's talk about the retention
9  process. What -- what is your role when a retention
10 situation comes up as department head?
11 A.   Well, I need to determine how serious the
12 offer is, how -- I need to gauge the department's
13 interest in retaining the individual. We kind of
14 have also since -- more recently we have sort of a
15 little more formalized process around that that
16 involves explicitly engaging the executive committee
17 which I think always happens but we now have sort of
18 formalized it.
19      Then I need to, you know, try to figure
20 out what the individual wants, whether he or she is
21 on the way out anyway, and there's really not much
22 we can do and, you know, what it takes to keep him
23 or her and then try to -- if we -- let's say, we
24 decide, A, we want to keep that individual and it's
25 in principle doable, convince the rest of the

Page 152

1  university to follow suit.
2  Q.   What documentation do you require of the
3  individual?
4  A.   Yeah. I wished I could give you a really
5  good answer to that. The problem is that these
6  things happen under some degree of time pressure
7  and -- and, you know, in realtime. And ideally I
8  get letters of interest or, you know, in best case
9  an actual offer letter that spells out the dollar
10 amounts, but that's not always possible.
11      And it makes those -- the cases where it's
12 not possible, it becomes much trickier, and I need
13 to try to find out the sources of information that
14 help me determine how serious the situation is.
15      You know, the Jennifer Pfeiffer case is
16 a -- is a good example where we had letters of -- a
17 solicitation letter from the UT -- from -- from the
18 University of Texas that made pretty clear that this
19 is sort of a serious ask that she was the only
20 individual.
21      Oftentimes, we have spies in other
22 institutions that can provide you additional
23 information. And so that's how you do it. I mean,
24 there's just -- I mean, in a perfect world you
25 always perfect records, but if you wait around for

153

1  the perfect record, then the window of opportunity
2  to do something might have very easily passed.
3      Q.   In the Jennifer Pfeiffer situation, what
4  was the ask?
5      A.   Well, the ask was -- I mean, she -- and I
6  don't know the exact details, but she got -- she was
7  targeted for a -- kind of a presidential chair
8  position that had a price tag of in the -- somewhere
9  between the 200- and $300,000 range and with
10 enormous research money and a 12-month appointment,
11 things like that where you don't have to go out for
12 grants anymore.  So those are the things that I
13 recollect.  I think it was last summer when this
14 happened.
15          And so -- and she's, you know, enormously
16 critical for our department because she's a young
17 faculty member who is really on the upswing, so it
18 was really somebody that we all agreed on we don't
19 want to lose.
20          And so we actually think we were able to
21 keep her, you know, without -- what do you say --
22 without selling the -- the china.  Is that the word?
23 Yeah.  Something like that, yeah.
24     Q.   Why?
25     A.   Because by combining a promotion raise

154

1  that she would be getting anyway, by accelerating
2  her promotion to full professor, and then adding a
3  decent but not enormous chunk of additional money,
4  we could provide her something that she was willing
5  to accept and can stay in Eugene for.
6      Q.   It sounds like you didn't match the Texas
7  offer, though.
8      A.   No.  This wouldn't have been possible.
9      Q.   Do you have any understanding of why she
10 chose to stick with the U of O offer rather than go
11 to Texas?
12     A.   Because we're a good department and she
13 has very good colleagues here and so that was -- you
14 know, one of the things that we have to consider is
15 how central is an individual for other individuals.
16 And so Jennifer Pfeiffer, Elliott Berkman, and
17 Maureen Zalewski, Phil Fisher are sort of a close
18 knit group of people -- and Nick Allen is probably
19 in that group too -- that really do a lot of work
20 and a lot of grant activity together.
21          <u>And so there -- it would be a -- there</u>
22 <u>is -- there is always the danger of a domino effect,</u>
23 <u>when one leaves, the others start leaving too.  So</u>
24 <u>all -- all of these are considerations that I need</u>
25 <u>to keep in mind.</u>

155

1      Q.   Do you know if she had any other
2  considerations like family in Eugene or a partner
3  she was trying to find a job for, or anything like
4  that?
5      A.   That would be -- I think that would be
6  very unwise for me to make speculations along --
7  along those lines.  You know, I need to take the
8  cases at face value and not consider what, you know,
9  the whole environment would be like, here versus
10 there.
11     Q.   No.  I understand.  I'm just asking if you
12 know if those -- any of those things were
13 considerations for her?
14     A.   Well, I can speculate, but I'm -- I'm
15 really trying -- I'm honestly trying very hard not
16 to do those in those cases.
17     Q.   So you never talked to her about those
18 kinds of considerations?
19     A.   No, not that I'm aware of.  I mean, I
20 don't know -- I mean, she's -- she's a close
21 colleague so we talk about all sorts of things, but,
22 you know, not -- not in the context of the
23 retention.
24     Q.   And I understand you wouldn't want that to
25 factor into your decision-making.  My question is

