*Hal Sadofsky*

*Volumes 1 & 2*

*Freyd v University of Oregon, et al*

*June 18th, 2018*



CC REPORTING AND VIDEOCONFERENCING
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

```
                              1
         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF OREGON
                    EUGENE DIVISION


JENNIFER JOY FREYD,            )
         Plaintiff,            ) No.
         v.                    ) 6:17-CV-00448-MC
UNIVERSITY OF OREGON, MICHAEL H.) Volume 1 of 2
SCHILL and HAL SADOFSKY,       ) Pages 1-119
         Defendants.           )
                               )


              DEPOSITION OF HAL SADOFSKY
                   June 18th, 2018
                       Monday
                     8:59 A.M.


         THE VIDEOTAPED DEPOSITION OF HAL SADOFSKY
was commenced at University of Oregon, EMU, Room
304, Eugene, Oregon, before Deborah M. Bonds,
CSR-RPR, Certified Shorthand Reporter in and for the
State of Oregon.
```

```
                              2
                  APPEARANCES

For the Plaintiff:
     JOHNSON JOHNSON LUCAS & MIDDLETON
     975 Oak Street, Suite 1050
     Eugene, Oregon 97401
     541/484-2434
     BY:  MS. JENNIFER MIDDLETON
     jmiddleton@justicelawyers.com

For Defendants U of O and Hal Sadofsky:
     BARRAN LIEBMAN LLP
     601 SW 2nd Avenue, Suite 2300
     Portland, Oregon 97204
     503/228-0500
     BY:  MS. PAULA BARRAN
     pbarran@barran.com
     BY:  MS. SHAYDA ZAERPOOR LE
     sle@barran.com

                             (continued)
```

```
                              3
           APPEARANCES (continued)

For Defendant Michael Schill:
     PERKINS COIE LLP
     1120 NW Couch, 10th Floor
     Portland, OR 97209
     503/727-2000
     BY:  MR. NATHAN R. MORALES
     nmorales@perkinscoie.com

Also Present:
     ROBIN CASSIDY-DURAN, CLVS, VIDEOGRAPHER
     JENNIFER JOY FREYD

Reported by:
     DEBORAH M. BONDS, CSR-RPR
     CC REPORTING & VIDEOCONFERENCING
     EUGENE       541/485-0111
```

```
                              4
                      INDEX

WITNESS.......................................PAGE
HAL SADOFSKY
    BY MS. MIDDLETON                         7,281
    BY MS. BARRAN                              268

EXHIBITS..................................REFERRED
Exhibit 3    Department of Psychology Policies  105
             and Procedure
Exhibit 11   Merit Raise Calculations 2018      116
Exhibit 13   List of Retention Situations       135
Exhibit 31   Memo, Baldwin/Arrow/Freyd to       188
             Executive Committee, 4/13/15
Exhibit 39   Sadofsky Response to Program       237
             Review

EXHIBITS....................................MARKED
Exhibit 40   Results of Psychology Department   240
             Meeting, 4/19/17
Exhibit 45   30(b)(6) Notice                     25
Exhibit 46   Retention Faculty Salary           135
             Adjustment
Exhibit 49   Job Posting                         61
Exhibit 50   Equity Salary Review Policy         99
                             (continued)
```

Page 5

```
 1   (continued)
 2   EXHIBITS....................................MARKED
 3   Exhibit 51    Merit Increase Policy                    103
 4   Exhibit 52    Final 2018 Raises                        116
 5   Exhibit 53    Email String, Sadofsky/Shipper           129
 6   Exhibit 54    Email String re: N. Allen                158
                   Retention
 7   Exhibit 55    Email String re: N. Allen                158
 8                 Retention
 9   Exhibit 56    Email String re: N. Allen                159
10                 Retention
11   Exhibit 57    Email String                             161
12   Exhibit 58    Email, Sadofsky to Mayr                  166
13   Exhibit 59    Email re: Dare Baldwin Retention         167
14   Exhibit 60    Email String re: P. Fisher 2017          172
                   Retention Negotiations
15   Exhibit 61    Email String with Spreadsheet            176
16                 from E. Berkman
17   Exhibit 62    Email String re: J. Freyd Review,        189
                   5/29/15
18   Exhibit 63    Email String re: Freyd Promotion         195
19                 and Equity Raises
20   Exhibit 64    Email, Mayr to Sadofsky re:              210
                   Gender Equity in Psychology
21   Exhibit 65    Email String, Mayr to Sadofsky,          222
22                 re: Gender Equity, 12/23/16
23   Exhibit 66    Email with Salary Spreadsheet            226
24   Exhibit 67    Email String re: Salary, 1/10/17         227
                                        (continued)
25
```

