*Scott Coltrane*

*Freyd v University of Oregon, et al*

*June 15th, 2018*



CC REPORTING AND VIDEOCONFERENCING
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

**Page 1**

```
               IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF OREGON
                          EUGENE DIVISION


JENNIFER JOY FREYD,            )
          Plaintiff,           ) No.
     v.                        ) 6:17-CV-00448-MC
UNIVERSITY OF OREGON, MICHAEL H.)
SCHILL and HAL SADOFSKY,       )
          Defendants.          )
                               )

                    DEPOSITION OF SCOTT COLTRANE
                          June 15th, 2018
                             Friday
                           10:34 A.M.


          THE VIDEOTAPED DEPOSITION OF SCOTT COLTRANE
was taken at University of Oregon, EMU, Room 107,
Eugene, Oregon, before Deborah M. Bonds, CSR-RPR,
Certified Shorthand Reporter in and for the State of
Oregon.
```

**Page 2**

```
                          APPEARANCES

For the Plaintiff:
     JOHNSON JOHNSON LUCAS & MIDDLETON
     975 Oak Street, Suite 1050
     Eugene, Oregon 97401
     541/484-2434
     BY:  MS. JENNIFER MIDDLETON
     jmiddleton@justicelawyers.com

For Defendants U of O and Hal Sadofsky:
     BARRAN LIEBMAN LLP
     601 SW 2nd Avenue, Suite 2300
     Portland, Oregon 97204
     503/228-0500
     BY:  MS. PAULA BARRAN
     pbarran@barran.com
     BY:  MS. SHAYDA ZAERPOOR LE
     sle@barran.com


                                          (continued)
```

**Page 3**

```
                    APPEARANCES (continued)

For Defendant Michael Schill:
     PERKINS COIE LLP
     1120 NW Couch, 10th Floor
     Portland, OR 97209
     503/727-2000
     BY:  MR. NATHAN R. MORALES
     nmorales@perkinscoie.com

Also Present:
     ROBIN CASSIDY-DURAN, CLVS, VIDEOGRAPHER
     JENNIFER JOY FREYD

Reported by:
     DEBORAH M. BONDS, CSR-RPR
     CC REPORTING & VIDEOCONFERENCING
     EUGENE        541/485-0111
```

**Page 4**

```
                             INDEX

WITNESS.........................................PAGE
SCOTT COLTRANE
     BY MS. MIDDLETON                               6

EXHIBITS....................................REFERRED
Exhibit 35    Psychology Department Self-Study   109
Exhibit 37    Letter, Mayr to Marcus/Sadofsky,   121
              12/6/16

EXHIBITS......................................MARKED
Exhibit 45    30(b)(6) Notice                     10
Exhibit 46    Retention Faculty Salary            69
              Adjustment
Exhibit 47    Retention Process                   69
Exhibit 48    Revision of Policy on Retention     92
              Offers, August 2017

MARKED TEXT...........................PAGE....LINE
INSTRUCTION                             11      7
INSTRUCTION                            124     23
INSTRUCTION                            125     19
```

Page 81

but it also exposes them to other places.  Other people see they're good and might be interested in recruiting them.  So it's all part of, I guess, the academic marketplace.

So we don't discourage them from doing that.  In fact, we encourage them to be as -- as involved on the national level as possible.

Q.  Is it a goal of the university's to pay people at market rates?

A.  Yes.

Q.  How does the university achieve that goal?

MS. BARRAN:  And I'm going to ask you to identify, if you would, which of the topics he was designated for that you're inquiring about.

MS. MIDDLETON:  To me it falls under the question of retention.

MS. BARRAN:  Well, I don't see that it does.  I'm going to allow -- I'm certainly going to allow him to answer, but I'd ask you to -- he -- he has been prepared to come here as a representative of the university for specific areas, so I mean, he can speak about what he thinks generally, but it's -- I don't see it as part of the 30(b)(6).

And I'm going to allow him to finish his answer, but I do want to point out that he is a

Page 82

30(b)(6) witness.

Go ahead.

A.  Can you ask it again?

MS. MIDDLETON:  Can you read back what the question was?

(The testimony was read.)

A.  By collecting data on how we compare in our offers to other AAU institutions in preparation for negotiating with United Academics in collective bargaining so that we can be speaking about the same issues.  And, you know, we want to pay people a fair salary so --

BY MS. MIDDLETON:

Q.  So one of the considerations on the retention policy, the fourth bullet down is (reading):  Implications for internal equity within the unit.

How does that consideration -- how does it affect retention offers?

A.  So again, I would divide my involvement with the process in the previous budget model and then the current more centralized model.  In the previous budget model, the choice as to whether or not to allow the stars to be paid substantially more than the average faculty member was a negotiation

Page 83

between the dean who controlled the purse strings and the department.

