IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JENNIFER JOY FREYD,

       Plaintiff,

      v.

UNIVERSITY OF OREGON, MICHAEL
H. SCHILL and HAL SADOFSKY,

      Defendants.

Case No. 6:17-cv-00448-MC

OPINION AND ORDER

MCSHANE, Judge:

As a concept, pay equity seems simple in its application—men and women performing the same job function are entitled to the same pay without regard to their gender. The Equal Pay Act, among other state and federal laws, requires employers to adopt compensation practices to ensure that female workers are paid the same as their male counterparts for work of comparable value. It would be a violation of the law, for example, to pay a male elementary school teacher

more than a female elementary school teacher if both are of the same tenure, work the same number of hours, and perform the same function of educating children.

When applied to a university setting, the notion of "equal pay for equal work" has unique complexities that are not found in other institutions. First, the notion of academic freedom spawns an environment where those working in the same discipline may choose to follow different paths of knowledge and pursue endeavors that create unique value to the institution. While education is core to the function of each department within a university, individual professors are given broad latitude to pursue research, obtain and manage grants, publish written work, and take on leadership roles in the university and the broader community.

A second hurdle facing pay equity in the university setting is the need of the institution to offer competitive salaries in order to attract top faculty, while at the same time being fair to senior professors whose salaries are often tied to a pay scale or a plan that has not kept up with the market. Colleen Flaherty, *Decompressing Salaries,* Inside Higher Ed. (February 11, 2013), http:www.insidehighered.com/news/2013/02/11/university-tries-deal-salary-compression-among-facutly-members (last visited May 1, 2019). The need to attract top faculty is unfortunately reciprocated by the need to prevent other institutions from poaching top faculty, particularly those who bring substantial grant money to the university. In this respect, a university is more akin to the National Baseball League than it is to a traditional employer. As a result, the academic job market is made up of those who are in demand (and can command more money during contract or retention negotiations) and those who are not. As to the latter group, this situation "means that good campus citizens who take on the introductory courses or devote extra time to advising—in other words, those who do the work that makes a college education meaningful for students—can feel they are taken for granted." *Id.*

Underlying all of this, of course, exists cultural and historical norms that have traditionally worked against women in the workplace. A university cannot claim that a man is getting paid for offering more value when equal access to the types of research, grant-writing, and leadership roles that create value have been denied to women.

By all accounts, the plaintiff in this case, Professor Jennifer Freyd, is a remarkable teacher and a well-respected scholar. She has been a professor of psychology at the University of Oregon (the "University") for more than thirty years. She is a national leader in the field of trauma and sexual violence, she has authored extensive publications, she attracts excellent graduate students to the psychology department, and she has won numerous awards. She is the sixteenth highest paid faculty member in her department of ninety professors.

Professor Freyd has brought numerous claims against the university, its president, and its Dean of the Natural Sciences Department, alleging gender discrimination in the establishment of her salary when compared to four male colleagues. Professor Freyd, in opposing defendants' summary judgement motion states, "This case at its core is simple: the University of Oregon . . . pays one of its most distinguished female professors . . . far less than men in her department who do the same job and are many years junior to her. That is the essence of pay discrimination."

Defendants move for summary judgement, maintaining that it is undisputed that the four male professors chosen by Professor Freyd as comparators perform work duties that are significantly different than those performed by Professor Freyd. As a result, they argue that Professor Freyd has failed to present evidence of gender discrimination to support her claims.

Even when viewed in the light most favorable to Professor Freyd, the evidence establishes that her four male colleagues perform significantly different work than that done by Professor Freyd. It would require the broadest of brush strokes to suggest that the work done by

each of the professors is simply teaching; the work and the value of that work varies greatly from professor to professor. Because Professor Freyd cannot establish that she performs substantially similar work in the unique setting of a university to that of her comparators, her claims fail. Professor Fryed's disparate impact claims fail because (1) she lacks statistical evidence sufficient to demonstrate the University's practice results in a disparate impact on women and (2) the University's practice is consistent with business necessity. The individual defendants are entitled to qualified immunity and, as discussed below, her claim in contract also fails. The Defense Motion for Summary Judgement is GRANTED.

