1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF OREGON

3          THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

4

5

6    JENNIFER JOY FREYD,                )
                                        )
7                      Plaintiff,       )
                                        )
8              v.                       ) No. 6:17-cv-00448-MC
                                        )
9    UNIVERSITY OF OREGON, MICHAEL H.   )
     SCHILL and HAL SADOFSKY,           )
10                                      )
                       Defendants.      )
11   _____)

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                       EUGENE, OREGON

16                  THURSDAY, APRIL 11, 2019

17                       PAGES 1 - 82

18

19

20

21

22                         Kristi L. Anderson
                           Official Federal Reporter
23                         United States Courthouse
                           405 East Eighth Avenue
24                         Eugene, Oregon 97401
                           (541) 431-4112
25                         Kristi_Anderson@ord.uscourts.gov

```
1    APPEARANCES OF COUNSEL:

2    FOR THE PLAINTIFF:

3    Jennifer J. Middleton
     jmiddleton@justicelawyers.com
4    Caitlin V. Mitchell
     cmitchell@justicelawyers.com
5    Johnson Johnson Lucas & Middleton, PC
     975 Oak Street, Suite 1050
6    Eugene, OR 97401-3124
     Telephone:  541-484-2434
7    Fax:  541-484-0882

8    Whitney Stark
     whitney@albiesstark.com
9    Albies & Stark, LLC
     210 SW Morrison Street, Suite 400
10   Portland, OR 97204-3189
     Telephone: 503-308-4770
11   Fax: 503-427-9292

12   FOR THE DEFENDANTS:

13   Paula A. Barran, OSB No. 803974
     pbarran@barran.com
14   Shayda Zaerpoor Le, OSB No. 121547
     sle@barran.com
15   Donovan L. Bonner, OSB No. 181929
     dbonner@barran.com
16   Barran Liebman LLP
     601 SW Second Avenue, Suite 2300
17   Portland, Oregon 97204-3159
     Telephone: 503-228-0500
18   Fax: 503-274-1212

19   FOR THE DEFENDANT SCHILL:

20   Cody M. Weston
     cweston@perkinscoie.com
21   Perkins Coie, LLP
     1120 NW Couch Street
22   10th Floor
     Portland, OR 97209-4128
23   Telephone:  503-727-2000
     Fax: 503-346-2089

24

25
```

```
 1                          PROCEEDINGS

 2                  THURSDAY, APRIL 11, 2019

 3              THE COURT:  Please remain seated, folks.  Thank

 4     you.

 5              All right.  Good afternoon, everybody.  Let's go

 6     ahead.  We'll go on the record.  I will have Ms. Pew call

 7     the case.

 8              THE CLERK:  Now is the time set for Civil Case

 9     17-00448, Freyd versus University of Oregon.  Oral argument

10     on motions for summary judgment.

11              THE COURT:  All right.  Let's have the parties

12     introduce themselves, starting with the plaintiff.

13              MS. MIDDLETON:  Jennifer Middleton on behalf of

14     plaintiff.  I am here with my associate, Caitlin Mitchell.

15     And on the phone is my cocounsel, Whitney Stark, and also my

16     client, who, unfortunately, was stuck in SFO and her plane

17     couldn't make it, but she's on phone.

18              THE COURT:  Okay.  Great.  Thank you.

19              All right.  For defense.

20              MS. BARRAN:  Paula Barran representing the

21     University of Oregon and Hal Sadofsky.  My client is present

22     through Mr. Park, who is from the general counsel's office,

23     and also Dr. Sadofsky is here in the courtroom with me.  And

24     I have two colleagues, Shayda Le and Donovan Bonner.

25              THE COURT:  All right.  Thank you.
```

14:21:59

1    MR. WESTON:  Good afternoon, Your Honor.  Cody

2    Weston for university president Michael H. Schill, who is

3    here behind me.

4        Your Honor, he may have to get up and leave if the

5    hearing goes long.  He has a meeting of the Higher Education

6    Coordinating Commission.

7        THE COURT:  Okay.

8        MR. WESTON:  So if he does leave, it's not out of

9    any disrespect.

10       THE COURT:  All right.  Okay.  I appreciate it.

11       Thank you, everybody.  Thanks for the briefing

12   that went into this.  I think it was really excellent on all

13   sides.  I was very happy with just how succinct the briefing

14   is on a very difficult issue.

15       I thought we would start -- it's the defense

16   motion, obviously.  I am thinking that we could probably

17   break it up into maybe first talking about the sufficiency

18   of the -- we'll call them the comparators and talk about

19   that issue first.  Then maybe we can get into the disparate

20   impact issue, business necessity, and maybe focusing a

21   little tighter on this issue of retention pay, retention

22   bonuses, retention negotiations and how that all plays in.

23       But let's first hear for defense.

24       MS. BARRAN:  Thank you, Your Honor.  I am going to

25   try to hone in on that.  I do want to talk just really

14:22:21  1    briefly, by way of introduction, as to what plaintiff

2    actually has to prove in terms of her comparators because

3    even though the language is different in the statutes, the

4    test that has been applied by both this court and by the

5    Ninth Circuit tends to borrow heavily from the way the Equal

6    Pay Act evaluates the substantial comparability in some

7    word.

8         We all can understand that plaintiff's burden is

9    initially to show that she is picking four comparators, and

10   she has named the four male comparators that are at issue

11   here, and that -- and she has to demonstrate in what way her

12   work, on a day-to-day basis, compares to their work.  It's

13   not enough for her to say our job description is the same.

14   That high level of abstraction is insufficient, and all of

15   the relevant case law out of the Ninth Circuit and out of

16   this court look to the day-to-day job duties.  What do you

17   do on a daily basis?  What are your duties?

18        Generally, one very helpful mechanism is to look

19   at whether there is a common core of tasks and then are

20   there additional sufficient tasks that differentiate.  So --

21        THE COURT:  But isn't that a fact issue for the

22   jury?  Or why isn't it a fact issue for the jury?

23        And maybe what is your best case to suggest the

24   facts here compel me, as a matter of law, to find that they

25   are insufficient?

14:22:46    1              MS. BARRAN:  Several things, Your Honor.

2              First, it would be a fact issue if there were a

3    dispute, but the facts here are undisputed as to what these

4    people do.

5              The plaintiff, of course, has told us in her

6    declaration what her work does.  When we took her

7    deposition, she was unable to say what her comparators did.

8    She did not know their day-to-day duties.  So she basically

9    has no knowledge.

10             But from the record, we have introduced very, very

11   concrete facts about what their day-to-day duties are, and

12   that accounts for several of the declarations that are

13   before Your Honor as well as a lot of the briefing.

14             None of that is disputed.

15             The only dispute is plaintiff's sense that a

16   professor is a professor is a professor, which we submit is

17   contrary to the law and does not follow what she needs to

18   do.

19             But there are no disputes, for example, about what

20   Professor Gordon Nagayama Hall did when he was at the Center

21   for Diversity and Community at the University of Oregon.

22             There are no disputes about what plaintiff does.

23             There are no disputes about the centers that are

24   run by Professor Fisher and Professor Allen.  There are no

25   disputes about Professor Mayr's duties as the department

14:23:12  1   head.

2          So the court has before it admitted and undisputed

3   facts, and from those it is a matter of law as to whether or

4   not these are appropriate comparators under all of the

5   statutes that plaintiff has raised.

6          So just quickly to run through the statutes that

7   she has sued under, she has brought a claim under the Equal

8   Pay Act, and that is certainly the strictest in language.

9   The standard that the courts apply -- and this would be

10   directly out of the Ninth Circuit, the *Stanley* case, the

11   *Spaulding* case, and out of the District of Oregon cases as

12   well, she has to prove that on a day-to-day basis that she

13   does substantially equal work with her four comparators.

14   And because her job is so very different in many, many

15   respects from all of them, she has not made out a prima

16   facie case under that statute.

17          She has a claim for discriminatory treatment under

18   Title VII.  And the test there, even though the language of

19   the statute is a little bit different, this court has held

20   that the test to apply is the same that follows the Equal

21   Pay Act.  Is the job substantially equal?

22          And that's, for example, the *Mentor Graphics* case.

23   At a minimum, even if she wanted to look to the general

24   language of the statute, she still has to show that she

25   is -- she is in a position where she is substantially

14:24:30
1  comparable in all material respects.  And she doesn't do

2  that because of the nature of the work that she is doing.

3          THE COURT:  But you would agree the core nature of

4  the work is the same across the board.  Let's say the core

5  requirements for a professor.  I think your argument is that

6  the university setting is just so unique with academic

7  freedom that, you know, professors do other things.  They

8  can go win the Pulitzer prize.  They become pretty valuable,

9  right?  I mean, they can do other things that somehow give

10  them more value.

11          MS. BARRAN:  That would be true.  They all do a

12  core of work, but one of the issues with plaintiff's case is

13  that she sees the core as these three general issues.  We

14  all teach, we all do service, we all do research.

15          And the courts have routinely rejected that as a

16  way of defining.  That's not what your job description is.

17  That's like calling yourself a team member.

18          But, in essence, there is a core that these

19  individuals do, but her four comparators do things so

20  remarkably different, and that's what differentiates it.

21          So, yes, Your Honor, there is a core.  I would

22  submit that it is a very tiny core because the exceptions

23  certainly swallow it up.

24          She has brought two statutory claims under Oregon

25  law.  And despite the differences in the way Oregon law has

14:25:57  1    used its language, the sense of it -- and this court has

2    interpreted it that way -- that she still has to show that

3    her job duties are substantially equal regardless of what

4    her job description says.

5              And we cited the *Conroy* case, *versus*

6    *Hewlett-Packard*, which was Judge Acosta's opinion, I believe

7    in 2016, so fairly recent.

8              Even if the court were to apply a more lenient

9    standard and look for substantial comparability or something

10   like that, plaintiff still doesn't need it.  And one of the

11   things I am going to be talking a little bit about is how

12   plainly differentiated her colleagues are in terms of their

13   responsibility.  Their responsibilities are so much -- so

14   very, very different.

15             She has a claim under the Oregon Equal Rights

16   Amendment, which appears to require enabling legislation

17   that has never been passed.  So it's -- and there is no case

18   law under it.  So Your Honor may be writing on a blank sheet

19   of paper on that.  If it is Oregon law and if it does in

20   fact require enabling legislation, then the enabling

21   legislation would be the statutes that we have already

22   talked about that require sort of the same level of

23   substantial equality.

24             She has sued under Title IX, which is -- again,

25   bars the Equal Pay Act statute.

14:27:16   1          And then she has brought these disparate impact

2    claims.  And I -- since you are going to take those

3    separately --

4          THE COURT:  Can we hold off on that a little bit

5    and let's focus on the comparators and the discrimination

6    claim.

7          MS. BARRAN:  Mm-hmm.  Right.

8          So taking a lead from what this court teaches and

9    what the Ninth Circuit jurisprudence teaches, we have

10   provided the court with an ample record of what the

11   individuals do.

12         So plaintiff has to show, on a day-to-day basis

13   under the Equal Pay Act, does she do work that requires

14   equal skill, effort, responsibility, and performed under

15   similar working conditions.  The areas of skill, effort, and

16   responsibility are also further articulated in the facts of

17   the cases.

18         So most of -- much of what I tried to do when we

19   put the briefing together was to give Your Honor the case

20   law which shows how these particular issues are treated, and

21   that's why there are so many individualized,

22   factually-specific cases cited in our papers.

