**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JENNIFER JOY FREYD, *Plaintiff-Appellant*,<br><br>v.<br><br>UNIVERSITY OF OREGON; MICHAEL H. SCHILL; HAL SADOFSKY, *Defendants-Appellees*. | No. 19-35428<br><br>D.C. No. 6:17-cv-00448-MC<br><br>OPINION |

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted May 12, 2020
Portland, Oregon

Filed March 15, 2021

Before: Jay S. Bybee and Lawrence J. VanDyke, Circuit Judges, and Kathleen Cardone,* District Judge.

Opinion by Judge Bybee;
Partial Concurrence and Partial Dissent by Judge VanDyke

* The Honorable Kathleen Cardone, United States District Judge for the Western District of Texas, sitting by designation.

## SUMMARY**


### Employment Discrimination

The panel reversed in part and affirmed in part the district court's grant of summary judgment in favor of the University of Oregon and other defendants in an action brought by a professor under the Equal Pay Act, Title VII, Title IX, and Oregon law.

Jennifer Freyd, a Professor of Psychology, alleged that the University paid her several thousand dollars less per year than it paid four of her male colleagues, despite their being of equal rank and seniority.

Reversing the district court's summary judgment on the Equal Pay Act claim, the panel held that on such a claim, the plaintiff has the burden of establishing a prima facie case of discrimination by showing that employees of the opposite sex were paid different wages for equal work. The plaintiff must show that the jobs being compared (not the individuals holding the jobs) are substantially equal. The panel concluded that, viewing the evidence in the light most favorable to Freyd, a reasonable jury could find that she and her comparators performed a common core of tasks and did substantially equal work.

Declining to certify questions to the Oregon Supreme Court, the panel reversed the district court's summary judgment on Freyd's claim under Or. Rev. Stat. § 652.220,


** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

which prohibits employers from paying wages to any employee "at a rate less than that at which the employer pays wages to employees of the opposite sex for work of comparable character, the performance of which requires comparable skills." Under Oregon law, "comparable work" is a more inclusive standard than equal work, and requires that the two jobs "have important common characteristics." The panel concluded that Freyd raised a genuine issue of material fact under § 652.220 for the same reasons she did so under the Equal Pay Act.

The panel reversed the district court's summary judgment on Freyd's disparate impact claim under Title VII. The panel held that to make a prima facie case of disparate impact, a plaintiff must show that a facially neutral employment practice has a significantly discriminatory impact on a group protected by Title VII. The plaintiff must also establish that the challenged practice is either not job related or is inconsistent with business necessity. Even if the practice is job related and consistent with business necessity, though, the plaintiff may still prevail by showing that the employer refuses to adopt an available alternative practice that has less disparate impact and serves the employer's legitimate needs. The panel concluded that, first, Freyd challenged a specific employment practice of awarding retention raises without also increasing the salaries of other professors of comparable merit and seniority. Second, she put forth evidence that this practice caused a significant discriminatory impact, and a reasonable jury could find that her statistical analysis showed a prima facie case of disparate impact. The panel agreed with the Seventh Circuit that where a sample is small but the results nevertheless indicate a disparity, the granting of summary judgment in favor of the defendant is premature.

The panel further held that the University did not establish a business necessity defense as a matter of law.

The panel affirmed the district court's summary judgment on Freyd's claims for disparate treatment under Title VII and her claims under Title IX, Or. Rev. Stat. § 649A.030, and the Oregon Equal Rights Amendment.

Dissenting in part and concurring in part, Judge VanDyke wrote that the district court's judgment on all claims, except Freyd's Or. Rev. Stat. § 652.220 claim, should be affirmed. Judge VanDyke wrote that the market-driven practice of pay disparities based on retention raises does not violate federal and Oregon laws prohibiting sex discrimination.

---

**COUNSEL**

Jennifer J. Middleton (argued) and Caitlin V. Mitchell, Johnson Johnson Lucas & Middleton PC, Eugene, Oregon; Whitney Stark, Albies & Stark LLC, Portland, Oregon; for Plaintiff-Appellant.

Paula A. Barran (argued), Shayda Zaerpoor Le, and Donovan L. Bonner, Barran Liebman LLP, Portland, Oregon, for Defendants-Appellees University of Oregon and Hal Sadofsky.

Cody M. Weston (argued), Stephen F. English, and Nathan R. Morales, Perkins Coie LLP, Portland, Oregon, for Defendant-Appellee Michael H. Schill.

Jennifer A. Reisch (argued), Equal Rights Advocates, San Francisco, California; Kelly M. Dermody and Michelle A. Lamy, Lieff Cabraser Heimann & Bernstein, San Francisco, California; for Amicus Curiae Equal Rights Advocates, 47 Organizations, and 57 Professors.

Glenn Rothner, Rothner Segall & Greenstone, Pasadena, California; Risa Lieberwitz, Donna Young, Aaron Nisenson, and Nancy Long, American Association of University Professors, Washington, D.C.; for Amicus Curiae American Association of University Professors.

---

**OPINION**

BYBEE, Circuit Judge:

Jennifer Freyd is a Professor of Psychology at the University of Oregon ("the University"). Although she is a well-recognized academic and pioneer in trauma studies, the University pays Freyd several thousand dollars less per year than it does four of Freyd's male colleagues, despite their being of equal rank and seniority. Freyd alleges that this gender disparity in pay is department wide and is caused by the University's practice of granting "retention raises" to faculty as an incentive to remain at the University when they are being courted by other academic institutions. She further claims that female professors at the University of Oregon are less likely to engage in retention negotiations than male professors, and when they do, they are less likely to successfully obtain a raise.

Freyd sued the University alleging violations of, *inter alia*, the Equal Pay Act, Title VII, Title IX, and Oregon law.

The district court granted summary judgment in favor of the University on all counts, finding that Freyd had failed to raise any genuine issue of material fact. *Freyd v. Univ. of Or.*, 384 F. Supp. 3d 1284 (D. Or. 2019).

We reverse in part and affirm in part.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. *Professor Freyd*

Jennifer Freyd is a Professor of Psychology at the University of Oregon.[1] She holds a PhD from Stanford University and taught at Cornell University before moving to the University of Oregon in 1987. Professor Freyd is "a leader in the field on the psychology of trauma," where "[f]or two decades she has been one of the main theoretical contributors and intellectual forces." She has authored several books and written hundreds of articles, most in peer-reviewed academic journals, on the topic of institutional trauma. Her colleagues describe her as "one of the most esteemed members in the Psychology Department."

At the University, Freyd is the principal investigator at the Freyd Dynamics Laboratory where she conducts empirical studies related to the effects of trauma. In that position, she is responsible for running the laboratory and supervising doctoral candidates, undergraduate students, and the lab manager. She finances the laboratory through private

[1] "Because this case comes to us on defendants' motion for summary judgment, we take all facts in the light most favorable to [Freyd], the nonmoving party." *Hopkins v. Bonvicino*, 573 F.3d 752, 760 n.2 (9th Cir. 2009).

donations. She also serves as the editor of the *Journal of Trauma & Dissociation*, "one of the most influential journals in the cross-disciplinary field of trauma research." In that role, she is responsible for writing editorials, selecting articles, and "supervis[ing] an editorial assistant, [seven] associate editors, 65 editorial board members, and dozens of ad hoc reviewers." She has also served on the editorial board for multiple other journals, and has worked as a guest reviewer for several foundations and journals.

Freyd has served in a variety of roles at the University. From 2014 through 2016, she served as a member of the University's Committee to Address Sexual and Gender Based Violence. In that role, she drafted policy proposals, administered campus-wide surveys, and wrote a substantive report on gender violence at the University. She was also the "central architect of the new reporting policy for sexual violence on campus." This service role "took an enormous amount of [her] time."

In addition, Freyd does "significant amounts of briefing, teaching, and consulting work for entities outside the higher education context, for example, for the United States Military and the National Park Service." She has worked as a consultant on twenty-two criminal and civil trials, and has consulted with a United States Senator and the White House.

B. *How the University Sets Salaries*

The Psychology Department of the University of Oregon adjusts tenure and tenure-track faculty salaries using two different mechanisms. First, faculty may seek a merit raise based on job performance. To obtain a merit raise, faculty must submit to a review of their performance over the

preceding three years. During this review, faculty are assessed based on the contributions they have made in the areas of research, teaching, and service.

Second, professors may seek a retention raise if they are being recruited by another academic institution. In these instances, the University considers the following five factors in determining whether it wishes to extend the professor a retention raise:

- expected productivity and potential of the faculty member to make a significant contribution to the unit and the university,
- the weight of evidence indicating imminent departure in the absence of a salary adjustment,
- any previous retention increases awarded to the faculty member,
- implications for internal equity within the unit, and
- strategic goals of the unit, school or college, and university.

Freyd states that although she receives "initial probes" from other universities about once a year, she has never engaged in a retention negotiation nor received a retention raise. She was happy at the University, her husband was employed there, they were raising a family, and she was not willing to misrepresent her willingness to accept a position elsewhere and leave the University of Oregon.

C. *Evidence of Gender Disparities in Pay*

In 2014, as part of an unrelated public records request, Freyd unintentionally received salary information for the Psychology Department faculty. She noticed that she was making between $14,000 and $42,000 less per year than four of her male colleagues with whom she was of comparable rank and tenure.[2] The four men—referred to in the litigation as "the comparators"—were Ulrich Mayr, Gordon Hall, Phil Fisher, and Nicholas Allen.

1. Ulrich Mayr

Ulrich Mayr was the Psychology Department's Head between 2014 and 2017. In that role, he was responsible for "day-to-day personnel and human resource matters, misconduct investigations, managing the faculty review process, and negotiating with faculty seeking retention offers." *Freyd*, 384 F. Supp. 3d at 1291. As Department Head, Mayr did not teach classes. Mayr has editorial responsibilities on academic journals. Mayr has received two retention raises.

2. Gordon Hall

Gordon Hall has been a Professor of Psychology at the University since 2001. From 2008 until 2017, he served as the Associate Director of the Center on Diversity and Community (CoDaC). In that role, he was responsible for planning and presenting workshops, assisting faculty in obtaining financial and other support, and representing

[2] The five were classified as "senior faculty member[s]" in the clinical division of the Psychology Department.

CoDaC in university-wide meetings. He reports that the role occupied "a significant and substantial amount of [his] time." Hall has editorial responsibilities on academic journals. Hall has received two retention raises.

3. Phil Fisher

Phil Fisher has been a Professor of Psychology at the University since 2008. He served as the Director of Clinical Training from 2014 through 2017. That position required him to oversee training in psychotherapy, organize weekly seminars, monitor curriculum, and interface with accrediting agencies. He is also the founding director of the University's Center for Translational Neuroscience. In that role, he is responsible for ensuring funding, managing and supervising staff, overseeing the budget, and making strategic decisions for the Center.

Much of Fisher's research is funded by federal grants, so Fisher also spends much of his time applying for and administering those grants. "Serving as a principal investigator or co-principal investigator of a grant imposes substantial administrative and professional responsibilities," including "obtaining appropriate institutional reviews and approval, performing the work, monitoring the work performed by others, exercising oversight on project personnel and sub-awards" and "manag[ing] submission of facilities and administrative charges to the funding agency." He has engaged in at least one retention negotiation.

4. Nicholas Allen

Nicholas Allen has been a Professor of Psychology at the University since 2014. He is the Director of the Center for

Digital Mental Health, which, like Freyd's laboratory, is privately funded. Like Fisher, however, some of Allen's other research is funded through federal grants, for which he must prepare and submit annual progress reports, manage students and researchers, "do media," and manage "the ethical aspects of the research in accordance with federal requirements." His research involves use of brain scanning machinery and biological samples, which requires oversight from technical staff. Allen has editorial responsibilities for academic journals. He has engaged in at least one retention negotiation.

D. *Connecting Retention Raises to Pay Disparities*

After obtaining the salary information and noticing the disparity in pay, Freyd conducted her own regression analysis on the data, comparing salary to years since PhD.[3] She noticed a marked disparity in pay between the genders: out of fourteen full professors in the Psychology Department, six out of the eight male professors (75 percent) fell above the regression line, while five out of six female professors (83 percent) fell below it. In April 2015, Freyd and two other female psychology professors, Dare Baldwin and Holly Arrow, conducted a second regression analysis on this data. This second analysis presented similar results.

In the spring of 2016, the Psychology Department engaged in a mandatory annual self-study. The self-study

[3] A regression analysis is "a common statistical tool . . . designed to isolate the influence of one particular factor—[e.g.,] sex—on a dependent variable—[e.g.] salary." *EEOC v. General Tel. Co. of Nw., Inc.*, 885 F.2d 575, 577 n.3 (9th Cir. 1989) (quoting *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 21–22 (2d Cir. 1988)) (alterations in original).

revealed further information about the pay disparity. The study showed that the Psychology Department faced "a significant equity problem with respect to salaries at the Full Professor level," with an annual average difference in salary between male and female full professors of $25,000. The self-study concluded:

> [T]his state of affairs appears to have emerged mostly as a result of retention raises playing a central role in Full Professors achieving competitive salaries. Faculty who have not pursued multiple outside offers across time, have fallen progressively and significantly behind in salary. In fact, when we control the number of years since the last major hiring/retention negotiation, the gender difference completely disappears.

The study also noted that of the twenty retention negotiations the Psychology Department had engaged in from 2006 through 2016, "only [four] affected female faculty, and only [one] of the successful retention cases was a woman," despite the fact that the percentage of female faculty in the department was around 50 percent. The study observed that "[i]n the past, the university occasionally provided substantial funds to address equity problems. However, this has not happened for about ten years. Thus, currently there are no tools available to address the equity problems that Psychology is facing."

Several months later, in December 2016, Psychology Department Head Mayr conducted his own regression analysis. This analysis included multiple variables, including years since PhD, years in rank, gender, and years since a

professor's last major negotiation. Mayr found that when he controlled for retention negotiations, the gender differential in pay decreased from $22,000 to $5,000. He sent his results to Andrew Marcus and Hal Sadofsky, the Dean and Associate Dean of the College of Arts and Sciences, with the comment that the "imbalance [between male and female full professor salaries] is difficult to ignore," in particular when considering lifetime cumulative effects. After offering several suggestions for addressing the problem, Mayr expressed "hope [that] we can immediately address our most glaring inequity case," Jennifer Freyd, and he recommended a "retroactive promotion raise" to "bring her salary to parity with the next-highest paid, male full professor."

Additional evidence came forth in December 2018, after this lawsuit was filed. Freyd retained economist Kevin Cahill to analyze "whether gender differences exist with respect to the salaries of full professors, and the degree to which any observed differences can be attributed to retention raises." Cahill based his analysis on the base salary of each full professor in the Psychology Department from 2007 through 2017, which amounted to a data set that included 125 data points. Cahill performed a regression analysis on this data and determined with a 99 percent degree of confidence "that female full professors earned, on average, approximately $15,000 less than their male counterparts, controlling for years in rank and time trends."[4] But when Cahill controlled for retention raises, "gender no longer was a statistically-significant determinant of full professor salaries." Cahill concluded that this evidence "strongly suggests that the

[4] Academic publications typically consider a 95 percent confidence or higher to be statistically significant.

gender discrepancy in full professor salaries can be attributed to retention raises."