156

1  really just do you know if any of those were
2  considerations for her?
3      A.   I really couldn't tell.
4      Q.   Okay.
5      A.   And, you know, she probably also has an
6  interest, you know, in such situations not to tell
7  me everything.
8      Q.   Yeah.  Do you consider retention
9  situations when they come up for associate
10 professors as different from when they come up for
11 full professors?
12     A.   Yeah.  I mean, they're -- they're much
13 less burdensome and much -- they're much less
14 difficult usually.  And -- because they're --
15 they're not that high stakes typically.
16          Now, let me -- let me step back for a
17 second and because that's -- that in a way just
18 counters what I just said about Jennifer Pfeiffer
19 because her situation came up while she was still
20 associate level.
21     Q.   Uh-huh.
22     A.   But sometimes we have these constellations
23 where somebody is sort of on the verge or could
24 easily be a full professor or is considered
25 somewhere else on the full professor rank, then you

```
                                                                      157
 1   essentially have to treat the individual like a full
 2   professor.
 3        Q.    So what are the different considerations
 4   for you just in general -- not in her situation in
 5   particular -- in considering full professors as
 6   compared with associates or vice versa?
 7        A.    Well, in some ways it's market driven.
 8   You know, if somebody considers -- if -- if there is
 9   a serious outside entity like UT Austin who says
10   this is an individual who we target as a
11   presidential chair -- which, you know per definition
12   is kind of full professor kind of position -- then
13   who are we to say that this person shouldn't be a
14   full professor, shouldn't be regarded as such.
15             I'm not sure that I'm answering your
16   question, but maybe I don't know what the question
17   is.
18        Q.    Yeah.  Let me rephrase it.  I'm just --
19   when you're considering a retention offer in
20   general, are the considerations different if it
21   comes from an associate professor than if it comes
22   from a full professor?
23        A.    Well, I'm not so sure that the
24   considerations are different but typically the --
25   the stakes are different.  You know, it's typically
```

```
                                                                      158
 1   on the associate level.  And we had a few cases like
 2   that that I, you know, compared to the bigger things
 3   that are going on, I would even -- you know, almost
 4   consider as peanuts, you know, where somebody might
 5   get an -- a prospect for an outside offer and they
 6   might ask for -- and it's -- and if I consider it
 7   for -- to be seriously -- serious, you know, we want
 8   to keep that, but then maybe a raise of like $4,000
 9   or something is -- is at stake, not $20,000.
10             And so those cases are just more easily
11   handled, and it doesn't require, you know, months
12   and months of going back and forth in negotiations.
13        Q.    What about the degree to which you want to
14   keep the person?
15        A.    Yeah.
16        Q.    And so same question.
17        A.    Yeah.
18        Q.    Would you work harder to keep a full
19   professor than you would an associate or the other
20   way around?
21        A.    Oh, that really depends, I mean, on -- on
22   the prospect.  I don't -- I'm not sure that I can
23   answer that conclusively.
24        Q.    So it depends on the person?
25        A.    Yeah.  If -- and, you know, the signals
```

```
                                                                      159
 1   I'm getting from the department, and so forth.  I'm
 2   not -- I'm not making those decisions alone.
 3        Q.    Right.
 4             (Deposition Exhibit 13
 5              marked for identification.)
 6   BY MS. MIDDLETON:
 7        Q.    Okay.  I've handed you Exhibit 13 --
 8        A.    Uh-huh.
 9        Q.    -- which is not fully up to date but it's
10   a list of retention situations.  Did you create
11   this?
12        A.    I might have.  I really don't remember.  I
13   create -- I'm sure I created similar documents at
14   some point or other or it could have been that I
15   created it together with -- because not all of the
16   information is information that I had.  I really
17   don't remember whether it was me, but I probably had
18   my hands in there somewhere.
19        Q.    It sounds like you have seen it before at
20   least.
21        A.    Yes.
22        Q.    In what context have you seen it before?
23        A.    It could have been in the context of
24   the -- of our -- in the context of our self-study.
25   No.  Because that -- that goes -- I -- I really
```

```
                                                                      160
 1   couldn't tell you.
 2        Q.    Can you tell me which of the retention
 3   situations on Exhibit 13 you were involved in?
 4        A.    Everything starting with 2014.
 5        Q.    So -- Ed Awh --
 6        A.    Ed Awh.
 7        Q.    Ed Awh -- is that how you pronounce it?
 8        A.    Ed Awh.
 9        Q.    And beyond?
10        A.    Uh-huh.
11        Q.    And then there was your own in 2009.
12   Right?
13        A.    My own in 2009?  Yes.
14        Q.    Describe your own retention negotiation in
15   2009.  What happened there?
16        A.    I got a -- the president -- or the -- not
17   the president.  The vice president and -- vice
18   president of the Humboldt University who is a
19   psychologist and he knows me very well -- he
20   targeted me for a so-called Humboldt professorship
21   which was a professor position that comes with
22   5 million euros that are combined for salary and
23   startups, so very lucrative.  And it's sort of a
24   mechanist the German government came up with to
25   bring sort of people they consider valuable back
```

161

1  into the country, you know. And yeah.
2         And Lou Moses was the -- so you need to
3  talk to Lou Moses. He was on the other side. So I
4  really don't -- I really know very little more than
5  that. And that was -- it was credible. It was
6  serious and, you know, my -- I -- at that time I had
7  a hard time convincing my family to actually be here
8  rather than back in Europe. So it was something
9  that we had to take seriously.
10     Q.    Why didn't you take the German offer?
11     A.    Well, because in general we like it here.
12 And I mean, I like the -- I like working in the
13 American academic system better than in the German
14 academic system. And I have enough experience
15 both -- both sides that there are reasons why we
16 like it here.
17        But, you know, it was always -- I mean,
18 this is not the -- I mean, I've done this twice, so,
19 you know, full disclosure, I had a similar situation
20 a few years earlier, and it was always between
21 trying to figure out whether we are at some point
22 going back and, you know, that was of the final
23 decision that we're staying.
24     Q.    Uh-huh.
25     A.    And frankly, I mean, it's also one that

162

1  was -- was very money driven and -- because with
2  three kids, having to get them through college, is
3  something that is a lot easier in Germany than it is
4  here.
5      Q.    I would think.
6      A.    Yeah.
7      Q.    Yeah. So was there kind of a tipping
8  point where if the U of O hadn't come --
9      A.    Yeah.
10     Q.    -- up with --
11     A.    Absolutely, yeah. I mean -- yeah.
12              (Deposition Exhibit 14
13              marked for identification.)
14 BY MS. MIDDLETON:
15     Q.    So does Exhibit 14 set out the package you
16 were provided?
17     A.    Uh-huh.
18     Q.    That was a yes?
19     A.    Yes.
20     Q.    Do you have any idea why they call it an
21 equity package?
22     A.    I have no idea.
23     Q.    And under the indirect cost returns
24 section there .4, it says (reading): The
25    vice president for research and I will

163

1  negotiate with you a portion of indirect
2  costs to go directly to you from your future
3  grants for a three-year period.
4      A.    Uh-huh.
5      Q.    Was that for salary or for research?
6      A.    For research. And actually, I don't think
7  I ever made use of that. It's completely escaped my
8  memory.
9      Q.    Maybe you still have it in a fund
10 somewhere.
11     A.    No. It's three years. Long gone.
12     Q.    Oh, well. Okay. Can the university -- do
13 you know if the university can allocate indirect
14 cost money to go into salary?
15     A.    No. No. Let's see. No. They --
16 let's -- they -- what they can do is if you have no
17 summer salary, they can say, you get this amount of
18 money for research and then you can use research
19 money to pay your summer salary, but it's not -- it
20 doesn't change your base rate or anything. It's
21 just -- just for the summer.
22     Q.    And the university can't just say, oh,
23 we'll take X amount of the indirect costs and pay
24 your base rate for that?
25     A.    No. No.