Page 6

```
 1   (continued)
 2   EXHIBITS....................................MARKED
 3
 4   Exhibit 68    H. Sadofsky changes of Jody              245
                   Shipper Notes
 5   Exhibit 69    Jody Shipper Notes                       245
 6   Exhibit 70    Psychology Department Pay Raise          267
                   Strategy, 2006
 7
...
25
```

Page 7

```
 1            THE VIDEOGRAPHER:  Today's date is
 2   June 18th, 2018.  The time is 8:59 a.m.  We're
 3   present for the videotaped deposition of Hal
 4   Sadofsky in the matter of Jennifer Joy Freyd,
 5   plaintiff, versus University of Oregon, Michael H.
 6   Schill, and Hal Sadofsky, defendants, in the United
 7   States District Court for the District of Oregon,
 8   Eugene Division, Case No. 6:17-CV-00448-MC.
 9            Would all present please identify
10   themselves, beginning with the witness.
11            THE WITNESS:  I'm Hal Sadofsky.
12            MS. MIDDLETON:  Jennifer Middleton on
13   behalf of plaintiff with Jennifer Freyd.
14            MS. BARRAN:  Paula Barran on behalf of
15   University of Oregon and Hal Sadofsky.
16            MS. LE:  Shayda Le on behalf of the
17   University of Oregon and Hal Sadofsky.
18            MR. MORALES:  Nathan Morales on behalf
19   of Michael Schill.
20            THE VIDEOGRAPHER:  Will the court
21   reporter please swear in the witness.
22   / / /
23   / / /
24   / / /
25   / / /
```

Page 8

```
 1            HAL SADOFSKY,
 2   having been first duly sworn to testify the truth,
 3   the whole truth, and nothing but the truth, was
 4   examined and testified as follows:
 5
 6                      EXAMINATION
 7   BY MS. MIDDLETON:
 8       Q.   Good morning, Mr. Sadofsky.  Have you ever
 9   had your deposition taken before?
10       A.   No, I haven't.
11       Q.   All right.  Well, just some basic ground
12   rules.  As you can tell, our court reporter, Debby,
13   is taking down everything we say.  So the most
14   important rule to make sure we get a clear
15   transcript is that we not speak on top of each
16   other.
17            So I will do my best to wait for you to
18   finish an answer before I ask my next question, and
19   if you could wait for me to finish my question even
20   if you know what I'm about to say before you start
21   to answer, that will make sure our transcript is
22   clear.  Okay?
23       A.   Yep.
24       Q.   Great.  And then the second rule is your
25   responses need to be audible, so yes, no, or
```

**97**

1  administrative role before that.
2          So I think in the -- in the current
3  academic year, I would be surprised if she
4  effectively does the job of a full professor in the
5  psychology department because I just don't see how
6  there are enough hours in the day to do the job that
7  she has been filling in for and the job of a full
8  professor.
9          Before that -- you know, based on my
10 recollection of her evaluations, the answer is yes,
11 although I don't know details and she had a
12 half-time appointment in the graduate school for the
13 last, I think, 2015 through 2017 or something like
14 that.  Maybe it was 2014 through 2017.  I'm not
15 sure.
16    Q.   Do you know what her duties were in the
17 half-time appointment in the graduate school?
18    A.   In a very general sense, I have an idea
19 about that, but I don't know the specifics of what
20 was delegated to her and what was the job of the
21 dean of the graduate school.
22    Q.   What's your general sense?
23    A.   She managed things like graduate duties
24 and -- the graduate duties and responsibilities
25 documents that departments are responsible for.  I