And some departments were very concerned that no one of similar merit be paid differently.  Other departments felt that whatever resources they could pay their best faculty would rise the tide for other faculty.  So there were differential pay levels for departments that on the outside looked kind of similar in their accomplishments.

Q.  Faculty, do you mean?

A.  Pay for faculty in a -- in the biology department, for instance, was more similar than it was in the chemistry department, but they -- they compete for similar sorts of grants so it didn't make a lot of sense, but I think it was historical accumulation of a policy where the department head would not make offers out of line with what current people were making but --

Q.  In biology, you're talking about?

A.  In biology or any -- as an example of any department.  Other departments would -- would actually pay as much as they could and hope that by doing so, eventually everybody would come up to that level.

Now, with the collective bargaining

Page 84

agreement, with percentages sort of built into that collective bargaining and with standardized procedures, I think we're having somewhat more similar processes at each department or unit.  And our goal, I would say, is to be competitive with similar institutions and so AAU basically, other research funding universities.

<u>So the implication for internal equity under the previous budget model was the dean would make a proposal:  Faculty member X who has an outside offer from this other place that's $30,000 more than we pay them -- that's probably more than would be normal -- $20,000 more than we would pay them.  Let's offer them 10, but we're going to use another $5,000 to the two people that this person is going to leapfrog so that the equity -- so the gaps don't get larger.

So those would be individual proposals that a dean would make using her or his own money.  And contrast that with the current model where faculty hiring is centrally funded in part because of collective bargaining agreement and a new budget model.</u>

If we approve the hiring of a faculty member, then we as an institution take

85

1   responsibility for any equity issues that will cause
2   within the department; hence, we're doing this
3   equity study to see as we're hiring more faculty --
4   because we've been on a five-year process of growing
5   our faculty and replenishing some of our most
6   productive faculty because they've reached
7   retirement age.  We hire something on the order of
8   50 new faculty every year, tenure track and tenured.
9           And so we're working on ways in which to
10  do that in a centralized way, whereas in the past
11  the distributed model did not really allow us as
12  much leverage in doing that.
13      Q.   Could a department head still approach a
14  retention offer the way you described and say, well,
15  I'm going to give the targeted faculty member 10,
16  but I'll give these other two people of similar
17  merit five?
18      A.   It is possible.  I can think of one case
19  in which it happened when I was provost and there
20  was central -- some central funding provided to
21  raise the salaries of those who'd been here longer.
22  And this was in reaction to the hiring of a new
23  Native American woman faculty in the College of
24  Education who came -- because she had a high salary
25  at her current institution, we hired her at a

86

1   substantially higher rate than what the existing
2   tenured professors were in this department.
3           And a proposal came forward from the dean
4   and more resources were given to do that.  It's
5   unusual.  That's the only one that I remember, but
6   it was definitely an institutional need to pay a
7   much higher rate to get a Native American woman
8   scholar because they're just hard to land.
9       Q.  And so the college then supported -- or
10  the university supported raising up the pay of other
11  longer-serving professors?
12      A.  _Yes.  Nobody was happy in the end because_
13  _it was not as much as they thought they deserved._
14  _And in my estimation the productivity of the other_
15  _faculty member was not as strong as the -- the newer_
16  _hire's._
17          _So that -- I mean, the overall picture for_
18  _me as provost are for the president because he's_
19  _really on a trajectory to increase the scholarly_
20  _reputation of the university is if we're going to_
21  _raise in the rankings, we have to hire better_
22  _than -- the productivity has to be more than the_
23  _faculty we have now._
24          And so internally that sometimes sets up
25  some issues -- apart from the pay, you know, there

87

1   _are many factors besides longevity and so it's how_
2   _to measure that merit and that productivity that_
3   _really is kind of where the action is._
4       Q.   So you'd want some -- well, you would look
5   at the merit of the other --
6       A.   Right.
7       Q.   -- affected faculty members.
8       A.   Yep.
9       Q.   The next bullet is (reading):
10  Strategic goals of the unit, school or
11  college, and university.
12          Can you explain that to me?  What are you
13  talking about by strategic goals and how do they fit
14  in?
15      A.   And so an example would be that applies to
16  psychology is with several gifts including the Lewis
17  gifts, we end with historical strengths.  We have
18  some subfields in psychology in which our ranking is
19  higher than other subfields, and one of those is
20  neuroscience.  And in part, that's from people like
21  Mike Posner who is a national academy member and one
22  of the first neuroscientists -- kind of create --
23  helped create the field.
24          And so we hired some people who were using
25  magnetic resonance imaging, FMRI machine.  And then