## BACKGROUND

Professor Freyd is a tenured professor in the University's Psychology Department. Professor Freyd was hired by the University in 1987 as an associate professor. She was promoted to full professor in 1992. Freyd Decl. ¶ 3, ECF No. 72. At the time of her hire, Professor Freyd was employed by Cornell University. She left Cornell for the University of Oregon because the University made her "an extremely attractive offer," including a tenured position, a job for her husband at the University, a large lab, and a corner office. Cornell attempted to retain Professor Freyd by offering her a larger salary, higher even than what the University offered, but Professor Freyd declined Cornell's retention offer and moved to Oregon. Barran Decl. Ex. B, at 17, ECF No. 57-2. Since 2013, Professor Freyd is a member of a collective bargaining unit of faculty members represented by United Academics union.

Professor Freyd is a highly respected member of the Psychology Department and is known as a national leader in the field of trauma psychology. Professor Freyd has published over 30 peer-reviewed manuscripts and is well regarded as both a teacher and a member of the University community for her engagement with students and service.

Professor Freyd became concerned that salary inequities in her department were related to gender. Specifically, Professor Freyd was concerned that her salary was below that of male professors in the Psychology Department who had less seniority than she did. She conducted her own analysis of the Psychology Department and expressed her concerns to Professor Ulrich Mayr, the head of the Psychology Department. Professor Mayr consulted administrators in the University's College of Arts and Sciences, which houses the Psychology Department. Professor Freyd requested a raise to bring her salary in line with her expected salary, predicted as a function of seniority.

The University decided not to offer Professor Freyd a raise after concluding that Professor Freyd was compensated at a higher rate than the majority of professors in the College of Arts and Sciences and that any discrepancy between Professor Freyd's salary and her male colleagues was attributable to retention raises (which Professor Freyd never sought) and significant differences in job duties. Professor Freyd then initiated this litigation.

## STANDARD OF REVIEW

A court must grant summary judgment if there is no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)).

**DISCUSSION**

**Professor Freyd's Claims With Respect to Pay Discrimination**

Professor Freyd brings claims of gender-based pay discrimination against the University under the following federal and state laws: The Equal Pay Act, Title VII, Title IX, the Oregon Equal Rights Amendment, ORS 659A.030, and ORS 652.220. Professor Freyd asserts that the University paid her less than four male colleagues in her department and that the University's policy surrounding retention raises has a disproportionate impact on the University's female psychology professors.

## I. Pay Equity Claims

ORS 652.220, Title VII, ORS 659A.030, Title IX, the Equal Pay Act, and the Oregon Equal Rights Amendment all prohibit an employer from discriminating between similarly situated employees on the basis of gender.

### a. ORS 652.220

To establish a wage discrimination claim under Oregon law, Professor Freyd must demonstrate that she has been discriminated against on the basis of her gender for work of comparable character that requires comparable skills. ORS 652.220(1). This standard is broader than the "substantially similar" standard of claims under Title VII and ORS 659A.030, and requires that the compared work have "important common characteristics." *Bureau of Labor & Indus. v. City of Roseburg*, 75 Or. App. 306, 309 n.2 (1985). In determining whether jobs are comparable, courts look at several aspects of the jobs, including the description, the requirements, and the responsibilities.

While all full professors in the Psychology Department have the same broad job duties of research, teaching, and service, they also have significant freedom in how they accomplish those

duties. Full professors are accorded academic freedom to direct their research to fit their individual interests, including decisions about the particular areas in their field of study they wish to pursue and whether they seek out federal grant funding for their research. For example, professors are able to "buy out" of teaching classes by getting grant funding that will support their salary, which reduces their teaching load and increases their time for research and service. Barran Decl. Ex. C, at 6, ECF No. 57-3. Professors may also serve in administrative capacities, like department head, that greatly reduce the amount of time they spend on teaching and research but increase their time spent in service. Barran Decl. Ex. A, at 10, ECF No. 57-1. By choosing to pursue optional roles, such as acting as the principal investigator of a federally funded research grant, directing a center of research, or serving as department head, full professors change their job duties and increase the amount of responsibility that their role requires. The University does not mandate that full professors take on these additional responsibilities, but it recognizes professors' freedom to do so and to "remake their job" into what they want to do, whether through outside funding or community roles. Barran Decl, Ex. A, at 3.

Professor Freyd names four male comparators, all full professors within the Psychology Department: Ulrich Mayr, Gordon Hall, Phil Fisher and Nicholas Allen.