23         But it is clear, and it's clear from the Supreme

24   Court in the *Gunther v. Washington* case, that we have to

25   look at the day-to-day job duties; not the job description,

14:28:26   1   not the way people describe it, but what do they actually

2   do.

3            So in terms of how that plays out, *Gunther* was a

4   jail guard case.  There were guards and there were matrons,

5   and both of them did basically the same thing when they had

6   this generalized, high-level duty of taking care of and

7   watching the prisoners.

8            But as the court evaluated the case, the matrons

9   had fewer prisoners, therefore less responsibility, lighter

10  safety risks.  They did more paperwork.  The male guards had

11  more prisoners and they did less paperwork.  And those were

12  meaningful differences between the two jobs.  The court

13  ultimately held that those were not comparable jobs for

14  purposes of the statutes.

15           That gives us some sense of how do we start

16  parsing the job duties and what do we start looking at.

17           In the Ninth Circuit, there was a case that had

18  been tried in the District of Oregon, went to the Ninth

19  Circuit for the phone company.  And this is the *Forsberg*

20  case that we have cited.  The male and female employees were

21  doing basically the same outcome.  They were testing phone

22  lines for problems.  But the males used one type of

23  technology.  They had a computerized program that they

24  tested with.  The females had a different job where they

25  were doing the exact same outcome but doing it manually.

14:29:47  1    And the court, District of Oregon and the Ninth Circuit,

2    said that's a meaningful difference between the two jobs.

3         So I mentioned that responsibility is one of the

4    factors that we look at.  And in each of the male

5    comparators, and I am going to go through each of them by

6    name and duties now, each of them --

7              THE COURT:  Before you do that --

8              MS. BARRAN:  Yes.

9              THE COURT:  -- it seems to me the cases that you

10   are describing deal with job duties that are given to the

11   employee as opposed to here, where we have basic duties and

12   then, you know, these -- at least my understanding, many of

13   these duties aren't really written into the contract so that

14   the U -- was it the coach case, the female basketball coach.

15             MS. BARRAN:  *Stanley*, yes.

16             THE COURT:  I mean, written into his contract was

17   he had to do a lot of other fundraising, development kinds

18   of things that made his job duties clearly different.

19        Here, and maybe you need to explain this, is these

20   comparators are coming in.  You know, their general job

21   duties are teaching, research, you know, those kinds of

22   things.

23             MS. BARRAN:  Service.

24             THE COURT:  Service.

25        And then on -- these are just -- these are things

14:31:02   1   that then they create that does create value, certainly.

2            MS. BARRAN:  Yes.

3            THE COURT:   But is it really a duty or is it

4   simply an additional, individualized job that these folks

5   are taking on themselves?

6            I am not trying to discourage that.  I imagine the

7   university appreciates it.  But is it the same thing as you

8   are going to work with a certain kind of technology, you are

9   going to work with something different.  This is you are all

10   going to do this basic job, and then we find out later

11   somebody has gone and written something or researched

12   something.

13            MS. BARRAN:  That would -- and, yes, that's

14   accurate, Your Honor.  Many of the cases that you see

15   outside of the university context are jobs that are actually

16   assigned, but there are an ample number of university cases

17   as well that will dive in and look at what people do.

18            And that starts with one of the historical cases

19   we cited, which was the *Penk v. Oregon University System*,

20   old enough so that we didn't even have individually defined

21   universities.  They were a part of one long system.

22            But that was a case that was tried.  It was a, I

23   think, 14-month trial that Judge Frye did, and it went up to

24   the Ninth Circuit.  And in that case, she was looking at

25   faculty as well and what did the faculty do.  Faculty are in

14:32:21  1   a unique position because they sometimes are given things to

2   do and often they volunteer for things to do.  But those

3   still change their day-to-day duties because, if they are

4   volunteers for something, that's going to fall under the

5   general rubric or perhaps research or perhaps service.

6            So if their job descriptions are, as the plaintiff

7   says, you must teach, you must do service for the

8   university, and you must do research, it is left to them to

9   decide how they are going to fulfill that.  And that's

10   really at the heart and soul of what academic freedom is in

11   a university, in an institution of higher education.  How

12   they do that is left up to them for their judgment, but

13   their overall job duty and job description includes those

14   responsibilities.  It's how you do that.  And I think you

15   can draw some comparisons with some other professions.

16            For example, law firms will have some level of

17   autonomy to determine what you are going to do and how you

18   do it.  It does not mean that you have the same job as

19   somebody who does something different from you.

20            I have not, and I have looked --

21            THE COURT:  Picking law firms, in terms of one of

22   the areas where women have some of the least equity in our

23   society, is maybe not the perfect --

24            MS. BARRAN:  I should probably pick a different

25   example, but it is something that -- you know, that is

14:33:45   1   familiar to all of us.

2            But when you have an institution where you say --

3   you know, where you are looking at something that is

4   historically compromised like the -- comprised, like the

5   university system, that is a function of how people -- how

6   people work.  The expectation is once you get academic

7   freedom, which is the great gift that we have given

8   university faculty, then you get to do the work that you

9   want to do within some very narrow parameters.

10           We just provided the court with the citation for

11  the appeal.  We had cited the *Spencer v. Virginia State*, I

12  think, *University*, at the trial level.  And it was just

13  affirmed by the Fourth Circuit.  And there's some language

14  in that opinion where the court starts off by saying,

15  "Professors aren't interchangeable like widgets.  Various

16  considerations influence the hiring, promotion, and

17  compensation of different professional jobs."

18           And they focus in on this idea that when you

19  give -- when somebody is gifted with academic freedom, they

20  pick their duties.  And that -- and I have not found a case

21  that says because you are a professor and you pick your

22  duties you somehow are outside the scope of the Equal Pay

23  Act.

24           And I would submit to the court that that is --

25  it's an interesting way it happens.  But if we looked at

14:35:11   1   under typical wage and hour law, one of the principles that

2   is applied under the Equal Pay Act and all the other wage

3   and hour laws is that if the employer suffers or permits the

4   work, then it is the employee's work.  We'll use that for

5   pay requirements.  If an employee volunteers to work

6   overtime, and the employer knows of it and suffers and

7   permits it, then that is the work for which the employee is

8   to be compensated.  This is just a different animal, but

9   that same principle is going to apply.

10          That was probably longer than you needed, Your

11   Honor.  I apologize.

12          So we have -- so we have four males.  And I want

13   to try to be as succinct as possible but go through them by

14   name and by duties and speak a bit about why they are so

15   very different.

16          And the first one is Ulrich Mayr.  Professor Mayr

17   plaintiff challenges, says he does the same work as she

18   does, that she is no less accomplished than he is.

19          Professor Mayr is the department head.  And in

20   that sense, he has some supervisory responsibility over the

21   plaintiff.  So in that sense, she is comparing herself to

22   somebody who is her supervisor in some ways.  She says he

23   doesn't have full supervision because he can't tell me what

24   to study and what to research, and that's accurate.  But he

25   does have some level of supervisory authority over her, and

14:36:37   1    it's in his job description as well, which is before the

2    court.

3              Professor Mayr has been department head since

4    2013, so, with the exception of the contract claim, that

5    would be the full scope of the statutes of limitations for

6    these various statutory claims.

7              And for all of that time there has also been a

8    collective bargaining unit in place for the faculty at the

9    University of Oregon.  The plaintiff is in the unit for

10   collective bargaining, and as a department head, Professor

11   Mayr is outside the unit because of his supervisory duties.

12             As the department head, he does things -- he does

13   major, significant things that the plaintiff doesn't do.

14   She doesn't disagree because she says she doesn't know what

15   he does on a day-to-day basis, although she acknowledges

16   that it is a very, very demanding job.

17             But just in general, these are the things that are

18   in the record before you.

19             THE COURT:  But I will tell you, with regard to

20   this particular comparator, I think the fact that he's a

21   department head makes him an insufficient comparator.  So --

22             MS. BARRAN:  I will move on.  Okay.  Thank you,

23   Your Honor.

24             THE COURT:  I am more concerned about the grant

25   writing comparison.

14:37:53  1          MS. BARRAN:  Okay.  Does that mean you do or don't

2     want me to talk about Professor Hall?

3          THE COURT:  Help me out with Professor Hall

4     because I don't have all my notes in front of me.  Professor

5     Hall is also --

6          MS. BARRAN:  CoDaC.  He --

7          THE COURT:  Is he now the department head?

8          MS. BARRAN:  No.

9          THE COURT:  Okay.

10          MS. BARRAN:  Maybe I should do him, and then I

11     will move on.

12          THE COURT:  Yes, please.  Yes.

13          MS. BARRAN:  I will try to be quick with him.

14          So Gordon Nagayama Hall joined the university in

15     2001, so he came later than plaintiff but his PhD was earned

16     earlier.  So he's senior to her in terms if you measure it

17     by PhD, but not by time in service.

18          When he joined the university, he was almost

19     immediately recruited into a half-time -- an approximately

20     half-time administrative position at CoDaC, the Center on

21     Diversity and Community at the University of Oregon, at a

22     time when, like all institutions, this university and others

23     have struggled for how do you -- how do you join your

24     diverse population into the community.

25          So if you are recruiting, for example, minority

14:39:08   1   professors, how do you make them function well?  How do you

2   help their success in an American university?

3           A lot of organizations, and this transcends higher

4   education, have great records in recruitment and then people

5   fail.  And they fail early and they fail in sad ways because

6   they haven't had the help to move them into the

7   organization.  I keep wanting to use the word "integrate,"

8   but that's not quite the right word.

9           It became Professor Hall's job to help them learn

10   how to be scholars and researchers.  So, in essence, he gave

11   up much of his private scholarship to take that -- his own

12   research scholarship to take that position.  He worked with

13   them on a one-on-one basis and was director of research for

14   a while, was the director of CoDaC and the interim director

15   of CoDaC.  And he reported for all of that work to the vice

16   president for diversity and inclusion, not through the

17   department.  And Professor Mayr, the department head, has

18   said that there were times that he had about zero FTE in the

19   psychology department because of his diversity work.

20           While he was associated with the department of

21   psychology, he did some things relating to clinical

22   training.  He became, at least the first known to us,

23   director of clinical training, and I am saying known in the

24   case of this lawsuit.  Clinical training required him to

25   take on administrative responsibilities to ensure that the

14:40:41  1    students were getting everything they needed to be good

2    clinicians.  So he worked to develop that.

3         The program was not accredited.  And there are two

4    accrediting bodies.  So he handled the accreditations.

5    Year-long projects.  Very, very demanding.  Took site

6    visits, required various studies, required becoming an

7    expert in the accreditation rules.

8         Plaintiff never did that.  Professor Freyd could

9    have taken that position, but she never took that

10   responsibility, out of all the clinical faculty.

11        THE COURT:  Let me ask kind of a question, maybe

12   later -- we can save it for disparate impact later.  But why

13   is it men are doing these things more?  Why is it the men

14   are getting -- you know, 21 men are being -- negotiating

15   retention bonuses and only five women?  So I guess in terms

16   of the comparator issue, are the same kinds of positions

17   open to women?

18        MS. BARRAN:  Oh, yes.

19        THE COURT:  Okay.

20        MS. BARRAN:  Yes.  So -- I mean, I think Dr. Hall

21   would have been tapped for CoDaC because he had a particular

22   area of study that related to diversity.  He's a Japanese

23   American and that was something that he had studied.

24        But people can certainly seek out administrative

25   jobs, and many women do.  Sarah Hodges from the psychology

14:42:06   1   department is actually dean in a graduate school doing that

2   work.