In January 2019, the University retained Debra Jones Ringold, Professor of Marketing at the Atkinson School of Management at Willamette University, to evaluate Cahill's analysis. Although Professor Ringold did not conduct her own statistical analysis, she questioned Cahill's conclusions, arguing that because Cahill did not "examine the conditions under which retention raise negotiations are triggered and consummated," he failed to rule out alternative causes of the correlation between gender and retention raises he found. Ringold argued that the study had "no probative value" because of the "very small size of the study population."

E. *Procedural History*

In January 2017, after Mayr forwarded his analysis, Freyd met with Marcus and Sadofsky to discuss the data[5] and request a retroactive merit raise to compensate for the pay inequity the retention raises had caused. In response, Sadofsky conducted his own analysis and "concluded [that Freyd's] compensation was not unfairly, discriminatorily, or improperly set."[6] Accordingly, she was denied a raise.

---

[5] This did not include the Cahill study or Ringold analysis, which had not yet been completed at this time.

[6] In his declaration prepared for this suit, Dean Sadofsky stated that he continued to hold the view that Professor Freyd had not been treated unfairly. He offered a detailed account of various factors that go into faculty salaries at the University, including state funding and external grants. Sadofsky offered additional context to show that Freyd's salary relative to her colleagues had changed over time and would have been quite favorable when measured in other time periods; the small number of

Two months later, in March 2017, Freyd filed a complaint, which she later amended, against the University, Sadofsky, and Marcus in the District of Oregon. She asserted various causes of action under the Equal Pay Act, 29 U.S.C. § 206(d); Title VII, 42 U.S.C. § 2000e-2; Title IX, 20 U.S.C. § 168(a); the Equal Protection Clause of the United States Constitution, U.S. Const. amend. XIV; the Equal Rights Amendment of the Oregon Constitution, Article 1, § 46; Oregon Revised Statute § 659A.030; Oregon Revised Statute § 652.220; and breach of contract.

The district court granted summary judgment for the defendants on each claim. It concluded that Freyd failed to raise a genuine issue of fact as to her Equal Pay Act and § 652.220 claims because she could not show that she and the comparators performed substantially equal or comparable work. *Freyd*, 384 F. Supp. 3d at 1290–95. The district court further concluded that Freyd's Title VII disparate-impact claim failed as a matter of law because (1) Freyd had presented insufficient statistical evidence of a disparate impact and, alternatively, (2) the university established that the challenged practice was job related and a business necessity. *Id*. at 1296–98. As to the Title VII disparate

---

professors in her cohort and their own movements in and out of the University affected her statistics.

He also observed that "[r]etention raises have a distorting effect" but are necessary "if the University is to retain faculty who bring in substantial external funding." He regarded the causal correlations demonstrated by Professors Freyd and Mayr as "too simplistic and incomplete." He concluded that because "[f]aculty pay is based on many factors other than seniority, . . . Prof. Freyd is well and fairly compensated by standards of her department, the college, the University, and even the profession."

treatment, § 659A.030, Title IX, and Oregon constitutional claims, the district court concluded that Freyd had failed to present any evidence of discriminatory intent. *Id*. at 1295. It concluded that Freyd lacked standing to bring the contracts claim, and that the individual defendants were entitled to qualified immunity on the equal-protection claim, which was only brought against them and not the University. *Id*. at 1298–1300. Freyd brought a timely appeal.[7]

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal under 28 U.S.C. § 1291.

We review grants of summary judgment de novo. *Animal Legal Def. Fund v. U.S. FDA*, 836 F.3d 987, 988 (9th Cir. 2016) (en banc) (per curiam). Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if the pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine when "a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA*, 771 F.3d 1119, 1125 (9th Cir. 2014). In making this assessment, we must resolve all inferences in Freyd's favor and view the evidence in the light most favorable to Freyd. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[7] Freyd has not appealed the district court's decision on the equal-protection and contract claims.

## III. ANALYSIS

### A. *The Equal Pay Act*

The Equal Pay Act mandates that

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earning by quantity or quality of production; or (iv) a differential based on any other factor than sex.

29 U.S.C. § 206(d)(1). "In an Equal Pay Act case, the plaintiff has the burden of establishing a prima facie case of discrimination by showing that employees of the opposite sex were paid different wages for equal work." *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1073–74 (9th Cir. 1999). To make this showing, the plaintiff must demonstrate that the jobs being compared—not "the individuals who hold the jobs"—are "substantially equal." *Id*. at 1074. "Substantially equal" does not necessarily mean "identical." *See Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1414 (9th Cir. 1988) (quotation marks and citations omitted); *cf. Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 917 (9th Cir. 1983) (reasoning that if a claim could be defeated by showing that the plaintiff had

additional duties, employers could easily subvert the intent of the Equal Pay Act). Instead, "the crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks." *Stanley*, 178 F.3d at 1074 (quoting *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 156 (3d Cir. 1985)). Once a plaintiff establishes a common core of tasks, "the court must then determine whether any additional tasks, incumbent on one job but not the other, make the two jobs 'substantially different.'" *Id.* (quoting *Brobst*, 761 F.2d at 156). "The question of whether two jobs are substantially equal is one that must be decided on a case-by-case basis." *Hein*, 718 F.2d at 913.

The record here contains extensive evidence about the work that Freyd and her four comparators do. A jury could find—as the district court did, and as the dissent proposes—that Freyd and her comparators' jobs are rendered unequal by the differences in the research that they do, centers that they run, and funding that they obtain. Yet the evidence here is not so one-sided as to mandate this conclusion as a matter of law. Instead, viewing the evidence in the light most favorable to Freyd, a reasonable jury could find that Freyd and her comparators perform a "'common core' of tasks" and do substantially equal work.

First, the district court arrived at its conclusion on this issue by contrasting the individual responsibilities of Freyd, Mayr, Hall, Fisher, and Allen, including the separate laboratories or projects they supervised. *See*, *e.g.*, *Freyd*, 384 F. Supp. 3d at 1291 (analyzing Hall's work at CoDaC); *id*. at 1292 (assessing Fisher's responsibilities managing federal grants); *id*. at 1293 (commenting on Allen's position as the director of the Center for Digital Mental Health). But "[i]t is the overall job, not its individual segments, that must

form the basis of comparison" in assessing the comparability of occupations. *Gunther v. Washington County*, 623 F.2d 1303, 1309 (9th Cir. 1979) (internal citations omitted); *cf. Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) ("Whether the work of two employees is substantially equal 'must be resolved by the overall comparison of work, not its individual segments.'") (quoting *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981)); *EEOC v. Cent. Kan. Med. Ctr.*, 705 F.2d 1270, 1272 (10th Cir. 1983), *rejected on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134 n.10 (1988) ("An employer may not 'escape the Act's reach by drawing overly fine distinctions in the tasks at issue.'") (quoting *Berman v. S. Davis Cmty. Hosp.*, 538 F.2d 859, 861 (10th Cir. 1976)).

A reasonable jury could find that Freyd, Fisher, Allen, and Hall share the same "overall job."[8] As full professors in the Psychology Department, Freyd and those three comparators all conduct research, teach classes, advise students, and "serve actively on departmental, college, and university committees and in other roles in service to the institution." They also "contribute to the University's goals regarding equity and inclusion" by participating in relevant associations and organizations. Although Freyd and her comparators all perform each of these functions, it is also true

---

[8] Mayr may be different because he was Department Head from 2014 through 2017. His administrative work consumed a great deal of his time; he did not teach classes, and the record does not show that he conducted research, obtained funding, or ran a center as did Freyd and the others. *See Hein*, 718 F.2d at 914–16 (finding a full-time coach's work substantially equal to that of a professor who did some coaching, but not substantially equal to that of a professor who did not coach at all). For this reason, our discussion of Freyd's comparators in the following section refers only to Hall, Allen, and Fisher.

that they do not teach the same courses, or supervise the same doctoral students, or manage the same centers. In this respect, they are not identical. But we are unable *as a matter of law* to pronounce their responsibilities so unique that they cannot be compared for purposes of the Equal Pay Act. *See Hein*, 718 F.2d at 914–17 (finding job of men's basketball coach substantially equal to plaintiff who taught classes, coached various women's sports, and served as an advisor and to plaintiff who spent 5/9 of her time coaching and 4/9 of her time on administrative duties).[9] Indeed, as Dean Sadofsky explained, the University itself regularly makes such comparisons in determining faculty salaries. He believes Freyd is "well and fairly compensated" under Department and University standards and that any differences in compensation have not been "affected by any gender bias." The dissent complains that we emphasize a "superficial" common core of tasks and downplay the "obvious" differences between Freyd and her male comparators. Dissenting Op. at 40. The differences are not so obvious, however, that for purposes of the Equal Pay Act, we can discern them without recourse to the finder of fact, the jury.

[9] The dissent faults us for relying on *Hein* because the court there relied on the clearly erroneous standard of review and made a statement in *dicta* that it may have approached the analysis differently if reviewed de novo. Dissenting Op. at 44 n.3 (citing *Hein*, 718 F.2d at 913, 915, 917–18). We do not believe the standard of review applied undercuts our conclusion here, as in *Hein* we were reviewing the district court's judgment and factual findings after a *bench trial*. *Hein*, 718 F.2d at 912. De novo review at a bench trial and summary judgment are different; there is no requirement to take the facts in the light most favorable to the non-moving party at a bench trial. Thus, the dissent places undue weight on this statement regarding a hypothetical de novo review and ignores the court's subsequent statement that "*sufficient evidence* supports the district court's determination that the two jobs had substantially equal responsibility." *Hein*, 718 F.2d at 915.

A couple of examples demonstrate the problem. The district court found relevant that Fisher founded and runs the Center for Translational Neuroscience. *See Freyd*, 384 F. Supp. 3d at 1292. In that role, he is responsible for ensuring funding, managing and supervising staff, overseeing the budget, and making strategic decisions. But Freyd likewise is the founder and principle investigator at Freyd Dynamics Labs. In that role, she is responsible for managing staff and students, raising funds, budgeting, and drafting and submitting conference presentations. Fisher and Freyd's centers are different, and this difference may justify a variance in the salary of their supervisors, but a reasonable jury could find these roles do not make Fisher and Freyd's jobs "substantially different." *Stanley*, 178 F.3d at 1074.

The district court also gave weight to the fact that Hall was the Associate Director of CoDaC from 2008 to 2017. *Id.* at 1291–92. In that role, he was responsible for planning and presenting workshops, assisting faculty in obtaining financial and other support, and representing CoDaC in meetings. But Freyd served as an appointed member to the University Committee to Address Sexual and Gender Based Violence from 2014 through 2016, a role which "took an enormous amount of [her] time" and included drafting policy proposals, administering campus-wide surveys, and writing a report. Again, we do not believe we can determine as a matter of law whether these two service roles makes Hall and Freyd's jobs substantially different.

The district court also focused on the fact that Freyd's research is privately funded, while her comparators administer federal grants. *Id.* at 1291–94. The record shows that administering a federal grant is a labor-intensive endeavor. In his declaration, Fisher explained that the

administrator of a federal grant is responsible for "obtaining appropriate institutional reviews and approval, performing the work, monitoring the work performed by others, . . . understanding and adhering to all sponsor-imposed terms and conditions as well as University policies and procedures related to the specific type of work . . . prepar[ing] and timely submit[ting] reports, signoffs and approvals . . . [and] manag[ing] submission of facilities and administrative charges to the funding agency." But according to Freyd, obtaining private funding requires similar efforts, and she must perform almost all of these same tasks as the principal investigator at her privately funded lab. We cannot say on this record that, *as a matter of law*, the differences between public funding and private funding are so great that an academic who obtains public funding does not do work that is substantially equivalent to an academic who obtains private funding.

The dissent complains that we have to compare "*actual* job duties," Dissenting Op. at 42, and that once we consider "the full picture of duties and skills," *id.* at 47, we must conclude that "the jobs *cannot* be substantially equal as a matter of law," *id.* at 47. We have two brief responses. First, the granularity with which the dissent picks through the facts would gut the Equal Pay Act for all but the most perfunctory of tasks. The Equal Pay Act, however, is "broadly remedial," and should be so "construed and applied" as to be "workable across the broad range of industries covered by the Act." *Corning Glass Works v. Brennan*, 417 U.S. 188, 198–99, 208 (1974); *see Rizo v. Yovino*, 950 F.3d 1217, 1226–28 (9th Cir. 2020) (en banc). Second, the dissent's conclusion that two faculty members in the same department cannot be compared is inconsistent with the fact that the University's own administrators regularly make these comparisons for purposes

of setting salaries.[10] The question is not *whether* faculty members can be compared, but *how* they compare, and the latter comparison is one fraught with judgment, not law. That is why former Department Chair Mayr urged the University to correct "our most glaring inequity case," while Assistant Dean Sadofsky claimed Professor Freyd was "well and fairly compensated." We do not have the tools to resolve the dispute without intruding on the civil jury's function.

* * *

Based on the record before us, a reasonable jury could find that Freyd and her comparators did substantially equal work. Accordingly, the district court's grant of summary judgment on this claim was in error.

B. *Oregon Revised Statute § 652.220*

Oregon Revised Statute § 652.220 prohibits employers from "[p]ay[ing] wages to any employee at a rate less than that at which the employer pays wages to employees of the

[10] The dissent argues that the "broad guidelines for setting salaries in the Department apply to *all* tenure-track faculty," Dissenting Op. at 46, and cites to policies from other University Departments, *see also* Dissenting Op at 42 n.2, apparently taking that to mean that the Psychology Department's merit review process applies university-wide. While Departments' individual policies may have identical or similar language to assess their professors, there is no indication in the record before us, nor in the policies the dissent has identified that the University has ever compared professors across Departments for the purposes of salary or promotion. We do not argue that *all* full-time professors at the University have substantially similar jobs—merely that on summary judgment, we cannot say as a matter of law that Freyd and her comparator's jobs as full-time tenure-track professors in the *same* department are so dissimilar that we cannot compare them.

opposite sex for work of comparable character, the performance of which requires comparable skills." Or. Rev. Stat. § 652.220(1)(b) (2017). The Oregon courts have held that "comparable work" is a more inclusive standard than equal work; it "does not require equality but that two items have important common characteristics." *Bureau of Labor & Indus. v. City of Roseburg*, 706 P.2d 956, 959 n. 2 (Or. Ct. App. 1985); *see also Smith v. Bull Run Sch. Dist. No. 45*, 722 P.2d 27, 29 (Or. Ct. App. 1986) ("It is not difficult for a plaintiff to make a prima facie case under [Or. Rev. Stat. §] 652.220(1)(b)."). Like the Equal Pay Act, § 652.220 also offers employers an affirmative defense if they can show that difference in compensation is "based in good faith or factors other than sex." Or. Rev. Stat. § 652.220(2)(b).