164

1      Q.    Let's go back to Exhibit 13. What do you
2  recall of the 2014 Gordon Hall retention situation?
3      A.    Not a lot except that I was not a fan of
4  providing a strong retention offer at -- to Gordon
5  Hall at that point.
6      Q.    There's no -- nothing in the new salary
7  section there.
8      A.    Yes. Because there was none.
9      Q.    So you don't think he got any pay raise as
10 a result of that retention in 2014?
11     A.    Uh-huh. I don't think so. I mean, if
12 anything, it must have been very small. The -- I
13 think -- or it says here he did get this faculty
14 fellowship here.
15     Q.    So I can tell you from other information
16 we've received from the university -- and I can pull
17 up the spreadsheet if you want to look at it --
18     A.    Uh-huh.
19     Q.    -- between 2014 and 2015, he received a
20 raise of about $20,000, almost 21.
21     A.    Uh-huh.
22     Q.    Do you have any idea what that was --
23     A.    That must have been with his outside
24 department activities. You know, he got this -- his
25 administrative duties with division of equity and

Ulrich Mayr
Volumes 1 & 2

165
1  inclusion.  <u>So there were times, you know during my</u>
2  <u>department headship where he essentially was -- had</u>
3  <u>either zero or very little FTE in our department.</u>
4      Q.   Let's take a look at that spreadsheet.
5           And, Paula, let me give you --
6           MS. BARRAN:  So tell me what this is.
7           MS. MIDDLETON:  It is -- there are
8  three different things on this thumb drive.  So the
9  one I'm directing you to is Freyd 10759 through 771.
10 Why don't we go ahead and mark it as an exhibit.
11          (Deposition Exhibit 15
12           marked for identification.)
13          MS. BARRAN:  Could you give me that
14 number again, please?
15          MS. MIDDLETON:  It's an Excel
16 spreadsheet.  It's 10759 through 771.
17          MS. BARRAN:  Okay.  And what part of
18 that do you want?
19          MS. MIDDLETON:  So I think I'm just
20 going to -- well, do you want to share it with --
21          MS. BARRAN:  I do.
22          MS. MIDDLETON:  -- Professor Mayr --
23          MS. BARRAN:  So I can what -- yeah.
24 So I can see what you're asking him.
25          MS. MIDDLETON:  If we pull up to the

166
1  2014-'15 academic year --
2           MS. BARRAN:  And -- and it's -- what.
3           MS. MIDDLETON:  And look at Gordon
4  Hall who is line 13.
5           MS. BARRAN:  And what part of this do
6  you want me on?
7           THE WITNESS:  Here it is.  Okay.  So
8  probably -- you want us to move to the right?
9           MS. BARRAN:  Yeah.  Whereabouts on
10 this do you want me to be?
11          THE WITNESS:  Yeah.  Which column?
12          MS. MIDDLETON:  I want you to be on
13 line 13 and direct you to column J.
14          THE WITNESS:  J.
15          MS. BARRAN:  Yeah.  See, dude, you're
16 pushing me -- you're taking me way over to the edge
17 here.  Okay.
18     A.   J 100.  So the -- the number says 100
19 there but that's --
20 BY MS. MIDDLETON:
21     Q.   Yeah.  So go up to the top.
22     A.   Uh-huh.
23     Q.   And column J is labeled 2014-'15
24 appointment percentage as of November '14.
25     A.   Uh-huh.

167
1      Q.   So would that represent the amount he was
2  appointed in the department of psychology?
3      A.   I have no idea.  I don't know what -- you
4  know, I don't -- this is -- this is not a
5  spreadsheet that I am at all familiar with.
6      Q.   Okay.  If the university represented that
7  he was appointed a hundred percent in the department
8  of psychology in the '14-'15 year, would you have
9  reason to dispute that?
10     A.   Would I have reason to dispute that?  You
11 know, I would have to look into my records because,
12 you know, he was in and out of these jobs.  I don't
13 really know when he was there.  What I can
14 definitely say is that we as a department did not
15 decide to give him a $20,000 raise.
16     Q.   Okay.
17     A.   What happened beyond that, I have no idea.
18     Q.   When someone has dual appointments like he
19 did for some period of time, do you have any
20 understanding of how their base salary would get
21 determined?
22     A.   No.  I'm sorry.  I feel dumb that I can't
23 say these things --
24     Q.   It's okay.
25     A.   -- but I -- these are very singular cases

168
1  and sometimes I'm not sure that anybody completely
2  understands how they should be handled or are
3  handled.
4      Q.   Okay.  Did you confer with anybody in
5  the -- is it CoDaC?  Is that what the -- his group
6  is called?
7      A.   I did not.
8      Q.   Okay.
9      A.   Yeah.
10     Q.   So let me just finish that question so
11 it's clear.
12     A.   Yeah.
13     Q.   When he apparently had this retention
14 negotiation in 2014, did you confer with anybody in
15 the CoDaC organization about --
16     A.   Oh, okay.  Now that --
17     Q.   -- to provide a retention rate?
18     A.   -- something comes back to me.  There may
19 have been -- it's possible that the vice president
20 for diversity and inclusion, Yvette, may have
21 decided to do something for him.  I have sort of
22 this vague recollection, but it was not something
23 that we endorsed in any way at that point.
24     Q.   Okay.  Why didn't you endorse a retention
25 raise --