**98**

1  think she managed disciplinary and grievance
2  processes and just did a lot sort of troubleshooting
3  when, you know, individual students ran into
4  problems or when departments ran into problems that
5  they didn't know how to solve.
6          She also did things like put together, you
7  know, awards ceremonies for graduate students who
8  were receiving awards.  I mean, these are the --
9  these are places where she was visible to me in my
10 role as opposed to things she might have done that I
11 don't know about.
12    Q.   And in her capacity as full professor in
13 the psychology department, can you describe her
14 day-to-day?
15    A.   Not in a way that's particular individual
16 to her.  I mean, I know because I -- I, you know,
17 taught from time to time with Professor Hodges, that
18 she spends a lot of time teaching, a lot of time
19 meeting with her graduate students, a lot of time
20 meeting with undergraduate students.  And I'm sure
21 that there are a lot of other things that go on too
22 but --
23    Q.   Are you familiar with what she studies?
24    A.   Yes, but I can't remember.  I mean, so I
25 guess that's sort of no.  We've talked about it and

**99**

1  now it's gone out of my head.
2          (Deposition Exhibit 50
3          marked for identification.)
4  BY MS. MIDDLETON:
5    Q.   I've handed you what's been marked
6  Exhibit 50.  Are you familiar with this equity
7  salary review policy?
8    A.   No.
9    Q.   Do you want to take a minute to review it?
10   A.   Sure.
11   Q.   Um --
12   A.   Sure.
13   Q.   Do you know if this policy has been
14 adhered to by the University of Oregon?
15   A.   I do not know.
16   Q.   Are you aware of the president ever
17 appointing a committee of administrative and
18 teaching faculty charged to design a mechanism to be
19 used for analyzing faculty salaries to identify
20 equity problems?
21   A.   No, but if the president had done it in
22 1986, I wouldn't know that.
23   Q.   <u>Can you tell from looking at this document</u>
24 <u>whether the policy has ever been rescinded?</u>
25   <u>A.   I cannot tell if it's been rescinded from</u>

**100**

1  <u>looking at this, no, but there's a revision history</u>
2  <u>paragraph on the second page which shows that it's</u>
3  <u>been renumbered.</u>
4    <u>Q.   But not rescinded.</u>
5    A.   It doesn't show it's been rescinded.
6    Q.   How does seniority factor in the
7  determination of compensation for full professors?
8    A.   It only factors in as accumulation, that
9  is, there are no decision points at which seniority
10 is a factor, but because if you've been here longer,
11 there may have been more raises, it may come in as a
12 factor there.
13   Q.   For someone who is an existing full
14 professor, are there factors besides merit -- well,
15 let me ask that question a different way.
16         Is there a way to get a raise besides a
17 merit raise, an across-the-board raise, an equity
18 raise, or a retention raise?
19   A.   A promotion raise or a six-year
20 post-tenure review raise.
21   Q.   Uh-huh.
22   A.   What were the four that you listed?
23   Q.   Across the board, equity monies, merit,
24 and retention.
25   A.   Yeah.  I think -- I think those six things

**117**

1  A. Do you -- do you have dates on these
2  spreadsheets?
3  Q. Well, Exhibit 11, the date we've got is
4  merit raise calculations 2018, and then there's some
5  dates along the right-hand side. And Exhibit 52,
6  all I can tell you is that the tab said Final 2018.
7  A. Uh-huh. No. I don't know. I -- so
8  Gordon Hall signed up for retirement probably
9  sometime around this period, but I don't remember
10 exactly when, but I think it was by the beginning of
11 this academic year.
12      And there's a 6 percent raise that's
13 automatic that goes with that. And in spite of
14 being a mathematician, I can't do that math in my
15 head, but that's -- that's the right order of
16 magnitude for this change. So -- so that's a
17 possible explanation.
18 Q. Uh-huh. What is the policy around
19 retirement? I mean, he signs up for it and then how
20 long before he actually retires?
21 A. Within three years.
22 Q. Do you -- has he said when he intends to
23 retire?
24 A. When you sign up, you have a -- a
25 drop-dead date, for lack of a better word. Right?