88

1   once you make that large investment of creating an
2   instrumentation facility, you need to have faculty
3   who will use it.  And there are medical uses, but
4   we're not a medical school.
5           So we did some hiring there and people
6   like Jennifer Pfeiffer and Phil Fisher use that
7   machine.  And then we're able to garner more gifts
8   like the Posner gift, but other gifts of people who
9   work in that area or Ulrich and -- so because we had
10  some retirements of people who had established our
11  reputation, including Mike Posner, we needed to
12  reload in that area.
13          So that's a strategic goal of psychology
14  to maintain its ranking in neuroscience.  Then
15  there's also some biologists who do neuroscience.
16  That's kind of a different related thing.  So those
17  are the kind of things.
18          So build expertise in a particular
19  subfield, and you need a certain number of senior
20  scholars for PhD students to come to study with
21  them.  You can't just have -- in many subfields --
22  one person doing research in an area doesn't
23  constitute a critical mass for getting the best in
24  the country.  So I don't know if that's a tangent
25  but --

## Page 149

1  as dean. I think I was dean then or maybe as
2  provost. So other times they wouldn't make it to
3  me. I didn't hear lots of squabbling, but those
4  were two departments -- one department in particular
5  that was fighting a lot.
6      Q.   Which one?
7      A.   History. But we did an endowed chair
8  hiring in history and then retained this woman in
9  history who was probably one of their best scholars.
10 And everybody respected them, but it was just sort
11 of the sour grapes. And the other thing is we were
12 committed to doing spousal hires at that point in
13 time and treating both members of a couple to be
14 able to retain them. And we hadn't done that very
15 often before.
16      So that's one of the things that comes
17 onto the table when somebody says, well, I really
18 would like to stay here but my partner doesn't have
19 the right kind of job. Is there anything you can
20 do?
21      And in the past we hadn't done that out of
22 concern for not -- you know, not following our own
23 rules, but we began to entertain those kind of
24 offers. And so what we end up doing is ad hoc
25 evaluation, is -- is the partner qualified? And we

## Page 150

1  set aside some money every year where we know
2  there's going to be so many of these that happen.
3      And so we're doing more of them but trying
4  to monitor that we're not breaking, you know
5  internal culture and evaluation of strength. Sorry.
6  That was a tangent.
7      Q.   That's all right. So you've mentioned the
8  pay equity study many times. And I'm wondering if
9  you know whether the pay equity study is going to
10 look into issues of internal equity apart from
11 protected groups.
12     So separate from looking at equity on the
13 basis of race or equity on the basis of gender or
14 other factors, just simply internal equity within
15 departments.
16     A.   I do not know the specifics because I left
17 before it got launched. My understanding is it was
18 looking at all times -- all types of differential
19 pay by categories. So protected groups but also in
20 rank and differential between, I think, schools and
21 colleges and departments, although that's a little
22 less of a concern because we know the business
23 schools pay more than the journalism schools.
24 That's just sort of the way it is.
25     Q.   Okay. I don't think I have any further

## Page 151

1  questions for you.
2      A.   Okay.
3           MS. BARRAN:  I want to take -- take
4  one minute and make a decision because I'm not sure
5  I have anything.
6           THE VIDEOGRAPHER:  Stand by, please.
7  We're off the record at 2:45 p.m.
8           (Recess:  2:45 to 2:48 p.m.)
9           THE VIDEOGRAPHER:  We're back on the
10 record at 2:48 p.m.
11          MS. BARRAN:  I don't have any cross.
12 Dr. Coltrane will read and sign, please.
13          THE VIDEOGRAPHER:  Stand by, please.
14 We're off the record at 2:48 p.m.
15          (The deposition was concluded
16           at 2:48 p.m.)

## Page 152

1  STATE OF OREGON    )
2                     )  ss.
3  County of Lane     )
4
5      I, Deborah M. Bonds, CSR-RPR, a Certified
6  Shorthand Reporter for the State of Oregon, certify
7  that the witness was sworn and the transcript is a
8  true record of the testimony given by the witness;
9  that at said time and place I reported all testimony
10 and other oral proceedings in the foregoing matter;
11 that the foregoing transcript consisting of 151
12 pages contains a full, true and correct transcript
13 of the proceedings reported by me to the best of my
14 ability on said date.
15     If any of the parties or the witness requested
16 review of the transcript at the time of the
17 proceedings, correction pages have been inserted.
18     IN WITNESS WHEREOF, I have set my hand and CSR
19 seal this 27th day of June 2018, in the City of
20 Eugene, County of Lane, State of Oregon.
21
22    *[signature]*
23 Deborah M. Bonds, CSR-RPR
24 CSR No. 01-0374
25 Expires September 30, 2020