First, Professor Freyd names Professor Ulrich Mayr as a comparator. Professor Mayr is the current head of the Psychology Department. As department head, Professor Mayr performs both financial and supervisory duties. These duties include day-to-day personnel and human resource matters, misconduct investigations, managing the faculty review process, and negotiating with faculty seeking retention offers. Barran Decl. Ex. A, at 8, ECF No. 57-1; Barran Decl. Ex. A, at 30; Barran Decl. Ex. A, at 17. Professor Mayr did not have to do, or worry about, any of the above responsibilities when he was "just a regular professor." Barran Decl. Ex. A, at

17. As Professor Freyd admits, the job duties between a department head and a teaching professor are very different: "one couldn't be a department head and also still teach. There just wouldn't be enough time." Barran Decl. Ex. B, at 13, ECF No. 57-2. Additionally, as department head, Professor Mayr is not part of the bargaining unit for faculty members. Barran Decl. Ex. C, at 11, ECF No. 57-3. Because the bulk of Professor Mayr's time is consumed by his management and supervisory duties as an administrator and he is not currently teaching, his job is not comparable to Professor Freyd's, and he is not a suitable comparator.

Second, Professor Freyd names Professor Gordon Hall as a comparator. From 2015-2017, Professor Hall held an appointment within the Psychology Department but was externally appointed to the Center on Diversity and Community ("CoDaC") as an interim director, a university-wide role. Hall Decl. ¶ 4, ECF No. 61. While working for CoDaC, Professor Hall split his time between that appointment and his activities as a psychology professor, reporting to both the Vice President for Diversity, Equity, and Inclusion and the Psychology Department. Barran Decl. Ex. C, at 11, ECF No. 57-3. As director of CoDaC, Professor Hall spent a significant amount of time working with faculty across campus to support equity and inclusion initiatives. This included assisting faculty in writing statements about their contributions to diversity and inclusion as part of their bids for promotion. Barran Decl. Ex. C, at 10. Accordingly, Professor Hall's teaching and research time was reduced during this period. Hall Decl. ¶ 4. As stated by Professor Hall, although he continued to hold a position in the Department of Psychology, his "CoDaC responsibilities occupied a significant and substantial part of my time." Hall Decl. ¶ 4. Professor Hall worked out of the CoDaC offices (at a different campus location than the psychology offices) and Professor Hall "estimate[d] that my work with CoDaC occupied half of my time, sometimes more." Hall Decl. ¶ 4.

Professor Hall also served as the Director of Clinical Training within the Psychology Department; the director of clinical training is responsible for "curriculum development, staffing of the curriculum, and organizing the supervision of practica." Barran Decl. Ex. A, at 11. The role of director of clinical training also requires leading periodic accreditation review processes, during which the director must complete a self-study document and a site visit with the American Psychological Association. Barran Decl. Ex. A, at 11. The daily work and responsibilities of the Director of Clinical Training are "very different from what a regular full professor would be doing." Barran Decl. Ex. A, at 11. Both Professor Hall's role in CoDaC and his role as director of clinical training required work very different from that of a regular professor, and the amount of time Professor Hall spent in those capacities changed the character of his overall job such that his job was not comparable to Professor Freyd's.

Third, Professor Freyd names Professor Phil Fisher as a comparator. Professor Fisher also served as the Director for Clinical Training for the Psychology Department and, like Professor Hall, served through an accreditation process. His duties in that position were the same as those described above with reference to Professor Hall. For this reason alone, Professor Fisher is not a suitable comparator to Professor Freyd. Additionally, a significant portion of Professor Fisher's time is spent completing the administrative requirements of the national grants that fund his research. While securing grant funding is not a requirement of the job of full professor, professors may choose to pursue grants to support their research, both in resource costs and to pay their graduate students. Barran Decl. Ex. A, at 5, ECF No. 57-1. In addition to the money itself, obtaining nationally-funded grants lends legitimacy and prestige to a professor's research because national grant applications are subject to "very rigorous review committees." Barran Decl. Ex. A, at 5. Conducting research funded by a national grant changes a professor's job

duties by imposing responsibilities for managing the budget of the project (including negotiating budget changes with the agencies funding the grants), supervising the staff conducting the grant-funded work, and completing detailed reports of grant activities. Barran Decl. Ex. A, at 32-33. The added accountability to sign off on required reporting for federal grants adds significant responsibilities above and beyond those of professors (such as Professor Freyd) who receive no federal funding. After all, the failure to fulfill obligations from federal grants could result in a loss of federal funding to the entire University. Barran Decl. Ex. A, at 33.