3       You have heard the name Kim Espy.  It's Kimberly

4   Espy, was an administrator.  Her academic home was in the

5   psychology department, but she was in a very, very highly

6   placed role, administrative role in the university.  And

7   those options are certainly available.

8       I think that the director of clinical training is

9   a really good example because that's sort of a hot potato

10   that is hugely time consuming, and people will step up to

11   the plate and take it.

12       Plaintiff has elected to do her university service

13   in different ways.  And it's -- you know, it's not that she

14   does not do service.  She is -- she does university service.

15   She does it well.  But it's different.  It's a very

16   different kind of service.

17       So all of those things would -- if done, would in

18   fact make somebody ripe for being poached, which is one of

19   the issues that we get into when we talk about the

20   retentions.

21       When Dr. Hall got -- he had a couple of retention

22   offers himself.  The first came right after the

23   accreditations, and I think that would be really easy to

24   understand.  Somebody who had been so successful in doing

25   that would be very valuable to another institution.

14:43:25    1    And the second came later.  The retention was

2    actually something that was lobbied for heavily by the vice

3    president for inclusion because of his diversity work.

4    Gordon Hall was a diversity warrior at this institution at a

5    time that it was really needed.

6    And that's very different from what the plaintiff

7    was doing.  He has -- and the differentiating factor now is

8    when he finished at CoDaC, which is just recently, he moved

9    back to the department of psychology and elected at that

10    time to begin his retirement, which fixes his compensation.

11    That's just a universal rule that everybody has.

12    One point that the court may see, if you do look

13    at the *Spencer* case in the Fourth Circuit, is this sense of

14    the importance of an institution in -- in taking somebody

15    who does an administrative work and sort of at least

16    freezing or red-circling their salary when they move back

17    into the faculty.  And the reason for that is you would

18    never have faculty take an administrative role if they were

19    going to suffer because Gordon Hall gave up his own research

20    work.  So he had no grants or very few grants.  And when he

21    moved back to psychology, pursuant to university policy,

22    there is not a deep slide back to faculty salary.  And then

23    his salary has been fixed because of the fact that he is

24    retiring.  Plaintiff is not retiring.  So that's a factor as

25    well.

14:44:54

1          THE COURT:  All right.

2          MS. BARRAN:  Moving on to Phil Fisher, who is one

3     of the two people with grants.  And we talk a lot about

4     grants in our briefing for the court because they are so

5     massively important.  The University of Oregon is funded by

6     tuition dollars and the legislature.  And the legislature,

7     it's not that they haven't been kind, it's that they have no

8     money.  So there will be years when maybe it's okay, but

9     this being a very, very good example, the dollars are just

10    not there to give to the university.  So if you try to fund

11    yourself with tuition, you price education out of reach for

12    those very students who desperately need this state

13    institution.

14          There are 23,000 students at the university, and

15    many, many, many of them can barely afford to be there.

16    Their friends and their family are helping them to be there.

17    And if this university is ever going to be able to fulfill

18    its mission, which is to be the educator of all of these

19    people, the -- particularly the poor and the minorities who

20    don't have that chance, they have to figure out how not to

21    fund the university on tuition and how not to depend on the

22    legislature.

23          So they do what big universities do.  They look

24    for major gifts.  They look for alums who have done very

25    well and want to contribute.  But the huge benefit to the

14:46:17

1    university comes from the large federal grants, and that's

2    for several reasons.  One is it brings enough money to pay

3    the faculty member who is doing the principal work on the

4    grant.  So if I go out and I get a federal grant from

5    National Institute of Health, some portion of my salary is

6    going to be compensated through the money that I just

7    brought in.  And that's a huge gift.

8            The second piece of it is what they call

9    facilities and something -- administration.  F and A.  F and

10   A is a percentage of the grant, and in the federal grants

11   it's an enormous percentage.  That pays for the overhead of

12   the university.  So if you have a lot of grants coming in,

13   then all of these day-to-day expenses of running the

14   infrastructure of the university are paid for by grants.

15           Now, it's not that somebody told the plaintiff to

16   go out and get grants.  But it is in the list of things that

17   they think about when they are evaluating somebody for

18   merit, and it is something that the plaintiff did early in

19   her career.  She had many grants, and then she changed her

20   research focus early in her career to something that

21   eventually evolved into what she is doing today.  And she

22   has told you that grant money is hard to find or impossible

23   to find for the work that she is doing.

24           So how does she fund her work?  The University of

25   Oregon funds her work.  So it's not that she's being

14:47:50   1   penalized for not getting grants, but somebody has to pay

2   for it, and the facilities are not free.

3          So the university funds her grant.  And where does

4   that money come from?  Many of those who have brought in the

5   large federal grants are spinning off the F and A money,

6   which goes to infrastructure.  Some of it goes back to the

7   department to pay for the labs and the infrastructure there.

8          So it's a complicated -- you know, I think

9   everybody who works with universities would devoutly wish

10  that we had a better way of financing it, but we don't.  And

11  the grants are incredibly important from that perspective.

12         In Phil Fisher's, Professor Fisher's case, he also

13  has a relationship on the grant work that he is doing with

14  Harvard University.  And Harvard, of course, is one of the

15  universities that has been trying to recruit him away.  In

16  2017 to 2018, Harvard University remitted back his full

17  salary to the University of Oregon because of the research

18  that he is doing.  In 2015 to 2017, that was 80 percent, and

19  that's up from 49 percent earlier.

20         The numbers right now are Harvard pays University

21  of Oregon approximately $500,000 a year for the privilege of

22  using Professor Fisher.  It would be a real economic hit to

23  lose Professor Fisher.

24         So what does he do that's different with this

25  grant money?  This is set out in great detail in David

14:49:17   1    Conover's declaration.  So he heads research, and he knows
         2    research back and forth because he used to be at a federal
         3    agency.
         4         So Professor Fisher has brought in something like
         5    $12 million to the university since 2008.  So he brings in
         6    grant money to the tune of about $1.2 million a year.
         7         When you have a grant, you have responsibilities
         8    that exceed what a typical faculty member without a grant is
         9    going to do.  And the big federal grants require this.
        10    There are lots of smaller grants that have lesser
        11    obligations.
        12         But Dr. Conover advises that there is sort of a
        13    federal watchdog that figures out how much time does a
        14    federal grant take, and the answer is about 42 percent of
        15    your time as a person working goes to the grant
        16    requirements.
        17         He has to do a lot of certifications.  He has to
        18    start with looking at people under him to ensure -- because
        19    he is key to a center as well.  So if there are grants going
        20    out -- grant applications, grant requests going out from his
        21    center, he is the person who has to sign off on whether they
        22    are meaningful and useful or not.  So he has that
        23    first-level responsibility of certifying to the agency, to
        24    the federal agency, that this is a worthy -- this is a
        25    worthy proposal for your consideration.

14:50:38   1        That's a responsibility that the plaintiff never

2    had and apparently doesn't seek, but it's certainly not one

3    that she does.

4        Skill, effort, and responsibility are the key

5    features of differentiating, and that level of

6    responsibility is significant.  He also -- as the grant is

7    being performed, he supervises the employees who come in and

8    do the grant work.  So there would be researchers, there

9    would be post docs, post doctoral fellows who are paid

10   employees.  He supervises about ten employees on an annual

11   basis.  So there's that employee supervision.  They are

12   employees of the university working on the grant, and he is

13   their boss.  He is their supervisor in that respect.

14       When grant money is being spent on the grant, he

15   is the person who has to sign on the bottom line and certify

16   to the United States government that these monies were

17   actually spent in this fashion.  So, again, his

18   responsibility is enormous there.

19       When he -- when you shift for a moment and look

20   at -- he is a principal in what's called the Center for

21   Translational Neuroscience.  So the university has several

22   centers, which are clusters of organizations where people

23   work on the same project.  So it becomes a magnet area on

24   campus for people who do this kind of work and for scholars

25   from the outside, and it dovetails with his work at Harvard

14:52:07   1    Center for the Developing Child.

2              So when we talk about centers, we think about who

3       are the principals in the centers.  Their responsibility is

4       to look at the meaningful work that is being done within the

5       center, but he's also gone out and raised the funds for the

6       center itself.

7              He is doing the strategic planning for how to

8       merge his center into the department of psychology over

9       time, and that means he's having to figure out the budgets.

10      He's having to figure out who is going to be staffing it.

11      He is going to have to be doing the strategic plan and sell

12      it to the university for how that's going to work.

13             That's different in a meaningful way from the work

14      that plaintiff does.  Plaintiff describes her research as

15      being largely survey based, written survey based.  She is a

16      prolific writer in her area of expertise.  She is a good

17      researcher, but her work is different.  She doesn't do the

18      kind of work that is done in the neuroscience area where

19      they use equipment, they use scanners, they use brain

20      imaging.  And this is going to be both Professor Fisher and

21      Professor Allen.

22             The -- the really significant differentiating

23      factors on this are certainly the responsibility for

24      employee supervision, 10 to 14 during the course of any

25      year, but also the massive amount of time that is spent

14:53:37

1    meeting the federal guidelines and the federal requirements.

2    He has to make sure that he certifies that if there is an

3    incident of harassment on the job that it has been

4    investigated.  He has to certify to the federal government

5    that it has been under some new NIH requirements, I think

6    it's NIH requirements, that he is responsible to do.

7         If he fails in his job, the consequences are dire.

8    And this is another area that folds into the responsibility

9    that he has.  If he makes the wrong statement on his

10   certifications, there are certainly some criminal statutes

11   that are at play.  But if the government concludes that this

12   was his fault or that this really did not look good for the

13   University of Oregon, the sanction can be to take all

14   federal dollars away from the University of Oregon.

15        So in terms of accountability, which is a piece of

16   responsibility, he has a massive job.  And it's a job that

17   plaintiff doesn't share.

18        There are historically some -- there is some

19   historical data on what has happened to scientists who have

20   failed to carry out this part of their responsibility.

21   Dr. Bernadine Healy used to be the head of the NIH, and she

22   got sideways with Representative Dingle in one the various

23   hearings and was questioned in detail about why she signed a

24   grant proposal before the proposer signed the proposal.

25        The question becomes, if you get sideways with

14:55:12   1   somebody in the federal government oversight, you might lose

2   your career and you might lose your institution's money.

3        So somebody has to have, I think, a strong

4   backbone and a pretty strong stomach to do this kind of

5   work.  It's very, very different from teaching, gathering

6   survey data.

7        In addition, he spins off quite a lot of money

8   that, in an indirect way, funds his colleague, Professor

9   Freyd.

10        He has also accepted -- with all of this that he

11   is doing, he has accepted the director of clinical training

12   position, which was open for this year.  This year Professor

13   Freyd is on a paid fellowship paid by the University of

14   Oregon at Stanford University.  She had asked Dr. Sadofsky,

15   who was the dean of the division, if he would make an

16   exception in pay.  And even though he was then a defendant

17   in her lawsuit, he agreed to pay her.

18        So she's not even on campus.  Dr. Fisher is doing

19   director of clinical training, the same sort of duties that

20   I previously described.  That's the hot potato position.

21        So managing that level of grant activity with all

22   that he does is dramatically different from the plaintiff's.

23   It's not -- I mean, it doesn't even come close to her

24   day-to-day duties.

25        She does a very different line of work.  She does

14:56:34  1    very many things.  And even in her own filings, she has

2    talked about her accomplishments in a way where she focuses

3    on the value of them but also underscores how very different

4    they are from her male colleagues.