Freyd has asked us to certify to the Oregon Supreme Court several unanswered questions about § 652.220. Specifically, she requests that we ask the Oregon Supreme Court (1) to define the term "work of comparable character," (2) to determine whether a retention raise is a "factor other than sex," and (3) to determine whether a retention raise is permissible under a revised version of the law.

Oregon law allows the Oregon Supreme Court to answer questions of law certified to it by this court so long as the question "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court and the intermediate appellate courts of this state." Or. Rev. Stat. § 28.200 (2019). But the decision to certify a question to a state "rests in the sound discretion of this court." *In re Complaint of McLinn*, 744 F.2d 677, 681 (9th Cir. 1984). Here, certifying Freyd's

questions to the Oregon Supreme Court would be of limited utility, so we decline to do so.

Freyd brought this suit under the 2017 version of § 652.220. The statute was substantially revised in 2019. One notable change by the Oregon legislature was to remove the broad "factor other than sex" affirmative defense from the statute. Or. Rev. Stat. § 652.220 (2019). And the statute's definition section now defines the term "work of comparable character" as "work that requires substantially similar knowledge, skill, effort, responsibility and working conditions in the performance of work, regardless of job description or job title." Or. Rev. Stat. § 652.210(13) (2019).

Because of these changes to the law, the Oregon Supreme Court's answers to Freyd's first two certified questions would be relevant only in this case and other cases brought under the old version of the law. And because Freyd's lawsuit was brought under the 2017 version, the answer to the third question would be irrelevant here. For these reasons, we decline to certify these questions to the Oregon Supreme Court.

Instead, we will resolve Freyd's § 652.220 claim ourselves. Because Oregon courts have declared that "comparable work" is a more inclusive standard than "substantially equal work," *see City of Roseburg*, 706 P.2d at 959 n.2, we conclude that Freyd has raised a genuine issue of material fact under § 652.220 for the same reasons she has done so under the Equal Pay Act. Accordingly, the district court's grant of summary judgment on this claim was erroneous.

C. *Title VII Disparate Impact*

"[T]o make a prima facie case of disparate impact under Title VII, the plaintiff[] must show that a facially neutral employment practice has a significantly discriminatory impact upon a group protected by Title VII." *Paige v. California*, 291 F.3d 1141, 1144 (9th Cir. 2002) (internal quotation marks omitted). "This showing consists of two parts: the plaintiff[] must demonstrate 1) a specific employment practice that 2) causes a significant discriminatory impact." *Id*. at 1145. The plaintiff must also establish that the challenged practice is either (a) not job related or (b) "[in]consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i) (2018). Even if the practice is job related and consistent with business necessity, though, a plaintiff may still prevail "by showing that the employer refuses to adopt an available alternative practice that has less disparate impact and serves the employer's legitimate needs." *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (internal citations omitted).

Here, the district court granted summary judgment on Freyd's disparate-impact claim on two grounds. First, it held that Freyd's evidence was insufficient as a matter of law to sustain a prima facie case of disparate impact. *Freyd*, 384 F. Supp. 3d at 1297. Second, it held that even if Freyd had made out a prima facie case, the University was entitled to an affirmative defense because (1) the challenged practice was job related and consistent with business necessity and (2) "Freyd has not put forth an alternative practice that would effectuate the University's legitimate business goal of retaining top talent in its Psychology Department." *Id*. Because we conclude that each of these conclusions are

erroneous, we reverse the district court's grant of summary judgment on this claim.

First, Freyd has challenged a specific employment practice. "Plaintiffs generally cannot attack an overall decisionmaking process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact." *Stout v. Potter*, 276 F.3d 1118, 1124 (9th Cir. 2002). Here, Freyd does not challenge the general practice of awarding retention raises, as the University alleges. Instead, she challenges the practice of awarding retention raises without also increasing the salaries of other professors of comparable merit and seniority. Freyd's theory of pay equity would not forbid the University from taking account of market factors, as evidenced by the salaries other universities were willing to pay to lure Oregon's faculty elsewhere. Rather, she argues that when a competing offer is made to a faculty colleague, it demonstrates that Oregon is out of step with respect to salary, and a retention raise should be offered to all comparable faculty members. And she argues, and has offered some evidence backed by statistics and studies, that female faculty members, for a variety of reasons related to gender, are less willing to move and thus less likely to entertain overtures from another institution. That puts them at a disadvantage vis-a-vis their male colleagues.

Second, Freyd has put forth evidence that this specific employment practice causes a significant discriminatory impact. For a plaintiff to rely on statistical evidence to establish a prima facie case of disparate impact the "statistical disparities must be sufficiently substantial that they raise such an inference of causation." *Stout*, 276 F.3d at 1122 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 995 (1988)).

Freyd offered two different sets of statistical evidence to support her claim of disparate impact. First, she submitted the Cahill analysis, which found that female professors earned an average of $15,000 less than male professors, and that the evidence "strongly suggests that [this disparity] can be attributed to retention raises." Second, she presented data showing that (1) the University enters into retention negotiations with female professors less often, and (2) when these negotiations are had with female professors, they are less likely to be successful. Her claim is that, for reasons related to gender, female faculty are less likely to seek, receive, or be receptive to competing offers, and thus the retention bidding practice favors male faculty. Her evidence, if credited, means that the problem is not that the University does not negotiate retention raises with female faculty, but that, relative to their male colleagues, female faculty receive fewer competing offers. The University is rewarding faculty who receive competing offers, and that favors male faculty.

The self-study data indicates, when taken in the light most favorable to Freyd, that there is gender bias in the availability of outside offers to female faculty. In its 2016 self-study, the Psychology Department noted that only four of the twenty retention negotiations the University entered into with psychology professors from 2006 through 2016 were with female professors, while sixteen were with male professors, despite the department having a roughly equal number of male and female professors.[11] And only one of the four

[11] The Psychology Department also noted that "[d]etailed analyses of all past retention cases among faculty indicate that the greater tendency of male faculty to engage in retention negotiations plays an important role in a gender-related salary gap among [] full Professors." It also acknowledged that "there is strong evidence of a gender bias in the

retention negotiations with female professors was successful, while nine of the sixteen with male professors were.[12]

The district court found as a matter of law that Freyd's statistical evidence was insufficient to sustain a claim of disparate impact. It reasoned that "[r]egardless of what Professor Freyd's expert says as to the reliability of the sample size, the rule in the Ninth Circuit is that '[s]tatistics are not trustworthy when minor numerical variations produce significant percentage fluctuations.'" *Freyd*, 384 F. Supp. 3d at 1296 (citing *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1273 n.4 (9th Cir. 1981)); *see also Morita v. S. Cal. Permanente Med. Grp.*, 541 F.2d 217, 220 (9th Cir. 1976) (small samples have "little predictive value and must be disregarded"). This conclusion was, of course, the criticism leveled at Freyd's study by Dean Sadofsky and at the Cahill Study by the University's expert, Ringold. We do not think that we can resolve this dispute among the experts. Although "the probative value of any statistical comparison is limited by the small available sample," *Stout*, 276 F.3d at 1123, we have not drawn a bright line to determine the adequacy of a data set. *Cf. Watson*, 487 U.S. at 994–95 (noting that formulations for assessing statistical evidence of disparate impact "have never been framed in terms of any rigid

---

availability of outside offers and the ability to aggressively respond to such offers."

[12] In her brief, Freyd states that twenty-six retention negotiations have occurred from 2007 through 2017, with fourteen out of twenty-one negotiations with male professors ending successfully and two out of five with female professors ending successfully. We cannot find this data in the record. Instead, we rely on the findings from the 2016 Psychology Department self-study. These numbers might be slightly more outdated than Freyd's, but they are supported by the record.

mathematical formula"). There is a danger in formulating a strict rule about data sets when, as here, the data may also contain a qualitative component. Our prior cases stated a general principle about the reliability of small data sets, but it did not establish a firm rule about denominators. And although there must be some floor for the sample size a party must evaluate in order to reach statistical significance, this is not an appropriate case in which to set such a floor; at least not on this record, where the expert witnesses themselves disagree about sample size's relevance. *See City of Pomona v. SQN N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat. Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable.").

Furthermore, we should observe that in each of the cases cited above, we noted the limited probative value of the small sample size, but none of those decisions ultimately rested on that issue alone. *See*, *e.g*, *Stout*, 276 F.3d at 1123 (concluding that even if the data were reliable, it did not reveal a disparate impact because the percentage of women selected was roughly proportional to the percentage of female applicants); *Contreras*, 656 F.2d at 1272 (discounting plaintiff's the statistical evidence because the results "were not statistically significant when tested at a .05 level of significance"); *Morita*, 541 F.2d at 219–20 (criticizing plaintiff's small sample size, but denying plaintiff's claim because plaintiff failed to satisfy an essential element of the claim).

The number of data points surely goes to the probative value of Freyd's evidence. But that is a matter for the experts to debate and the jury to resolve. *See Bouman v. Block*,

940 F.2d 1211, 1225 (9th Cir. 1991) ("Whether the statistics are undermined or rebutted in a specific case would normally be a question for the trier of fact."). We think that a reasonable jury could find that Freyd's statistical analysis shows a prima facie case of disparate impact. Despite the relatively small data set, the Cahill study was conducted at a markedly high level of statistical significance. And while the dissent argues that the statistics from the Psychology Department's own self-study do not demonstrate statistical significance, Dissenting Op. at 56–57, the evidence of retention negotiation disparities[13] appears to satisfy the "four-fifths rule," a standard promulgated by the Equal Employment Opportunity Commission, which "states that a selection practice is considered to have a disparate impact if it has a selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate of the group with the highest rate." *Stout*, 276 F.3d at 1124 (internal quotation marks omitted). We agree with the Seventh Circuit that where a sample is small but the results nevertheless indicate a disparity, the "granting of summary judgment in favor of [defendant] on this issue by the District Court was premature." *Fisher v. Transco Services-Milwaukee, Inc.*, 979 F.2d 1239, 1245 (7th Cir. 1992).[14]

---

[13] We also note that these statistics were significant enough to the Department leadership that it noted the retention raises were the potential cause of an equity issue.

[14] We are puzzled by the dissent's critical comments about the statistical analysis prepared by the Psychology Department in its 2016 self-study. Dissenting Op. at 57 (stating that the study "was conducted by professors and employees of the *Psychology* Department—not experts in the field of mathematics, statistics, or economics."). We think we do not trespass the boundaries of our expertise with the observation that the tools

The district court held, alternatively, that "even if Professor Freyd had made out a prima facie case for disparate impact, summary judgment would still be appropriate" because the University established a "business necessity" defense. *Freyd*, 384 F. Supp. 3d at 1297. This conclusion is in error, for two reasons. First, there is conflicting evidence about the need for retention raises and whether the retention raises are job-related.[15] Second, the district court assessed the

---

of "mathematics, statistics, [and] economics" are commonly used in other disciplines, including psychology. We are not aware of any legal principle that would allow us to disparage an academic department's *self-study* on the grounds that we did not think its faculty qualified to conduct such a study. These questions go to the weight of the evidence, not its admissibility, and should be left for the jury to resolve.

[15] Dean Sadofsky defended the University's practice of compensating faculty "where there is compelling evidence that a preemptive action is necessary to prevent the loss of a valued faculty member." On the other hand, Professor Louis Moses, former Psychology Department Head, criticized the University's retention policy as counterproductive:

> [It] effectively punish[es] [a faulty member] for not going on the job market. In doing so the administration sends a message to faculty that the only way to receive a large salary raise is to pursue an outside offer, thereby encouraging individuals to game the system by shopping themselves around as a way to negotiate an increase. Encouraging behavior of this kind is costly in terms of time, resources, and energy; not only for the faculty member involved and the competing universities, but also for the department and UO administration when they need to respond to the competition.

The Psychology Department's own self-study also expressed skepticism regarding retention raises, noting that "it is not obvious that the frequency of retention negotiations is a strong indicator of overall productivity."

wrong practice. Freyd is not challenging the practice of awarding retention raises; she challenges the practice of awarding retention raises to some professors without increasing the salaries of other professors of comparable merit and seniority. And as explained below, Freyd has proffered an alternative practice that may be equally effective in accomplishing the University's goal of retaining talented faculty. Thus, we cannot say as a matter of law that the University's policy and practice represents a business necessity.

Even if we thought the University's policy represented a business necessity, Freyd may show that there is a viable alternative practice that would serve the University's needs. *See Ricci*, 557 U.S. at 578; *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975). "Factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals." *Watson*, 487 U.S. at 998. Freyd has proposed, as an alternative to the current practice, that "when [the University] gives a retention raise to a Psychology professor, it should evaluate the resulting salary disparity with others in the same rank with comparable merit and seniority, and give affected individuals a raise." The record contains conflicting evidence as to whether this alternative would be equally as effective as the current practice in serving the University's legitimate business goals. On one hand, current University policy already mandates consideration of "implications for internal equity" when determining whether to grant a professor a retention raise. And as the University's former interim president Scott Coltrane testified, the University has engaged in this alternative practice in the past, granting other professors

equity raises when another professor the school deemed to be less distinguished was offered a retention raise.[16] But on the other hand, the University argues that this alternative practice would increase its costs, which is inconsistent with its "limited budget and an obligation to spend that budget responsibly." And Coltrane testified that, in his view, when the alternative practice was used in the past, "[n]obody was happy in the end," because the budgetary restraints forced the University to give each professor a smaller raise than she believed she deserved. This conflicting evidence raises a genuine issue of material fact as to the adequacy of Freyd's proposed alternative policy.[17]

* * *

On this record, there is at least a genuine issue of material fact as to whether Freyd established a prima facie case of disparate impact. The district court erred in granting summary judgment on this claim.

---

[16] The dissent appears to assert that we should not credit these statements because of the contradictory facts regarding costs and other administrative burdens. Dissenting Op. at 59–61. But at summary judgment, we must take the record in the light most favorable to Freyd and therefore must credit these conflicting facts.

[17] The dissent reveals its strong preference for a "market-driven practice." Dissenting Op. at 39; *see also id.* at 57–59. This is a policy question better addressed to the need for Title VII. A "business necessity" defense is not the same as a guarantee of a free market. *See Rizo*, 950 F.3d at 1223, 1230 (discussing the Supreme Court's rejection of "market force theory" in *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974)).

D. *Title VII Disparate Treatment*

To establish disparate treatment under Title VII, a plaintiff "must offer evidence that 'gives rise to an inference of unlawful discrimination,' either through the framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (alteration marks omitted) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The *McDonnell Douglas* framework contains three, burden-shifting steps. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). At the first step, the plaintiff must make a prima facie case of discrimination, which requires a showing that "(1) [s]he is a member of a protected class; (2) [s]he was qualified for h[er] position; (3) [s]he experienced an adverse employment action; and (4) similarly situated individuals outside h[er] protected class were treated more favorably." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) (quoting *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)). Once a prima facie case has been shown, the burden then shifts to the defendant to show a legitimate, nondiscriminatory reason for the challenged actions. *See McDonnell Douglas*, 411 U.S. at 802. The burden then returns to the plaintiff, who must show that the proffered nondiscriminatory reason is pretextual. *See id*. at 804. While intent is not relevant to a disparate impact theory of recovery, the disparate treatment theory does require proof of discriminatory intent. *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1484 (9th Cir. 1993) (citing *Watson*, 487 U.S. at 988).