Ex. B, Page 11 of 19
Decl. of P. Barran in Support of Reply Memo

```
                                          177
 1      Q.   So it sounds like --
 2      A.   I don't think it's a legally binding
 3   anything.
 4      Q.   Okay.  So then the next on the list is
 5   another Gordon Hall --
 6      A.   Really?
 7      Q.   -- retention, yeah, for 2015.  Any
 8   recollection of that one?
 9      A.   Yes.
10      Q.   What do you recall about that one?
11      A.   That he received post-doc support.
12      Q.   That's the $190,000?
13      A.   140,000.
14      Q.   Oh.
15      A.   I don't know what -- what is that --
16   because in the right most column, it says $140,000
17   for two years of post-doc support.  So I'm not sure
18   what the 190 means.
19      Q.   Well, right above it, it says research
20   funds, 50,000.
21      A.   I see.  Okay.
22      Q.   So were you a part of --
23      A.   I was part of that.  He wanted a salary
24   increase.  I objected to the salary increase and I
25   personally also was not in favor of this at all.
```

```
                                          178
 1   But this is -- he -- he -- Gordon Hall is highly
 2   valued in the administration because of his role in
 3   the diversity activities.  And so it was a decision
 4   that was made beyond me.
 5      Q.   And did you not support it for the same
 6   reasons you've already described?
 7      A.   Yeah.
 8      Q.   Okay.  Who were Sean and Heidemarie
 9   Laurent?
10      A.   It was a couple -- she had the assistant
11   professor position -- a assistant professor
12   position.  He was a adjunct or NTTF teaching -- had
13   a teaching position.  And they received a joint
14   offer to go to Illinois -- University of Illinois.
15           And we tried to retain her, but the
16   department was not in favor of having him --
17   offering him a position.  So it was an unfortunate
18   situation.
19      Q.   And it looks like they left?
20      A.   They left.
21      Q.   So I should add the department was not
22   willing to give him a faculty level tenure-track
23   position.  They would have done stuff for him to
24   stay employed at the university and get -- maybe get
25   some research funding, something like that, but not
```

```
                                          179
 1   a tenure-track position.
 2      Q.   Who was Pranj Mehta?
 3      A.   Pranj Mehta is a -- was a social
 4   psychologist who left for the University College of
 5   London, and who we tried to retain but couldn't.
 6      Q.   What position did he or she hold?
 7      A.   Here?
 8      Q.   Yes.
 9      A.   He held a assistant professor position.
10      Q.   And that's a man?
11      A.   That's a man, yes.
12      Q.   Okay.  And what about Azim Shariff?
13      A.   Almost the same story, just one year
14   earlier -- one year earlier?  Oh, actually, I think
15   there might have been two such -- yeah.  It was all
16   very confusing.  So actually Pranj had two
17   subsequent -- successive offers, one was to Irvine
18   that fell through, and then came the London offer.
19   And Azim Shariff also had an offer from Irvine.
20   Again somebody we would have really liked to retain,
21   and we couldn't.
22      Q.   And he ultimately went to Irvine?
23      A.   Yes.
24      Q.   Do you know if that was money driven or
25   some other reason?
```

```
                                          180
 1      A.   You know, I can only speculate.
 2      Q.   And Nash Unsworth, what position does he
 3   hold?
 4      A.   He is an associate.
 5      Q.   And I noticed he had had a retention two
 6   years prior.
 7      A.   Uh-huh.
 8      Q.   What do you recall about this 2016 one?
 9      A.   That he was targeted by Notre Dame.  He's
10   a very highly productive department -- member of our
11   department.  And so apparently -- I don't -- so
12   what -- and I don't recall exactly how much we -- in
13   addition we offered him.
14           So the -- what's the column here -- there
15   was something funky about his particular raise
16   because it was folded in with a regular promotion
17   raise.  And so it looks like a very large -- a
18   relatively large raise, but I think it was actually
19   much smaller in actuality because -- so this 11,000
20   here reflects two different things compounded on top
21   of each other.
22           A regular, like 8 percent promotion raise,
23   and then the actual -- an additional raise that we
24   provided him.  And I -- if you're interested, I
25   probably have some records on that too.
```

181

1    Q.   Well, the little notes next to the 99,000
2    says ATB/merit, January 17 --
3    A.   Yes.
4    Q.   -- 3595.  Does that look like the split
5    you're talking about?
6    A.   Yes.  Something like that.  Yeah.
7    Q.   Okay.
8    A.   So I felt -- at that point -- I remember
9    feeling at that point that we -- I was surprised how
10   easy we could -- we could -- how easy it was to
11   actually keep him.
12   Q.   And by easy you mean not a high dollar
13   number?
14   A.   No, not -- not enormously expensive.
15   Q.   What do you recall about Nick Allen in
16   2017?
17   A.   Well, Nick Allen was targeted for a chair
18   position at -- what was it -- some little England --
19   Birmingham or something like that -- for a director
20   for some new center, a very prestigious position.
21   And he's -- he's also one of our sort of central
22   people that a lot of other people rely on -- you
23   know, obviously because we hired him as a -- on
24   the -- he already was hired on this chair position
25   so --

182

1         And so he was -- he was one of the people
2    that we really wanted to keep.  Oh, yeah.  It
3    actually says Birmingham here.  And yeah, so we
4    managed to do that.
5         (Deposition Exhibit 17
6         marked for identification.)
7    BY MS. MIDDLETON:
8    Q.   Okay.  Exhibit 17 is some emails about the
9    Nick Allen situation.
10   A.   Uh-huh.
11   Q.   And if you turn to page 3 --
12   A.   Uh-huh.
13   Q.   -- it reads sort of back to front the way
14   emails sort of do.
15   A.   Uh-huh.
16   Q.   There's an email from Hal Sadofsky --
17   you're copied on it -- to David Conover describing
18   the situation.
19   A.   Uh-huh.
20   Q.   And David Conover's response.  So first,
21   who is David Conover?
22   A.   He's the vice president for research.
23   Q.   What's his role in retention negotiations?
24   A.   He is the master of the startup component,
25   so not salary, but anything in addition.