**118**

1  You promise to retire by a certain date. And it can
2  be as far in the future as three years into the
3  future. But I don't know -- I don't have a -- I
4  don't remember when Gordon signed up or when -- or
5  what he wrote down as his retire-by date. The
6  sensible thing is to put it as far out as possible,
7  which is three years from the date you signed up,
8  but I don't know if that's what he did.
9  Q. And psychology determines the merit raises
10 as -- as a dollar amount as opposed to a percentage
11 amount. Correct?
12 A. That's what I conclude from the -- 1.5 on
13 page 14 of this document of policies and procedures.
14 I didn't -- I wouldn't have remembered that.
15 Q. Okay. So is it your understanding, then,
16 that the department would determine the dollar
17 amount, and then the university administrators would
18 then translate that into a percentage of base salary
19 for the raise?
20      So, for instance, in the spreadsheet
21 that's Exhibit 11, there's a column saying merit
22 raise is a percentage of base under Option 1.
23 A. Uh-huh.
24 Q. The question really is: The dollar amount
25 comes first and then the percentage is calculated

**119**

1  from the dollar amount. Correct?
2  A. That's correct.
3      MS. MIDDLETON: I think this is a good
4  time for a lunch break.
5      MS. BARRAN: Okay.
6      MS. MIDDLETON: Should we just take a
7  half an hour? If you want a little more time, we
8  can do that but --
9      MS. BARRAN: Do you need more time or
10 do you think that --
11 A. Half an hour is fine -- no. Half an hour
12 -- if it's okay with you guys.
13      MS. BARRAN: Yeah. Half an hour is
14 fine.
15      THE VIDEOGRAPHER: Stand by, please.
16 We're off the record at 12:17 p.m.
17      (The deposition was adjourned at
18       12:17 and resumed at 12:57 p.m.)
19      (End of Volume 1.)

**120**

1       IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF OREGON
3                 EUGENE DIVISION
4
5  JENNIFER JOY FREYD,           )
6       Plaintiff,               ) No.
7  v.                            ) 6:17-CV-00448-MC
8  UNIVERSITY OF OREGON, MICHAEL H. ) Volume 2 of 2
9  SCHILL and HAL SADOFSKY,      ) Pages 120-290
10      Defendants.               )
11                                )
12
13         DEPOSITION OF HAL SADOFSKY
14              June 18th, 2018
15                 Monday
16               12:57 P.M.
17
18      THE VIDEOTAPED DEPOSITION OF HAL SADOFSKY
19 was resumed at University of Oregon, EMU, Room 340,
20 Eugene, Oregon, before Deborah M. Bonds, CSR-RPR,
21 Certified Shorthand Reporter in and for the State of
22 Oregon.
23
24
25

**Page 181**

```
 1              (Pause.)
 2              This is what I get.
 3   BY MS. MIDDLETON:
 4       Q.   So is that based on a base pay of 169,588?
 5       A.   Yes.  So it's 169,588 plus 8 percent of
 6   169,588.
 7       Q.   So the spreadsheet -- this is --
 8   difference --
 9              MR. MORALES:  I'm just going -- I'm
10   just going to make a standing objection with respect
11   to this spreadsheet.  I think by now it's apparent
12   that this is purely speculative, that he's already
13   made it clear that he cannot explain any disparities
14   in that spreadsheet.
15   BY MS. MIDDLETON:
16       Q.   The spreadsheet for '16-'17 with Phil
17   Fisher appears to show a base salary of 164,696.
18       A.   Right.  That's -- what date is on that
19   salary?
20       Q.   That is November 1 of '16.
21       A.   There was a raise on January 1st, 2017.
22   So that's not the amount that the 8 percent would
23   have been applied to.
24       Q.   And then the six-year post-tenure review
25   was on top of that?
```

**Page 182**

```
 1       A.   On top of --
 2       Q.   The January 1 --
 3       A.   Right.  So the January -- there was a
 4   January 1st, 2017, raise, which I'm hypothesizing
 5   raised his base rate to 169,588.  And then if you
 6   add 8 percent to that, then I guess you'd hit
 7   183,155, and that would be the post-tenure review
 8   raise, which would take place in the chain of
 9   academic year from '16-'17 to '17-'18.
10       Q.   Got it.
11              See, he was able to explain it perfectly.
12              So if we go back to the faculty salary
13   retention policy, one of the considerations in that
14   policy -- yeah, that one -- is internal equity.  And
15   I'm wondering how you took into account internal
16   equity in negotiating the retention raises we've
17   just discussed?
18       A.   By -- by doing the best to be conservative
19   and minimizing the amount of the raise within the --
20   within the priority of retaining a faculty member.
21       Q.   The procedure on the back of that policy
22   asks for a request form that includes a written
23   narrative that should acknowledge any issues
24   concerning compensation equity that may result if an
25   increase is approved.
```