Professor Fisher also founded the Center for Translational Neuroscience ("CTN"), of which he is the current co-director. In that role he supervises employees and contributes to the strategic integration of CTN into the Psychology Department. Barran Decl. Ex. C, at 9. Moreover, Professor Fisher's salary is offset by Harvard University because he performs work for Harvard, a role for which he reports to that university directly.[1] Barran Decl. Ex. A, at 9. Because Professor Fisher performs substantial administrative duties in his role as co-director of CTN and in his grant management work, his work is sufficiently different to Professor Freyd's to make the jobs non-comparable.

Fourth, Professor Freyd names Professor Nicholas Allen as a comparator. Professor Allen, like Professor Fisher, has significant daily responsibilities that stem from managing large federal grants. These grants, during both the application process and the administrative process, are the focus of a significant amount of Professor Allen's work at the University. He uses funds from the grants to buy out of some of his teaching load. Barran Decl. Ex. C, at 9, ECF 57-3. Professor Allen is responsible for the submission of several detailed and complex grant applications each year to maintain funding, and, as a principal and co-investigator on federal

---

[1] Specifically, grant funding provided 25% of Professor Fisher's salary for 2011-13, 35% for 2013-14, 49% for 2014-15, 80% for 2015-17, and 100% for 2017-18. Sandofsky Decl. ¶ 6(d).

grants, Professor Allen is responsible for annual reports and other administrative requirements. Allen Decl. ¶ 5, 7, ECF No. 59. The additional responsibilities stemming from Professor Allen's are "significant and a very big part of my work." Allen Decl. ¶ 7. Federal "[g]rant administration responsibilities are complex, time consuming, and an important part of doing funded research." Allen Decl. ¶ 7. Professor Allen submits applications for 3-4 grants per year. In those applications, Professor Allen "take[s] overall responsibility for the preparation of those submissions," which "require the preparation of complex and detailed documents" that may run 500 pages. Allen Decl. ¶ 5. Additionally, Professor Allen is the director of the Center for Digital Mental Health, a role with requires him to supervise staff and fulfill the administrative requirements of maintaining external funding. Barran Decl. Ex. C, at 9. In his research, Professor Allen uses brain imaging and scanning technology, which requires specialized expertise and the supervision of technological staff. Allen Decl. ¶ 9. By contrast, Professor Freyd conducts her research through administering surveys, Freyd Decl. ¶ 16, which does not require advanced technology. Professor Allen's extensive grant management duties, as well as the technological differences in his research methods, render the day-to-day activities of his job sufficiently different to Professor Freyd's so that Professor Allen's job is not comparable to Professor Freyd's.

Professor Freyd argues that because she is not evaluated on the amount of federal grant money she does or does not bring in, that factor cannot qualify as a basis to distinguish her job from those of full professors who successfully receive such grants. This argument is meritless. When determining whether two jobs are substantially similar, "[a]ctual job performance and content, rather than job descriptions, titles or classifications, is determinative." *Spaulding v. Univ. of Washington*, 740 F.3d 666, 697 (9th Cir. 1984). Depending on the requirements of the

grant in question, federal grant recipients may have substantial additional duties and responsibilities above and beyond those borne by full professors who receive no federal funds. As with all comparisons between jobs, the court must evaluate the positions on a case by case basis. *Id.* Professor Freyd's argument that a professor's job duties are limited to service, research, and teaching misses the mark. By focusing only on the alleged job duties, Professor Freyd overlooks the actual day-to-day work and responsibilities of her alleged comparators.[2] The record clearly establishes that, at least as to Professors Fisher and Allen, the additional burdens of applying for, receiving, and complying with federal grants creates significant additional duties and responsibilities that are not shouldered by Professor Freyd. For example, the record indicates that the administrative responsibilities of federally funded research consumes approximately 42% of the principal researcher's time. Conover Decl. ¶ 3, ECF No. 58. These administrative responsibilities, outlined above, take a proportionately larger amount of a researcher's time the more grant activity the researcher has. *Id.* Administrative responsibilities that take nearly half of a professor's working time substantially change the nature of the professor's duties such that they are  no longer an appropriate comparator to a professor who does not perform federal grant administration work.