5           So moving on, if I may, to Professor Allen,

6    Professor Allen is Australian.  So it became sort of natural

7    to see him being recruited by a commonwealth institution a

8    few years after he came.  He was recruited to the

9    university, and there was some funding which was put in

10   place to offer a chair to somebody who was not yet at the

11   university.

12          So the gift, which came from a family in the

13   Northwest, was to target somebody and to bring a superstar

14   to the University of Oregon.  And that superstar was

15   Professor Allen.  He's the one that the department head,

16   Dr. Mayr, referred to as insanely productive.  He's

17   published something like 87 papers in a year or two, which

18   is like a lifetime's body of work.

19          He also is a grant procurer for the university.

20   He doesn't have quite as much under his belt yet because he

21   is newer to the university, but he also has a center.  So he

22   manages the Center for Digital Mental Health.

23          And when I look at what he does there, I can't

24   help but think about the *Forsberg* case, which is the phone

25   line, you know, the equipment that you use.

14:58:09

1    Dr. Allen studies brains in developing children,
2    but he does it through digital technology.  So he has gotten
3    grants to help develop this because it seems to propose a
4    sea change for how we look at mental health in developing
5    children.  He uses brain imaging.  They do MRIs.  They test
6    bodily fluids.  And he uses all of that equipment.
7    But he's also doing longitudinal tests, trying to
8    figure out ways to deploy those little things that every
9    human being has -- kids more than most -- which would be
10   smartphones and other digital media, and to do things with
11   that media which helps capture the data.
12   It's very interesting technology.  In fact, it's
13   so interesting that he just secured -- and it's while this
14   case was pending -- a $3 million grant from the Gates
15   Foundation for his work.  So this whole idea of longitudinal
16   neuro-imaging is part of what he is doing.  He is using
17   different things.  He is using different equipment.
18   But he is also -- he has -- his CV is attached to
19   his declaration, and you can see the federal grant money
20   that is coming in.
21   And he has those same oversight duties that
22   Dr. Fisher has in terms of the grants and the grants that he
23   is doing.  He is -- I mean, as with both of them, the buck
24   stops at their desk.  If something goes wrong, it's their
25   responsibility.

14:59:39

1        He has brought into -- so he has a center and has

2   brought in ten faculty from other institutions who are

3   affiliated with it.  He's directing it.  This is the Center

4   for Digital Mental Health, which is using -- using this.

5   And there are staff as well.

6        So his day-to-day activities are very, very

7   comparable, very, very similar to his colleague, Professor

8   Fisher, and very different from Professor Freyd.

9        One of the other interesting things about

10  Dr. Allen is that for some period of time within the statute

11  of limitations he was actually paid less than Dr. Freyd.  So

12  there's only a very small period of time where his

13  compensation increased so that he was paid more, and that

14  came from a retention offer, which is one of the things I

15  know we need to discuss as well.

16        Dr. Allen has been the next volunteer or the next,

17  I guess "pigeon" is perhaps the wrong word, to pick up the

18  clinical training, director of clinical training position,

19  too.  So he is moving into an accreditation year now.  So he

20  will be making sure that they re-up and refresh their

21  accreditations on the two accrediting bodies in the

22  department of psychology, and he is going to be doing that.

23        Some of this is tied to a strategic goal of this

24  university.  So the University of Oregon is one of those R1

25  institutions.  That is the highest level of research

15:01:20   1   capability.  They want to be there.  They want to play at

2   that tier.  It brings things to this institution that are

3   remarkable for this city and remarkable for this state.  A

4   lot of what happens when you are an R1 institution feeds

5   work off into the community, and it is highly desirable.

6          Federal grants are key to doing that.  That's the

7   grant money that pays for the work that is done to

8   ultimately maintain the R1 status.  So in terms of -- and I

9   have a section in the brief that, unless you have some

10   questions, I will probably skip over today, but there are

11   strategic decisions that this university has made as a

12   public body that are reserved to them.  And the decision to

13   seek out and maintain R1 status is key and very, very

14   important to how this university is going to function into

15   the future.

16          THE COURT:  So this may or may not be relevant,

17   but does that also favor men in terms of its impact?  In

18   terms of equity?  Are the folks who are being involved in

19   this kind of research, this level --

20          MS. BARRAN:  Mm-hmm.

21          THE COURT:  -- of science, I mean, is it

22   inevitable in many ways, culturally and historically?

23          And do I get to even consider that?

24          MS. BARRAN:  I would --

25          THE COURT:  I mean, the answer may be no, it's not

15:02:43   1   and I don't get to consider it, but --

2          MS. BARRAN:  I guess I, standing here, wouldn't

3   dream of suggesting that you can't or even that you

4   shouldn't.

5          So I can tell you that, no, it doesn't.  It

6   doesn't favor men.  It is a science neutral.  And I can

7   point to that in several ways, the first one being that

8   until her retirement in 2016, the highest paid psychologist

9   in the department of psychology at the University of Oregon

10  was Helen Neville, an extraordinary scientist who brought in

11  over her career probably three times the level of grant

12  money than a Phil Fisher has brought into the institution.

13  Helen Neville was a legend at the University of Oregon, and

14  absolutely they supported her, but she was able to

15  accomplish extraordinary things.

16         One of the key people in working with Professor

17  Fisher and Professor Allen is Dr. Jennifer Pfeifer, newly

18  tenured faculty member.  So she was not a tenured faculty

19  member at the time this lawsuit was filed, but she had a

20  very, very attractive offer from the University of Texas.

21  And the University of Oregon fought like heck to keep her

22  and was successful in doing that.  She is and has been

23  described as one of the people who is the future of the

24  university.

25         So no.  It may be that what we are looking at is

15:04:10   1    the coincidence of some people who have a very strong work

2    ethic and have wanted to do things like this and have made

3    it happen.  But it isn't gender based and plaintiff has not

4    presented any evidence to suggest that it is.

5              I mean, I think that the university has all of the

6    concerns that Your Honor just mentioned about the concern

7    about advancing women, particularly women in the sciences

8    because stem programs are very, very frequently male

9    dominated, and we are moving out of that as a society.  This

10   institution, this university is not blind to that, and they

11   have worked very hard.  They would not have given Dr. Freyd

12   the financial support for her own work if they thought that

13   women didn't deserve to be scientists.

14             And I think that's a very important thing to

15   remember that, to the extent that Dr. Freyd has not been

16   able to get her own funding, it has come from this

17   university, which has supported her and supported her in

18   various ways by its laudatory representations of her work.

19   She is regularly appearing on the website.  She is regularly

20   being given awards.  Her peers think very, very highly of

21   her.  Her department head thinks very, very highly of her.

22   This is a career that has been one that the university has

23   taken care of in many, many ways because people believe in

24   her and her work, but it is different.

25             THE COURT:  Okay.  I want to give some other folks

15:05:43    1    a chance to respond to the comparators.

2              Mr. Weston, I mean, I know your issue is somewhat

3    more discrete, but if you want to have -- I don't know what

4    more you can add.

5              MR. WESTON:  No, Your Honor.  President Schill

6    joins in the arguments of the university, so I don't have

7    anything.

8              THE COURT:  All right.

9              Ms. Middleton, I do think this is your -- your

10   hardest argument is this comparator issue.  You know, are

11   these really appropriate comparators when -- in looking at

12   pay equity?

13             MS. MIDDLETON:  Well, I will start by saying that

14   in the variety of claims Professor Freyd has brought not all

15   of them require substantial equality of jobs.

16             THE COURT:  Correct.  And I understand that.  And

17   we'll get, certainly, to disparate impact, all that.  I get

18   that.

19             MS. MIDDLETON:  Okay.  But turning to the Equal

20   Pay Act, which does require substantial equality of jobs,

21   the Equal Pay Act requires a showing of equality of skills,

22   effort, and responsibility required by the employer for the

23   particular position.

24             So it's not about evaluating the unique skills

25   that the individuals bring to a job and the way those

15:06:48   1   individuals effectuate those responsibilities.

2         The case law is clear on this that you look at the

3   duties expected by the employer of the job, not the unique

4   facets of the job that the individual brings.  *Hein v.*

5   *Oregon College of Education*, for example, talks about how

6   the statute explicitly applies to jobs that require -- jobs

7   that require equal skills and not employees that possess

8   equal skills.

9         *Spaulding v. University of Washington*, which

10   defendants cite, say the same thing.  There's a section

11   there where it talks about faculty being engaged in

12   interdisciplinary teaching or research which is of their own

13   desire to do but not required by the job and therefore not

14   relevant to -- not determinative to the idea of whether the

15   job is the same.

16         Same with *EEOC v. Maricopa*.  It's the job

17   performance requirements that are determinative.

18         In the environment we are talking about here,

19   which is a high-level academic research institution, one

20   component of the job expectation that the University of

21   Oregon imposes on all full professors in the psychology

22   department is that they each go out and develop their own

23   individual research agenda.  They all go out and make a name

24   for themselves in the field because they make unique

25   contributions and they have studied something different from

15:08:12   1   what everybody else is studying and they have something new

2   and different to say about whatever that topic is.

3         And each individual, as they create their own

4   portfolio of research and teaching and service, might need

5   to call on different resources to figure out how to fund

6   that.  So some individuals, in determining their area of

7   research, might go seek external federal grants.

8         Professor Freyd has been able to do her research

9   without needing to do that.  She's got significant private

10   foundation funding as well.  And it is true the university

11   supports her, although the university supports every single

12   one of its full professors in psychology, some far more than

13   Professor Freyd.

14         THE CLERK:  I get a little distracted.  Shaking

15   your head up and down does not help win a case.  I can

16   promise the audience that.  So, audience members, you don't

17   have to -- it's not a basketball game.  We are just here to

18   listen.

19         Thank you.  Go ahead.

20         MS. MIDDLETON:  Sorry, Your Honor.

21         So each individual researcher is carving their own

22   individual portfolio of what they are doing.  Some of them

23   have to fund it in different ways.  But the expectation of

24   the job imposed by the University of Oregon is that you

25   create that research portfolio and you go off and do the

15:09:32   1   research and publish in top-level, peer-reviewed journals.

2   The fact that different people bring different skills to the

3   job and do it in different ways is part of the job

4   expectations.  So they are all meeting that same collective

5   expectation.

6          THE COURT:  But you would agree, a department

7   head, I mean, is very different than somebody working under

8   the department head.

9          I mean, Judge -- you know -- Mosman can't direct

10   my work, but he is in many ways my supervisor.  It didn't

11   dawn on me to think when Judge Aiken had the job I was being

12   treated unfairly.

13          MS. MIDDLETON:  We concur that the department head

14   duties, in particular, are different from the duties of the

15   job of a full professor.  They are also, importantly, paid

16   separately from the base salary of a full professor.  So

17   Ulrich Mayr gets a stipend on top of his base salary

18   specifically because he is department head and pays him for

19   completing those duties.  And meanwhile, he is still

20   expected to fulfill the basic job requirements of the full

21   professor job, which is what he is paid his base salary for.

22          THE COURT:  But doesn't it get -- and to me it's

23   mind-boggling complicated when certain things allow you to

24   kind of almost buy out having to teach a class or bring on

25   additional graduate students.  I mean, there's so much

15:10:57  1  interplay depending on, really, what somebody is doing and

2  how much money they are bringing in.  It's almost -- it's

3  very difficult to compare one professor to another in terms

4  of what their -- you are calling it what their portfolio is,

5  but haven't they really created their own job because that's

6  the nature of a university setting?

7            MS. MIDDLETON:  They have each created their own

8  way of effectuating the requirements of the job, sure.  And

9  I think the defendant would agree on that.  But the basic

10  job requirements remain the same, and that's what we look at

11  here.