Freyd has not presented evidence sufficient to raise a genuine issue of material fact concerning disparate treatment.

She has not presented "direct or circumstantial evidence of discriminatory intent." *Vasquez*, 349 F.3d at 640. She has also not presented evidence sufficient to establish a prima facie case under the *McDonnell Douglas* framework because she has not shown that similarly situated individuals outside of her protected class were treated more favorably than her. Freyd's comparators engaged in retention negotiations with the University and were granted substantial salary increases as a result. Freyd has never engaged in retention negotiations. Though the University did deny Freyd a raise in 2017, the raise Freyd sought at that time was a retroactive equity raise. There is no evidence that her comparators ever received—or even sought—retroactive equity raises. Under university policy, equity raises and retention raises are distinct. Applications for equity raises and retention raises are assessed differently, through different processes that weigh different criteria.

Because equity raises and retention raises are not comparable, we cannot say that Freyd's comparators were treated "more favorably" than was Freyd in this context. Thus, she cannot establish a prima facie case of disparate treatment, and the district court's grant of summary judgment was proper on this claim.

E. *Oregon Revised Statute § 659A.030*

Oregon Revised Statute § 659A.030 prohibits "an employer, because of an individual's . . . sex . . . to discriminate against the individual in compensation or in terms, conditions or privileges of employment." Or. Rev. Stat. § 659A.030(1)(b) (2017). Oregon courts assess 659A.030 claims under the same framework as they do Title VII disparate treatment claims. *See Dawson v. Entek Int'l*,

630 F.3d 928, 934–35 (9th Cir. 2011). Because summary judgment was proper on Freyd's disparate treatment claim, it was also proper on her § 659A.030 claim.

F. *Title IX*

Title IX mandates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681 (2018). Freyd alleges that the University violated Title IX by "knowingly and intentionally pa[ying] Professor Freyd less than men in the same job because of her sex" and "fail[ing] and refus[ing] to rectify this sex discrimination when made aware of it." As with her Title VII disparate treatment claim, because Freyd has presented no evidence of intentional discrimination, there is no genuine issue of material fact here. We affirm the district court's grant of summary judgment on Freyd's Title IX claim.

G. *The Oregon Equal Rights Amendment*

The Oregon Equal Rights Amendment mandates that "[e]quality of rights under the law shall not be denied or abridged by the State of Oregon or by any political subdivision in this state on account of sex." Or. Const. Art. I § 46. Because Freyd has presented no evidence of intentional discrimination, she cannot prove that the University denied her equality of rights "on account of" her sex. *Cf. Klein v. Or. Bureau of Labor & Indus.*, 410 P.3d 1051, 1061 (Or. Ct. App. 2017) (defining the phrase "on account of" in the context of anti-discrimination statutes to mean "'by reason of' or 'because of'"). We affirm the

district court's grant of summary judgment on Freyd's state constitutional claim.

## IV. CONCLUSION

We conclude that Freyd has presented a genuine issue of material fact under the Equal Pay Act and Or. Rev. Stat. § 652.220 and for disparate impact under Title VII. We thus reverse the district court's grant of summary judgment for those claims. But because we find that Freyd has not presented a genuine issue of material fact for her claims for disparate treatment under Title VII, and her claims under Title IX, Or. Rev. Stat. § 659A.030, and the Oregon Equal Rights Amendment, we affirm the district court's grant of summary judgment for those claims.[18] Nothing we have said here should be taken as reflecting our judgment on the merits of the claims we are remanding to the district court.

Each party must bear its own costs.

**REVERSED IN PART; AFFIRMED IN PART.**

[18] The University has moved to strike mention of Allen's updated declaration from the record, as well all argument depending on it. It has also moved to strike some social science scholarship referenced in the opening brief. Because we did not consider nor rely on either of these materials in making this decision, striking this evidence would have no bearing on the outcome of this case. We **DENY** the motion.

VANDYKE, Circuit Judge, dissenting in part and concurring in part:

Jennifer Freyd is far from the typical employee arguing that she is being treated differently based on her sex. She is not merely *a* professor of Psychology, or even just a *tenured* professor of Psychology. She is a full professor of Psychology at the University of Oregon—the top echelon, crème-de-la-crème of her academic field. She is, one might say, in the big leagues of her profession. According to Dr. Freyd herself, her job at her elite level of academic achievement is marked by "considerable discretion and autonomy in developing and executing a unique research agenda and professional profile," and "[n]o two people will exercise their discretion and autonomy in the same way."

Just as we see with top professional athletes or the very best attorneys in their field, competition is fierce for leading academic talent. Universities understandably attempt to poach top dons from other schools by offering better pay and other benefits and opportunities, and the professors' home institutions are often required to make comparable offers (called "retention raises") to keep their own outstanding people—especially those who are willing to seriously entertain an offer to change institutions.

This case effectively challenges that market-driven practice as violative of a host of federal and Oregon laws prohibiting sex-based discrimination.[1] If Freyd is correct

[1] The majority criticizes what it characterizes as my "strong preference for a 'market-driven practice.'" My preferences are unrelated to my pointing out the obvious here. The fact that an employment practice is "market-driven" may not *necessarily* exempt it from Title VII, but it is

that—even in this elite context, where the defining characteristic of professors at this level is their uniqueness—pay disparities based on retention raises can permit a jury to award damages for sex discrimination, then employers will predictably be incentivized to abandon a tool for retaining top talent and revert to lock-step pay. Worse, unless all of the federal circuits agree with ours (always an unlikely proposition), another predictable result of today's decision is that universities in the Ninth Circuit will be unable to compete economically to retain their best professors, and we could see a corresponding brain drain in universities in the western states.

Of course, if this were required by our laws prohibiting sex discrimination, then so be it. But it isn't. The district court was correct that, for professors at this level, "a university is more akin to the National Baseball League than it is to a traditional employer." *Freyd v. Univ. of Or.*, 384 F. Supp. 3d 1284, 1288 (D. Or. 2019). Only by emphasizing a superficial "common core of tasks" shared by full professors and downplaying all of the obvious differences that have made them stand-outs in their profession can the majority conclude that "a reasonable jury could find that Freyd and her comparators … do substantially equal work" for purposes of the Equal Pay Act. The majority also errs in its consideration of Freyd's Title VII disparate impact claim, relying on irrelevant statistical data to find a genuine issue of material

---

unquestionably *relevant* to whether it is prohibited. While it is perhaps true that a "'business necessity' defense is not the same as a guarantee of a free market," it is certainly true that *every* business necessity is, ultimately, market-driven. Even the majority cannot avoid market-driven concepts when discussing the University's business necessity defense ("the need for retention raises" and "job-related" have no meaning apart from a job market).

fact and then indulging the academic fiction that the University's retention raise practice may not serve a business necessity. I disagree with these conclusions, and therefore respectfully dissent.

## I. The Equal Pay Act

The Equal Pay Act prohibits an employer from discriminating between employees of different sexes for performing "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). Individuals of different sexes perform "equal work" for purposes of establishing a prima facie case under the Equal Pay Act if "the jobs [being compared] are substantially equal." *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1414 (9th Cir. 1988) (alteration in original) (citation omitted). In considering the substantial equality of jobs, we look to whether the jobs share a "common core of tasks" and "whether any additional tasks, incumbent on one job but not the other, make the two jobs 'substantially different.'" *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1074 (9th Cir. 1999) (citation omitted).

The majority here faults the district court for focusing on the differences in job responsibilities of Freyd and her male comparators and instead highlights high-level similarities and "examples" of characteristics shared by the jobs to conclude "that Freyd and her comparators perform a '"common core" of tasks' and do substantially equal work."

I think the majority misapplies the standard. It initially asserts that a reasonable jury could find Freyd and her male comparators have the same "overall job" because they all

conduct research, teach classes, fulfill service roles, and work toward the University's equity and inclusion initiatives. The primary basis for the assertion that they *all* have the same "overall job," however, is the Department's "Tenure-Track Faculty Professional Responsibilities" document—i.e., a Department policy document setting out job descriptions for professors in Psychology. The problem with the majority's reliance on this policy document is that this court is required to compare *actual* job duties—not job descriptions—in determining whether the relevant jobs are substantially equal. *See Spaulding v. Univ. of Wash.*, 740 F.2d 686, 697 (9th Cir. 1984) (asserting "[a]ctual job performance and content, rather than job descriptions, titles or classifications, is determinative" when comparing jobs for purposes of the Equal Pay Act), *overruled on other grounds by Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477 (9th Cir. 1987) (en banc). Furthermore, this policy document applies to assistant professors, associate professors, and full professors in the Psychology Department—a much broader comparison group that does not have, and Freyd does not argue they have, substantially equal jobs.[2]

---

[2] The majority's reliance on this policy document demonstrates a deeper flaw in its approach to the Equal Pay Act. The Psychology Department isn't the only department at the University to use the "Tenure-Track Faculty Professional Responsibilities" document to set expectations for its professors. The Physics and Classics Departments, for example, have adopted nearly identical job expectations in their own professional responsibilities documents. *See Department of Physics Tenure-Track Faculty Professional Responsibilities* ("*Physics Policy*"), UNIV. OF OR. 1–4 (Mar. 3, 2017), https://provost.uoregon.edu/files/phys_ttf_prof_resp_final_03_03_2017.pdf; *Department of Classics Tenure-Track Faculty Professional Responsibilities* ("*Classics Policy*"), UNIV. OF OR. 1–4 (Mar. 3, 2017), https://provost.uoregon.edu/files/clas_ttf_prof_resp_final_03_03_2017.pdf. Like Freyd and her male comparators, all tenure-track professors in

When looking at the *actual* job responsibilities of Freyd and her male comparators as set out in the record, it is not true that "Freyd and her comparators all perform each of the[] functions" set out in the Department's professional responsibilities document—i.e., research, teaching, advising students, performing service roles, and contributing to equity and inclusion initiatives—as the majority contends. Ulrich Mayr and Gordon Hall, for example, taught few—if any—classes between 2014 and 2017, because their roles as

---

Physics and Classics are expected to conduct research, teach classes, and advise students. *Compare, e.g.*, *Department of Psychology Tenure-Track Faculty Professional Responsibilities* ("*Psychology Policy*"), UNIV. OF OR. at 1 (Mar. 3, 2017), https://provost.uoregon.edu/files/psych_ttf_prof_resp_final_03_03_2017.pdf (asserting full-time tenure-track faculty should "spend 40% of their effort on research, 40% on teaching, and 20% on service over the academic year"), *with Classics Policy* at 1 (same), *and Physics Policy* at 1 (same for tenure-track faculty at rank of professor). Like Freyd and her comparators, Physics and Classics professors are directed to "serve actively on departmental, college, and university committees and in other roles in service to the institution." *Psychology Policy* at 4; *Physics Policy* at 4; *Classics Policy* at 4. And those professors must "contribute to the University's goals regarding equity and inclusion," *Physics Policy* at 4, *Classics Policy* at 4, just like Freyd and her male colleagues, *Psychology Policy* at 4. Applying the majority's incorrect reasoning, one would have to conclude that a reasonable jury could find Freyd's job is substantially equal to that of all tenure-track professors in the Physics and Classics Departments because their responsibilities can be compared to Freyd's—at least at a 30,000-foot level based on the generic job requirements set out in these professional responsibilities documents. Although the majority claims it "do[es] not argue that *all* full-time professors at the University have substantially similar jobs," where would it draw the line? Freyd's job could be substantially equal to that of an associate professor of Physics, but not to that of an associate professor of Biology? Or Freyd could establish substantial job equality with an assistant professor of Classics, but not a full professor of Anthropology? The logical implications of the majority's analysis are breathtakingly expansive.

department head and Associate Director (then Interim Director) of CoDAC, respectively, consumed so much of their time. Hall also conducted very little of his own scholarly research during that time due to his commitments with CoDAC. There is likewise no evidence in the record that Phil Fisher's job included any responsibilities related to the promotion of the equity and inclusion goals of the University.

The majority contends that the "granularity with which the dissent picks through the facts would gut the Equal Pay Act for all but the most perfunctory of tasks." But a case-specific evaluation of the actual job performance and content, based on a review of the overall job, is exactly what the Equal Pay Act requires. *Gunther v. County of Washington*, 623 F.2d 1303, 1309 (9th Cir. 1979) ("To make this showing, actual job performance and content, not job titles, classifications or descriptions is determinative. It is the overall job, not its individual segments, that must form the basis of comparison, and, because job duties vary so widely, each suit must be determined on a case-by-case basis." (internal citations omitted)). The majority can only reach its conclusion here by a high-level over-generalization of the jobs held by Freyd and her comparators to conclude that a jury could find the jobs substantially equal.[3]

[3] The majority cites *Hein v. Oregon College of Education*, 718 F.2d 910, 914–17 (9th Cir. 1983) in support of the proposition that it cannot *as a matter of law* hold that the responsibilities of the professors here are incomparable for purposes of the Equal Pay Act. In doing so, it explains that *Hein* found substantial job equality between a male educator (who spent three-quarters of his time teaching and one-quarter coaching) and two female educators, one of whom spent two-thirds of her time on teaching and one-third on coaching, and the other who spent five-ninths of her time in athletics with both coaching and administrative duties. But

the court in *Hein* relied heavily on the clearly erroneous standard of review in its qualified finding and noted that its approach might be different under a *de novo* review. *Hein*, 718 F.2d at 913, 915, 917–18 ("Although we might accept this proposition [that the institutional importance of a basketball coach translates into clearly different job responsibilities] *were it presented to us de novo*, sufficient evidence supports the district court's determination that the two jobs had substantially equal responsibility." (emphasis added)). It ultimately vacated judgment and remanded with respect to those female educators because the district court excluded comparisons to male faculty who might be making *less* than the plaintiffs. *Id*. at 916, 918. For another similarly situated plaintiff in *Hein*, the court determined that the finding of substantially equal jobs was clearly erroneous because that plaintiff did not coach at all, and "[u]nder the Equal Pay Act, jobs requiring different skills are not substantially equal." *Id*. at 914. This case therefore presents numerous distinctions from *Hein*. Here, the majority is not reviewing the district court's ruling for clear error, which circumscribed the review in *Hein*. This record also does not contain such a specific breakdown of time spent on different duties. And if it did, it would reveal that Freyd and her comparators did not have substantially equal jobs. *Cf. Hein*, 718 F.2d at 914 ("[T]he differences in job content between the positions held by Dr. Hein and Mr. Boutin were not inconsequential. A coaching job plainly requires skills that a noncoaching job does not.").