183

1    Q.   So he writes (reading):  I am not
2    happy about a retention offer for someone
3    who got here a little more than two years
4    ago.
5         And goes on.
6    A.   Uh-huh.
7    Q.   Do you recall this exchange?
8    A.   Not in detail, but I'm not surprised to
9    see it.
10   Q.   Why aren't you surprised to see it?
11   A.   Well, because, I mean, that's kind of his
12   role.  That's sort of the regular back and forth you
13   get around these kind of retention negotiations.
14   It's not that everybody just keels over when
15   somebody grieves for money.
16   Q.   Did you have some of the same concerns,
17   that he just got here?
18   A.   I -- yes and no.  In principle, yes, but I
19   also, in my judgment, had very high confidence in
20   his value for the university and knew that we as a
21   university are better off with him than without him.
22   Q.   Was this a preemptive retention situation?
23   A.   Well, we're in a gray zone here.  I mean,
24   it's -- it was -- he was out for -- he was the only
25   candidate they were targeting.  So that makes it a

184

1    little more than just sort of a vague preemptive
2    offer.  I've seen the email communication from the
3    other side so it, in my judgment, was very, very
4    serious.
5    Q.   So you saw the emails from Birmingham?
6    A.   Yeah.
7    Q.   If you turn to the first page, there's an
8    email from Stacy Williams-Wright.  Who is she?  Do
9    you know?
10   A.   Actually, I don't.  I think she must be
11   somebody working in the VPR's office.
12   Q.   She describes a little about the startup
13   package.  And my question is -- you may or may not
14   know the answer to this, but was part of his
15   existing startup package translated into the
16   retention investment in the center or was the
17   retention investment in the center all new money?
18   A.   I don't remember those details.  I really
19   have to say.  You need to understand that a lot of
20   the -- these details about how things actually
21   happened are then handled not by me anymore, you
22   know, much of the money questions I -- it's not --
23   you know, sometimes there is a little bit of
24   department money at stake, then of course I know
25   about it.  But how other things fall in place, I

## 189

1                 marked for identification.)
2   BY MS. MIDDLETON:
3        Q.   Okay.  I've handed you Exhibit 18 which is
4   another email chain relevant to Nick Allen's
5   retention.  And if you go to the back, kind of the
6   last set of emails there.
7        A.   The back?
8        Q.   Correct.  On that page to your left.  I'm
9   looking at your email to Nick saying (reading):
10    See below.  They were able to add another
11    10K to salary, and you're referring to Hal
12    Sadofsky saying he can go to 160K.
13           Do you recall if the original offer was to
14  go to 150?
15       A.   I guess so.
16       Q.   Did you have any part in these
17  negotiations around exactly how much the salary
18  offer should be?
19       A.   Probably, but I don't really remember the
20  exact details.
21       Q.   Who would you typically talk to in that
22  process?
23       A.   I would talk to executive committee
24  members, but I also would talk to Hal Sadofsky.
25       Q.   And Hal Sadofsky is the guy who can make

## 190

1   the decision about the money.  Right?
2        A.   I'm not sure whether he makes the final
3   decision, but he's sort of my -- my link to the rest
4   of the administration.
5        Q.   Okay.  So then you're not talking to
6   people above --
7        A.   Usually not.
8        Q.   -- Mr. Sadofsky?
9        A.   Usually not.
10       Q.   Okay.  Do you recall any of your
11  discussions with the executive committee around the
12  Nick Allen situation?
13       A.   Not in detail.
14       Q.   Do you recall generally what the
15  discussions were?
16       A.   Only that I got the strong endorsement to
17  try to really keep him.
18       Q.   So then the next sentence of your email
19  says (reading):  I think that doing more with
20    the center is simply too tough to tackle
21    given the time pressure.
22           Do you recall this, that he was asking for
23  support for a center?
24       A.   Yeah.  And he got one -- got a center
25  which actually is very productive now, so I don't

## 191

1   want to belittle the center thing.  Yes.  I do
2   recall that that's what he wanted to do, and that he
3   got some support for that actually.
4        Q.   He came back with a very detailed, you
5   know, advocacy on his own behalf.
6        A.   Uh-huh.
7        Q.   And then later some information about
8   precisely the breakdown of the budget.
9        A.   Uh-huh.
10       Q.   Did you have any role in discussions about
11  exactly how his budget would get funded if this
12  center idea would happen?
13       A.   Not -- not the sources of the -- of that
14  funding.
15       Q.   Okay.  One of the things you said in that
16  earlier email was (reading):  As a preemptive
17    offer, this is by far the largest that I
18    have seen at the UO.
19           Is that still true?
20       A.   I'm not sure -- even sure whether it was
21  true then.
22       Q.   Oh, really?
23       A.   I mean, not that I'm -- you know, but it
24  was -- it certainly was one of the highest, whether
25  it was really the highest or not, but I also wanted

## 192

1   to make him feel good.
2        Q.   All right.  The next one is Dare Baldwin
3   in 2017.  What do you remember about her?
4        A.   Sorry.  I lost my microphone here.
5            She was -- she was targeted -- or she
6   applied to a so-called Lego professorship in -- I
7   think it was Cambridge, England.  And she was
8   invited out, but was one of four at the point where
9   she approached me.
10       Q.   And what happened?
11       A.   I brought the situation to Hal Sadofsky,
12  and he at least initially basically said you know,
13  let's wait and see whether she gets an offer or
14  whether she actually becomes the real -- the real
15  candidate.
16           Dare was unhappy about that.  She, you
17  know, sort of expected a more preemptive offer.  I
18  communicated that back to Hal because I thought she
19  somewhat had a point, but it's -- it was trickier.
20  It was not a -- it was not a clearcut case -- not as
21  clearcut as with Nick Allen.
22       Q.   Why not?
23       A.   Well, because Nick Allen was the only
24  candidate at that point and it was really about him.
25  And, you know, Dare Baldwin was a much more -- you

193

1  know, usually we don't do retention offers when
2  you're one out of four, so that's a 25 percent
3  chance that you actually get the offer.
4        So that just didn't seem like the same --
5  we were in the same ballpark.  There's also -- I
6  mean, just frankly in terms of overall merit,
7  there's -- was at that point at least a difference
8  between Dare Baldwin and Nick Allen.
9        Nick Allen, you know, is almost insanely
10 productive, both in terms of publishing and grant
11 funding.  And Dare was a little bit -- you know, in
12 a holding pattern.  You know, and so it was just
13 tougher to make the same type of strong argument
14 that we really, really, really need to do that.
15 Yeah.
16     Q.   How would you compare Professor Freyd on
17 that continuum to Dare Baldwin or Nick Allen if she
18 came to you with a retention offer?
19          MS. BARRAN:  Objection to the
20 hypothetical.
21          Go ahead if you can answer.
22     A.   I would make a very strong effort for
23 Jennifer Pfeiffer -- not -- Jennifer Freyd.
24 BY MS. MIDDLETON:
25     Q.   Stronger than for Dare Baldwin?