**Page 183**

```
 1       Q.   Did you create any written narratives like
 2   that in connection with these retention raises?
 3       A.   No, I didn't.  The -- if we are following
 4   this procedure to the letter, then the department
 5   head would have done that in consultation with me.
 6   I did -- I did look at relevant salaries as we -- as
 7   we -- as we went through these, but I didn't create
 8   a written narrative.
 9       Q.   Did you receive a written narrative from
10   Professor Mayr?
11       A.   I don't remember doing -- I don't remember
12   having received that, no.
13              MS. BARRAN:  Could we identify the
14   exhibit number?  I don't know that we did.  And I
15   might not have heard it.
16              MS. MIDDLETON:  46.
17              MS. BARRAN:  Thank you.
18   BY MS. MIDDLETON:
19       Q.   How much time and energy would you say you
20   spend dealing with retention situations?
21       A.   I don't know exactly.  The psychology --
22   excuse me -- the psychology department has far more
23   than its fair share of retention activity.  And, you
24   know, when I think about other departments, I might
25   have had two retentions that I've had to deal with
```

**Page 184**

```
 1   in the four years that I've been divisional dean or
 2   associate dean whereas in psychology, I've had this
 3   whole spreadsheet's worth.
 4              And it's -- it's -- it's pretty time
 5   consuming.  I don't know.  I mean, one of these
 6   might end up eating up a couple days of time in lots
 7   and lots of little small bits.
 8       Q.   Why do you think the psychology department
 9   gets so many more than other departments?
10       A.   There's -- there are a couple of reasons.
11   It's a very strong department, so they have a lot of
12   faculty that are attractive to outsiders.  That's
13   not just true for psychology.  I would argue that
14   biology, for example, is just as strong, but they
15   don't seem to have the same, same percentage of
16   retention activity.
17              Because it's primarily not a wet lab
18   science, I think people are a little bit more
19   portable.  You don't have to build a wet lab, which
20   is also expensive and sort of, you know, move --
21   move your mice or whatever or start a new -- start a
22   new colony of mice.
23              And then we have people like Jen Pfeifer
24   and Phil Fisher and Nick Allen who are really
25   well-funded and doing work that -- you know, this is
```

```
                                                    289

 1   STATE OF OREGON     )
 2                       )  ss.
 3   County of Lane      )
 4
 5       I, Deborah M. Bonds, CSR-RPR, a Certified
 6   Shorthand Reporter for the State of Oregon, certify
 7   that the witness was sworn and the transcript is a
 8   true record of the testimony given by the witness;
 9   that at said time and place I reported all testimony
10   and other oral proceedings in the foregoing matter;
11   that the foregoing transcript consisting of 288
12   pages contains a full, true and correct transcript
13   of the proceedings reported by me to the best of my
14   ability on said date.
15       If any of the parties or the witness requested
16   review of the transcript at the time of the
17   proceedings, correction pages have been inserted.
18       IN WITNESS WHEREOF, I have set my hand and CSR
19   seal this 3rd day of July 2018, in the City of
20   Eugene, County of Lane, State of Oregon.
21
22   [signature]
23   Deborah M. Bonds, CSR-RPR
24   CSR No. 01-0374
25   Expires September 30, 2020
```

```
 1   HAL SADOFSKY
 2   Freyd v. University of Oregon, et al.
 3   June 18th, 2018
 4
 5   PAGE/LINE...................................CHANGE
 6   |_____
 7   |_____
 8   |_____
 9   |_____
10   |_____
11   |_____
12   |_____
13   |_____
14   |_____
15   |_____
16   |_____
17
18       I declare under penalty of perjury that the 288
19   pages of the transcript referenced above are true
20   and correct except for such corrections as noted.
21       Executed this ...... day of ............, 2018.
22
23          |............................|
24                  HAL SADOFSKY
25
```