For the fiscal years 2008 through 2018, Professor Freyd received one award of federal funding, for $25,000. Conover Decl. ¶ 13. During that same time, Professor Fisher received 34 awards of federal funding for $12,359,571. Conover Decl. ¶ 13. Despite not joining the

---

[2] I note that limiting the comparison, as urged by Professor Freyd, to a full-professor's general duties of service, teaching, and research does not in fact help Professor Freyd. Taking such a "bird's eye" view of day-to-day duties and responsibilities would significantly increase the number of comparators. The focus, as always, is on the actual duties and responsibilities (as opposed to the job title or description) of the positions. Nearly all UO full-professors, and certainly most in the Natural Sciences Department, have the general job duties of service, teaching, and research. But out of the 90 full-professors in that department, Professor Freyd is the 16th highest paid, and her salary is 20% higher than that of the average full-professor in the Natural Sciences Department. Sadofsky Decl. ¶ 6(c). Freyd cannot have it both ways. She cannot brush aside other full-professors in the department earning less while sweeping in those Psychology professors making more.

University until 2014, Professor Allen received two awards of federal funding for $786,109.

Conover Decl. ¶ 13. Additionally, Professor Allen was recently advised he "will be awarded

another large NIH grant on which I am the primary investigator." Allen Decl. ¶ 5. Even when

employees perform superficially the same function, in this case research, a court must look

beyond the surface to the underlying skills and responsibilities required of each employee's

specific job. *See Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1415 (9th Cir. 1988). More

so than in any other field, academia provides the opportunity for full professors to design their

own jobs; two full professors in the same department do not have the same job if they have

chosen different skills to develop and responsibilities to bear to carry out their work. Professor

Freyd's assertion that she can accomplish her research goals effectively without federal grant

money does not negate the fact that she performs different job duties, and shoulders different

responsibilities, than her federally funded colleagues. Professor Freyd fails to establish that any

of her alleged comparators perform work of a comparable character to her own.

### b. Equal Pay Act

The Equal Pay Act provides, in relevant part, that:

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying
> wages to employees . . . at a rate less than the rate at which he pays wages to employees
> of the opposite sex . . . for equal work on jobs the performance of which requires equal
> skill, effort, and responsibility, and which are performed under similar working
> conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a
> merit system; (iii) a system which measures earning by quantity or quality of production;
> or (iv) a differential based on any other factor than sex.

29 U.S.C. § 206(d)(1). To establish a claim under the Act, Professor Freyd must establish "a

prima facie case of discrimination by showing that employees of the opposite sex were paid

different wages for equal work." *Stanley v. Univ. of Southern Cal.*, 178 F.3d 1069, 1073-74 (9th

Cir. 1999). The Equal Pay Act "creates a type of strict liability; no intent to discriminate need be shown." *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986) (citation omitted).

To establish her prima facie case, Professor Freyd must show that her job is "substantially equal" to the jobs performed by her colleagues of the opposite sex. *Stanley*, 178 F.3d at 1074. Professor Freyd need not establish that the jobs are identical, *id.*; instead, she must demonstrate that the jobs have a "common core" of tasks and do not have additional tasks so extensive that they make the jobs substantially different from each other. *Wachter-Young v. Ohio Cas. Grp.*, 236 F. Supp. 2d 1157, 1161 (D. Or 2002) (citations omitted). The determination of whether two jobs are substantially equal is a fact-specific, case-by-case analysis. *Hein v. Oregon College of Educ.*, 718 F.2d 910, 913 (9th Cir. 1983).

The Ninth Circuit has set out the test for a prima facie case under the Equal Pay Act: "whether the plaintiff is receiving lower wages than the average of wages paid to all employees of the opposite sex performing substantially equal work and similarly situated with respect to any other factors, such as seniority, that affect the wage scale." *Hein* 718 F.2d at 916. Because Professor Freyd's four named comparators are not similarly situated under the broader comparable standard of ORS 652.220, they necessarily fail the stricter "substantially equally and similarly situated" test required by the Equal Pay Act.

**Title VII, ORS 659A.030, Title IX, and Oregon Equal Rights Amendment**

Both Title VII and ORS 659A.030 expressly prohibit discrimination in compensation on the basis of a protected classification, including sex. 42 USC § 2000e-2(a)(1); ORS 659A.030(1)(b). To establish a claim under Title VII for disparate treatment, Professor Freyd must either demonstrate evidence of the University's discriminatory intent or establish a prima facie case under the *McDonnell Douglas* framework, which requires Professor Freyd to show

that (1) she is a member of a protected class, (2) she performed her job satisfactorily, (3) she suffered an adverse employment action, and (4) she was treated differently than a similarly situated employee who is not a member of the same protected class. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (describing requirements with reference to racial discrimination). Professor Freyd has not provided evidence of discriminatory animus.