12            And that's what makes this case different, for

13  instance, from the male prison guards versus the matrons in

14  the *Gunther* case.  Those were two separate sets of duties,

15  with the employer imposing different expectations on the two

16  different -- you know, different jobs, different titles,

17  different duties.

18            Here, the University of Oregon is imposing the

19  same duties on all of the full professors.  There are some

20  duties that defendants have pointed to, for example, in

21  administering a grant that are externally imposed.

22            So the federal government says or NIH says, if we

23  are going to give you this bundle of money, you have to sign

24  these certifications and you have to oversee compliance with

25  certain regulations and so forth.  None of those are

15:12:20   1   expectations that the University of Oregon is imposing on

       2   those full professors to do the basic job of perform

       3   research and publish and teach and do service.  Those are

       4   duties imposed by an external source that the individual has

       5   sought out to fund their research, but it's not part of the

       6   job performance requirements imposed by the University of

       7   Oregon.

       8           THE COURT:  Okay.

       9           MS. MIDDLETON:  And I would also say, to hold

      10   otherwise in this context, to say that because every

      11   individual full professor meets their job expectations by

      12   carving out a different niche and doing their job in a

      13   different way means that they all have different jobs is

      14   essentially to eviscerate the Equal Pay Act in academia

      15   because part of the job is to create your own unique voice

      16   and do the research in your own way.  And if that makes

      17   everybody's job different, then the law simply doesn't apply

      18   in higher academics.

      19           THE COURT:  Okay.  So let's talk about this whole

      20   retention pay issue.  At least in the disparate impact

      21   world, I mean, at some point, if the university is able to

      22   show that there is a -- the language in different claims is

      23   different, but let's say a business necessity for these

      24   retention pays, I mean, I am trying to envision another

      25   model that would both protect equity and at the same time

15:14:03   1   allow a university to retain people who have brought more

2   value than others to the university.  I mean, I am not

3   completely buying into this absolute gamesmanship that they

4   are all faking this idea that they are wanted somewhere

5   else.  Your comparators -- I mean, I have got to think that

6   a university who wants a certain kind of program accredited,

7   and here's an expert in accrediting that kind of program,

8   he's the first person they are going to want to steal.

9          And I don't understand how the university can

10   protect itself in keeping those people, especially a state

11   government-run university versus a well-endowed private

12   university, perhaps, and still have equity among the

13   different department folks.  I mean, it seems more like the

14   NBA to me in some ways.

15          You know, and I'm wondering if even -- even if it

16   is not job related.  I am a professor in the English

17   department.  I just win the Pulitzer prize for a great novel

18   I wrote on the side.  Harvard wants me because they want

19   great writers teaching their wealthy, privileged English

20   majors who are still going after a liberal arts education.

21   They want me.

22          And how does the university create a system that

23   somehow benefits my colleagues and keeps me there at the

24   same time?

25          And I know you have tried to propose one.  I am

15:15:37   1   not sure if I completely understand it or whether it's

           2   really doable.

           3            MS. MIDDLETON:  Okay.  A lot of issues you raise

           4   here.

           5            THE COURT:  I know.  Sorry.

           6            MS. MIDDLETON:  So I would start by saying in the

           7   disparate impact claim in particular, we don't have to show,

           8   as a legal matter, that there is an equally effective

           9   alternative practice.

          10            Now, I can offer one and we'll talk about that,

          11   but I just want to make clear the law doesn't require that.

          12   Once we have shown the disparate impact, then the burden

          13   shifts to defendants to show both job-related and consistent

          14   with business necessity.

          15            THE COURT:  Right.

          16            MS. MIDDLETON:  If they can't show both of those

          17   things, then Professor Freyd wins.

          18            An alternative way for her to win, even if they

          19   show both of those things, is to offer an alternative

          20   practice.  So I just want to make that clear.

          21            THE COURT:  I know I am jumping way to the end of

          22   the argument, but that's where I was most confused.

          23            MS. MIDDLETON:  Good.  Well, let's talk about it,

          24   then.

          25            So on the alternative she proposed, I understand

15:16:34  1   that in the briefs it might have gotten a little muddled.

2   We quoted former interim president Scott Coltrane --

3          THE COURT:  Right.

4          MS. MIDDLETON:  -- in describing how equity might

5   be considered in the context of a retention raise.  He made

6   it sound very formulaic.  I didn't mean it to be, you know,

7   an absolute formula, like you offer the person 20,000 and

8   then you offer somebody else five or whatever he said.

9          My intention was to propose an alternative, which

10  is you determine how much you want to pay this -- the

11  targeted professor, how much is appropriate for the

12  university to come up with to try and keep that professor.

13  And then, as the university's policy currently requires it

14  to do but the university doesn't actually do, you take into

15  account the impact of that retention raise on equity

16  throughout the department.

17         So --

18         THE COURT:  Is that a permissive or mandated,

19  though?  Is it "should" on that?  They should take into --

20         MS. MIDDLETON:  I think it's probably a should.

21         THE COURT:  Okay.

22         MS. MIDDLETON:  I don't have it in front of me,

23  but I will --

24         THE COURT:  I think it's should.

25         MS. MIDDLETON:  Okay.  So this is what they should

15:17:43  1   do.  This is what we are proposing.  It's the alternative

2   practice that they actually effectuate that "should."They

3   look at equity.

4         And we are not saying that everyone in the

5   department has to get the same raise.  We are saying that

6   they look at people with comparable time and rank.  They

7   look at people with comparable value to the university and

8   merit.  And by the way, the departments do these merit

9   determinations, assigning a number to every professor every

10   time they have merit money to distribute for raises.

11         So actually examining and comparing the merit of

12   the different professors is not something that is not doable

13   or not feasible in this context because they already do it.

14         So you can compare the merit evaluations of other

15   professors who are of similar time and rank, take a look at

16   their salaries.  And then, sure, the university has to make

17   a judgment call about, you know, who here deserves to be

18   raised up along with the targeted individual for retention.

19   And we -- you know, interim president Coltrane described

20   that they have done that in the past, worked their retention

21   system that way.

22         Former department head Lou Moses described in his

23   declaration that the psychology department has made

24   retention offers exactly that way, considering the impact of

25   these retentions on equity throughout the department and

15:19:08   1   proposing raises to affected individuals that would bring

2   them more in line.

3          And so it's doable at the university.  They have

4   done it before.  And it would significantly close the gap of

5   these retention problems.

6          THE COURT:  But can't a professor at any time ask

7   for an equity review?  And did your client ask for an equity

8   review regarding her salary?

9          MS. MIDDLETON:  Anybody can ask for a raise at any

10   time, and my client did that.  And she did it with the

11   strong backing of her department head and with significant

12   data about the gender disparities in the department, showing

13   that she was way below the regression line for salaries in

14   her department and that she wasn't the only one.  That women

15   in the department in general, among full professors, were

16   far below the regression line.

17          So, yeah, she can do that.  My client did that.

18   They took it to Hal Sadofsky and Dean Marcus, and she was

19   turned down.

20          So it's the practice --

21          THE COURT:  I mean, I am trying to remember.  That

22   was a national kind of review where Oregon was below the

23   national average but she was above it?  There was --

24          MS. MIDDLETON:  No.

25          THE COURT:  In terms of pay?  I may be mistaking

15:20:30   1   something there.

2           MS. MIDDLETON:   Yeah, I am not sure what you are

3   talking about.

4           They did a self-study within department --

5           THE COURT:   Okay.

6           MS. MIDDLETON:   -- in which they both looked at --

7   examined themselves and then commissioned external reviewers

8   to look at the department.   And both of those studies also

9   concluded that women were essentially underpaid in the

10   department based on these regression analyses, which, of

11   course, are basically creating an average salary, what you

12   would expect the salary to be based on years in rank over

13   time for, you know, the average full professor in the

14   psychology department.

15           There's also evidence in the record that

16   department head Mayr did these kind of regression analyses

17   regularly whenever he considered salaries in the department.

18   And he talks in his deposition testimony, I want to say it's

19   at Page 240 of Exhibit 6, he talks about how he does these

20   analyses regularly; that over time the individuals coming in

21   and out of the picture might shift, but the general --

22   general trend has been the same over the time he's been

23   department head, which is that the women are

24   disproportionately under the regression line, and the reason

25   is these retention raises.

15:21:51   1          THE COURT:  Okay.

2          MS. MIDDLETON:  So that's part of why he so

3    strongly supported Professor Freyd's request for an equity

4    raise.

5          THE COURT:  Okay.  All right.  Anything else you

6    want to --

7          MS. MIDDLETON:  Does Your Honor want to hear about

8    the specific individuals?  I feel like Ms. Barran --

9          THE COURT:  If you'd like to, yeah.

10          MS. MIDDLETON:  I'd simply say with -- well, as I

11    said with Dr. Mayr, he is paid separately for those

12    department head duties.

13          The defendants talked about the director of

14    clinical training role that Professor Fisher has had and

15    now I think Professor Allen is about to take it on.

16          Professor Freyd has never been invited to play

17    that role or never been asked to.  But, again, when Dr. Hall

18    had that role, he was paid separately for that one as well.

19          The other thing I'd say about Dr. Hall is he was

20    paid separately for his duties in CoDaC, the administrative

21    position doing diversity and equity work, but he still was

22    required to perform his basic job expectations as a full

23    professor in psychology, and that's what his base salary was

24    compensating for, or let me say that again.  His base salary

25    was determined relative to the psychology department

15:23:20   1   salaries, but he was paid through a different bucket and in

2   addition for his duties with CoDaC.

3           And he's back fully in the department now.  He's

4   not doing those duties with CoDaC anymore.  So there's no

5   reason now not to consider him a perfectly adequate

6   comparator.

7           And I would also say, just in terms of the --

8           THE COURT:  Is he the one who is retiring and his

9   pay is fixed?

10          MS. MIDDLETON:  Yes.

11          THE COURT:  So that's kind of a different

12   situation, isn't it?

13          MS. MIDDLETON:  Well, except that defendants have

14   not asserted that their factor other than sex in this

15   case -- well, they haven't really said what their factor

16   other than sex is to justify the pay disparities.

17          All of the focus on grant work, on the CoDaC

18   duties, on all of this, everything else, is directed toward

19   different jobs.

20          The only thing they have talked about in the

21   context of factor other than sex is a defense to the Equal

22   Pay Act claim is retention.

23          THE COURT:  Right.

24          MS. MIDDLETON:  So they are not claiming that

25   grant work or the retirement pay or anything else is the

15:24:25  1   reason for the disparity.

2           But I will just say, with respect to Professor

3   Hall, he was paid more than Dr. Freyd before he announced

4   the retirement anyway, so now he has an extra bump.

5           THE COURT:  So those bumps all came from retention

6   negotiations, right?

7           MS. MIDDLETON:  Yes.  Yeah.

8           THE COURT:  Okay.

9           MS. MIDDLETON:  I would say that comparing, for

10  example, whether the administrative duties of administering

11  a grant is the same as the administrative duties that

12  Professor Freyd has in running her lab and supervising

13  employees in the context of her research and supervising

14  people in the context of her journal duties and so forth,

15  those are all questions of fact for a jury.  They are --

16  they might not be identical.  Maybe a jury would find them

17  to be identical.  They are certainly closely related.  These

18  are all questions of fact for a jury to consider.

19          THE COURT:  Okay.  All right.  Thank you,

20  Ms. Middleton.

21          All right.  So we are kind of moving into issues

22  around disparate treatment.  We can talk a lot more about

23  the retention pay approach.