Despite these differences, the majority seems to conclude that because female professors in *Hein* were able to demonstrate—after a bench trial—substantial job equality with a male educator also in the Physical Education Department, Freyd could likewise establish substantial job equality with male full professors in the Psychology Department. But equating Freyd to the female plaintiffs in *Hein* merely because they all share the same broad title of "professor"—and ignoring the fact that the *Hein* plaintiffs held positions at a different level, in a different department, and at a different college than Freyd—contradicts Ninth Circuit precedent, which *the majority quotes from* Hein. *See* Majority Opinion at 18 ("The question of whether two jobs are substantially equal is one that must be decided on a *case-by-case basis*." (emphasis added) (quoting *Hein*, 718 F.2d at 913)). So it's not as if *Hein* precludes us from determining whether two jobs are substantially equal as a matter of law. To the contrary, since *Hein*, this court has affirmed a district court's grant of

The majority also claims I'm saying that two faculty members in the same department cannot be compared—apparently ever. Not so. It is not that two faculty members in the same department could never be compared, as there are undoubtedly situations when professors' jobs can be compared for purposes of the Equal Pay Act. *See, e.g.*, *Hein*, 718 F.2d at 914–18. The key here is the unique nature of the "full professor" positions specifically held by Freyd and her four comparators, making them not substantially equal and more like NFL or MLB players. Further, the majority's reference to the fact that the University "regularly amake[s] these comparisons [of professors' jobs] for purposes of setting salaries" is not particularly compelling, because the broad guidelines for setting salaries in the Department apply to *all* tenure-track faculty in that department—not just its full professors. Unless the majority thinks *all* tenure-track professors in the Department have substantially equal jobs—which Freyd wisely doesn't argue—its argument proves too much.

---

summary judgment on an Equal Pay Act claim on the basis that the jobs being compared were *not* substantially equal as a matter of law. *See, e.g.*, *Forsberg*, 840 F.2d at 1416 (determining two jobs were not substantially equal—despite that they "performed the same function for the company" and "involv[ed] superficially similar tasks"—because "[l]ooking beyond the surface similarities to the underlying skills required in performing the two jobs leaves no doubt that plaintiff's claims of sex-based pay discrimination must fail"). Accordingly, *Hein* does not support the proposition that the differences in the responsibilities of the professors here cannot be adjudicated for purposes of the Equal Pay Act *as a matter of law*, as the majority contends.

When the majority compares the *actual* job duties of Freyd and her male comparators, it largely focuses on the similarities between Freyd and two of her comparators in discrete aspects of their jobs: (1) the fact that both Freyd and Fisher run research laboratories and (2) the fact that both Freyd and Hall took on significant service roles to the University. Ironically, the majority does exactly what it just chastised the district court for doing—comparing "individual segments" of the positions held by Freyd and her male comparators instead of their "overall job[s]." *See Gunther*, 623 F.2d at 1309. Notwithstanding this error, I do agree that Freyd and her comparators share some of the same basic job requirements. Freyd, Fisher, and Allen each run their own research center. Freyd and Allen both teach courses, and Freyd, Mayr, Hall, and Allen all have editorial responsibilities on journals.

But considering only the minimum qualifications for full professor is not reflective of the full picture of duties and skills required of each individual position. *Cf. Forsberg*, 840 F.2d at 1416–17 (looking beyond "two jobs involving superficially similar tasks" to determine that they "require[d] qualitatively different skills in their performance" and therefore, were not substantially equal). While these similarities may establish that Freyd and her comparators share a "common core of tasks," our analysis cannot end there. We are instead required to analyze "whether any additional tasks, incumbent on one job but not the other, make the two jobs 'substantially different.'" *Stanley*, 178 F.3d at 1074 (citation omitted). As a result, it made sense for the district court to focus on the differences in job duties because if those differences make up a significant enough portion of the jobs being compared, the jobs *cannot* be substantially equal as a matter of law. To properly assess

the differences in actual job duties between Freyd and her comparators, I will compare Freyd's job to that of each of her comparators.

**A. Ulrich Mayr**

Ulrich Mayr, the head of the Psychology Department, does not do substantially equal work as Freyd. The majority essentially concedes as much in footnote eight of the opinion. The requirements of the department head position—managing the Department, handling faculty grievances, running scientific misconduct investigations, participating in retention negotiations, and conducting the tenure and faculty review process—consume nearly all of Mayr's working time and are responsibilities that Freyd does not share. Freyd even agreed "that the department head duties, in particular, are different from the duties of the job of a full professor." Because the vast majority of Mayr's job consists of department head tasks that are not part of the content of Freyd's job, Mayr's work is qualitatively different from, and thus not substantially equal to, Freyd's work.

**B. Gordon Hall**

Gordon Hall's work is likewise not substantially equal to Freyd's. The majority reaches a different conclusion, however, by classifying Hall's position as Associate Director, and then Interim Director, of CoDAC as a mere "service role" and then arguing that Freyd also took on a "service role" as a member of the University Committee to Address Sexual and Gender-Based Violence. Based on that reasoning, the majority could not determine as a matter of law whether Hall's and Freyd's "two service roles makes Hall and Freyd's jobs substantially different." But, again, the majority misses

the ball here, impermissibly comparing "individual segments" of Hall's and Freyd's work—i.e., their service *roles*, not their jobs as a *whole*—to conclude that Hall and Freyd do substantially equal work.

By considering these positions in the context of *all* of the job responsibilities borne by Hall and Freyd, it is clear that their overall jobs are not substantially equal. Hall's responsibilities with CoDAC consumed at least half of his working time, sometimes more, and thus significantly reduced the portion of his job spent teaching and conducting his own direct research. While the majority homes in on Freyd's statement that she spent an "enormous amount of [her] time" working with the University Committee to Address Sexual and Gender-Based Violence, she also reported spending "extensive time and effort" running her research lab and additional time supervising and meeting with lab members; was "very involved in the development of the field of trauma research"; invested "significant time and energy" teaching trauma courses and working with students and faculty who disclosed their own traumatic experiences in the teaching setting; did "a substantial amount of advising and mentoring" of graduate students; and engaged in "significant amounts of briefing, teaching, and consulting work for entities outside the higher education context."

Because Freyd—in her own words—asserts that her position requires her to devote a significant amount of time to each of these many tasks, the record simply does not support that she could have spent anywhere close to 50% or more of her time on her service work with the University Committee to Address Sexual and Gender-Based Violence, even viewing the evidence in the light most favorable to her. In addition to the very different responsibilities imposed by these two jobs

overall, the specialized skills required to accomplish even the two discrete "service roles" relied on by the majority—i.e., knowledge of diversity, equity, and inclusion initiatives and phenomenon (for Hall's role) versus experience with sexual and gender-based trauma (for Freyd's role)—are clearly very different. As a result, Hall's overall job (at least half of which was devoted to equity and inclusion work) is qualitatively different than Freyd's job (made up of varying tasks related to the field of trauma), and therefore the two are not substantially equal. *See Gunther*, 623 F.2d at 1309–10 (concluding that prison matrons did not do substantially equal work as male prison guards where the matrons spent "as much as 50% of their working time" on clerical work, whereas the male guards "spent very little time performing clerical work," and the prisoner-to-guard ratio was significantly higher for male guards).

**C. Phil Fisher**

Phil Fisher does not do substantially equal work as Freyd, in particular because part of his work is done directly for (and is compensated by) Harvard University, and he spends a substantial amount of time administering large federal research grants, which Freyd does not. Harvard University pays approximately 20–30% of Fisher's salary in exchange for his work at Harvard. By nature of Fisher doing a portion of his job for an *entirely different university*, the department head could only generically describe this part of his work as having to do with "policy, advising, [and] research coordination" and having "some synergy" with Fisher's work for the University of Oregon. But the department head didn't "need to have an exact description" of Fisher's work for Harvard, he explained, because he doesn't "have to oversee that work."

In addition to the considerable time devoted to his work for Harvard, Fisher invests "a very large part of [his] time" in applying for and administering federal research grants, having been awarded over $9 million in grant funding during his decade at the University. He has historically submitted five or six grant applications per year, each of which can take anywhere from weeks to months to prepare and consume a substantial portion of his time. After receiving these grants, Fisher bears substantial administrative responsibilities, including ensuring that time spent on a project is appropriately allocated to the grant, all of the expenses charged to the grant are allowable and reasonable, all of the reports satisfy the government's requirements and are timely submitted, and he and his staff have complied with all of the relevant federal laws and conditions imposed on the grants. In describing the duties imposed by administering large federal grants, the department head reiterated that these grants require significant reporting requirements, negotiating budget changes with the government, complying with data security requirements, and "a lot of really nasty overhead."

The majority asserts that, "according to Freyd," her responsibilities associated with obtaining private funding for her research are similar to those of her male comparators who manage large federal grants to conduct their research, and so it cannot say as a matter of law that the difference in funding sources means Freyd does not do substantially equal work as her male comparators. The majority bases this assertion on Freyd's briefing, which argues that the underlying tasks required of her male comparators to *manage federal grants* are similar to the duties she bears in *managing her research lab*. But as noted above, Freyd, Fisher, and Allen each run their own research lab—presumably bearing similar administrative burdens associated with actually managing

that laboratory—but Fisher and Allen *also* manage significant federal grants. So obtaining and managing large federal grants imposes significant and very different duties for Fisher and Allen *in addition to* the normal administrative duties of running their labs. This conclusion is supported by the fact that, as opposed to the numerous responsibilities borne by Fisher and Allen as a result of the millions of dollars in external grant funding that they received and oversee, Freyd's only *funding-related* responsibilities, as she describes them, appear to be raising private donations and overseeing the budget, accounting, and grant approvals for the approximately $285,000 in cumulative private donations she has received for her lab in over a decade. These are not similar responsibilities.

Considering the composition of responsibilities comprising Fisher's job as a whole, including the significant portions devoted to his work for Harvard and to applying for and administering federal grants, results in the conclusion that Fisher does work that is not substantially equal to Freyd's work.

**D. Nicholas Allen**

Nicholas Allen does not do substantially equal work as Freyd because Allen, like Fisher, administers a number of large federal grants to facilitate his research and serves as the current Director of Clinical Training, roles which make up a substantial portion of his work and which require different responsibilities and skills than Freyd's work. In over four years since Allen joined the University, he has obtained, individually and with others, over $8.8 million in federal grant funding. He was also awarded another large grant from the National Institute of Mental Health for an upcoming

project on suicide prediction. Allen assumes primary responsibility for the preparation of three or four grant applications on average each year, each of which, as noted above, may take anywhere from weeks to months to prepare and which cumulatively consume a substantial portion of his time. After receiving the federal grants, Allen is responsible for satisfying the complex, time-consuming administrative requirements associated with managing such grants. His grant-related responsibilities are generally similar to Fisher's grant-related responsibilities described above. As discussed in relation to Fisher's work, Freyd does not bear the same responsibilities associated with obtaining and managing federal grant funding.

In 2017, Allen also assumed the position of Director of Clinical Training. In addition to overseeing the preparation, training, and supervision of clinical psychology doctoral students, organizing weekly seminars, and working with accrediting agencies, Allen is responsible for leading the Department of Psychology's re-accreditation process with the American Psychological Association ("APA"). This burdensome process—one that has consumed hundreds of hours in preliminary work alone—involves conducting a self-study of the University's clinical program, hosting an on-campus visit and interviews, and implementing any required follow-up from the APA. In contrast, Freyd has not served as the Director of Clinical Training and does not bear any of these responsibilities.

Given the substantial portion of Allen's job that is devoted to administering large federal grants and serving as the Director of Clinical Training—both of which come with duties and skills not required of Freyd's job—Allen's job is not substantially equal to Freyd's job.

* * *

Based on the significant differences in responsibilities constituting Freyd's job relative to those of each of her male comparators' jobs, Freyd and each of her male comparators do not do substantially equal work. Thus Freyd cannot establish a prima facie case under the Equal Pay Act. Accordingly, I would affirm the district court's grant of summary judgment on her Equal Pay Act claim.

**II. Oregon Revised Statute § 652.220**

Oregon state law prohibits an employer from engaging in salary discrimination between employees of different sexes who perform "work of comparable character, the performance of which requires comparable skills." Or. Rev. Stat. § 652.220(1) (2017). This "comparable" work standard is more inclusive than the "equal work" standard under the Equal Pay Act. *Smith v. Bull Run Sch. Dist. No. 45*, 722 P.2d 27, 29 (Or. Ct. App. 1986). "Comparable" work only requires that the jobs being compared "have important common characteristics." *Bureau of Labor & Indus. v. City of Roseburg*, 706 P.2d 956, 959 n.2 (Or. Ct. App. 1985).

Because the minimum qualifications of a full professor may establish a "common core of tasks" shared by Freyd and her male comparators, such "common core of tasks"—while not sufficient to establish substantial equality among jobs for purposes of the federal Equal Pay Act—may demonstrate sufficient "common characteristics" shared by the jobs for a reasonable jury to conclude Freyd and her male comparators do "comparable" work for purposes of Or. Rev. Stat. § 652.220(1) (2017). I therefore agree with the majority's

conclusion that the district court erred in granting summary judgment to the University on this claim.

## III. Title VII Disparate Impact

"A plaintiff establishes a prima facie case of disparate impact by showing a significant disparate impact on a protected class caused by a specific, identified, employment practice or selection criterion." *Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002). In concluding that there is at least a genuine issue of material fact as to whether Freyd established a prima facie case under her disparate impact claim, the majority credits two sets of statistical data provided by Freyd as demonstrating a "significant discriminatory impact" on female professors of Psychology.

As an initial matter, the majority interprets the data relating to the number of female Psychology professors (as opposed to male Psychology professors) engaging in retention negotiations and the number of "successful" negotiations resulting therefrom to mean that female faculty receive fewer competing offers. But this data only states that "of the 20 retention cases, only 4 affected female faculty, and only 1 of the successful retention cases was a woman (the percentage of female faculty in our department is currently about 49%)." This does not necessarily mean that female faculty receive fewer competing offers; it simply shows that the female faculty who *engaged in* retention negotiations, as known to the authors of the self-study, totaled four out of twenty. Freyd concedes that she does not know any women who have left the University in the last ten years where the University could have retained them with a better retention offer. And she has also stated that "[o]ne of the things that I think is really important to understand is that the most

common way … this [outside recruitment] occurs is there is an initial probe, and if *that probe is rejected, that tends to be the end of it*, and I rejected those probes." (emphasis added). So even when considering in the light most favorable to Freyd, this data simply shows that fewer female faculty have *engaged* in retention negotiations. Freyd's explanations indicate that such data does not encompass the total *availability* of outside offers to female faculty.

Moreover, the choice of female faculty to accept or reject the Department's retention-based counter-offers does not support the conclusion that the Department's failure to adjust salaries of *other* professors (who have not been offered retention raises) caused a significant disparate impact on female professors. The decision to accept or reject an outstanding retention offer is in the sole discretion of the professor who received the offer and may be made for many different reasons. The University can lead a professor to the offer, but it can't make the professor accept it. The majority claims that rewarding faculty who receive competing offers favors male faculty, but the fact that female psychology professors may choose to decline to accept the University's counter-offers is partially dependent on the independent actions of female professors. It does not follow that female professors were the subject of a significant disparate impact because a greater percentage of them *elected* not to accept a retention offer.