194

1     A.   I'm not sure that I want to answer these
2  kind of questions because I don't know who's
3  getting -- who -- who they're going to get back to.
4  Let's put it this way.  I would make a very strong
5  effort.
6     Q.   Well, let's ask about productivity.  Do
7  you feel she's more productive than Dare Baldwin?
8     A.   You know, I'm not sure that everybody
9  would share that, but in my mind, Jennifer Freyd has
10 in her own way built something that is very unique
11 and that I think should be -- should receive the --
12 you know, or would be nice if it would receive the
13 kind of credit -- the tools to do that.
14     Q.   What is it that she's built?  How would
15 you describe it?
16     A.   She has devised a field of research that
17 is -- that didn't really exist to that degree before
18 she went into that and has been quite productive
19 in -- in that field.  And you know, part of her work
20 is -- sort of straddles the boundaries to advocacy
21 which sometimes makes her a somewhat more tricky
22 proposition, when you view people just in terms of
23 scientific productivity.
24        And that's where, you know, some people
25 might -- not everybody might see it as exactly as

195

1  I'm presenting it here but, you know, I would go to
2  bat for her if I had this -- this opportunity.
3     Q.   Does her research support graduate
4  students?
5     A.   Well, not from funding.  I mean, except
6  maybe for funding grad students generate for
7  themselves through writing --
8     Q.   Through her mentorship?
9     A.   -- individual grants, but she -- her --
10 her research -- she -- because she doesn't have -- I
11 mean, she has -- I think she has a little bit of
12 foundation or private funding but that doesn't go
13 far.  You know, research -- you know, a grad student
14 for a year is about $50,000 so that goes -- doesn't
15 go very long, so that's -- grad students are very
16 expensive.
17     Q.   So let me ask that in a different way.
18     A.   Yeah.  Okay.
19     Q.   Would the grad students she works with be
20 able to receive their funding without her?
21     A.   Well, we've -- the department funds grad
22 students through teaching fellowships.  So in some
23 ways people who don't have grants rely on the
24 department -- the university providing teaching
25 fellowships for their graduate students.

196

1     Q.   Do you have any idea how many of her grad
2  students are funded by the department versus funded
3  by outside funding?
4     A.   You know, I don't.  My suspicion is that
5  the majority is probably through the department but
6  I'm -- because, you know, those -- those research
7  fellowships generated through the federal grants are
8  not easy to get to.  So I'm not sure that -- that's
9  a very regular occurrence in her lab.  I'm sure
10 there were some.
11    Q.   Is Ford Foundation funding prestigious
12 like the federal grants?
13    A.   It's -- it's a little more tricky for
14 us -- for the department because they -- if I
15 remember correctly, they don't pay tuition.  So they
16 provide some funding, but then we -- the department
17 still has to provide additional money so they're --
18 they're in between.
19    Q.   Does she have some grad students funded
20 through Ford?
21    A.   I mean, I don't -- I really don't know.
22    Q.   Okay.  So what ultimately happened in the
23 Dare Baldwin situation?
24    A.   That -- after a lot of back and forth and
25 me, you know, advocating as much as I thought would

---

197

1  make sense in this case, Hal Sadofsky came around
2  and offered a $10,000 raise and -- but with the
3  expectation that she then withdraws from the
4  Cambridge offer -- or from the Cambridge competition
5  because, I mean, that's -- that's usually what comes
6  with a preemptive offer, that you don't stick around
7  and make -- what happens, but she wasn't willing to
8  do that. And she didn't end up getting that offer.
9          (Reporter clarification.)
10    A.   She did not.
11 BY MS. MIDDLETON:
12    Q.   And she ultimately didn't -- so she
13 ultimately didn't get any raise.
14    A.   No.
15    Q.   And then one thing I forgot to ask you
16 about Nick Allen.
17          (Deposition Exhibit 19
18           marked for identification.)
19 BY MS. MIDDLETON:
20    Q.   Is Exhibit 19 the final agreement with
21 Nick Allen in connection with his 2017 retention?
22    A.   Uh-huh. Yes.
23    Q.   Would you have supported Professor Allen's
24 center idea even without a competing offer?
25    A.   Whether or not I would have supported it

---

198

1  is sort of besides the point. Nobody would have
2  moved $400,000 without a competing offer.
3     Q.   And in Point 5 of this letter it talks
4  about noncourse buyout time charged to NIH grants.
5          Can you explain that to me?
6     A.   Not really. It's a very, very tricky
7  thing that the university does. Not just -- not in
8  Nick Allen's case alone. It's just -- it's a --
9  it's -- I'm sure you're also talking to Hal
10 Sadofsky. I think he can --
11    Q.   I am.
12    A.   -- give you a much better --
13    Q.   Okay.
14    A.   -- account of how exactly that works.
15    Q.   Fair enough.
16    A.   Yeah.
17          MS. MIDDLETON: So I'm told we have
18 five minutes to go so why don't we take a break.
19          THE WITNESS: Five minutes?
20          MS. MIDDLETON: On the video.
21          THE WITNESS: Oh.
22          MS. MIDDLETON: We just need to change
23 the tape.
24          THE VIDEOGRAPHER: Stand by, please.
25 We're going off the record at 3:03 p.m.