Prima facie claims for discrimination under Oregon law are evaluated using the same standard as federal claims. *Dawson v. Entek Int'l*, 662 F. Supp. 2d 1277, 1284 (D. Or. 2009), *rev'd*, 630 F.3d 928 (9th Cir. 2011). To satisfy the fourth element of the *McDonell-Douglas framework*, that she was treated differently than similarly situated employees who are not members of her protected class, Professor Freyd must meet the same standard of substantial similarity as required by the Equal Pay Act claim discussed above. *Gunther v. Washington Cty.*, 623 F.2d 1303, 1313 (9th Cir. 1979), *aff'd*, 452 U.S. 161, 101 S. Ct. 2242, 68 L. Ed. 2d 751 (1981). Professor Freyd's claims under Title VII and ORS 659A.030 fail for the same reason that her Equal Pay Act claim fails.

Title IX claims also require a showing of discrimination, and Professor Freyd concedes that the standard is the same as that of Title VII claims. Pl.'s Opp. to Def.'s Mo. for Summ. J., at 42, ECF No. 68. The Ninth Circuit has not yet addressed whether Title IX and Title VII claims may proceed together or whether Title VII displaces Title IX in the employment context. I need not decide that issue here: assuming the claim could be made, Professor Freyd's Title IX claim fails because, as I have held above, Professor Freyd's Title VII claim fails.

Similarly, the Oregon Equal Rights Amendment codifies equality of rights under the law regardless of sex, but does not set out a standard different from those already discussed under

which to evaluate a claim of pay discrimination on the basis of sex. This claim fails under the standards discussed above.

## II. Impact Claims

Title VII and ORS 659A.030 prohibits an employer from implementing a policy that has a disparate impact on members of a protected class. This is so even if the policy is facially neutral, unless the policy is job-related and consistent with business necessity, and there is not a viable alternative presented to effectuate the employer's legitimate goals.

To establish a disparate impact claim under Title VII, Professor Freyd must first show that the University employs a practice, the consequences of which "fall more harshly on one group than another and cannot be justified by business necessity." *Raytheon Co. v. Hernandez*, 540 US 44, 52–53 (2003) (quoting *Int'l Bhd. Of Teamsters v. United States*, 431 US 324, 335– 335 n.15 (1977)). There is no requirement for Professor Freyd to show that the University had discriminatory intent in order for her to establish a disparate impact claim. *Stout v. Potter*, 276 F3d 1118, 1123 (9th Cir 2002).

Professor Freyd alleges that the University's practice of awarding retention raises causes a disparate impact on female professors in the Psychology department. Professor Freyd supports her assertion with evidence that suggests a salary gap of at least $15,000 and as much as $25,000 between male and female full professors that is the product of the University's practice of offering retention raises. Cahill Decl. ¶ 5, ECF No. 71. Professor Freyd also offers evidence that the University has offered retention raises sufficient to keep female professors who have outside offers 40% of the time, while they have offered sufficient raises to keep male professors with outside offers 62% of the time, which indicates that the University retained women at a rate of only 65% of the rate that they retained men. These figures reflect a very small pool: the sample

included 21 negotiations with men and 5 with women, and Professor Freyd has not offered any evidence that the University made retention offers to a smaller percentage of women who requested negotiations than men, only that the University's negotiations with men were successful for the University's goal of retention more frequently. Additionally, there are fewer than a dozen full professors in the Psychology Department. Stark Decl. Ex. 7, at 5, ECF No. 76.

Professor Freyd's data reflects such a small sample size as to render the statistical significance of Professor Freyd's analysis suspect. The Ninth Circuit has recognized that "statistical evidence derived from an extremely small universe, as in the present case, has little predictive value and must be disregarded." Morita v. S. California Permanente Med. Grp., 541 F.2d 217, 220 (9th Cir. 1976) (quoting *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir. 1975)). In Stout, six female applicants for a company-wide promotion alleged gender discrimination. The court noted the small sample size limited the probative value of the plaintiffs' statistical argument in support of a disparate impact claim. *See Stout*, 276 F.3d at 1124 ("A sample size involving 6 female applicants in a pool of 38 applicants is likely too small to produce statistically significant results."). Regardless of what Professor Freyd's expert says as to the reliability of the sample size, the rule in the Ninth Circuit is that "Statistics are not trustworthy when minor numerical variations produce significant percentage fluctuations." *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1273 n.4 (9th Cir. 1981). Here, had three female professors (rather than two) accepted the University's retention offers, the female retention rate would be 60% (rather than 40%) versus the male retention rate of 62%. It is samples like these that have "little predictive value and must be disregarded." *Morita*, 541 F.2d at 220 (quoting *Harper*, 525 F.2d at 412). Professor Freyd has not provided sufficient statistical

evidence to establish a prima facie case that the University's practice of offering retention raises has a disparate impact on women and does not make out a claim under either federal or state law.