24          I guess the question I have for defense -- and I

25  will leave it up to you who wants to take it -- I mean, when

15:25:44  1   would the Equal Pay Act ever apply to a university?  Or can

2   it?

3            MS. BARRAN:  It would, indeed.

4            THE COURT:  The way you are describing it, every

5   professor is different.

6            MS. BARRAN:  Uh-huh.  And if every professor is

7   different, it doesn't apply because the act is structured

8   that way.  But that's a very superficial way to look at the

9   university.

10           So if you look at the faculty who are sort of

11  stretched out and you start as perhaps an instructor and

12  then you might become an assistant professor and then you

13  might get tenure, we are talking about the very rarefied

14  tenured faculty.

15           But think, for example, about coming in as an

16  instructor.  And I was trying to think about the most

17  by-rote teaching thing, but since I did languages, I am

18  going to talk a little bit about languages.

19           So let's posit instructors in the department of

20  romance languages who teach French grammar.

21           THE COURT:  Why do the liberal arts always get

22  picked on when it comes to this kind of stuff?

23           MS. BARRAN:  You know, I share that.  I --

24           THE COURT:  Well, isn't there a case that

25  associate professors share the same duties?

15:26:48     1        MS. BARRAN:  Well, the plaintiff is only talking

2    about the senior-most tenured faculty who have been charged

3    with the expectation of going off and developing something

4    new and wonderful and defining their own world with academic

5    freedom.  This is -- Dr. Mayr gave fairly compelling

6    testimony about this.  Once you have that, once you have

7    that position, we do not do the same things.

8        There's nothing wrong with that.  If Congress

9    wants to pass a law saying we are going to change that,

10   Congress can pass that law.  And then there will be First

11   Amendment challenges about academic freedom because we know

12   that's been a big issue in the courts.

13       But Congress and the State of Oregon have elected

14   not to pass such a law because the idea is always we want to

15   look at the equality of pay within apples to apples.  We

16   don't want to be comparing apples to mangoes.  That's too

17   much.  It's not that it's beyond the capability of the

18   court, but it's also something that Congress and the State

19   of Oregon believe should be done by the university, which is

20   the specialist in education, and they should bring their

21   unique knowledge to doing that.

22       But you will have jobs at universities that are

23   absolutely subject to the Equal Pay Act.  And we are not

24   saying that tenured faculty are not subject to the Equal Pay

25   Act, if you could show two people who did basically the

15:28:16   1   same.  And within the department of psychology there are

2   such people.  I mean, plaintiff's work is very similar to a

3   colleague's, Gerard Saucier.  It's more similar to his than

4   it is to Professor Fisher's.  You can compare those two.

5   They do very many of the same things and the comparison

6   would be great.  He just happens to earn less, so he has not

7   been on her list.

8         But if you take her argument to the furthest

9   extension, one of the questions I think the court may ask is

10   why are we only talking about a department because plaintiff

11   is saying, once you are a professor, you have a job.  There

12   are 750 tenure track -- tenure eligible or tenure track

13   professors at this institution.  Plaintiff only wants to

14   compare herself to four within her department.  I'd --

15         THE COURT:  Plaintiff is 16th among those tenured?

16         MR. PREUSCH:  She is 16th in the division of

17   natural sciences.

18         THE COURT:  How many --

19         MS. BARRAN:  About 90.  It's in Dr. Sadofsky's

20   declaration.

21         So I disagree with the argument that we are trying

22   to talk the university out of the Equal Pay Act.  It is

23   there in all its glory.  The university has been doing equal

24   pay studies and moving it along to make sure that they are

25   complying with the new law that Oregon has passed and trying

15:29:43   1   to ensure it.

2          But the important first question, the part of the
3   prima facie case, is not where does the money come from.
4   The Ninth Circuit has said we look at the jobs first.  If
5   the jobs don't meet the substantial equality or substantial
6   comparability, if that's the statute test, then we are not
7   going to compare money on jobs that are merely similar.  And
8   that's been emphatic, and we have a history of law on that.

9          I wanted to respond to some of the questions about
10  this alternative practice because I don't agree with how
11  it's been described, and I just wanted to make sure that I
12  had an opportunity.

13         THE COURT:  Can I ask you this first.

14         MS. BARRAN:  Yes.

15         THE COURT:  This disparate impact, should I be
16  concerned that only five women sought retention bonuses?
17  Two -- only two received offers, sufficient offers, I guess,
18  to keep them.  21 men.  12, I think, received sufficient
19  offers.

20         I mean, I know statistics are a little -- and this
21  is a low number to rely heavily on the statistics.  But why
22  shouldn't I?

23         MS. BARRAN:  Yeah.  And you should not for a
24  number of reasons, including that the plaintiff doesn't make
25  out a prima facie impact case.

15:31:09

1    But let me see if I can answer your question

2    first.

3          Number one, plaintiff has admitted that she has

4    never heard of a woman who has been recruited on the outside

5    who did not get a retention offer from the university.

6          Number two, I think our numbers, as set out in

7    Dr. Sadofsky's declaration, may differ from that.  But if

8    those are the same numbers, then -- you know, then those are

9    the numbers.

10         Number three, there have been men who have said,

11   "See you," and gone to the University of Chicago, which had

12   much richer offers for them.

13         Number four -- and I want to move in a moment into

14   why the plaintiff doesn't have an impact claim, but I do

15   want to say that I questioned -- during Dr. Freyd's

16   deposition, I questioned her on do you have any data?  Do

17   you know of any data that women are not -- that women in the

18   northwest of -- on the West Coast of the United States, the

19   Pacific Northwest or within Oregon, are somehow

20   disadvantaged in getting offers someplace else?

21         And her response, which we have quoted in our

22   papers, was that she knew of no such data.  The only data

23   that she had read was in Europe but not here.  She didn't

24   know of any data.

25         But also, and this is probably considerably more

15:32:29   1   important for Your Honor's consideration, she also said that

2   there was not a single faculty member in the department of

3   psychology who could not get an outside offer if he or she

4   wished.

5             And that's very powerful testimony.  This is one

6   of the flagship departments in the university.  This is a

7   very, very strong department.  And out of the plaintiff's

8   own mouth is, "If I wanted" -- if anybody.  And I said,

9   "You, too?"

10            And she said, "Yes, me, too.  If I wanted an

11   offer, I could get one someplace else."

12            She has, for her own reasons, decided not to even

13   entertain the slightest bits of the initial nibbling.

14            So -- and I am thinking that I need to talk a

15   little bit about the impact so that I can explain for Your

16   Honor why this fits in.

17            So plaintiff has to prove a lot of things to have

18   an impact claim.  And the first thing she needs to do is to

19   provide the court -- and it's her responsibility to do this

20   in response to our motion -- provide the court with adequate

21   statistical evidence that there is in fact an impact being

22   caused by the retention offers.

23            She has chosen to look at a group of about ten.

24   There are some Ninth Circuit cases that say even 28 is not

25   enough to get reliable statistics.

15:33:57   1        And she's produced a statistical declaration which
          2   has been rebutted by the expert.  And I don't -- that's been
          3   adequately briefed, I think, for Your Honor, and it isn't
          4   something that I think this court can accept because he
          5   takes people out.
          6        The statistical testing that the plaintiff has
          7   done is always just a simple plot.  It's like how many years
          8   have I been here and what does my salary look like.  It
          9   doesn't account for anything else.  It doesn't factor --
         10   factor in much of anything.
         11        But if you want to look at the impact theory, she
         12   has multiple things she has to prove, and she has to start
         13   with a statistical disparity.
         14        The second thing she has to do is she has to
         15   identify the very specific and narrow practice or policy
         16   that causes that disparity.
         17        So here is something that is a significant problem
         18   in how she has done this.  She says retentions are the
         19   problem.
         20        THE COURT:  Right.
         21        MS. BARRAN:  But retentions have many, many
         22   variables.  So what she needs to do, and she has not done
         23   this, she hasn't had anybody look at how is the retention
         24   practice done and at what point in considering retentions is
         25   this impact if there is an impact caused.

15:35:18   1        So, for example, one of the considerations is
       2  going to be we are not going to make you a retention offer
       3  because we are going to lose you anyway.  I mean, there was
       4  that whole issue with what they called the two Eds who went
       5  to Chicago.  And the offer was so rich, they said, you know,
       6  we are not even going to make another bid on this because we
       7  are out of money.  We are not going to give you any more
       8  money.
       9        The situation with Professor Baldwin, who has
      10  submitted a declaration.  So she was the one that wanted to
      11  go to Cambridge.  There were many considerations that went
      12  into the size of the proposal.  One of them was the timing.
      13  Her department head said, "Why don't you wait?  You are not
      14  a finalist.  You are one of four."
      15        THE COURT:  Right.
      16        MS. BARRAN:  She wanted -- but she wanted to push
      17  it.  So maybe what happened to her happened because she did
      18  it too quickly.  She should have waited until later.
      19        Ultimately she was given an offer that was going
      20  to pay her more than she would have gotten at Cambridge;
      21  elected, for her own reasons -- she hasn't said why -- to
      22  stay at the University of Oregon, turned down the offer, and
      23  then didn't get the Cambridge offer anyway.
      24        But that -- but we don't know at what point that
      25  negotiation failed.  We just know that there was an issue of

15:36:36  1   timing.  We know that there was an issue of consideration as

2   to what was the level of her scholarship, how much money do

3   we have, how much money can we bring in.

4           And certainly with the two in this department,

5   Dr. Fisher and Dr. Allen, there were major considerations

6   about how much money they are bringing in, which pays for

7   them.  If money has to be gotten from someplace else, then

8   they have to figure out where it goes.

9           Plaintiff hasn't done anything to attempt to say

10   this money -- this impact that I think has happened has come

11   from not looking at women's scholarship the right way or not

12   taking us seriously or not giving us enough money.  We just

13   don't know what that factor is, and that's critical to the

14   failure of the claim.

15           She also has, and this is the part of our briefing

16   that talks about *Garcia v. Spun Steak*.  An impact has to

17   fall more heavily on the minority.

18           And in this case, retention offers hit everybody.

19   And everybody who talks about it talks about retentions are

20   inequitable practices.

21           You know, and as a footnote, if Your Honor could

22   figure out a way to write a nationwide injunction to keep

23   Harvard and Yale from trying to take our people, we would

24   support that, but it's not going to happen.  We will always

25   have to be dealing with these great faculty that are being

15:37:58   1   drawn away by other places, Jennifer Pfeifer being an

2   excellent example.  The university wanted to keep her very

3   badly and did.

4          But there are real concerns in putting the

5   compensation structure out of whack because it does.  But

6   when you talk to the people in the department and you have

7   declarations before you, it is men and women who express

8   concerns.  Gordon Hall's declaration, he was paid less than

9   Helen Neville.  He was paid less than others.  Every time --

10   when Phil Fisher and Nick Allen got retention offers, they

11   bounced above him, if that was -- if they were below him,

12   and it put him out of whack in comparison to them.

13          Every single person who is below them has been

14   affected by it in the same way.  And that is not a disparate

15   impact because the impact statute requires it to fall

16   harshly -- more harshly on the minority population.

17          On the Oregon side, the practice has to be

18   totally, completely uniform.  And plaintiff has said that

19   it's not uniform.  So it's got technical issues.

20          Plaintiff has also not demonstrated that she was

21   affected by this because, as you know, she never -- she

22   never brought an outside offer to the university.  She never

23   had an opportunity.  She never gave them an opportunity to

24   negotiate.