These "statistics" are thus completely useless to the question at hand. Nonetheless, the majority chalks this up to a "dispute among the experts" "that we can[not] resolve." This is incorrect. Unlike the regression analyses conducted by Dr. Cahill, a labor economist—there is *no* expert interpreting or analyzing this data set of twenty retention

negotiations. Instead, the majority plucked this information from the Psychology Department's 2016 self-study that was conducted by professors and employees of the *Psychology* Department—not experts in the field of mathematics, statistics, or economics. The small sample size (i.e., four women out of twenty total professors engaging in retention negotiations and only one in four accepting the offer), together with Freyd's failure to demonstrate that these figures are statistically significant, further undermines the reliability of these statistics. *Cf. Stout*, 276 F.3d at 1123 ("A sample involving 6 female applicants in a pool of 38 applicants is likely too small to produce statistically significant results."); *Bouman v. Block*, 940 F.2d 1211, 1225–26 (9th Cir. 1991) (warning that "it is the combination of small sample size and small success rate that calls into question the statistical significance of a violation of the [four-fifths] rule").[4] To that end, this data comparing the number of retention negotiations and resulting "successes" experienced by female and male professors does not establish a prima facie case of disparate impact.

Even if Dr. Cahill's separate regression analyses were to establish a prima facie case of disparate impact, the University has demonstrated that its practice of offering retention raises to externally recruited professors, without also providing raises to other professors of comparable merit and seniority, is both "job related … and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). This

[4] The majority questions this critique of the University's self-study, but the point is not to dispute the University's *qualifications* in conducting such a study. Rather, it is that due to the small sample size, mere satisfaction of the four-fifths rule is not sufficient without also a showing of statistical significance. *Bouman*, 940 F.2d at 1226.

is independently sufficient to defeat Freyd's disparate impact claim. First, the University's retention practice is job-related. A practice is "job related" if "it actually measures skills, knowledge, or ability required for successful performance of the job." *Assoc. of Mexican-Am. Educators v. California*, 231 F.3d 572, 585 (9th Cir. 2000) (quoting *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1271 (9th Cir. 1981)). A retention raise is the result of a retention negotiation that may only be triggered by an external offer or pursuit of a faculty member by an outside institution. Other institutions seek out professors in the Department because of the experience the professors have gained from, and their successful performance in, their *current job* at the University. For example, Hall was recruited by the University of Michigan specifically because they were about to embark on a very similar accreditation process to the one that Hall had just completed for the University of Oregon.

Many of the retention negotiations in the Department are prompted by external offers to faculty who have amassed large federal grants in their current positions. And the Department takes the amount of grant funding that a professor receives into account under its guidelines and procedures to determine merit raises, reviews, promotion, and tenure. When the Department assesses whether to make a retention offer to an externally recruited faculty member, it generally undertakes a merits evaluation of that faculty member and considers "whether the faculty member's contributions to the department and the field are worthy of further investment[,]" among other factors. This separate analysis conducted by the Department is also clearly related to the job experience and job performance of the faculty member and therefore related to the member's current job.

Awarding retention raises to only those professors who receive external offers or are recruited by other universities is also a "business necessity." Freyd acknowledges that the University must "have world-class scientists doing world-class research" to support its mission as a renowned research institution. But if one high-quality professor leaves the University, others that work closely with that individual or engage in significant grant activity together may also leave. An exiting professor may take grant and other external funding with them—funding that supports a portion of the University's infrastructure, graduate student stipends and tuition, and the salary for research assistants, among other expenses. The purpose of the retention-raise policy is to ensure that the University is not "priced out of the market" and has a way to recruit and retain these high-caliber professors.

But the ability to do so depends on available resources. At times, the University has been unable even to match the external offer made to a professor, much less fund additional raises for other professors. In addition, these retention situations often occur under some time pressure with a short window of opportunity. Determining whether the University has the budget both to extend a viable retention offer and provide raises to other professors of comparable merit and seniority would likely cause the University to lose out on professors under a tight timeline for negotiation. As a result, the University's practice of granting retention raises without also providing raises to other faculty of comparable merit and time in rank is a "business necessity."

Freyd has also failed to separately establish a claim of disparate impact by presenting an alternative employment practice that the University refused to implement. *See*

42 U.S.C. § 2000e-2(k)(1)(A)(ii). Freyd's proposed alternative practice is that, when the Department awards a retention raise, it should also give raises to other professors in the same rank with comparable merit and seniority. Freyd argues— and the majority credits—that the University has taken this approach in the past, and this practice is consistent with Department policies on retention raises. But we must consider *cost* and other administrative burdens in determining whether the alternative practice "would be equally as effective as the challenged practice in serving the employer's legitimate business goals." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 998 (1988) (O'Connor, plurality).

Significantly, the example that Freyd provides—and the majority highlights—of the University previously applying this alternative practice was during a time when the University employed a completely different budget model, and the dean of each department had control over that department's budget. Even back then, only certain departments followed this practice, while others paid their star faculty as much as they could and hoped that the other professors would eventually reach that level. Freyd does not provide any evidence that the University could currently afford to grant raises across the board when one of their faculty is offered a job elsewhere, nor does she suggest any criteria for determining which professors are considered of "comparable merit and seniority" to warrant such raises. This approach poses serious financial concerns for the University, as well as concerns that it could hinder the University from effectively pursuing externally recruited faculty in time-sensitive situations. This alternative employment practice would not serve the University's legitimate business interest

in retaining highly valued, externally recruited faculty.[5] Thus, Freyd cannot establish a case for disparate impact under any of her proffered legal theories, and I would affirm the district court's grant of summary judgment on this claim.

## IV. Title IX and the Oregon Equal Rights Amendment

Freyd raises claims under Title IX and the Oregon Equal Rights Amendment, but the only arguments that she asserts in her opening brief on appeal with respect to these claims are the same theories under which she brings her Title VII and Oregon Revised Statute § 659A.030 claims. Because her Title VII and Oregon Revised Statute § 659A.030 claims

[5] The majority claims that we must credit conflicting facts about Freyd's proposed alternative practices when reviewing in a light most favorable to Freyd. But even on summary judgment, "[t]he plaintiff's proposed alternative(s) must be 'equally effective' as the defendant's chosen policy at serving the defendant's interest(s), taking into account '[f]actors such as the cost or other burdens' that alternative policies would impose." *Hardie v. Nat'l Collegiate Athletic Ass'n*, 876 F.3d 312, 320 (9th Cir. 2017) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 661 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e-2(k), *as recognized in Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015)). Freyd has not shown how her proposed alternative is equally effective, especially considering the additional costs and burdens. *See Hardie*, 876 F.3d at 321 ("We find Hardie has failed to establish that the pre-2011 policy would be equally effective as the current policy in serving the NCAA's legitimate interests."); *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 773 (11th Cir. 1991) ("Plaintiffs in this case never presented evidence to show that requiring the University to pay the A.A.C.S.B. 'market rate' to longer-serving professors is economically possible for the University.").

fail,[6] her claims under Title IX and the Oregon Equal Rights Amendment likewise fail. Any alternative theories or arguments supporting these claims have been waived. *See Greenwood v. FAA.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief."); *see also Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986) (declining to consider "matters on appeal that are not specifically and distinctly argued in appellant's opening brief"). Accordingly, I agree with the majority's conclusion to affirm the district court's grant of summary judgment on these claims.

* * *

For the reasons set forth herein, the district court's grant of summary judgment on all claims—except Freyd's Oregon Revised Statute Section 652.220 claim—should be affirmed. I therefore respectfully dissent.

[6] I concur in Section III, Parts D and E, of the majority's opinion regarding Freyd's Title VII disparate treatment claim and her Oregon Revised Statute § 659A.030 claim. I also concur in denying Freyd's Motion to Certify and the University's Motion to Strike.

Approved by the Office of the Provost and Academic Affairs: March 3, 2017

**Department of Physics**
**Tenure-Track Faculty Professional Responsibilities**

## I. Preamble

Tenure-track faculty (TTF) are expected to attain—and maintain—a full spectrum of accomplishment in research, teaching, and service. They are evaluated according to rigorous academic standards typical of other major American research universities. The occupational security and flexibility that TTF enjoy reflect the combination of sustained, disciplined effort and intellectual freedom indispensable to the creation and dissemination of new knowledge, which are cardinal missions of any research university.

## II. Workload expectations for TTF

Besides teaching their courses and guiding students in other ways, TTF should be engaged in research, scholarship, or creative activity during the academic year. Service duties are generally secondary, in particular for assistant professors, but increase significantly with each advance in rank. As a rough guideline, a full-time TTF at the rank of Professor should on average spend 40% of their effort on research, 40% on teaching, and 20% on service over the academic year. Individual workload assignments should reflect a realistic balance of duties consistent with the criteria for review.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

### A. Research

Tenure-track faculty are expected to pursue an active program of research, scholarship, and/or creative activity appropriate to their professional qualifications, expertise, and evolving professional interests; and to disseminate the fruits of this effort to appropriate scholarly and lay audiences through publication and other forms of presentation. Individual faculty research programs are monitored, evaluated, and rewarded through established contract review, promotion and tenure, post-tenure review, and merit review processes and, through peer review, held to the national and international standards of the relevant scholarly disciplines.

**B. Teaching**

**1. Standard course load.** The standard course load for TTF in the department is three courses of at least 4 credit hours each during the academic year. TTF are expected to be able to teach a full range of courses, from introductory undergraduate surveys through advanced graduate seminars, on both broad and specialized subjects. The importance of TTF contributions to the General Education curriculum, where a TTF's broad command of a scholarly field is especially valuable, should not be overlooked.

**2. Course revision.** TTF are expected to revise their courses as needed to incorporate advances in academic content and pedagogy, and to ensure that their courses continue to promote the learning outcomes of the departments and programs (including General Education) of which they are a part.

**3. Independent study courses.** In addition to the standard classroom course load, TTF frequently supervise students, both graduate and undergraduate, in independent study courses. In these instances, faculty members are expected to maintain standards of student work and student-instructor engagement appropriate to the awarding of academic credit. This topic is addressed further in section C4 below.

cited in Freyd v. University of Oregon No. 19-35428 archived on March 11, 2021

**4. Course load reduction.** These policies are described in section IV below.

**5. Team-teaching.** A course team-taught by two faculty members will typically count as half a course for each unless both contribute nearly full effort as part of a special educational opportunity for students. In the latter case, a team-taught course may count as a full course for each faculty member with the approval of the department or program head(s), and so long as the unit can meet its curricular and enrollment needs with existing resources. Generally, the faculty members' other teaching assignments should generate sufficient enrollments to compensate for any loss created by the team-teaching arrangement.

**6. Course load increase for unsatisfactory research productivity.** UO aspires to be a preeminent and innovative public research university. In order to fulfill this aspiration, all our tenured faculty members must be actively engaged in research and scholarship throughout their careers. This policy is intended to address concerns about research productivity after tenure, and the resultant workload equity issues, by providing support for faculty and guidance for addressing unsatisfactory research productivity.

If concerns about research productivity arise or persist during any three- or six-year post-tenure review, and the Provost or their designee concludes that the faculty member's research productivity is unsatisfactory, the department or unit head will consult with the faculty member and recommend to the Provost a development plan for demonstrable improvement. The development plan can include mentoring or other

Approved by the Office of the Provost and Academic Affairs: March 3, 2017

support and suggest directions for research. It should include time lines and measurable goals for improved research productivity. The faculty member is responsible for regularly consulting with their department or unit head, who will provide guidance for the faculty member's efforts to attain development plan goals. Upon approval by the Provost or designee, the development plan will be implemented as soon as possible with the goal of reaching satisfactory performance by the next scheduled post-tenure review.

Should the Provost or designee conclude that the faculty member's research productivity remains unsatisfactory at the post-tenure review following the implementation of the development plan, the faculty member's standard workload may be adjusted to increase teaching and/or service. This gives the faculty member an opportunity to continue making a full-time contribution to the department's mission. The faculty member's workload reallocation should be recognized in the merit raise process with appropriate adjustments to the percentage of the merit raise determined by teaching and/or service. The department head will remain open to discussions with the faculty member about ways to support the faculty member in achieving their research goals, which may include future changes to teaching and service loads

**C. Advising, student contact, and graduate student and postdoctoral education and mentoring**

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

**1. General advising expectations.** TTF are expected to advise and mentor students who take their courses insofar as this is considered a normal part of teaching any course. They may also be called upon to provide academic advising for students they have not taught in courses but who are enrolled in the degree programs for which they serve as faculty. They should be willing to write recommendation letters and serve as references for students whom they are qualified to evaluate on the basis of coursework or other contact.

**2. Office hours and student contact.** TTF should hold at least two office hours a week and be available by appointment during the terms in which they teach. They should also make themselves reasonably available to students via email and/or other appropriate online media.

**3. Thesis and dissertation committees.** TTF should expect to serve as chairs or members of both undergraduate and graduate thesis and dissertation committees, as appropriate to their expertise, the nature of their academic unit, and the needs and interests of their students.

**4. Graduate education.** Extensive advising and mentoring of graduate students, both inside and outside of formal classroom coursework, are a particular responsibility of TTF, and often inseparable from a TTF's own research program. In addition to writing

recommendation letters and serving as references, TTF customarily help their graduate students secure postgraduate positions and connect them to appropriate professional development opportunities and networks in their fields.

**5. Postdoctoral mentoring and education.** Postdoctoral scholars play an important role in the research programs of TTF faculty. TTF are obliged to advise and mentor postdoctoral scholars on research and professional responsibilities. In addition to providing professional references, TTF customarily help their postdoctoral scholars secure future employment and connect them to appropriate professional development opportunities and networks in their fields.

**D. Service**

**1. Shared governance.** TTF bear significant responsibility for shared governance and are therefore expected to serve actively on departmental, college, and university committees and in other roles in service to the institution. Assistant professors are expected to perform some service, typically within the department, though less than associate and especially full professors, for whom service expectations both inside and outside the department rise substantially over the course of a career.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

**2. Departmental service.** TTF are expected to take part in the normal service workload of the department. This includes participation in standing and ad hoc committees' work as spelled out in the department's internal governance document, any regular work needed (in the judgment of the department head) beyond that, and any other service work that may happen irregularly (for example, curricular review and program review).

**3. Professional service.** TTF often serve as members or officers of professional organizations, editorial boards, and conference and prize committees for their disciplines at the national and international levels. They are also called upon to lend expert evaluations in the peer review of academic publications, grants and fellowships, and promotion and tenure cases for colleagues at other institutions.

**E. Equity and inclusion**

Faculty are expected to contribute to the University's goals regarding equity and inclusion. These contributions may consist of research, teaching, and service activities as appropriate, as well as involvement with academic and professional associations, non-profit, governmental, and/or private sector organizations.

**III. Teaching and Service Assignment Process for TTF**

**A. Teaching and service within the department**

Except as otherwise determined by the Provost, Dean, or other designee, the department head shall be responsible for the scheduling and assignment of all faculty members' professional responsibilities.

Teaching assignments are initially set after discussion between the faculty member and the Physics curriculum committee. The committee recommendations are forwarded to the department head who makes final teaching assignments after consultation with the faculty members.