---

199

1          (Recess: 3:03 to 3:14 p.m.)
2          THE VIDEOGRAPHER: We're back on the
3  record at 3:14 p.m.
4          (Deposition Exhibit 20
5           marked for identification.)
6  BY MS. MIDDLETON:
7     Q.   So next on our retention list is another
8  retention negotiation with Phil Fisher in 2017.
9  And, yeah, let's hand you Exhibit 20. Feel free to
10 get oriented.
11          Exhibit 20 has a -- starting at the bottom
12 of the first page, February 2nd, 2017, email from
13 Phil Fisher to you talking about Nick Allen's
14 retention process. And he says about halfway
15 through that paragraph (reading):  It may
16   have some impact on my own retention
17   decision-making.
18          Can you give me some context for that
19 comment? What was going on here that Phil Fisher
20 thought that Nick Allen's retention had some impact
21 on his own retention decision-making?
22    A.   Well, it was --
23          MS. BARRAN: Objection. Asks for him
24 to speculate about what's on somebody else's mind.
25 Go ahead and answer if --

---

200

1          MR. MORALES: Join in that objection.
2          MS. BARRAN: -- to the extent that you
3  can.
4     A.   Yeah. I alluded to that a little bit --
5  that -- that the -- they perceived each other as
6  very important colleagues.
7  BY MS. MIDDLETON:
8     Q.   What was your understanding at this
9  point -- so February of 2017 -- of Phil Fisher's own
10 retention situation?
11    A.   I knew that he was under consideration for
12 a director position at the -- some Harvard institute
13 for the developing child or something like that.
14 And he was heading there or already at that point
15 was there on sabbatical. And so there -- there was
16 a real concern where -- that he simply basically was
17 going to go there and stay there.
18    Q.   Was that a different position than the one
19 he'd --
20    A.   Somewhat different position, yeah.
21    Q.   So just to finish the question --
22    A.   Yeah. Sorry.
23    Q.   -- the one he'd been considered for in
24 2015?
25    A.   Yes. It's my understanding that it's a

201

1  different position.
2     Q.  Okay.  But both were at Harvard?
3     A.  Yeah.
4     Q.  He mentions in this email PSI changes he's
5  been planning to advocate for.  What's PSI?
6     A.  That's the Prevention Sciences Institute.
7     Q.  And what are the changes he's talking
8  about as far as you know?
9     A.  I don't exactly remember but his own
10 center was part of the Prevention Sciences
11 Institute.  And he was not particularly happy with
12 that constellation.  So I think the changes that
13 he's alluding to making his own center being a thing
14 on its own rather than being part of some large
15 entity.
16    Q.  So did Professor Fisher start to talk with
17 you around February of 2017 about another retention
18 negotiation?
19    A.  Yes.
20    Q.  Tell me about those discussions.
21    A.  Well, they proceeded very slowly because
22 Harvard moved very slowly, but he eventually got an
23 offer, an actual offer from Harvard that was, you
24 know, very -- very strong.  And he and his wife were
25 both in Harvard -- in Harvard and Boston at that

202

1  time so you have to take that very seriously.
2          He -- his request was not for more salary
3  at this point but he wanted to -- wanted to have
4  support for the center as a standalone being.
5     Q.  Uh-huh.
6          (Deposition Exhibit 21
7           marked for identification.)
8  BY MS. MIDDLETON:
9     Q.  So I've handed you Exhibit 21 which has an
10 April 5th, 2017 --
11    A.  Uh-huh.
12    Q.  -- email that apparently he sent to you.
13 Do you recall receiving this email?
14    A.  From Berkman?  Vaguely.
15    Q.  So this is essentially his request for
16 ongoing support for his center?
17    A.  Uh-huh.  Uh-huh.
18    Q.  That was a yes?
19    A.  Yes.  Sorry.
20    Q.  I notice at the bottom of page 2 he
21 includes in his request preemptive retention offers
22 to Jen -- is that Jen Pfeiffer --
23    A.  Uh-huh.
24    Q.  -- and Elliott Berkman --
25    A.  Uh-huh -- yes.

203

1     Q.  -- as part of his request.  How did you
2  respond to that?
3     A.  Not -- independently of actual retention
4  constellation.  So Jennifer Pfeiffer around that
5  time had her own situation that required responding
6  to, and, you know, those two things interacted to
7  some degree because both perceived each other as
8  very important colleagues, but I -- so far nothing
9  happened with Elliott, for example.
10    Q.  Has anything happened up to today with
11 Elliot in terms of a retention?
12    A.  Not recently.  I think there was something
13 some years back but not -- not in this general
14 context here.
15    Q.  Okay.
16         (Deposition Exhibit 22
17          marked for identification.)
18 BY MS. MIDDLETON:
19    Q.  Okay.  Exhibit 22.  We've moved on to July
20 of 2017.  And it looks like Phil Fisher is still
21 expecting an offer and he sets out those terms
22 there.
23    A.  Uh-huh.
24    Q.  Do you recall whether at this time in July
25 of '17 Jennifer Pfeiffer had her offer from UT

204

1  Austin?
2     A.  Yes.  I think so.  I'm pretty sure that
3  was already in the making, but I'm not -- I'm not a
4  hundred percent because I know that I had to deal
5  with the Jennifer Pfeiffer situation out of my own
6  vacation, and so that was around sometime in July,
7  so it must have been around that time.
8     Q.  Okay.  And he says at No. 6 (reading):
9     Other standard retention details regarding
10    my salary, research funds, et cetera.
11         At some point did he ask for a salary
12 increase?
13    A.  He actually never did.
14         (Deposition Exhibit 23
15          marked for identification.)
16 BY MS. MIDDLETON:
17    Q.  And Exhibit -- is Exhibit 23 the final
18 offer that was made to Phil Fisher?
19    A.  I think so.  I emphasize that most of the
20 negotiations around that I was in part initially --
21 most of those happened really between the president
22 and the provost -- between Phil Fisher and the
23 provost and the president directly.  I had very
24 little involvement in that so I'm --
25    Q.  Do you know if any department money is