Even if Professor Freyd had made out a prima facie case for disparate impact, summary judgment would still be appropriate. There is no genuine issue of material fact about whether the University is entitled to an affirmative defense and Professor Freyd has not put forth an alternative practice that would effectuate the University's legitimate business goal of retaining top talent in its Psychology Department. "Disparate-impact liability may only condemn practices or policies that are 'artificial, arbitrary, and unnecessary.'" *Hardie v. NCAA*, 876 F.3d 312, 319 (9th Cir. 2017) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The burden here shifts to the University to offer any business justification for the practice of offering retention raises. *Id.* "The defendant's practice need not be 'essential' or 'indispensable' to achieving its stated goal, but the relationship between the practice and its purpose must be more than 'insubstantial.'" *Id.* at 320 (quoting *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 659 (1989) (superseded by statute on other grounds, 42 U.S.C. § 2000e-2(k), as recognized in *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, —U.S.—, 135 S.Ct. 2507, 2523 (2015)). The University must show that the employment practice is both job-related and consistent with business necessity. 42 U.S.C.A. § 2000e-2(k)(1)(a)(ii).

As an initial matter, the University easily meets the business necessity prong of the affirmative defense. The record shows that offering retention raises to faculty who are being recruited by other universities is justified by business necessity. The University must retain its faculty who are being recruited by other institutions, especially those who secure federal funding, because they help the University to maintain its status as a top tier research institution, expand its research footprint, and provide funding for the training of graduate students. Barran

Decl., Ex. C, at 15. Professor Freyd herself acknowledges the importance of retaining world class scientists at the University so it can continue its membership in American Association of Universities as an R1 institution. Barran Decl., Ex. B, at 7. Engaging in negotiations with professors who have received offers from other universities is vital to retaining talent at the University, which is necessary to its mission of conducting world class research.

Professor Freyd argues that, even if the practice of engaging in retention negotiations is consistent with the University's business necessity, it does not satisfy the "job-related" prong of the affirmative defense analysis. Professor Freyd asserts that receiving offers from competing universities and engaging in retention negotiations is not related to the work of being a professor because it does not further the professors' teaching, research, or service. Freyd Decl. ¶ 27. This argument is misguided because professors, including the named comparators in this case, receive competing offers directly because of their job performance, including their ability to attract federal grant funding. Barran Decl., Ex. C, at 15. Her own experience in leaving Cornell in 1987 speaks to this reality. Universities regularly seek out faculty who will add to the institution's academic profiles, whether through the prestige of their research or the grant funding they attract.

Finally, Professor Freyd claims that the University could adopt a different practice, such as distributing salary funds to ensure that all professors fall along the regression line of salary as predicted solely as a function of seniority or time in service or otherwise "creat[ing] a system that was based on doing the job well and rewarding it for doing the job well." Barran Decl., Ex. B, at 20. However, Professor Freyd does not provide any specific suggestions for how to create a system in which professors would be compensated solely on the basis of their time in rank that would address retention issues, and she does not present evidence that there is an alternate employment practice that would ameliorate the difference in male and female full professor

salaries in the Psychology Department while effectuating the University's legitimate business need to negotiate with professors who have received competing offers.

**Professor Freyd's Claim with Respect to Equal Protection**

Professor Freyd brings individual claims against Defendants Michael Schill, President of the University of Oregon, and Hal Sadofsky, Dean of the Natural Sciences Department of the University of Oregon, for violating Professor Freyd's rights under the Equal Protection Clause of the 14th Amendment. Professor Freyd alleges that defendants Schill and Sadofsky discriminated against her by paying her less money than her male colleagues. To hold a state official personally liable for an equal protection claim, a Professor Freyd must show that the defendant intentionally discriminated against the Professor Freyd as a member of a protected class.