25          So she hasn't even pled this as an impact claim,

15:39:30   1   with a major failing on the statistical evidence and a major

2   technical failing on inability to point to what is actually

3   causing the impact that she sees.

4            But then the second, and Your Honor mentioned, of

5   course, the business justification, the job -- job

6   relatedness.  And I don't know if you want me to even talk

7   about that.  It seems so self-certain to me.  But if we lose

8   Phil Fisher, we lose Phil Fisher and all the money that goes

9   with him.  We want to keep Phil Fisher because of our

10   knowledge of what he has done for the university.

11            And this is a thread that runs through all of our

12   papers.  It is important to the university.  It's clearly a

13   business necessity, consistent with business necessity and

14   job related, which brings us, then, to the demonstration.

15            Dr. Coltrane, who was interim president for a

16   while and was the provost and has had a number of various

17   positions at the university, is the person who spoke about

18   sort of the germ of what the plaintiff has suggested is the

19   alternate practice.  And he said we tried this once and

20   nobody was happy.  It didn't work.  And we tried it in a

21   hiring situation.  It wasn't a retention issue at all.

22            Both he and Dr. Sadofsky have provided

23   declarations about this kind of proposal as being completely

24   unworkable.  And it's unworkable for a number of reasons.

25   Your departing person is going to need what your departing

15:41:12   1   person needs to stay at the university.

2          So the way the plaintiff initially described it

3   was give that person half and then spend the other half on

4   the two or three people who are out of whack.

5          I think that the court might want to look at the

6   *Rudebusch* decision in the Ninth Circuit because it does send

7   a clear message that unless you have some sort of

8   statistical proof that you have -- that you actually have a

9   gender issue, you can't just be handing out money because in

10  that case, they ended up getting a reverse discrimination

11  claim when they tried to do some equity management.

12         And the plaintiff, I believe, was successful in

13  that case because there are always going to be disparities.

14  I mean, the Ninth Circuit has always held that you are not

15  going to have a particularly uniform compensation system.

16         So plaintiff has this burden, and we have briefed

17  it with a Ninth Circuit case.  It's the *Hardie v. NCAA* case.

18  Plaintiff has to have first offered this proposal to the

19  university, and it has to be tested and it has to be a

20  proposal that will work.

21         And that's -- you know, it's -- you know, it's the

22  complaining party shall demonstrate that each particular

23  challenged practice causes a disparate impact, and the

24  complaining party must make a demonstration with respect to

25  an alternative practice, and the respondent must refuse to

15:42:44   1   adopt it.

2            So plaintiff has to demonstrate that it's not

3   going to diminish the gap but to stop an impact.  But we

4   suggest that this is just another theory of go find more

5   money and do more equity adjustments.  It does not carry her

6   burden.  And it is squarely a burden that is in her pockets.

7   She has not ever, in the past, proposed an alternative

8   practice.

9            When I asked her what her alternative practice was

10  during her deposition, it was different again.  Her practice

11  was you need to pay people more so that they feel wanted at

12  this university and they won't be attracted to leave.  That

13  was her alternative practice.

14           So, you know, the idea that we can just coin money

15  and pass it out to people that we think may be inequitably

16  treated is potentially unlawful but also requires us to

17  figure out where the money is going to come from.

18           The alternative practice is required -- to be an

19  alternative practice that satisfies the requirements, the

20  alternative practice has to be something that meets all the

21  university's needs.  And both Dr. Coltrane and Dr. Sadofsky

22  have explained in quite some detail why it doesn't.

23           I wanted to correct, I think, a misunderstanding

24  about the going out and looking at the national.  I think

25  that Your Honor was talking about what Dr. Sadofsky had done

15:44:15  1   and Ms. Middleton was talking about something else also.

2            When plaintiff asked for -- she had asked for a

3   raise.  And what had happened is her department head had

4   given her an eight percent raise, and then subsequently she

5   learned that if he had pushed really hard she might have

6   qualified for an exceptional equity increase.

7            So about a year after the fact she asked Dean

8   Sadofsky to see whether he could get her the extra four

9   percent.

10           And he outlines this in great detail in his

11  declaration.  He went back to look at whether or not that

12  was a supportable request and a meritorious request, and he

13  looked first at internal equity.  He looked within the

14  department.  And then he was the one who looked to the

15  division of natural sciences and saw where the plaintiff was

16  paid there.

17           And then the University of Oregon uses a specific

18  data bank for comparators for compensation.

19           So he went -- and they have a public section.

20           So he went out and looked at that public section.

21  And that was where typically University of Oregon lags

22  behind because we have full professors, and we pay them

23  poorly because of money the state allocates.  And against

24  that, we usually lag behind.

25           Professor Freyd made substantially more than the

15:45:40   1    service had targeted.  So he was benchmarking, and he did

2    that benchmarking to see where she was and then concluded

3    that he did not see grounds for an exceptional additional

4    four percent increase.  And Professor Freyd was indeed

5    disappointed by that.

6              I want to return for a moment to something that we

7    have pointed out in our reply memorandum, too, on the impact

8    claim.

9              So the essence of an impact claim is an entirely

10   neutral practice which falls more harshly.  If you -- and

11   we -- I tried in the reply memorandum to pick out the very

12   specific parts where plaintiff describes what her impact

13   claim is, and her impact claim is described as we are not

14   complaining about retentions.  We are saying that you treat

15   women differently in retentions.  And that's a treatment

16   claim.  And you can't merge the two.  It's an either/or.

17   You either have an impact claim or you have a treatment

18   claim.

19             But all of the description of what plaintiff sees

20   as wrong accepts that we have to retain and then says, "But

21   you treat women poorly."  And that was the -- sort of

22   something that was supported by Dr. Baldwin's declaration.

23   She didn't think she got a fair shake in comparison to

24   Professor Allen.

25             If you look at this as a treatment claim, which I

15:47:03   1   think the plaintiff has clarified she's thinking about, then

2   plaintiff loses on that as well because she has never -- she

3   never elected to see what she might be able to do on the

4   open market.

5        And nobody's suggesting gaming anything, and I

6   wouldn't suggest to her -- I don't think the university

7   would suggest to her that she should just go out and get an

8   offer for the sake of getting an offer.  But it's a little

9   bit like the promotion that you didn't apply for and then

10   you start complaining about the person who got selected.

11        She could have.  She could have sought to go to

12   another institution if she wished, but she didn't.  She

13   elected not to, and she elected to stay at the university,

14   and that disentitles her from bringing a treatment claim

15   because she doesn't have standing.

16        If there is somebody with standing, it would be

17   somebody who went through the process and is able to look at

18   a male comparator and say, "You treated me shabbily and you

19   didn't treat him shabbily."

20        So, for example -- and I am not suggesting that

21   Dr. Baldwin has a valid theory.  But she has articulated,

22   you know, "You treated me worse than Dr. Allen."  Well,

23   that's Dr. Baldwin's theory, and that's her potential claim

24   if she thought it was a claim.

25        But plaintiff doesn't have that.  She has to find

15:48:25   1   a way of showing that she was similarly situated in all

2   respects with the male she compares herself to.  And because

3   she never did this, then she does not -- she doesn't meet

4   the requirements for a treatment claim.

5           So, you know, the impact -- the retention issue

6   and the impact claim fails entirely.

7           And I would -- you know, Your Honor had asked

8   earlier about, you know, women and developing women.  And I

9   think that Dr. Freyd is somebody who actually illustrates

10  something that this institution has done.  And you probably

11  will recall her testimony about how she was recruited to the

12  University of Oregon.  She was at Cornell.  Cornell made her

13  a retention offer to keep her from going to the University

14  of Oregon, and she turned it down because she thought that

15  she would be better treated in Oregon and she would have a

16  better career and be more fulfilled and be happier, and the

17  weather was better here.  Not in the last few days, but.

18          But it was a family offer.  It was an offer to her

19  and a separate offer to her husband.  You might remember her

20  testimony that she, quote, got everything I asked for,

21  quote.

22          And when she came here, somebody senior to her

23  moved out of a corner office for her.  And she summarized,

24  "I felt very wanted."  That's what this university did in

25  1987 to recruit Professor Freyd to this institution.

15:49:54  1        So there isn't kind of the history of thinking

2   that women scientists are second-class citizens that you

3   would expect to see if you had this kind of impact claim or

4   we don't treat women well on retentions.  The statistic that

5   the university has given you that we have consistently

6   always tried to retain a woman who -- a faculty member who

7   has gotten an offer from some other place is a powerful

8   statistic.

9        I think that there is perhaps a general sense that

10  maybe women don't do this as much.  But, number one, that's

11  not attributable to the university.  And secondly, we have

12  no data.  That's sort of a social understanding.

13       This university is not responsible for correcting

14  something that society put in place someplace else.  They

15  are responsible for what they do themselves, and they take

16  that responsibility.

17       And I -- oh, I think I have covered everything

18  that I intended to cover on this, Your Honor.  Thank you.

19       THE COURT:  All right.  Thank you, Mr. Barran --

20  Ms. Barran.

21       Mr. Weston, was there anything you wanted to add?

22       MR. WESTON:  No, Your Honor.  President Schill has

23  been dismissed in his individual capacity, so he's only in

24  in his official capacity, and we are in line with the

25  university.

15:51:20    1          THE COURT:  Oh, that's right.  Okay.

2          Ms. Middleton, you have the final word.

3          If we go back to disparate impact, I mean, I am --
it seems unfair, the whole system.  I mean, you have -- you
know, I hate it when we are calling, you know, certain
people within a department superstars.  And they are getting
the retention pay when there are, you know, more senior
professors who probably do, you know, the real work of the
university.  They are teaching more undergraduate classes,
they are taking on more advisory roles, but they are stuck
in a pay structure from their contract that doesn't come
close to some of these retention payments.

13          But how does that impact women in particular?  I
mean, it has to be disparate impact towards a minority
group, not towards everybody else doing the work of the
university who is not a superstar.  Your argument has to say
it impacts women more.

18          So can you help me with that?

19          MS. MIDDLETON:  The data we presented shows that,
in the context of full professors in the psychology
department, women are disproportionately impacted by the
facially neutral practice of giving retention raises.

23          So there are kind of three different sources for
this.  One is the data that you recited about who asks for
retention raises and how often they are actually given an

15:52:42   1   adequate retention raise.  Those numbers you -- that the

2   court recited meet what's called the four-fifths rule,

3   which, under the disparate impact case law, is a kind of

4   rule of thumb for determining disparate impact where women

5   are chosen at a rate that's four-fifths of the rate that men

6   are chosen in.  That shows a disparate impact.  So --

7        THE COURT:  Yes, but aren't there some cases that

8   kind of shoot down low numbers using these kind of numbers

9   on the four-fifths rule?  We have got -- I mean, if five is

10   a pretty low number to draw long-term conclusions over, I

11   mean, it would only take one to shift it remarkably in maybe

12   the defense favor.

13        MS. MIDDLETON:  Well, there are two other sources

14   of data.

15        So that's one, and I think it's instructive.  Some

16   cases are fine with the lower numbers.  Others aren't.

17   There's a mix of opinions on that.

18        But that's why we presented additional evidence.

19        So we have got the four-fifths rule.  And then we

20   have got the regression analyses that Dr. Cahill did.

21   Defendants have disputes with that, but to me that just

22   shows more disputes of fact.

23        He clearly analyzed the salaries among full

24   professors in the department, determined a significant

25   disparity between female full professors and male full

15:54:08   1    professors.  And once he corrected for the retention bonuses

2    that the men got, that gap closed.