There are two elected committees in Physics, the Personnel and Post-tenure Review committees. These elections are held in spring, with the elected committees taking effect the following academic year. This process is described in the Physics governance document. Once these committees are in place, the remaining departmental committee and service assignments are made by the department head in consultation with the faculty members. Assignments should be in place before the start of fall term.

The College and the University recognize the value of teaching that occurs outside a faculty member's home department, whether in another department, in another college, in an interdisciplinary academic program, or in an enrichment program. A faculty member may be offered such a teaching opportunity, with or without a stipend, in lieu of a course assignment in the home department. Approval of such assignments is at the discretion of the Dean or Dean's designee, acting in consultation with the heads or directors of both the home and the host departments or programs. Approval from the Dean's Office is not required for any course taught in another unit of the College of Arts and Sciences without a stipend.

cited in Freyd v. University of Oregon No. 19-35428 archived on March 11, 2021

A faculty member shall be afforded the opportunity to meet with their department head at least annually, before responsibilities are assigned, to discuss their preferences regarding assignments for teaching, research, service and other professional responsibilities, and anticipated resource needs; to address concerns about advising load inequities and balancing demanding with less-demanding assignments; and to discuss when FTE allocation may differ from the norm. Faculty members may request consideration of adjustment of schedules or assignments.

The Provost or designee may modify scheduled assignments, provided that the department head discusses changes with the faculty member before they are made and that changes are not made for arbitrary or capricious reasons.

**B. Overload assignments**

An overload assignment is (1) an assignment that is in addition to the faculty member's regular assignment and FTE status; (2) a one time or limited assignment, made or approved by the Provost or designee, that is in addition to or different from regular or usual assignments for the member's classification and rank; or (3) assignments unrelated to the faculty member's primary job responsibilities.

Overload assignments in some specific programs (as identified in in the Assignment of Professional Responsibilities article of the CBA) may be compensated through a lump sum. All other overload appointments will be assigned an FTE percentage commensurate with normal workload duties and compensated accordingly. Faculty may request that overload compensation take the form of class release. No faculty member may be disciplined or terminated for refusing an overload assignment. No faculty member may be disciplined or terminated for refusing an overload assignment.

Appointments for which compensation is paid, in whole or in part, with federal funds may be ineligible for overload compensation.

**C. Stipends**

The allotment of stipends will be consistent with university and college policy.

cited in Freyd v. University of Oregon No. 19-35428 archived on March 11, 2021

**D. Course cancellation policy**

If a course is cancelled for any reason, a TTF may be asked to teach the same course, or an alternative course, in a subsequent term. If scheduling or curricular reasons make this impossible or inadvisable, the TTF will be required to teach the course or an alternative course in the following academic year in addition to the regular course load. The faculty member may also agree to give up a previously banked course release to compensate for a course cancellation. Whatever the case, the TTF is expected to rebalance research, teaching, and service duties, across academic years if needed, so as to remain fully engaged at the appointed FTE.

**IV. Course load reduction**

There are three main ways a faculty member's course load in a department may be reduced from the unit's base load: A) a course buyout where funds (e.g., from a grant) are explicitly exchanged for a course reduction, B) an FTE reduction in the department either for an assignment in another unit, or for some other purpose (e.g. to serve as Associate Dean), or C) a course release where someone is given a course reduction without any funds or FTE exchanged for this reduction (e.g. to serve as DGS within the unit). Any reduction in course workload for a faculty member is subject to the

department meeting its curricular needs and requires approval by the department head and Dean.

**A. Course buyouts**

See CAS course buyout policy.

**B. FTE reassignment to unit outside of the department**

A TTF may be offered an assignment in a unit other than the home department, with or without additional compensation, to perform duties outside the home department by reassigning the FTE of the faculty member. For example, appointment into an Associate Dean position in the College reassigns part or all of a person's FTE in course instruction to administration.

**C. Course release**

The Dean provides an allocation of course releases to the departments annually (not including the department head/program director releases) based on CAS published guidelines. The departments determine how to allocate those course releases, as described below. If the department uses more course releases than allocated by the Dean in a given year, these will be charged to future allocations. The department may carry forward extra course releases up to 25% of its annual allocation.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

Course releases shall be granted for significant departmental service assignments. A TTF member who serves as director of undergraduate or director of graduate studies shall be granted one term of course release. (The Dean provides the course release policy for the department head.)

In addition, the department head, in consultation with the department curriculum and/or personnel committee, may provide course releases to TTF members according to the following considerations:

The development of a new course or the significant re-working of an existing course may be allotted an associated course release. This must be arranged in advance by agreement between the TTF member and the department head.

If the department has on hand more teaching capacity than is necessary to cover its course commitments for a particular term, a TTF member may be designated a course release based on non-course related instructional activity, i.e. individual instruction. Priority for such releases will be given to research active faculty members who have a history of providing a high level of individual instruction, with the expectation that such instruction would continue during the release term. Typically, this individual instruction

would be in the form of research advising of graduate students, undergraduate students, or postdocs. Individual instruction will be tallied over the prior three-year period to determine eligibility. Again, such assignments are made by the department head, usually in consultation with the departmental curriculum and/or personnel committees.

We recognize that some teaching assignments require more faculty effort. These include teaching of large-enrollment courses or teaching a course for the first time. These factors should be included in the consideration of course releases.

A faculty member may bank a course release (or fractional course release) for use in a subsequent academic year. It is the department head's responsibility to keep an accurate list of banked course releases. No more than three course releases may be banked at one time, and no more than one banked course release may be redeemed in a given year without the approval of the Dean or Dean's designee. A banked course release must be redeemed within three years of being banked unless otherwise approved by the Dean or Dean's designee.

The department head may require a faculty member to bank a course release if the department cannot otherwise meet its curricular and enrollment needs for a given year with available resources.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

Approved by the Office of the Provost and Academic Affairs: March 3, 2017

**Department of Classics**
**Tenure-Track Faculty Professional Responsibilities**

## I. Preamble

Tenure-track faculty (TTF) are expected to attain—and maintain—a full spectrum of accomplishment in research, teaching, and service. They are evaluated according to rigorous academic standards typical of other major American research universities. The occupational security and flexibility that TTF enjoy reflect the combination of sustained, disciplined effort and intellectual freedom indispensable to the creation and dissemination of new knowledge, which are cardinal missions of any research university.

## II. Workload expectations for TTF

Besides teaching their courses and guiding students in other ways, TTF should be engaged in research, scholarship, or creative activity during the academic year. Service duties are generally secondary, in particular for assistant professors, but increase significantly with each advance in rank. As a rough guideline, full-time TTF should spend 40% of their effort on research, 40% on teaching, and 20% on service over the academic year. Individual workload assignments should reflect a realistic balance of duties consistent with the criteria for review.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

### A. Research

Tenure-track faculty are expected to pursue an active program of research, scholarship, and/or creative activity appropriate to their professional qualifications, expertise, and evolving professional interests; and to disseminate the fruits of this effort to appropriate scholarly and lay audiences through publication and other forms of presentation. Individual faculty research programs are monitored, evaluated, and rewarded through established contract review, promotion and tenure, post-tenure review, and merit review processes and, through peer review, held to the national and international standards of the relevant scholarly disciplines.

### B. Teaching

**1. Standard course load.** The standard course load for TTF in the department is 5 courses of at least 4 credit hours each during the academic year. TTF are expected to be able to teach a full range of courses, from introductory undergraduate surveys through advanced graduate seminars, on both broad and specialized subjects. The importance of TTF contributions to the General Education curriculum, where a TTF's broad command of a scholarly field is especially valuable, should not be overlooked.

**2. Course revision.** TTF are expected to revise their courses as needed to incorporate advances in academic content and pedagogy, and to ensure that their courses continue to promote the learning outcomes of the departments and programs (including General Education) of which they are a part.

**3. Independent study courses.** In addition to the standard classroom course load, TTF frequently supervise students, both graduate and undergraduate, in independent study courses. In these instances, faculty members are expected to maintain standards of student work and student-instructor engagement appropriate to the awarding of academic credit. This topic is addressed further in section C4 below.

**4. Course load reduction.** These policies are described in section IV below.

**5. Team-teaching.** A course team-taught by two faculty members will typically count as half a course for each unless both contribute nearly full effort as part of a special educational opportunity for students. In the latter case, a team-taught course may count as a full course for each faculty member with the approval of the department or program head(s), and so long as the unit can meet its curricular and enrollment needs with existing resources. Generally, the faculty members' other teaching assignments should generate sufficient enrollments to compensate for any loss created by the team-teaching arrangement.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

**6. Course load increase for unsatisfactory research productivity.** UO aspires to be a preeminent and innovative public research university. In order to fulfill this aspiration, all our tenured faculty members must be actively engaged in research and scholarship throughout their careers. This policy is intended to address concerns about research productivity after tenure, and the resultant workload equity issues, by providing support for faculty and guidance for addressing unsatisfactory research productivity.

If concerns about research productivity arise or persist during any three- or six-year post-tenure review, and the Provost or their designee concludes that the faculty member's research productivity is unsatisfactory, the department or unit head will consult with the faculty member and recommend to the Provost a development plan for demonstrable improvement. The development plan can include mentoring or other support and suggest directions for research. It should include time lines and measurable goals for improved research productivity. The faculty member is responsible for regularly consulting with their department or unit head, who will provide guidance for the faculty member's efforts to attain development plan goals. Upon approval by the Provost or designee, the development plan will be implemented as soon as

possible with the goal of reaching satisfactory performance by the next scheduled post-tenure review.

Should the Provost or designee conclude that the faculty member's research productivity remains unsatisfactory at the post-tenure review following the implementation of the development plan, the faculty member's standard workload may be adjusted to increase teaching and/or service. This gives the faculty member an opportunity to continue making a full-time contribution to the department's mission. The faculty member's workload reallocation should be recognized in the merit raise process with appropriate adjustments to the percentage of the merit raise determined by teaching and/or service. The department head will remain open to discussions with the faculty member about ways to support the faculty member in achieving their research goals, which may include future changes to teaching and service loads.

**C. Advising and student contact**

cited in Freyd v. University of Oregon No. 19-35428 archived on March 11, 2021

**1. General advising expectations.** TTF are expected to advise and mentor students who take their courses insofar as this is considered a normal part of teaching any course. They may also be called upon to provide academic advising for students they have not taught in courses but who are enrolled in the degree programs for which they serve as faculty. They should be willing to write recommendation letters and serve as references for students whom they are qualified to evaluate on the basis of coursework or other contact.

**2. Office hours and student contact.** TTF should hold at least two office hours a week and be available by appointment during the terms in which they teach. They should also make themselves reasonably available to students via email and/or other appropriate online media.

**3. Thesis and dissertation committees.** TTF should expect to serve as chairs or members of both undergraduate and graduate thesis and dissertation committees, as appropriate to their expertise, the nature of their academic unit, and the needs and interests of their students.

**4. Graduate education.** Extensive advising and mentoring of graduate students, both inside and outside of formal classroom coursework, are a particular responsibility of TTF, and often inseparable from a TTF's own research program. In addition to writing recommendation letters and serving as references, TTF customarily help their graduate students secure postgraduate positions and connect them to appropriate professional development opportunities and networks in their fields.

Approved by the Office of the Provost and Academic Affairs: March 3, 2017

**D. Service**

**1. Shared governance.** TTF bear significant responsibility for shared governance and are therefore expected to serve actively on departmental, college, and university committees and in other roles in service to the institution. Assistant professors are expected to perform some service, typically within the department, though less than associate and especially full professors, for whom service expectations both inside and outside the department rise substantially over the course of a career.

**2. Departmental service.** TTF are expected to take part in the normal service workload of the department. This includes participation in standing and ad hoc committees work as spelled out in the department's internal governance document, any regular work needed (in the judgment of the department head) beyond that, and any other service work that may happen irregularly (for example, curricular review and program review).

**3. Professional service.** TTF often serve as members or officers of professional organizations, editorial boards, and conference and prize committees for their disciplines at the national and international levels. They are also called upon to lend expert evaluations in the peer review of academic publications, grants and fellowships, and promotion and tenure cases for colleagues at other institutions.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

**E. Equity and inclusion**

Faculty are expected to contribute to the University's goals regarding equity and inclusion. These contributions may consist of research, teaching, and service activities as appropriate, as well as involvement with academic and professional associations, non-profit, governmental, and/or private sector organizations.

## III. Teaching and Service Assignment Process for TTF

**A. Teaching and service assignments**

Except as otherwise determined by the Provost, Dean, or other designee, the department head shall be responsible for the scheduling and assignment of all faculty members' professional responsibilities.

The College and the University recognize the value of teaching that occurs outside a faculty member's home department, whether in another department, in another college, in an interdisciplinary academic program, or in an enrichment

program. A faculty member may be offered such a teaching opportunity, with or without a stipend, in lieu of a course assignment in the home department. Approval of such assignments is at the discretion of the Dean or Dean's designee, acting in consultation with the heads or directors of both the home and the host departments or programs. Approval from the Dean's Office is not required for any course taught in another unit of the College of Arts and Sciences without a stipend.

A faculty member shall be afforded the opportunity to meet with their department head at least annually, before responsibilities are assigned, to discuss their preferences regarding assignments for teaching, research, service and other professional responsibilities, and anticipated resource needs; to address concerns about advising load inequities and balancing demanding with less-demanding assignments; and to discuss when FTE allocation may differ from the norm. Faculty members may request consideration of adjustment of schedules or assignments.

The Provost or designee may modify scheduled assignments, provided that the department head discusses changes with the faculty member before they are made and that changes are not made for arbitrary or capricious reasons.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

**B. Overload assignments**

An overload assignment is (1) an assignment that is in addition to the faculty member's regular assignment and FTE status; (2) a one time or limited assignment, made or approved by the Provost or designee, that is in addition to or different from regular or usual assignments for the member's classification and rank; or (3) assignments unrelated to the faculty member's primary job responsibilities.

Overload assignments in some specific programs (as identified in in the Assignment of Professional Responsibilities article of the CBA) may be compensated through a lump sum. All other overload appointments will be assigned an FTE percentage commensurate with normal workload duties and compensated accordingly. Faculty may request that overload compensation take the form of class release. No faculty member may be disciplined or terminated for refusing an overload assignment. No faculty member may be disciplined or terminated for refusing an overload assignment.

Appointments for which compensation is paid, in whole or in part, with federal funds may be ineligible for overload compensation.

Approved by the Office of the Provost and Academic Affairs: March 3, 2017

**C. Stipends**

The allotment of stipends will be consistent with university and college policy.

**D. Course cancellation policy**

If a course is cancelled for any reason, a TTF may be asked to teach the same course, or an alternative course, in a subsequent term. If scheduling or curricular reasons make this impossible or inadvisable, the TTF will be required to teach the course or an alternative course in the following academic year in addition to the regular course load. The faculty member may also agree to give up a previously banked course release to compensate for a course cancellation. Whatever the case, the TTF is expected to rebalance research, teaching, and service duties, across academic years if needed, so as to remain fully engaged at the appointed FTE.