                                                                            305

1   A.   A post doc who was employed on that grant
2   and so he had these supervisory functions that got
3   him out of the bargaining unit.
4   BY MS. BARRAN:
5   Q.   And supervised people the same way, for
6   example, that Nick Allen and Phil Fisher
7   supervised --
8   A.   I assume so, yes.
9   Q.   Okay.  When -- when these large
10  research -- research dollars come in, is it the case
11  that the amount of the indirect costs for the large
12  grants can actually pay for the retention increase
13  that you're making to some of the faculty member
14  bringing -- faculty members bringing them in?
15  A.   Yes.
16  Q.   So if you have a highly productive grant
17  submitter, it's -- it's in your view worth paying
18  extra money to them because they can even bring in
19  more than your salary.
20  A.   Yes.
21  Q.   You were asked some questions about Dare
22  Baldwin's retention offer.  Did you have a sense
23  that she just asked for it too soon when she was one
24  of four rather than when she was closer?
25  A.   She would have -- you know, it's -- I'd

                                                                            306

1   have to speculate, but I think she would have stood
2   a better chance as the single, lone remaining
3   candidate.
4   Q.   Can you think of anybody in the department
5   who has been deciding compensation that affects
6   Jennifer Freyd that you think has discriminated
7   against her because she's a woman?
8   A.   No.  And on the contrary, I -- you know,
9   if -- I know that over the years -- and it may only
10  have happened twice when there was an opportunity,
11  but when there was an opportunity for equity raises,
12  there was always an attempt made to do something for
13  Jennifer Freyd.
14  Q.   In -- going back to the charts you had
15  testified about the substantial of fact that
16  starting salaries and the increase in starting
17  salaries can have on compensation comparisons.  Do
18  you remember that testimony?
19  A.   Uh-huh.
20  Q.   If you were going to do a full scale study
21  to determine whether there was bias in the
22  department, would you want to correct for the fact
23  that some people came in and started at higher
24  salaries simply because of the time that had
25  elapsed?

                                                                            307

1   A.   Yes.  I'm not exactly sure how you would
2   want to do that, but in principle it is a factor
3   that needs to be considered.  I mean -- and it's, of
4   course, more important when it comes to late entries
5   like Nick Allen.  It's maybe a little bit less of a
6   factor for just the regular -- when you start hiring
7   people on the assistant professor level.
8   Q.   Okay.  That's all I have.  Thank you,
9   Dr. Mayr.
10  A.   Okay.
11
12                 EXAMINATION
13  BY MS. MIDDLETON:
14  Q.   I just have one follow-up.  You mentioned
15  a review process of Nick Allen just a few weeks ago.
16  What was that --
17  A.   It was not a review process of Nick Allen.
18  It was we -- all departments of -- on campus were
19  asked to provide sort of a department-wide metrics
20  or -- it's a long story actually, and I don't think
21  you want to hear the whole story, but it's --
22  it's -- it was a department level response to a
23  request for how the department evaluates itself.
24       And we -- instead of just providing a
25  single number -- people didn't want to do that.  We

                                                                            308

1   provided a -- more like a holistic statement of how
2   our department is doing overall, and then just
3   listed all the products, all the manuscripts for the
4   entire department.
5        But in doing so, I couldn't help noticing
6   that one of our faculty contributed like two or
7   three times as much as the next best on the list.
8   And that was Nick Allen.
9   Q.   Uh-huh.  And is it correct that people go
10  in and out of the bargaining unit?
11  A.   It -- yes, it is.  It happens with -- you
12  know, you -- you can have a grant and be in the
13  bargaining unit until you hire an individual who can
14  be in the bargaining unit.  Then you need to go out.
15  Q.   And if that grant ends, then you're back
16  in?
17  A.   Then you're back in, and so you go in and
18  out.
19  Q.   Got it.  I have nothing further.
20       MS. BARRAN:  Okay.  Dr. Mayr will read
21  and sign, please.  And I don't have anything further
22  either.
23       MS. MIDDLETON:  Thank you.
24       THE VIDEOGRAPHER:  Okay.  Stand by,
25  please.  This concludes the deposition of Ulrich

                                                                    309

 1   Mayr.  The time is 5:58 p.m.                1   Ulrich Mayr
 2           (The deposition was concluded       2   Freyd v. University of Oregon, et al.
 3            at 5:58 p.m.)                      3   June 13th, 2018
 4                                               4
 5                                               5   PAGE/LINE.....................................CHANGE
 6                                               6   |_____
 7                                               7   |_____
 8                                               8   |_____
 9                                               9   |_____
10                                              10   |_____
11                                              11   |_____
12                                              12   |_____
13                                              13   |_____
14                                              14   |_____
15                                              15   |_____
16                                              16   |_____
17                                              17
18                                              18       I declare under penalty of perjury that the 309
19                                              19   pages of the transcript referenced above are true
20                                              20   and correct except for such corrections as noted.
21                                              21       Executed this ...... day of ............, 2018.
22                                              22
23                                              23        |............................|
24                                              24                  ULRICH MAYR
25                                              25

                                                                    310

 1   STATE OF OREGON    )
 2                      )  ss.
 3   County of Lane     )
 4
 5       I, Deborah M. Bonds, CSR-RPR, a Certified
 6   Shorthand Reporter for the State of Oregon, certify
 7   that the witness was sworn and the transcript is a
 8   true record of the testimony given by the witness;
 9   that at said time and place I reported all testimony
10   and other oral proceedings in the foregoing matter;
11   that the foregoing transcript consisting of 309
12   pages contains a full, true and correct transcript
13   of the proceedings reported by me to the best of my
14   ability on said date.
15       If any of the parties or the witness requested
16   review of the transcript at the time of the
17   proceedings, correction pages have been inserted.
18       IN WITNESS WHEREOF, I have set my hand and CSR
19   seal this 25th day of June 2018, in the City of
20   Eugene, County of Lane, State of Oregon.
21
22   *[signature]*
23   Deborah M. Bonds, CSR-RPR
24   CSR No. 01-0374
25   Expires September 30, 2020