Defendants Schill and Sadofsky each assert that they have qualified immunity because they are government officials performing discretionary functions. Qualified immunity for each defendant depends on whether he violated a clearly established constitutional right in their individual capacities as university officials. An official's conduct will only violate a "clearly established" right when "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. Al–Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (internal bracketing and quotations omitted). Existing precedent "must have placed the statutory or constitutional question beyond debate." *Id.* at 741, 131 S.Ct. 2074. The Supreme Court, in analyzing qualified immunity and the "clearly established" requirement, looks to whether precedent that directly establishes a right exists, and does not account for emergent or theoretical rights. *Id.*

Professor Freyd asserts that defendants Schill and Sadofsky intentionally discriminated against her because she brought her concerns about her compensation to their attention through complaints to her department head, Ulrich Mayr, and neither Schill nor Sadofsky took action to bring her salary in line with the four male colleagues the University paid more than Professor Freyd. Further, Professor Freyd claims that defendants Schill and Sadofsky were not performing discretionary functions in paying her less than her four proposed comparators because it is not a discretionary issue whether to pay some employees less than others. Ultimately the question of whether the pay differential resulted from discretionary actions is the same inquiry as whether the law was clearly established. If the payment of retention raises or differentials in payment resulting from grant administration and other duties was not in violation of clearly established law, it falls within the discretionary functions of supervisors and university administrators.

It is clearly established law that employers may not discriminate against similarly situated employees on the basis of gender. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989). Variations in salary between employees alone, however, do not indicate discrimination, and there are no cases in Oregon or the Ninth Circuit that clearly establish a prohibition on retention raises. Further, defendant Sadofsky, when confronted with Professor Freyd's equity concerns, conducted his own analysis and decided that, because Professor Freyd was paid more than the average of the full professors in her department, including at times her chosen comparators, an extra 4% equity raise was not appropriate. Professor Freyd disputes that defendant Sadofsky used appropriate comparators to make this determination, but does not offer evidence of discriminatory animus. There is no evidence in the record that demonstrates that either defendant Schill or defendant Sadofsky made a decision in violation of clearly established law; thus, both individual defendants are entitled to qualified immunity.

**Professor Freyd's Claim With Respect to Breach of Contract**

Professor Freyd alleges that the University violated the implied covenant of good faith and fair dealing arising from an employment contract between Professor Freyd and the University. Professor Freyd alleges that this violation occurred when the University did not pay her wages equal to four of her male colleagues, thereby violating the terms of the University's anti-discrimination policy incorporated by reference into her employment contract.

To establish a breach of contract claim under Oregon law,  Professor Freyd must demonstrate, inter alia, the existence of a contract. *Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570, 927 P.2d 1098, 1101 (1996). Generally, every contract has an implied covenant of good faith and fair dealing, and a plaintiff may assert a violation for a violation of this covenant regardless of whether express contract terms have been violated. *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445, 240 P.3d 94, 101 (2010). The implied covenant of good faith and fair dealing "serves to effectuate the objectively reasonable expectations of the parties." *Id.*

To determine whether a claim for violation of the implied duty of good faith and fair dealing has been established, the threshold question is whether there is a contract from which an implied covenant of good faith and fair dealing may be properly inferred. Professor Freyd is a member of a collective bargaining unit, and all claims regarding the terms and conditions of employment in a job subject to a collective bargaining agreement ("CBA") are preempted by the CBA. *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 997-998 (9th Cir. 1987). For rights derived through the CBA, Professor Freyd does not have individual standing to bring suit.

Professor Freyd asserts that she and the University are bound by an employment contract that is separate from the CBA (Second Am. Compl. ¶83), (P's Opp. to M/S/J p. 47). However,

the only employment agreement other than the CBA in the record is Professor Freyd's Notice of Appointment and Contract, which was the initial hiring document between Professor Freyd and the University in 1987. The Notice of Appointment and Contract was for Professor Freyd's initial position with the university, that of an associate professor, and the document indicates on its face that it covers the terms of Professor Freyd's appointment to that position specifically. (Stark Decl. Ex. 15).

Since the time of her appointment as an associate professor over 30 years ago, Professor Freyd has been promoted to a full professor position and, in that position, she has been part of a collective bargaining unit. The terms of the CBA provide that the CBA is the governing document for the terms and conditions of employment of the bargaining unit members.[3] Because Professor Freyd's claim regarding bad faith and unfair dealing is related to the University's purported failure to follow its own policies, and those policies are incorporated by reference into the CBA, Professor Freyd's contract claim falls under the CBA.

## CONCLUSION

Defendants' Motions for Summary Judgment are GRANTED.

IT IS SO ORDERED.


DATED this 2nd day of May, 2019.


_____/s/ Michael McShane_____
Michael McShane
United States District Judge

---

[3] Recognizing she lacks standing under the CBA, Professor Freyd acknowledges that her breach of contract claim is not based on the CBA. Resp., at 47-48; ECF No. 54.