3         So that shows not only that it's the policy that's

4    causing this gap but also that the gap is there in the first

5    place, statistically.

6         And then we also have the data that department

7    head Mayr found himself.  It's the same data I was talking

8    about before.  He recites it in his deposition, it's

9    Page 240, I think, where he talks about having done these

10   regression analyses multiple times over a number of years,

11   and the pattern is the same.  Women are, as a group in the

12   department, paid less than the men are based on the

13   regression line.  And the reason for it, when he corrects

14   for the retention bonuses, is the retention.  So that meets

15   the prima facie showing.

16        I would dispute the defendants' argument around

17   saying basically we can't even show there is an employment

18   practice that's subject to disparate impact analysis here.

19        The Supreme Court in *Watson v. Fort Worth Bank &*

20   *Trust* looked at the practice of just simply using

21   subjective -- each manager's subjective discretion to decide

22   on promotions and hiring and found that that by itself was

23   enough of a practice to be subject to disparate impact

24   analysis.

25        And the retention policy is more of a policy than

15:55:49   1   what you were talking about in the *Watson* case.  Sure, it's
         2   subjective.  Sure, you have to exercise discretion.  But the
         3   Supreme Court said that doesn't mean it's not amenable to
         4   disparate impact analysis.
         5        I also want to address the defendant's point about
         6   Professor Freyd not having asked for a retention raise.  For
         7   one thing, the fact that she hasn't asked for one doesn't
         8   mean she's not affected by the practice throughout the
         9   department.  In fact, defendant talked about how everyone is
        10   affected in the department.  The men who actually get the
        11   retention raises are the most affected and they benefit from
        12   it, but everyone in the department is affected by it.
        13        So, for instance, if you look back at the *Griggs*
        14   case, with the Supreme Court first recognizing the idea of
        15   disparate impact where they said an employer that uses a
        16   high school diploma as a way to weed people out of these
        17   low-level factory jobs, that had -- the court found that had
        18   a disparate impact on African-American applicants.  The
        19   court didn't go and say, well, every African-American
        20   applicant has to try and get a high school diploma in order
        21   to even have standing to bring this claim.  That's not the
        22   point.  You look at what the facially neutral practice is,
        23   and then you look at the impact of that practice in that
        24   department on the minority group, and that's enough to show
        25   that your member of the minority group is affected by it.

15:57:17   1    That person doesn't have to go fulfill some requirements to

2    try and meet that policy in order to have been affected by

3    the policy.

4          THE COURT:  But you are not trying to turn it into

5    disparate treatment.  You are saying it's disparate --

6          MS. MIDDLETON:  I'm saying disparate impact here.

7    Yeah.  Yeah.

8          And I would also say our disparate impact and

9    disparate treatment claims don't collapse into the same

10   thing.  The disparate impact analysis talks about the

11   policy, which is a written policy.  It's in the record.

12   It's facially neutral.  I don't think there is any dispute

13   that the policy on its face is facially neutral.  It

14   operates to have a disparate impact on women.

15         The kind of disparate treatment evidence we

16   provided helps explain why that impact exists, but it's

17   not -- we are not saying that the policy is not facially

18   neutral.  The policy is facially neutral, but we have some

19   explanatory factors about why this disparate impact would

20   happen.

21         And then separately we have Professor Freyd's

22   disparate treatment claim, which is, just like her male

23   comparators, she asked for a raise.  So she might not have

24   asked for a retention raise, but she asked for a raise.  All

25   of her male comparators asked for a raise.  They all got a

15:58:31   1   raise.  She didn't get a raise.  That's disparate treatment.

2        Some of the explanatory factors we give for why

3   retention policies have this kind of impact help support the

4   disparate treatment theory, but it's a different theory.

5        And in the Ninth Circuit, it's clear that a

6   plaintiff can bring both.  The *Rose v.* something case.  *Rose*

7   *v. Wells Fargo* case is an example of bringing both.  And you

8   are absolutely allowed to do that.

9        I also just want to point out that defendants'

10   argument that basically to even bring this claim Professor

11   Freyd needs to have gone to shop herself around on the

12   market and tried to negotiate a retention raise is, from a

13   policy standpoint, absolutely against the interests of the

14   University of Oregon.  For the university to say essentially

15   that in order to get paid equitably with her colleagues,

16   every professor who -- you know, who is paid less than men

17   who are getting retention raises needs to go get a competing

18   offer just subjects the university to losing people.  And it

19   invites poaching by the Harvards and the Yales that we don't

20   want to see taking away the top faculty in the university.

21        An alternative practice like the one we have

22   proposed would help address that problem.  It would let

23   people know that if there is a disparity caused by a

24   retention, there will some equalization for those of equal

25   merit and equal time in years in service.

16:00:28   1      THE COURT:  But doesn't that -- I guess it's back

2    to doesn't that solution take away from your argument that

3    it's gender based because you would have to apply that

4    equity to the males and females equally that are of the same

5    tenure who are not receiving these retention bonuses.

6        MS. MIDDLETON:  Sure.  And the -- the idea --

7    there would be no issue around applying it to everybody who

8    is equally affected.  The -- some of the evidence we

9    provided around why the facially neutral policy has this

10   disparate effect on women is exactly because women are less

11   likely to be the ones shopping themselves around and getting

12   the alternative offers and then negotiating a retention

13   raise.

14       And so they are the ones who are more likely to

15   get the raise, but ultimately the university has to follow

16   the law and pay people who are in the same job with the same

17   years of service and the same merit equitably.  And that's

18   men and women, and if it requires raising up, you know, a

19   man here and a woman there, that's fine.  It would solve the

20   disparate impact problem of this facially neutral policy.

21       THE COURT:  All right.  Anything else from the

22   plaintiff?

23       MS. MIDDLETON:  I do want to address one more

24   thing about the Oregon state law.

25       THE COURT:  Sure.

16:01:57  1          MS. MIDDLETON:  So Professor Freyd brought a claim
        2    under 652.220, which is Oregon's equal pay law.  That law,
        3    at the time she filed her claim and still, requires
        4    comparison of comparable jobs, not equal jobs.
        5          As of January 1st, 2019, that law was
        6    significantly amended and the Bureau of Labor has issued
        7    significant regulations detailing a lot of the different
        8    components of the law.
        9          The one that is important here, in my view -- or
       10    most important, among many, is that the Oregon legislature
       11    got rid of the defense of essentially a factor other than
       12    sex.  The law now lists, I think it's maybe five or six
       13    different practices that can account for a disparity in pay,
       14    and none of them is this open-ended factor other than sex,
       15    and none of them is a retention raise.
       16          So Professor Freyd's claim -- you know, she still
       17    works there, and her claim is for equitable relief going
       18    forward as well.  So I don't know if the court wants me
       19    perhaps to amend the complaint to make allegations under the
       20    new version of the law, but we would like to assert that her
       21    claim under 652.2.0 -- or 220, I think, has vastly different
       22    standards now as of January 1, 2019, and the defenses the
       23    defendant has put forward are no longer valid.
       24          THE COURT:  Okay.  I will take a look at that.
       25          MS. MIDDLETON:  Thank you, Your Honor.

16:03:37   1            THE COURT:  Thank you, Ms. Middleton.

2            Does the defense want to address that issue?

3            MS. BARRAN:  Yes.  And I want to go back to one of

4    the things Ms. Middleton said about the four-fifths rule

5    because it's just wrong.

6            The fourth fifths rule is a sampling rule.  So if

7    you had a group of women and a group of men who had gotten

8    offers and you only paid retentions to 80 percent of the

9    women but 100 percent of the men, that's the operation of

10   the four-fifths rule.

11           What has happened here is the University of Oregon

12   has paid the women who have gotten outside offers, has made

13   a retention to 100 percent of them.  Every single woman.

14   And that's the evidence in the record.  Every single woman

15   who has brought a competing offer has gotten a retention

16   offer from the University of Oregon.

17           So nobody's sampling.  That's the whole

18   population.  They paid everybody.

19           So that argument only works if the university was

20   saying -- you know, if the university, because it's

21   sampling, women have to be advantaged at 80 percent of the

22   male rate.  In this case, women are advantaged

23   disproportionally than the men because every single one of

24   them has gotten one.  It's just a -- it's a statistical rule

25   which I am never particularly articulate at, but that was

16:04:55   1   wrong.

2          Second, the university has never -- and plaintiff

3   admits this -- has never told her that she had to go out and

4   get another offer to be paid equitably.  The university

5   believes and asserts that Professor Freyd is paid

6   appropriately and fully in compliance with the law.  Her pay

7   sits exactly, precisely where it should sit.

8          I want to mention the new law because one of the

9   things that is in place in the new law is that there is a

10   list of factors, one of which is that jobs are

11   differentiated by responsibility.  And that takes us back to

12   the very concrete differentiating factors on these

13   individuals.

14          It may not call it a factor of one's sex, but the

15   differentiating factors for Ulrich Mayr, Gordon Hall, Phil

16   Fisher, and Nick Allen are very, very plainly within the

17   list.  And the list is actually quite long, and they are all

18   sort of broken out into subparts.  But responsibility

19   includes accountability.  And as we have discussed when we

20   have talked about those concrete factors, there's a high

21   level of accountability.

22          Your Honor, I don't know where you are in what you

23   want to hear from, but I'd feel very remiss to my client,

24   Dr. Sadofsky, if I didn't have an opportunity to discuss the

25   claims against him unless your court doesn't -- unless the

16:06:23    1    court doesn't want to hear anything further on that.

2          THE COURT:  Oh, that's just the Equal Protection

3    claim?

4          MS. BARRAN:  It's the --

5          THE COURT:  The contract claim I don't need to

6    hear about.

7          MS. BARRAN:  Okay.

8          THE COURT:  I think we have covered, between today

9    and your briefings --

10          MS. BARRAN:  Yes.

11          THE COURT:  -- I think I am pretty comfortable we

12    have covered everything.

13          MS. BARRAN:  Yes.

14          THE COURT:  So what I'd like to do is get an

15    opinion out soon.  Normally I would tell you we are going to

16    have it out next week.

17          The problem with that is I have also just got

18    buried with a lawsuit of 21 states trying to stop the

19    Department of Health and Human Services from dramatically

20    changing the rules in Title X having to do with -- well,

21    primarily with Planned Parenthood.  So I am kind of in the

22    middle of that, too.  Otherwise, I would say I think I can

23    make up my mind and get something out soon.  If it's not out

24    next week, we may have to skip another week to do so.

25          But I will try my best to get focused on

16:07:32   1   everything you said.  I really appreciate the amount of

2   briefing, and oral argument here, by the way, is very, very

3   good.  I am sure the law students who are watching will come

4   back -- will go back and talk a little bit about just how

5   well prepared everyone is.  So I do appreciate that very

6   much.

7             And we will do our best, if we can, get it out

8   next week.  If we can't, it will probably be about three

9   weeks.

10             I am looking at Mr. Svelund, who is working on it

11   with me.

12             So we will be working hard on this.  I appreciate

13   it.  Thank you very much.  We will be in recess.

14             MS. MIDDLETON:  Thank you, Your Honor.

15             *(The proceedings were concluded this*

16             *11th day of April, 2019.)*

17

18

19

20

21

22

23

24

25

16:08:07  1           I hereby certify that the foregoing is a true and

2     correct transcript of the oral proceedings had in the

3     above-entitled matter, to the best of my skill and ability,

4     dated this 15th day of July, 2019.

5

6     /s/Kristi L. Anderson
      _____

7     Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25