**IV. Course load reduction**

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

There are three main ways a faculty member's course load in a department may be reduced from the unit's base load: A) a course buyout where funds (e.g., from a grant) are explicitly exchanged for a course reduction, B) an FTE reduction in the department either for an assignment in another unit, or for some other purpose (e.g. to serve as Associate Dean), or C) a course release where someone is given a course reduction without any funds or FTE exchanged for this reduction (e.g. to serve as DGS within the unit). Any reduction in course workload for a faculty member is subject to the department meeting its curricular needs and requires approval by the department head and dean.

**A. Course buyouts**

See CAS course buyout policy.

**B. FTE reassignment to unit outside of the department**

A TTF may be offered an assignment in a unit other than the home department, with or without additional compensation, to perform duties outside the home department by reassigning the FTE of the faculty member. For example, appointment into an Associate Dean position in the College reassigns part or all of a person's FTE in course instruction to administration.

**C. Course release**

The Dean provides an allocation of course releases to the departments annually

(not including the department head/program director releases) based on CAS published guidelines. The departments determine how to allocate those course releases, as described below. If the department uses more course releases than allocated by the Dean in a given year, these will be charged to future allocations. The department may carry forward extra course releases up to 25% of its annual allocation.

At present the Classics Department does not provide course releases for internal service except for that stipulated by the College. Assistant Professors, when negotiating for their initial contract, may receive one course release within their first three years of employment.

A faculty member may bank a course release (or fractional course release) for use in a subsequent academic year. It is the department head's responsibility to keep an accurate list of banked course releases. No more than three course releases may be banked at one time, and no more than one banked course release may be redeemed in a given year without the approval of the Dean or Dean's designee. A banked course release must be redeemed within three years of being banked unless otherwise approved by the Dean or Dean's designee.

The department head may require a faculty member to bank a course release if the department cannot otherwise meet its curricular and enrollment needs for a given year with available resources.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

Approved by the Office of the Provost and Academic Affairs: March 3, 2017

**Department of Psychology**
**Tenure-Track Faculty Professional Responsibilities**

## I. Preamble

Tenure-track faculty (TTF) are expected to attain—and maintain—a full spectrum of accomplishment in research, teaching, and service. They are evaluated according to rigorous academic standards typical of other major American research universities. The occupational security and flexibility that TTF enjoy reflect the combination of sustained, disciplined effort and intellectual freedom indispensable to the creation and dissemination of new knowledge, which are cardinal missions of any research university.

## II. Workload expectations for TTF

Besides teaching their courses and guiding students in other ways, TTF should be engaged in research and scholarship during the academic year. Service duties are generally secondary, in particular for assistant professors, but increase significantly with each advance in rank. As a rough guideline, full-time TTF should spend 40% of their effort on research, 40% on teaching, and 20% on service over the academic year. . Individual workload assignments should reflect a realistic balance of duties consistent with the criteria for review.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

### A. Research

Tenure-track faculty are expected to pursue an active program of research and scholarship appropriate to their professional qualifications, expertise, and evolving professional interests; and to disseminate the fruits of this effort to appropriate scholarly and lay audiences through publication and other forms of presentation. Individual faculty research programs are monitored, evaluated, and rewarded through established contract review, promotion and tenure, post-tenure review, and merit review processes and, through peer review, held to the national and international standards of the relevant scholarly disciplines.

### B. Teaching

**1. Standard course load.** The standard course load for TTF in the department is four courses of at least 4 credit hours each during the academic year. TTF are expected to be able to teach a full range of courses, from introductory undergraduate surveys through advanced graduate seminars, on both broad and specialized subjects. The importance of TTF contributions to the General Education curriculum, where a TTF's broad command of a scholarly field is especially valuable, should not be overlooked.

**2. Course revision.** TTF are expected to revise their courses as needed to incorporate advances in academic content and pedagogy, and to ensure that their courses continue to promote the learning outcomes of the departments and programs (including General Education) of which they are a part.

**3. Independent study courses.** In addition to the standard classroom course load, TTF frequently supervise students, both graduate and undergraduate, in independent study courses. In these instances, faculty members are expected to maintain standards of student work and student-instructor engagement appropriate to the awarding of academic credit. This topic is addressed further in section C4 below.

**4. Course load reduction.** These policies are described in section IV below.

**5. Team-teaching.** A course team-taught by two faculty members will typically count as half a course for each unless both contribute nearly full effort as part of a special educational opportunity for students. In the latter case, a team-taught course may count as a full course for each faculty member with the approval of the department or program head(s), and so long as the unit can meet its curricular and enrollment needs with existing resources. Generally, the faculty members' other teaching assignments should generate sufficient enrollments to compensate for any loss created by the team-teaching arrangement.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

**6. Course load increase for unsatisfactory research productivity.** UO aspires to be a preeminent and innovative public research university. In order to fulfill this aspiration, all our tenured faculty members must be actively engaged in research and scholarship throughout their careers. This policy is intended to address concerns about research productivity after tenure, and the resultant workload equity issues, by providing support for faculty and guidance for addressing unsatisfactory research productivity.

If concerns about research productivity arise or persist during any three- or six-year post-tenure review, and the Provost or their designee concludes that the faculty member's research productivity is unsatisfactory, the department or unit head will consult with the faculty member and recommend to the Provost a development plan for demonstrable improvement. The development plan can include mentoring or other support and suggest directions for research. It should include time lines and measurable goals for improved research productivity. The faculty member is responsible for regularly consulting with their department or unit head, who will provide guidance for the faculty member's efforts to attain development plan goals. Upon approval by the Provost or designee, the development plan will be implemented as soon as

possible with the goal of reaching satisfactory performance by the next scheduled post-tenure review.

Should the Provost or designee conclude that the faculty member's research productivity remains unsatisfactory at the post-tenure review following the implementation of the development plan, the faculty member's standard workload may be adjusted to increase teaching and/or service. This gives the faculty member an opportunity to continue making a full-time contribution to the department's mission. The faculty member's workload reallocation should be recognized in the merit raise process with appropriate adjustments to the percentage of the merit raise determined by teaching and/or service. The department head will remain open to discussions with the faculty member about ways to support the faculty member in achieving their research goals, which may include future changes to teaching and service loads.

**C. Advising and student contact**

**1. General advising expectations.** TTF are expected to advise and mentor students who take their courses insofar as this is considered a normal part of teaching any course. They may also be called upon to provide academic advising for students they have not taught in courses but who are enrolled in the degree programs for which they serve as faculty. They should be willing to write recommendation letters and serve as references for students whom they are qualified to evaluate on the basis of coursework or other contact.

cited in Freyd v. University of Oregon No. 19-35428 archived on March 11, 2021

**2. Office hours and student contact.** TTF should hold at least two office hours a week and be available by appointment during the terms in which they teach. They should also make themselves reasonably available to students via email and/or other appropriate online media.

**3. Thesis and dissertation committees.** TTF should expect to serve as chairs or members of both undergraduate and graduate thesis and dissertation committees, as appropriate to their expertise, the nature of their academic unit, and the needs and interests of their students.

**4. Graduate education.** Extensive advising and mentoring of graduate students, both inside and outside of formal coursework, are a particular responsibility of TTF, and often inseparable from a TTF's own research program. In addition to writing recommendation letters and serving as references, TTF customarily help their graduate students secure postgraduate positions and connect them to appropriate professional development opportunities and networks in their fields.

Approved by the Office of the Provost and Academic Affairs: March 3, 2017

**D. Service**

**1. Shared governance.** TTF bear significant responsibility for shared governance and are therefore expected to serve actively on departmental, college, and university committees and in other roles in service to the institution. Assistant professors are expected to perform some service, typically within the department, though less than associate and especially full professors, for whom service expectations both inside and outside the department rise substantially over the course of a career.

**2. Departmental service.** TTF are expected to take part in the normal service workload of the department. This includes participation in standing and ad hoc committees work as spelled out in the department's internal governance document, any regular work needed (in the judgment of the department head) beyond that, and any other service work that may happen irregularly (for example, curricular review and program review).

**3. Professional service.** TTF often serve as members or officers of professional organizations, editorial boards, and conference and prize committees for their disciplines at the national and international levels. They are also called upon to lend expert evaluations in the peer review of academic publications, grants and fellowships, and promotion and tenure cases for colleagues at other institutions.

cited in Freyd v. University of Oregon No. 19-35428 archived on March 11, 2021

**E. Equity and inclusion**

Faculty are expected to contribute to the University's goals regarding equity and inclusion. These contributions may consist of research, teaching, and service activities as appropriate, as well as involvement with academic and professional associations, non-profit, governmental, and/or private sector organizations.

**III. Teaching and Service Assignment Process for TTF**

**A. Teaching and service within the department**

Except as otherwise determined by the Provost, Dean, or other designee, the department head in close collaboration with the Chair of the Undergraduate Education Committee (UEC) and the Associate Department Head shall be responsible for the scheduling and assignment of all faculty members' professional responsibilities. In scheduling courses each faculty's expertise, preferences, distribution of "hard" and "easy" courses within the current and recent years, as well as the department's teaching needs will be taken into consideration.

The College and the University recognize the value of teaching that occurs outside a faculty member's home department, whether in another department, in another college, in an interdisciplinary academic program, or in an enrichment program. A faculty member may be offered such a teaching opportunity, with or without a stipend, in lieu of a course assignment in the home department. Approval of such assignments is at the discretion of the Dean or Dean's designee, acting in consultation with the heads or directors of both the home and the host departments or programs. Approval from the Dean's Office is not required for any course taught in another unit of the College of Arts and Sciences without a stipend.

A faculty member shall be afforded the opportunity to meet with his or her department head at least annually, before responsibilities are assigned, to discuss his or her preferences regarding assignments for teaching, research, service and other professional responsibilities, and anticipated resource needs; to address concerns about advising load inequities and balancing demanding with less-demanding assignments; and to discuss when FTE allocation may differ from the norm. Faculty members may request consideration of adjustment of schedules or assignments.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

The Provost or designee may modify scheduled assignments, provided that the department head discusses changes with the faculty member before they are made and that changes are not made for arbitrary or capricious reasons.

**Overload assignments**

An overload assignment is (1) an assignment that is in addition to the faculty member's regular assignment and FTE status; (2) a one time or limited assignment, made or approved by the Provost or designee, that is in addition to or different from regular or usual assignments for the member's classification and rank; or (3) assignments unrelated to the faculty member's primary job responsibilities.

Overload assignments in some specific programs (as identified in in the Assignment of Professional Responsibilities article of the CBA) may be compensated through a lump sum. All other overload appointments will be assigned an FTE percentage commensurate with normal workload duties and compensated accordingly. Faculty may request that overload compensation take the form of class release. No faculty member may be disciplined or terminated for refusing an overload assignment. No faculty member may be disciplined or terminated for refusing an overload assignment.

Appointments for which compensation is paid, in whole or in part, with federal funds may be ineligible for overload compensation.

**C. Stipends**

The allotment of stipends will be consistent with university and college policy.

**D. Course cancellation policy**

If a course is cancelled for any reason, a TTF may be asked to teach the same course, or an alternative course, in a subsequent term. If scheduling or curricular reasons make this impossible or inadvisable, the TTF will be required to teach the course or an alternative course in the following academic year in addition to the regular course load. The faculty member may also agree to give up a previously banked course release to compensate for a course cancellation. Whatever the case, the TTF is expected to rebalance research, teaching, and service duties, across academic years if needed, so as to remain fully engaged at the appointed FTE.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

**IV. Course load reduction**

There are three main ways a faculty member's course load in a department may be reduced from the unit's base load: A) a course buyout where funds (e.g., from a grant) are explicitly exchanged for a course reduction, B) an FTE reduction in the department either for an assignment in another unit, or for some other purpose (e.g. to serve as Associate Dean), or C) a course release where someone is given a course reduction without any funds or FTE exchanged for this reduction (e.g. to serve as DGS within the unit). Any reduction in course workload for a faculty member is subject to the department meeting its curricular needs and requires approval by the department head and Dean.

**A. Course buyouts**

See CAS course buyout policy.

**B. FTE reassignment to unit outside of the department**

A TTF may be offered an assignment in a unit other than the home department, with or without additional compensation, to perform duties outside the home department by reassigning the FTE of the faculty member. For example, appointment into an Associate

Approved by the Office of the Provost and Academic Affairs: March 3, 2017

Dean position in the College reassigns part or all of a person's FTE in course instruction to administration.

**C. Course release**

The Dean provides an allocation of course releases to the departments annually (not including the department head/program director releases) based on CAS published guidelines.. The departments determine how to allocate those course releases, as described below. If the department uses more course releases than allocated by the Dean in a given year, these will be charged to future allocations. The department may carry forward extra course releases up to 25% of its annual allocation.

The following section specifies general course-release guidelines. However, the exact number needs to be within the CAS Dean's allocation, and the constitution of course releases in a given year needs to be approved by the department head, and in some cases by the CAS Dean to ensure an adequate representation of both undergraduate and graduate teaching in the remaining courses to fulfill the department's teaching mission.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021

*Pretenure course releases*
At the discretion of the department head, pretenure faculty may be eligible for up to four course releases on request, to be distributed across the six pretenure years. This includes any course release committed to in the faculty member's offer letter. For faculty who join the department with years on the tenure clock, the maximum number of course releases will be appropriately prorated. The department head may limit course releases if necessary to ensure that a sufficiently strong teaching record can be established.

*Course releases for important department functions*
Course releases may be given for the following major departmental functions:

- Chair of the UEC: 1 course /year
- Chair of the GEC: 1 course /year
- Associate Head: 1 course/year
- Newsletter/Alumni coordinator: 1 course/year
- Chair of GAC: 1 course/2 years, typically in the 2nd year.
- Director of Clinical Training: 1 course/year
- In addition, courses releases can be negotiated for major ad-hoc duties (e.g., compiling a self-study in the context of a program review).

*Animal-Lab Release*
Faculty who entertain an active program of research that primarily involves maintaining and studying animals in captivity can apply for one undergraduate course release per

Approved by the Office of the Provost and Academic Affairs: March 3, 2017

year. Granted course releases will be reviewed annually by the Department Head and the Executive Committee and cannot be banked.

*Minimum Teaching Load*

Typically, no more than two course releases can be used per year. Only under rare circumstances and after discussion with the Department Head and the CAS Dean can a load below two courses be granted. Also, remaining courses should reflect an adequate representation of undergraduate and graduate courses (i.e., approximately 75% undergraduate or core graduate courses).

*Banking Courses*

A faculty member may bank a course release (or fractional course release) for use in a subsequent academic year. It is the department head's responsibility to keep an accurate list of banked course releases. No more than three course releases may be banked at one time and no more than one banked course release may be redeemed in a given year without the approval of the Dean or Dean's designee. A banked course release must be redeemed within three years of being banked unless otherwise approved by the Dean or Dean's designee.

The department head may require a faculty member to bank a course release if the department cannot otherwise meet its curricular and enrollment needs for a given year with available resources.

cited in Freyd v. University of Oregon
No. 19-35428 archived on March 11, 2021